IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|   |   |   |
|---|---|---|
|   | : | CIVIL ACTION |
| IN RE HERLEY INDUSTRIES INC. | : |   |
| SECURITIES LITIGATION | : | No. 06-2596 |

## MEMORANDUM AND ORDER

**Juan R. Sánchez, J.**                                    **September 30, 2009**

This is a securities fraud class action brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a) (the Exchange Act). Court-appointed lead plaintiff, Galleon Management LP (Galleon), and Plaintiff Norfolk County Retirement System (Norfolk) seek an order under Federal Rule of Civil Procedure 23 certifying a class of all persons or entities who sustained a loss as a result of purchasing or otherwise acquiring the common stock of Herley Industries, Inc. (Herley) from October 1, 2001, to June 14, 2006, inclusive (the Class Period). Defendants and their immediate families are excluded from the class. Galleon and Norfolk seek to serve as class representatives.

Because Galleon has demonstrated it has standing and satisfies the class action requirements of Rule 23, this Court will grant the Lead Plaintiff's Motion for Class Certification.

1

## FACTS

Galleon brought this action on behalf of all persons who purchased common stock during the Class Period. The proposed class asserts claims against Herley; Herley's former Chairman, Lee Blatt; and Herley officers Anello Garefino, Thomas Gilboy, John Kelley, and Myron Levy (the Individual Defendants), for violations of Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

Herley manufactures microwave products and technologies for defense contractors, the U.S. government, and international customers. Herley is a heavily traded public company with an average daily volume exceeding 120,000 shares during the Class Period. From 2000-2006, sales to the U.S. government directly accounted for approximately 22% of Herley's total sales and, according to an expert report submitted by Galleon, indirect government purchases made up as much as 77% of Herley's sales.[1] *See* Declaration of Scott D. Hakala, Ph.D., Pl.'s Ex. C, ¶ 27. Herley's SEC filings suggest the company's long-term business strategy was to pursue sole-source production contracts with the U.S. government. Sole-source contracts are governed by Federal Acquisition Regulations, which require a contractor to submit a bid with a detailed accounting of production costs and allow the government to audit the contractor to verify the reasonableness of the contractor's bid price. 48 C.F.R. §§ 15.205, 15.402, 15.403-3, 15.403-4.

On June 6, 2006, Blatt and Herley were indicted for submitting fraudulent and inflated cost data to the U.S. government. From November 29, 2000, to December 9, 2002, the time period covered by the indictment, Defendants made numerous public statements detailing the company's health, relationship with the government, and compliance with government regulations. Plaintiffs

---

[1] The indirect sales figures consist of work Herley performed as subcontractors or sub-subcontractors for government projects.

2

allege Defendants also claimed they were unaware of any circumstances likely to lead to cancellation of Herley's government contracts. Following the indictment, the U.S. government barred four of Herley's facilities from receiving new contract awards. The value of Herley's stock plunged.[2] The following month, Herley's auditor, BDO Seidman, resigned, concluding Herley's management was unwilling to conduct an adequate investigation to reveal additional wrongdoers and to ascertain the illegal activity's impact on the company's financial statements. On October 13, 2006, Herley announced an agreement with the government to lift the ban on awarding new contracts to Herley on the condition the company abide by many costly ethical, operational, and disclosure requirements.

Kevin Montoya, a Herley shareholder, filed this lawsuit on June 15, 2006. The Complaint alleges Herley, Blatt, and the Individual Defendants knowingly misled members of the proposed class to defraud them into purchasing shares of Herley stock at inflated prices. The Complaint further alleges Defendants' misconduct harmed shareholders who held Herley stock at the time of the corrective disclosures. On November 14, 2006, the Court appointed Galleon to serve as lead plaintiff, finding it possessed the largest financial interest in relief as required by the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. §§ 77z-1, 78u-4 . *Montoya v. Herley Indus., Inc.*, No. 06-2596, 2006 WL 3337485, at *2 (E.D. Pa. Nov. 14, 2006). The Court further found Galleon satisfied the requirements of Federal Rule of Civil Procedure 23. *Id.* At the same time, the Court consolidated several related cases into the present action.[3] Five days after consolidation, the Court issued an Order listing the remaining plaintiffs as Richard Finley, Kevin

---

[2] Herley's stock dropped from a price of $17.50 per share at the close of business on June 5, 2006, to between $9 and $12 per share during the remainder of the month of June.
[3] The consolidated cases were *Tighe v. Herley*, No. 06-2733; *Finley v. Herley*, No. 06-2735; *Pan West Corp. Retirement Account v. Herley*, No. 06-2997; and *Zilenziger v. Herley*, No. 06-3126.

Montoya, Pan West Corp. Retirement Account, Henry J. Tighe, IRA, and Rodman J. Zilenziger. Order of Nov. 20, 2006. Each of the named plaintiffs filed their own actions prior to consolidation.

Galleon, the lead plaintiff, is the investment adviser for two funds claiming pecuniary loss from their purchase of Herley securities at a fraudulently inflated price, Galleon Captains Offshore, Ltd. and Galleon Captains Partners L.P. Galleon claims the funds gave it discretionary investment authority and the power to act as their attorney-in-fact. In support of this contention, Galleon provided sworn statements from Raj Rajaratnam, director of the two Captains funds and managing partner of Galleon. Rajaratnam avers Galleon "is the attorney-in-fact for the Galleon Funds with unrestricted decision making authority to act in connection with the Funds' investments." Pl.'s Reply Ex. 6, ¶7. Further, in the management agreements between Galleon and the Captains funds, both funds grant Galleon broad authority to act on their behalf. Pl.'s Reply Ex. 6, ¶¶7-8. Given these documents and Rajaratnam's control of both Galleon and the funds, Galleon has met its initial burden of showing it has both discretionary authority and power of attorney to act for the funds.

The Galleon funds, which allege losses of more than $2.7 million, assigned their claims in this matter to Galleon on February 27, 2009, more than two years after Galleon was named lead plaintiff. Other than Galleon, the class member with the largest financial loss is Norfolk County Pension Retirement System (Norfolk), which claims losses of approximately $104,000 during the Class Period.[4]

---

[4] Because Galleon may continue to serve as lead plaintiff by virtue of its assignment from the funds, the Court need not decide whether Norfolk might be an appropriate substitute for Galleon. However, should Galleon be deemed inadequate, at this time there appears to be no reason why Norfolk would be unable to properly represent the class.

4

Plaintiffs filed a Consolidated Complaint on February 5, 2007, and the Court subsequently denied in material part Defendants' Motion to Dismiss. The Court now affirms Galleon's appointment as lead plaintiff and certifies the proposed class.

## DISCUSSION

To certify a class, the Court must make all necessary factual and legal inquiries and consider all relevant evidence. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307 (3d Cir. 2008). The Court must resolve all issues pertaining to certification, even when disputed issues implicate elements of the cause of action, making necessary factual determinations using a preponderance of the evidence standard. *Id.* In securities cases such as this one, "[c]lass actions are a particularly appropriate and desirable means to resolve claims" because "the effectiveness of securities laws may depend in large measure on the application of the class action device." *Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir.1985) (quoting *Kahan v. Rosenstiel*, 424 F.2d 161, 169 (3d Cir. 1970)).

Standing and the ability to serve as a class representative are different concepts and must be evaluated separately. *Hassine v. Jeffes*, 846 F.2d 169, 175 (3d Cir. 1988). Standing involves "both constitutional limitations on federal court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). The Court must first determine whether Galleon has constitutional standing under Article III to pursue securities claims on behalf of the class. *See id.* at 176 ("[R]eview of standing is a threshold inquiry."). If the Court finds in the affirmative, it must then consider whether Galleon can satisfy the elements of Rule 23.[5]

---

[5] In the class action context, the salient prudential standing limitation is "the general prohibition on a litigant's raising another person's legal rights." *Allen v. Wright*, 468 U.S. 737, 751 (1984). Prudential standing in class actions is demonstrated by showing a plaintiff can satisfy the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a). *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 100-01 (2d Cir. 2007). When a party qualifies as a class member under Rule 23, there is "no question" he will satisfy prudential standing requirements.

At the outset, it is necessary to address Defendants' contention that Galleon, as an investment adviser, lacks standing to bring suit.[6]  Galleon believes it has standing because it is an investment adviser with full discretionary investment authority and power of attorney to act on behalf of the funds.  In the alternative, Galleon contends its standing derives from the assignment of claims made after this suit was filed.  The Court holds that only the Galleon funds had standing to sue at the inception of this action, but Galleon nonetheless now has standing based on the funds' assignment of claims to Galleon.

The issue of standing raises constitutional concerns which are no less critical merely because a case involves a class of plaintiffs.  *See Warth v. Seldin*, 422 U.S. 490, 502 (1975) (holding named plaintiffs in a class action "must allege and show that they personally have been injured, not only that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent").  Under Article III, a federal court has jurisdiction to hear a complaint only if there is an actual case or controversy.  To satisfy constitutional standing requirements, a plaintiff must show:  (1) he has suffered an "injury in fact" which is "concrete and particularized" and "actual or imminent"; (2) there is a causal connection between his injury and the alleged conduct

---

*Devlin v. Scardelletti*, 536 U.S. 1, 7 (2002).

[6] Standing issues are generally decided before other issues that go to the merits of a case because a lack of standing strips a court of jurisdiction.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88-89 (1998).  Despite this general rule, in the class action context the Supreme Court has created an exception, directing courts to address Rule 23 considerations first when class certification is "logically antecedent" to issues of standing for the class as a whole.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 612 (1997); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999).  However, this exception does not apply when only the class representative's standing is challenged.  *See Clark v. McDonald's Corp.*, 213 F.R.D. 198, 204 (D.N.J. 2003) ("[T]he *Ortiz* exception treating class certification as the antecedent consideration does *not* apply if the standing issue would exist regardless of whether the named plaintiff filed his claim alone or as part of a class.") (emphasis in original).  Therefore, the Court will consider the issue of whether Galleon has standing before deciding whether the class may be certified under Rule 23.

such that the injury is "fairly traceable to the challenged action of the defendant"; and (3) it is likely his "injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations and punctuation omitted). These criteria are commonly referred to as injury-in-fact, causation, and redressability. Defendants challenge Galleon's standing based only on the first element, claiming Galleon has not suffered an injury-in-fact.

Congress may create rights that affect a standing analysis, but Congress cannot circumvent the "case or controversy" requirement of Article III. *See Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n.10 (1973) ("Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute."). Any rights created by Congress must be substantive rights. *Village of Bellwood v. Dwivedi*, 895 F.2d 1521 (7th Cir. 1990). Congress cannot "authoriz[e] someone whose substantive rights have *not* been invaded to sue to redress an invasion of someone else's substantive rights." *Id.* at 1526 (emphasis in original). In enacting the PSLRA, Congress revised the procedure for pursuing a securities class action but did not create any new substantive rights. *Popp Telecom, Inc. v. Am. Sharecom, Inc.*, 361 F.3d 482, 489 (8th Cir. 2004). Instead, the PSLRA is "merely a procedural rule." *Id.* Therefore, enactment of the PSLRA does not affect the instant constitutional standing analysis.

Defendants argue investment advisers do not have standing to pursue the claims of their clients' funds, urging this Court to adopt the reasoning of the Court of Appeals for the Second Circuit in *W.R. Huff Asset Management Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100 (2d Cir. 2008). In *Huff*, the Second Circuit held an investment adviser could not pursue claims on behalf of its clients—even when the adviser had power of attorney and full discretionary authority to make investment decisions—because the adviser had not suffered an injury-in-fact. *Id. Huff* relied upon

7

a recent Supreme Court decision, *Sprint Communications Co. v. APCC Services, Inc.*, 128 S. Ct. 2531 (2008), which the *Huff* court interpreted to mean "the minimum requirement for an injury-in-fact is that the plaintiff have legal title to, or a proprietary interest in, the claim." 549 F.3d at 108.

While *Huff* was not a class action, the court's holding has ramifications for investment advisers seeking to become lead plaintiffs. *See* Samuel H. Rudman, *Meaning of Second Circuit's "W.R. Huff" for Investment Advisers*, N.Y.L.J. (Jan. 30, 2009) ("[*Huff*] limits the ability of investment advisers who suffered no direct injury to serve as lead plaintiffs in securities class actions."). Several district courts have applied *Huff* to lead plaintiff determinations in securities class actions. *See, e.g.*, *Baydale v. Am. Express Co.*, No. 09-3016, 2009 WL 2603140 (S.D.N.Y. Aug. 14, 2009) (declining to appoint an investment adviser as lead plaintiff because its claim of third-party standing would render it atypical); *In re IMAX Sec. Litig.*, No. 06-6128, 2009 WL 1905033 (S.D.N.Y. June 29, 2009) (replacing an investment adviser as lead plaintiff in the wake of *Huff*); *In re SLM Corp. Sec. Litig.*, 258 F.R.D. 112 (S.D.N.Y. 2009) (substituting new lead plaintiffs due to an investment adviser's standing problem); *In re Vivendi Universal, S.A. Sec. Litig.*, 605 F. Supp. 2d 570 (S.D.N.Y. 2009) (holding some plaintiffs qualified for *Huff*'s third-party standing exception, and those who did not could cure their standing problems with assignments from the real parties-in-interest); *Northstar Fin. Advisers, Inc. v. Schwab Invs.*, 609 F. Supp. 2d 938, 942 (N.D. Cal. 2009) ("Under *Huff*, which this Court finds persuasive, [the plaintiff] cannot bring claims on behalf of its clients simply by virtue of its status as an investment advisor.").[7]

---

[7] Notably, no court has dismissed a case based on a lead plaintiff's lack of standing. Instead, when courts have considered the existence of a standing problem for the lead plaintiff, those courts simply substituted appropriate plaintiffs. *See In re IMAX Sec. Litig.*, 2009 WL 1905033; *In re SLM Corp. Sec. Litig.*, 258 F.R.D. 112.

Although the Third Circuit has not directly addressed the issue of whether investment advisers have Article III standing to pursue claims for their clients, district courts in this circuit have traditionally allowed investment advisers and managers to serve as lead plaintiffs in class actions. *See, e.g., Marsden v. Select Med. Corp.*, 246 F.R.D. 480, 486 (E.D. Pa. 2007) (holding an investment manager with authorization who is the clients' attorney-in-fact has standing to bring securities claims); *In re Able Labs. Sec. Litig.*, 425 F. Supp. 2d 562, 571 (D.N.J. 2006) (allowing a plaintiff with power of attorney and full discretionary authority to serve as lead plaintiff); *In re DaimlerChrysler AG Sec. Litig.*, 216 F.R.D. 291, 299 (D. Del. 2003) ("[R]ecent cases . . . have concluded that investment advisers with the authority to make investment decisions for their clients are 'purchasers' for purposes of the securities laws such that they have standing."); *Roth v. Knight Trading Group, Inc.*, 228 F. Supp. 2d 524 (D.N.J. 2002) ("[Plaintiff]'s status as an investment adviser does not prevent it from serving as lead plaintiff."); *EZRA Charitable Trust v. Rent-Way, Inc.*, 136 F. Supp. 2d 435 (W.D. Pa. 2001) (holding an investment adviser with "unrestricted decision-making authority" to purchase securities for its clients was a "purchaser" under the Exchange Act); *In re Rent-Way Sec. Litig.*, 218 F.R.D. 101 (W.D. Pa. 2003) (finding the lead plaintiff's role as an attorney-in-fact conferred standing, even if the documentary evidence lacked language explicitly stating the investment manager had power of attorney for its clients). These earlier decisions were based on an analysis of Rule 23 and the relevant provisions of the PSLRA, but no court in this circuit has considered investment advisers' Article III standing in light of the *Huff* decision.[8]

---

[8] One court in this circuit allowed an investment adviser to serve as lead plaintiff after *Huff*, but the court did not consider what impact the *Huff* decision might have had on the lead plaintiff's standing. *Dutton v. Harris Stratex Networks, Inc.*, Nos. 08-755, 05-815, 2009 WL 1598408 (D. Del. June 5, 2009). The *Dutton* decision did not cite *Huff* or analyze Article III standing requirements, instead

While Second Circuit decisions are not binding authority, the Court finds *Huff* persuasive and will apply its reasoning to this case. *Huff* did not deal with the question of whether investment advisers are appropriate plaintiffs in a class action; indeed, the Second Circuit refused to decide the issue. 549 F.3d at 105 n.5 ("[W]e need not decide when, in the context of a class action under the PSLRA, an investment adviser could qualify as a suitable lead plaintiff."). Like the *Huff* court, however, this Court is bound to apply Supreme Court precedent, which now suggests plaintiffs must have some type of proprietary interest in the claim they are litigating. *See Sprint Commc'ns*, 128 S. Ct. 2531. Further, Galleon has alleged no cognizable injury to itself; it has merely demonstrated it has discretionary investment authority and acts as the underlying funds' attorney-in-fact. This status alone does not endow Galleon with standing to continue litigating this action on behalf of the prospective class.

Further, Galleon does not have standing under the third-party exception to the injury-in-fact requirement. Courts permit "third-party standing" when a plaintiff can show: "(1) a close relationship to the injured party and (2) a barrier to the injured party's ability to assert its own interests." *Huff*, 549 F.3d at 109 (citing *Kowalski v. Tesmer*, 543 U.S. 125 (2004)). Courts have employed this doctrine to find standing in lawsuits prosecuted by trustees, guardians ad litem, assignees, and estate executors. *Id.* at 109-10. The third-party standing doctrine also applies to an organization, which "may sue to address [their] members' injuries even without a showing of injury to the association itself." *United Food & Commercial Workers Union Local v. Brown Group*, 517 U.S. 544, 551 (1996). The Second Circuit rejected the argument investment advisers have third-party standing for their clients because the "investment advisor-client relationship is not the type of

---

relying on earlier case law to find the lead plaintiff had "authority to litigate." *Id.* at *3.

10

close relationship courts have recognized as creating a 'prudential exception' to the third-party standing rules." *Huff*, 549 F.3d at 110. The *Huff* court also found there was no reason why the beneficial owners of the securities–sophisticated investors who had participated in litigation surrounding the securities at issue–could not bring claims in their own right. *Id.*

In this circuit, to find third-party standing courts similarly require both a "close relationship" and "some obstacles that prevent [the injured party] from pursuing its own claims." *Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 288-89 (3d Cir. 2002). The "close relationship" requirement ensures the third-party plaintiff will be as effective an advocate as the injured party. *Id.* at 290. In a business setting, this type of relationship exists "where the rights of the potential plaintiff and third-party plaintiff neatly align." *Nasir v. Morgan*, 350 F.3d 366, 376 (3d Cir. 2003). Because it is preferable for an injured party to advance its own rights, the "obstacle" element requires a showing the injured party is somehow hindered from asserting its rights. *Phila. Marine Trade Ass'n Int'l Longshoreman's Ass'n Pension Fund v. Comm. of IRS*, 523 F.3d 140, 146 (3d Cir. 2008) (holding there was no standing for a third party to sue on behalf of a fund which did not need a third party to protect its rights). In the wake of *Huff*, only one court has allowed an investment adviser to serve as a plaintiff based on the third-party standing doctrine. *See In re Vivendi Universal*, 605 F. Supp. 2d at 578 (finding fund managers had third-party standing because the foreign-owned funds were not "legal entities that could bring suit").

Galleon, unlike the investment advisers in *Huff*, is closely connected to the Galleon funds. The same people control both Galleon and the funds. Raj Rajaratnam serves as director of the two funds and as Galleon's managing partner. As Rajaratnam explained, "All of Galleon Management's transactions in Herley Securities . . . were made on behalf of funds that are controlled by individuals

11

and entities that also control Galleon Management . . . . Each of the Galleon Funds shares directors and/or officers with Galleon Management." Pl.'s Reply Ex. 5, ¶ 2. Despite this relationship, however, Galleon cannot avail itself of the third-party standing doctrine. Even if the Court were to find the relationship between Galleon and the underlying funds sufficiently close, there is no reason the funds could not have pursued the legal claims on their own—indeed, Rajaratnam stated the funds are "willing and able" to serve as named plaintiffs in this litigation should the Court deem it necessary. Pl.'s Reply Ex. 6, ¶ 12. Therefore, the third-party standing exception described in *Huff* does not apply to Galleon. The Court must turn to whether Galleon presently has standing derived from the funds' assignment of their claims.

A valid assignment gives a plaintiff standing to pursue an assignor's claims, even if the assignee will not receive any pecuniary gain from pursuing the action and would otherwise not have standing. *Sprint Commc'ns Co.*, 128 S. Ct. at 2533 (allowing an assignee to bring suit, even though the assignee had agreed to remit any recovery to the assignor of the legal claim); *Cordes & Co. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 102 (2d Cir. 2007) ("It is indeed commonplace for an assignee to institute or continue an action of his or her assignor on an assigned claim even though he or she, apart from the assignment, is without standing, and the court, apart from the assignment, would be without power to decide the case."). The narrow question here is whether the class may be certified with Galleon continuing to serve as lead plaintiff, even if Galleon did not have standing at the time of its appointment but has since cured its standing infirmity with a valid assignment.

As a general matter, this Court has broad discretion to allow parties to substitute plaintiffs and amend a complaint as fairness requires.[9] *See* Fed. R. Civ. P. 15, 17; *Foman v. Davis*, 371 U.S.

---

[9] Plaintiffs have not filed a formal motion to amend their Complaint, but must do so pursuant to this Order for Galleon to proceed as lead plaintiff in this action.

178, 181 (1962) ("It is . . . entirely contrary to the spirit of the Federal Rules of Civil Procedure for decisions on the merits to be avoided on the basis of . . . mere technicalities."). The "real party in interest" provision of Rule 17(a), while closely related to the issue of standing, requires a distinct analysis. *Schafer v. Decision One Mortgage Corp.*, No. 08-5653, 2009 WL 1886071, at *5 n.4 (E.D. Pa. June 30, 2009) (explaining the case law on the intersection of these two doctrines is convoluted because "[t]he distinction between standing to sue and the real party in interest doctrine is, understandably, often blurred" (quoting *Tate v. Snap-On Tools Corp.*, No. 90-4436, 1997 WL 106275, at *4 (N.D. Ill. Feb. 11, 1997))). Under Rule 17, a court must allow a "reasonable time" for the "real party in interest to ratify, join, or be substituted into the action." Fed. R. Civ. P. 17(a)(3). This Rule is intended to be used "when determination of the proper party to sue is difficult or when an understandable mistake has been made." *Nelson v. County of Allegheny*, 60 F.3d 1010, 1015 n.8 (3d Cir. 1995) (quoting Fed. R. Civ. P. 17, Advisory Committee's Notes (1966 Amend.)). A substitution of the real party in interest is allowable when the change is "merely formal" and does not "alter[] the known facts and issues on which the action is based." *Id.* (quoting *Staren v. Am. Nat'l Bank & Trust Co.*, 529 F.2d 1257, 1263 (7th Cir. 1976)). A ratification subsequent to the commencement of a lawsuit "may be sufficient to cure any real party in interest defects in the suit." *Motta v. Resource Shipping & Enters. Co.*, 499 F. Supp. 1365, 1371 (S.D.N.Y. 1980). Courts have "discretionary authority to determine whether ratification is appropriate in a given case." *Id.* In exercising this discretion, the Court must abide by Rule 17's purpose to "protect the defendant from subsequent litigation and to finally resolve the dispute at hand." *Id.*

Outside the class action context, several courts have held Rule 17 cannot be used to cure standing defects which existed at the outset of litigation. *See, e.g., Clark v. Trailiner Corp.*, 242 F.3d

388 (10th Cir. 2000) (disallowing a debtor from re-opening a bankruptcy proceeding because it is not permissible to "*retroactively become* the real party-in-interest and thus establish standing") (emphasis in original) (punctuation omitted); *Berger v. Weinstein*, No. 07-994, 2008 WL 3183404, at *3 n.4 (E.D. Pa. Aug. 6, 2008) ("[A]n assignment of legal rights which takes place after the commencement of litigation does not abdicate the constitutional requirement that standing 'must exist from the commencement of litigation.'" (quoting *Friends of Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000))); *In re Spree.Com Corp.*, 295 B.R. 762 (Bankr. E.D. Pa. 2003) (holding a plaintiff without constitutional standing could not use Rule 17 to substitute a new plaintiff who suffered the alleged injury-in-fact).

Class actions, however, are treated differently due to the presence of multiple plaintiffs. *See Kremens v. Bartley*, 431 U.S. 119 (1977) ("[T]he presence of a properly certified class may provide an added dimension to our Art. III standing analysis."). To prosecute a class action, at least one named plaintiff is required to have standing. *Goodman v. Lukens Steel Co.*, 777 F.2d 113 (3d Cir. 1985); *Griffin v. Dugger*, 823 F.2d 1476, 1483-84 (11th Cir. 1987) ("[A] claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim."). Whether a class has Article III standing "is determined vis-a-vis the named parties." *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283 (3d Cir. 1998). If no named plaintiff has standing to pursue claims on behalf of the class, the case must be dismissed. *Hassine*, 846 F.2d at 176; *In re Initial Public Offering Sec. Litig.*, 214 F.R.D. 117, 122 (S.D.N.Y. 2002).

In analyzing whether Galleon may continue as lead plaintiff, it is important to note the PSLRA construct of a "lead plaintiff" is not coextensive with a "named plaintiff" under the

14

traditional law of class actions. *In re Initial Public Offering*, 214 F.R.D. at 123. ("[T]he concept of a 'named plaintiff' survives in securities class actions distinct from the PSLRA-defined 'lead plaintiff.'"). Lead plaintiffs need not have standing to pursue every claim, so long as at least one *named* plaintiff has standing on each claim. *See Hevesi v. Citigroup, Inc.*, 366 F.3d 70, 82 (2004) (holding it is "inevitable" lead plaintiffs in a securities class action will not always have standing on all class members' claims); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1157 (C.D. Cal. 2008) ("[N]othing in the PSLRA requires that the lead plaintiffs have standing to assert all of the claims." (quoting *In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 205 (S.D.N.Y. 2008))). The *Countrywide* litigation is instructive. There, a class action was certified and a lead plaintiff appointed, but the investors who filed the original cases remained in the litigation as named plaintiffs. *Countrywide*, 588 F. Supp. 2d at 1157-58. The court held the lead plaintiff need not have standing to pursue every class claim, because to decide otherwise would either force the court to appoint large groups of lead plaintiffs, in contravention of the purpose of the PSLRA, or "waste judicial resources by litigating securities cases in separate actions." *Id.* at 1157. The court explained its consolidation order named multiple investors as plaintiffs, including one plaintiff who had standing to pursue the disputed claims. *Id.* Because this named plaintiff had standing, even though the lead plaintiff did not, the claim remained a part of the litigation. *Id.*

Similarly, the named plaintiffs in this lawsuit are Richard Finley, Kevin Montoya, Pan West Corp. Retirement Account, Henry J. Tighe, IRA, and Rodman J. Zilenziger, and neither their standing—nor the standing of the prospective class as a whole—has been challenged. The case is therefore properly before the Court, and the only consideration is whether Galleon now has the ability to continue as lead plaintiff.

The PSLRA and the Federal Rules of Civil Procedure are silent as to the standard for substituting, removing, or disqualifying lead plaintiffs. Since 1995, courts have created a high bar for altering a lead plaintiff's status, "generally restrict[ing] appointment of substitute and additional lead plaintiffs to those instances where it is *necessary* to maintain representation of the prospective class." *In re NYSE Specialists Sec. Litig.*, 240 F.R.D. 128, 133 (S.D.N.Y. 2007) (collecting cases) (emphasis added).

After *Huff*, two courts have held a valid assignment can cure a plaintiff's standing deficiency. *See Northstar Financial Advisers, Inc. v. Schwab Investments*, 609 F. Supp. 2d 938, (N.D. Cal. 2009) (interpreting *Huff* to hold an investment adviser was not a proper plaintiff, but finding an assignment of claims from one of the plaintiff's clients would cure this deficiency); *In re Vivendi Universal*, 605 F. Supp. 2d 570, 584 ("[A] standing defect at the commencement of suit does not require dismissal of the action with prejudice."). In *Vivendi*, the court denied summary judgment against those investment advisers who lacked standing under *Huff*'s recently announced rule. Instead, applying Rule 17, the court allowed "the real parties in interest, i.e., the persons or entities that had standing to bring plaintiff's claims at the commencement of the suit" a "reasonable time" to take action through joinder, ratification , or substitution. *Id.* at 584. The court recognized the impracticability of reorganizing the litigation, which had been ongoing for several years. Because some investment advisers had already been assigned the claims from their clients, the court allowed the plaintiffs 30 days to amend their complaint to reflect these assignments. *Id.* at 586.

Two other district courts have declined to decide whether a post-filing assignment cures an investment adviser's standing deficiency, instead deciding the issue on Rule 23 grounds. *See In re IMAX Sec. Litig.*, No. 06-6128, 2009 WL 1905033 (S.D.N.Y. June 29, 2009); *In re SLM Corp. Sec.*

*Litig.*, 258 F.R.D. 112 (S.D.N.Y. 2009). In both cases, the courts were asked to reconsider lead plaintiff determinations in light of *Huff.* Rather than holding assignments cannot cure a standing deficiency which existed at the time a suit was filed, the courts determined the standing issue would be problematic under Rule 23 because it would create legal issues unique to the lead plaintiffs. *In re SLM*, 258 F.R.D. at 116; *In re IMAX*, 2009 WL 1905033 at *3 ("[I]rrespective of whether the assignments of claim[s] cure [plaintiff]'s deficient Article III standing, [the plaintiff] now 'faces unique legal issues that other class members do not.'" (quoting *In re SLM*, 258 F.R.D. at 116)).

Although Galleon did not have standing at the time of its appointment as lead plaintiff, it now has standing by virtue of the funds' assignment of their claims. Rule 17 gives this Court broad discretion to substitute the real parties in interest, which, at the inception of this lawsuit, were the funds that actually suffered injury from Defendants' alleged misrepresentations. However, the funds' assignment of their claims to Galleon means *Galleon* has now become the real party in interest, and the funds no longer have legal title to their claims.[10] The funds, through the assignment of their claims, have ratified Galleon's role in this action. Galleon presently stands before the Court as the real party in interest to pursue the funds' claims against Herley. Further, Galleon has served as an adequate lead plaintiff for more than two years, and its financial interest in this matter is far larger than Norfolk's. The Court exercises its discretion under Rule 17 to affirm Galleon's role as the lead plaintiff in this action.[11]

---

[10] On February 27, 2009, both funds assigned to Galleon "all rights, title and interest of the assignor in the assignor's claims, demands or causes of action arising from assignor's purchase of common stock in Herley Industries, Inc." Pl.'s Reply Ex. 6.

[11] The Court's holding that Galleon has standing as a result of the funds' assignment and may proceed as lead plaintiff, even though Galleon did not have standing at the inception of the litigation, is limited to the unique circumstances of this case. *Huff* altered the legal landscape of investment adviser standing nearly two years after the Court appointed Galleon as lead plaintiff. Plaintiffs filing suit after *Huff* have the benefit of its standing analysis.

Allowing Galleon to continue as lead plaintiff best serves the goals embedded in the PSLRA. Because investment advisers represent clients who often suffer the greatest loss among shareholders, the PSLRA tends to favor their appointment as lead plaintiffs. This aligns with Congress' intent in drafting the PSLRA, which was intended to replace dysfunctional, lawyer-driven securities class action litigation. S. Rep. 104-98, at 4-6 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679-83. As the legislative history explains, under the old system,

> the initiative for filing 10b-5 suits c[ame] almost entirely from the lawyers, not from genuine investors. Lawyers typically rel[ied] on repeat, or "professional," plaintiffs who, because they own a token number of shares in many companies, regularly lend their names to lawsuits. Even worse, investors in the class usually ha[d] great difficulty exercising any meaningful direction over the case brought on their behalf. The lawyers c[ould] decide when to sue and when to settle, based largely on their own financial interests, not the interests of their purported clients.

*Id.* at 6. The PSLRA's guidelines for appointing a lead plaintiff were drafted to ensure the lead plaintiff–not the lead counsel– has the largest incentive to vigorously litigate on behalf of the class. *Id.* (explaining the PSLRA seeks to enhance the role of class members by "transfer[ing] primary control of private securities litigation from lawyers to investors"); *see also In re Cendant Corp.*, 260 F.3d 183, 197 (3d Cir. 2001) ("Congress' clear intent in drafting the PSLRA was to transfer control of securities class actions from attorneys to class members through a properly selected lead plaintiff.") (punctuation omitted). This provision was meant to "increas[e] the role of institutional investors," who could then exert tighter control over class counsel and who have the greatest incentive to secure a large recovery for the class. S. Rep. 104-98, at 4-6, 11. Further, Congress believed having a large investor in the role of lead plaintiff will give courts greater confidence any settlement negotiated is "fair and reasonable" to the class as a whole. *Id.* at 11. In short, the

18

legislative history shows Congress believed institutional investors with the largest financial loss are generally the party best positioned to "balance the interests of the class with the long-term interests of the company and its public investors." *Id.*

While Norfolk is itself an institutional investor, its claimed $104,000 loss pales in comparison to the millions Galleon alleges it lost from the funds' investment in Herley securities; indeed, Norfolk's alleged loss is less than 4% of Galleon's. As the Court explained in its decision appointing Galleon lead plaintiff, Galleon satisfied the requirements to become the presumptive lead plaintiff in this matter. *Montoya*, 2006 WL 3337485, at *1. Then, the question the Court faced was not whether Norfolk could do "a better job of protecting the interests of the class than the presumptive lead plaintiff," but was instead whether Norfolk could demonstrate Galleon would not "fairly and adequately" represent the class. *Id.* (quoting *Cendant Corp. Litig.*, 264 F.3d 201, 268 (3d Cir. 2001)).

The Court recognizes the language of the PSLRA cannot abrogate the requirement a plaintiff must have standing at the time the plaintiff files suit. *Friends of Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000); *Lujan*, 504 U.S. 555, 570 n.4 (1992) ("[J]urisdiction is to be assessed under the facts existing when the complaint is filed."). As the Court has explained, this general law requires a somewhat refined analysis in a class action where, at the class certification stage, it is undisputed the named plaintiffs and members of the class seeking certification *do* have standing. Galleon stands before the Court today with valid assignments from the funds. Further, Galleon has been litigating this case for more than two years, and to appoint a new lead plaintiff at this late date would unduly disrupt the litigation process.

The Court therefore confirms Galleon's status as lead plaintiff in this action. Norfolk, which suffered the next largest loss, shall be named as a class representative.[12] The Court will proceed to determine whether class certification is appropriate under Rule 23.

To certify a class, courts follow a two-step process. First, the Court must find the proposed class satisfies the four requirements of Rule 23(a): (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. These requirements are known as numerosity, commonality, typicality, and adequacy. Defendants dispute only the typicality and adequacy elements.

Second, the Court must determine whether the case falls within one of the three categories provided for in Rule 23(b). Plaintiffs argue this case satisfies 23(b)(3) because common questions of law or fact predominate over individual issues, thus making a class action the best option for a fair and efficient trial. This court must make a finding, by a preponderance of the evidence, that the elements of Rule 23 are met. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 307. The party moving for class certification bears the burden of showing the Rule 23 elements are satisfied. *Amchem*, 521 U.S. at 613-14.

The undisputed elements of numerosity and commonality are clearly satisfied. While no specific number of class members is required to maintain a class action, the Third Circuit recognizes that a class of more than 40 generally meets the numerosity requirement. *Stewart v. Abraham*, 275

---

[12] While the PSLRA creates a procedure for appointing a lead plaintiff, it is silent as to which parties may serve as class representatives. Courts therefore retain the power to appoint additional class representatives. *See Hevesi v. Citigroup, Inc.*, 366 F.3d 70, 82 (2004) ("[T]he PSLRA does not in any way prohibit the addition of named plaintiffs to aid the lead plaintiff in representing a class.").

F.3d 220, 226-27 (3d Cir. 2001). During the relevant time period, the number of outstanding shares of Herley securities was approximately 13.86 million, and there was an average daily trading volume of 120,000 shares. Herley's SEC filings indicate approximately 200 holders of record and 4,800 beneficial stockholders in October 2005. There are at least hundreds, if not thousands, of investors who purchased Herley stock during the Class Period. Joinder of these investors in one action would be impracticable.

The commonality element requires the named plaintiffs "share at least one question of fact or law with the grievances of the prospective class." *Id.* at 227. This requirement "is not a high bar: it does not require identical claims or facts among class members." *Chiang v. Veneman*, 385 F.3d 256, 265 (3d Cir. 2004). The common legal and factual issues in this action include: (1) whether Defendants' acts violated the federal securities laws; (2) whether SEC filings, press releases, and other statements disseminated to the investing public during the Class Period misrepresented material facts about Herley's relationship with the Government; (3) whether Defendants knew or deliberately disregarded that their statements were misleading; and (4) whether the market price of Herley stock during the Class Period was artificially inflated due to the allegedly misleading statements.

Both Galleon and Norfolk present claims typical of the class as a whole. The typicality requirement "safeguard[s] against inter-class conflicts" by ensuring the class representatives' interests are sufficiently aligned with those of the entire class so the representatives will "work to benefit the entire class through the pursuit of their own goals." *Sley v. Jamaica Water & Utils., Inc.*, 77 F.R.D. 391, 394 (E.D. Pa. 1977); *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 141 (3d Cir. 1998). While this element largely overlaps with the other Rule 23 requirements, a finding of typicality

requires a specific inquiry into whether the named plaintiffs' claims are sufficiently similar to ensure absent class members' claims will be adequately represented. *Eisenberg*, 766 F.2d at 786. Some variance among the circumstances surrounding individual class members or the damages sought will not destroy a finding of typicality, so long as "there is a strong similarity of legal theories." *Baby Neal v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994). In securities class actions, questions of investors' individual reliance will not preclude a finding of typicality. *Eisenberg*, 766 F.2d at 786.

Defendants challenge Galleon's typicality based on two grounds.[13] First, Defendants contend Galleon is subject to unique defenses because it purchased approximately 30,000 shares of Herley stock after the company made corrective disclosures. Second, Defendants argue Galleon manipulated Herley stock when it made stock purchases in April 2002, thereby negating the presumption of market reliance. Both of these arguments are unavailing.

A class representative is not "typical" if it is "subject to a unique defense that is likely to become a major focus of the litigation." *Beck v. Maximus, Inc.*, 457 F.3d 291, 301 (3d Cir. 2006). Meritless defenses will not preclude a finding of typicality; instead, Defendants "must show some degree of likelihood a unique defense will play a significant role at trial." *Id.* at 300. This Court has already rejected Defendants' contention Galleon is an unsuitable lead plaintiff due to its short sales during 2002. Short sales do not give rise to a valid defense and are not inconsistent with a fraud-on-the-market theory. *See Argent Classic Convertible Arbitrage Fund L.P. v. Rite Aid Corp.*, 315 F. Supp. 2d 666, 676 (E.D. Pa. 2004). Moreover, even if Galleon was not relying on the market when

---

[13] Defendants also argue typicality is lacking due to Galleon's status as an investment adviser. This issue is resolved in the Court's discussion of standing, because as an assignee, Galleon now "stands in the shoes" of the underlying funds. *Police v. Nat'l Tax Funding, L.P.*, 225 F.3d 379, 414 (3d Cir. 2000). A plaintiff is neither atypical nor inadequate under Rule 23 merely because it is an assignee. *See Cordes*, 502 F.3d at 99-100.

it made its 2002 short sales, those sales are not part of its claim in the present action, so Defendants cannot use this information to rebut the presumption of reliance. The claims of Galleon and Norfolk are typical of those of the class because they involve identical legal issues and arise from the same course of conduct by Defendants. Plaintiffs allege they and the entire class were injured in connection with their purchases of Herley securities because Herley's stock price was negatively affected due to Defendants' misleading public statements. The typicality requirement is satisfied.

Finally, Galleon and Norfolk are adequate class representatives. While the commonality and typicality elements tend to merge with the adequacy element, a finding of adequacy requires inquiry into the competency of class counsel and potential conflicts of interest. *Gen. Tel. of Sw. v. Falcon*, 457 U.S. 147, 158 n.13 (1982). Specifically, the Court must examine the "qualifications of counsel to represent the class" and investigate "conflicts of interest between named parties and the class they seek to represent." *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 312 (3d Cir. 1998).

Lead counsel Kirby McInerney LLP has submitted attorney biographies and an extensive list of securities class actions in which they have participated. Defendants do not challenge the lead attorneys' qualifications, and lead counsel's submissions show they are competent to try this case. Defendants instead contend Galleon is unfit as a class representative, alleging Galleon lacks credibility and honesty due to its "market manipulation." To the extent this contention rests on the allegation Galleon's short sales in 2002–which are not the subject of this dispute–render Galleon inadequate as class counsel, the Court again rejects this line of argument. Even if Galleon's interest as a short seller did not align with the class interests in 2002, when the short sales were conducted, such activity by Galleon does not create any present conflict in this litigation. Galleon and Norfolk,

like other members of the potential class, seek to recover losses they allege occurred as a result of Defendants' misrepresentations.

Defendants further claim Galleon is unfit because the SEC issued citations for 17 violations of Rule 105 of Regulation M based on short-sale transactions conducted during the same period as the Class Period.[14] Although Defendants acknowledge none of these 17 transactions involved Herley stock, they argue Galleon's short selling of Herley stock in 2002 is sufficiently similar to the behavior cited by the SEC as to raise questions about Galleon's credibility. This argument is without merit. As the Court previously noted when selecting Galleon as lead plaintiff for this action, the SEC's civil charges do not include a finding of fraud, and any misconduct by Galleon cited by the SEC was unrelated to Galleon's Herley transactions. *See Montoya*, 2006 WL 3337485, at *2. In short, Galleon is a credible lead plaintiff whose interests in this litigation align with those of the class. The Court has no doubt Galleon, with the help of Norfolk, will continue to vigorously litigate in a manner beneficial to the class as a whole.

Having satisfied the requirements of Rule 23(a), the Court must now examine whether Galleon and Norfolk meet one of the requirements set forth by Rule 23(b). Plaintiffs seek certification under Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The predominance and superiority inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

---

[14] Rule 105 of Regulation M prohibits an investor from purchasing shares in a public offering to cover short sales made within five days prior to the pricing of that offering. 17 C.F.R. § 242.105(a)(1).

In making this determination, a court should consider: (1) class members' interest in individually controlling separate actions; (2) the extent and nature of any existing related litigation concerning the controversy; (3) the desirability of concentrating the litigation in the particular forum; and (4) any difficulties likely to arise in managing the class action. Fed. R. Civ. P. 23(b)(3).

While the predominance test bears some similarity to the elements of Rule 23(a), it is "a standard far more demanding than the commonality requirement." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 310-11. Because common issues must *predominate* over individual claims, "[i]f proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable." *Id.* at 311 (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 172 (3d Cir. 2001)). The superiority requirement then necessitates an analysis of whether a class action is the best manner to render a "fair and efficient adjudication of the controversy." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 186 (3d Cir. 2001). Courts must render a holistic determination based on "multiple points of view: the judicial system, the potential class members, the present plaintiff, the attorneys for the litigants, the public at large, the defendant, and the issues." *Chakejian v. Equifax Info. Servs.*, 256 F.R.D. 492, 501 (E.D. Pa. 2009). Ultimately, Rule 23(b)(3) creates a balancing test, requiring courts to weigh the merits of the class action device against the merits of individual adjudications. *See In re Cmty. Bank of N. Va.*, 418 F.3d 277, 309 (3d Cir. 2005).

In this case, common issues predominate over any individual concerns. The proposed class consists of investors who purchased Herley stock from October 1, 2004, to June 14, 2006, and who, as a result of Herley's misrepresentations, suffered a financial loss when Herley's fraud was

revealed.[15] Common factual issues include: (1) whether Defendants knew Herley was submitting fraudulent data to the government; (2) whether Defendants made misleading public statements; and (3) whether Defendants' misconduct caused Herley's stock to decline in value. The availability of the fraud-on-the-market theory in securities class actions such as this one alleviates any concern questions of individual reliance would dominate class-wide issues.[16] *See In re Resource Am. Sec. Litig.*, 202 F.R.D. 177, 191 (E.D. Pa. 2001).

Further, the benefits of proceeding as a class action outweigh any alternative procedure. As is true of a great deal of securities class actions, smaller individual investors do not have a strong interest in pursuing separate cases given the high cost of individual suits. There is no other ongoing litigation surrounding the decline of Herley stock based on its alleged misrepresentations, and this court provides a proper venue to adjudicate Plaintiffs' claims. This case is, at its core, a straightforward securities class action that does not raise any concerns about management

---

[15] Defendants assert the class is overbroad, arguing the class description includes individuals who sold stock prior to June 14, 2006. Defendants make the dubious argument that such purchasers made a profit and must therefore be excluded from the class. Such a contention is without merit on its face, as the class is explicitly limited to those investors who experienced a *loss* as a result of purchasing Herley stock at fraudulently inflated prices.

[16] There is sufficient evidence for the Court to find the fraud-on-the-market theory will be available to Plaintiffs because Herley securities were traded in an efficient market. Courts have created 10 factors to consider in determining market efficiency, requiring us to examine, with regard to the securities: (1) whether they were publicly traded; (2) trading volume; (3) whether they were followed by market analysts; (4) if they were listed by several market makers; (5) whether they could register on SEC Form S-3; (6) if they were quick to respond to the release of company-specific information; (7) the size of market capitalization; (8) the size of the public float for the security; (9) the ability to short sell the security; and (10) the level of autocorrelation. *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 208 (E.D. Pa. 2008). Plaintiffs' expert report provides enough evidence for the Court to make a preliminary finding that Herley securities were traded in an efficient market under the *DVI* factors. *See* Declaration of Scott D. Hakala, Ph.D., Pl.'s Ex. C.

difficulties.[17]  The predominance and superiority elements are met.  The class is entitled to certification under Rule 23, and Galleon and Norfolk shall be certified as class representatives.

For the foregoing reasons, Lead Plaintiff's Motion for Class Certification is granted.  The class shall consist of all persons or entities who purchased or otherwise acquired the publicly traded securities of Herley Industries, Inc. during the period from October 1, 2004, to June 14, 2006, inclusive, and who sustained a loss as a result of this acquisition, excluding Defendants, employees of Defendants, and Defendants' immediate families.  Galleon and Norfolk shall be appointed as class representatives.  Plaintiffs are instructed to move to amend their Consolidated Complaint within 30 days in accordance with this opinion.

An appropriate order follows.

---

[17] The standing issues raised in this case do not defeat the predominance requirement.  While the question of whether an investment adviser has standing after it has been assigned its clients' claims following the commencement of litigation is unique to Galleon, this Order may be immediately appealed pursuant to Federal Rule of Civil Procedure 23(f).  Standing concerns can thus be resolved expeditiously, long before this case is decided on the merits.  Moreover, Norfolk's standing to pursue class claims has not been challenged.  Even if Galleon left this litigation, its exit would not impair Norfolk's ability to represent the class' common issues.