## VI.C
## DEFENDANTS' OTHER FALSE AND MISLEADING STATEMENTS

77.    Throughout the Class Period, Defendants, in addition to issuing the materially false and misleading SEC filings discussed above, issued to the public other materially false and misleading statements.  As detailed below, such statements included:

(a)    Quarterly press releases announcing Herley's quarterly and annual financial results (the "Financial Press Releases") (see ¶ 78);

(b)    Quarterly conference calls with analysts and investors in which Defendants further discussed Herley's operations, results, and prospects;

(c)    Frequent press releases announcing new, renewed, extended or augmented contracts with the Government (the "Government Defense Contract Press Releases") (see ¶ 80);

(d)    Yearly speeches by Defendant Blatt, given at Herley's annual meeting of shareholders and simultaneously disseminated to the public in press releases, discussing Herley's operations, results, strategies and prospects (the "Chairman's Addresses") (see ¶¶ 84-90); and

(e)    Various other statements concerning Herley's operations, results and prospects contained in press releases and conference calls (see ¶ 92).

78.    In addition to the quarterly and annual financial statements contained in Herley's SEC filings, which were materially false and misleading for the reasons stated above (see ¶¶ 72-74), Defendants also reported Herley's purported financial results in quarterly press releases (the "Financial Press Releases") and in quarterly conference calls with analysts and investors, listed in the table below:

### The Financial Press Releases and the Conference Calls

52

| Date | Event | Contents |
|---|---|---|
| October 1, 2001 | press release | Q4 2001 and 2001 results |
| December 26, 2001 | press release | Q1 2002 results |
| March 6, 2002 | press release | Q2 2002 results |
| May 29, 2002 | press release | Q3 2002 results |
| September 25, 2001 | press release | Q4 2002 and 2002 results |
| December 12, 2002 | press release | Q1 2003 results |
| March 12, 2003 | press release | Q2 2003 results |
| March 13, 2003 | conference call | Q2 2003 |
| June 5, 2003 | press release | Q3 2003 results |
| October 7, 2003 | press release | Q4 2003 and 2003 results |
| October 7, 2003 | conference call | Q4 2003 and 2003 |
| December 11, 2003 | press release | Q1 2004 results |
| March 15, 2004 | press release | Q2 2004 results |
| March 16, 2004 | conference call | Q2 2004 |
| June 14, 2004 | press release | Q3 2004 results |
| June 15, 2004 | conference call | Q3 2004 |
| October 15, 2004 | press release | Q4 2004 and 2004 results |
| October 18, 2004 | conference call | Q4 2004 |
| December 9, 2004 | press release | Q1 2005 results |
| December 10, 2004 | conference call | Q1 2005 |
| March 8, 2005 | press release | Q2 2005 results |
| March 9, 2005 | conference call | Q2 2005 |
| June 9, 2005 | press release | Q3 2005 results |

| June 10, 2006 | conference call | Q3 2005 |
|---|---|---|
| October 24, 2005 | press release | Q4 2005 and 2005 results |
| November 1, 2005 | conference call | Q4 2005 and 2005 |
| December 13, 2005 | press release | Q1 2006 results |
| December 14, 2005 | conference call | Q1 2006 |
| March 8, 2006 | press release | Q2 2006 results |
| March 9, 2006 | conference call | Q2 2006 |

79.    The Financial Press Releases and the above-mentioned conference-calls, in which Defendants reported Herley's purported financial results, were materially false and misleading for the same reasons as stated above in section VI(B).

80.    Throughout the Class Period, Defendants caused Herley to issue numerous press releases announcing that Herley had won new defense contracts, or had had old defense contracts extended and/or augmented at the option of the Government, to provide the Government directly or indirectly (through contracting with certain prime defense contractors – e.g., Northrop Grumman, Lockheed Martin, Raytheon and Boeing – themselves working on Government contracts) with Herley's products.  Such press releases (collectively, the "Government Defense Contract Press Releases") are listed in the table below:

**Government Defense Contract Press Releases[3]**

| Date | Title of Press Release |
|---|---|

---

[3]    Excluded from this list are press releases announcing: (i) non-defense contracts won and/or extended by Herley (e.g., medical imaging systems) and (ii) defense contracts with foreign governments (e.g., Switzerland, South Korea, Australia, India) or non-governmental entities (e.g., NATO, EADS).

| | |
|---|---|
| December 4, 2001 | Herley Receives $1.0 Million Contract Award To Supply High Power Microwave Hardware For E-2C Aircraft |
| January 7, 2002 | Herley Receives Contract Awards Totaling $3.4 Million – Herley Will Supply Microwave Products for the E2-C Surveillance Aircraft, the F-18 Fighter Aircraft and the HARM and RAM Missiles |
| January 15, 2002 | Herley Receives Contract Awards Totaling $4.29 Million; Microwave Hardware for F-16 Aircraft And AMRAAM Missiles |
| February 22, 2002 | Herley Receives Contract Award's Totaling $7.5 Million; Herley Will Supply Microwave Products for the National Missile Defense And E-2C Programs |
| April 3, 2002 | Herley Receives $3.5 Million Contract Award for the U.S. Navy's F-18 E/F Super Hornet; This Award Represents the 2nd Year Release of a Five-Year $16.5 Million Contract |
| June 10, 2002 | Herley Receives a $15.3 Million Contract From The U.S. Navy; Herley Will Supply Complex Integrated Microwave Assemblies for Electronic Warfare Simulation |
| June 18, 2002 | Herley Received Contract Awards Totaling $3.1 Million; U.S. Military Actions Beginning to Generate Order Activity |
| July 18, 2002 | Herley Receives Contract Award for $ 2.2 Million; 4th Quarter Backlog Continues to Grow (Textron Sensor-Fuzed Weapon) |

| | |
|---|---|
| July 24, 2002 | Herley Receives $2.6 Million Contract Award From Northrop; F-16 Business Activity Remains Strong; Year-to-Date Bookings Exceed Forecasts |
| August 5, 2002 | Herley Receives $6.4 Million Contract Award; Herley Will Supply Defense Electronics for F-16 Upgrades |
| August 16, 2002 | Herley Backlog Increases to a Record $90 Million; August Bookings in Excess of $10 Million |
| September 30, 2002 | Herley Awarded $1.6 Million Contract To Supply And Integrate Flight Avionics Hardware For The Skeeter Target; Herley Will Be A Key Participant In Next Generation Aerial Target Program For The U.S. Air Force |
| October 14, 2002 | Herley Receives Additional $1.1 Million in Contract Awards for Rivet Joint; Increasing Opportunities in Intelligence, Surveillance and Reconnaissance Upgrades |
| January 13, 2003 | Herley Receives Contract Awards Totaling $3.9 Million; Options Are Expected to Range Between $20 and $65 Million; Herley Will Supply Defense Electronics to the AMRAAM Program |
| March 21, 2003 | Herley Receives $1.5 Million Contract Award (vertical launch missile) |
| March 24, 2003 | Herley Reaffirms Expectations for a Strong 2nd Half and Full Year; Fiscal 2003 Revenue and Earnings Guidance Directed to the High End of Range; Herley's Business Strategy to Focus on Multi-Year Funded Programs Proving Successful |

| April 14, 2003 | Herley Receives $1.1 Million Contract Award from Raytheon Electronic Systems (National Missile Defense Program) |
|---|---|
| April 15, 2003 | Herley Receives $3.05 Million in Contract Awards to Supply Transponders for the Space Launch Program |
| June 5, 2003 | Herley Receives $2.3 Million Contract Award; Herley Will Provide Microwave Hardware for Textron's Sensor Fuzed Weapon |
| June 11, 2003 | Herley Receives Contract Awards Totaling $3.5 Million; Herley Will Be Supplying Microwave Hardware for the F-18 Aircraft |
| June 24, 2003 | Herley Receives $1.5 Million Contract Award from Lockheed Martin Space Systems (Low Cost Missile Test Kit) |
| July 8, 2003 | Herley Receives Contract for Next Generation Missile Tracking Hardware; Contract Award Including Options Totals $1.9 Million; The First Application Will Be the Advanced Medium Range Air to Air Missile ("AMRAAM") Program |
| July 9, 2003 | Herley Receives $1 Million Contract Award (power amplifiers for military airborne communications) |
| August 27, 2003 | Herley Receives Contracts Totaling $1.7 Million; Herley Solidifies Position as Key Supplier to U.S. Missile Defense Programs |
| August 29, 2003 | Herley Receives $9.4 Million Contract Award From the U.S. Navy; Herley Will Supply Radar Tracking Transponders for Systems Training and Target Operations |

| | |
|---|---|
| September 11, 2003 | Herley Receives $2.25 Million Contract Award; Business Activity in Defense Markets Remains Strong (power amplifiers for upgraded communications systems) |
| October 23, 2003 | Herley Receives $3.6 Million Corporate Purchasing Agreement From Lockheed Martin (Navy's AEGIS Combat System AN/SPY-1 radar components) |
| December 1, 2003 | Herley Receives $3.6 Million Contract Award for ICAP III Program; Herley Will Supply Microwave Hardware to Northrop Grumman (new jamming system Navy EA-6B Prowler aircraft and EA-18G Growlder aircraft) |
| December 19, 2003 | Herley Receives Contract Awards Totaling $6.2 Million (missile encoders for the AMRAAM, switch filters for ASPIS II, I/Q modulators for Northrop Grumman, time delay units for Ballistic Missile Defense, hybrids for the Small Diameter Bomb, microwave components for the Rolling Airframe Missile, microwave components for U-2 "Butterfly") |
| January 12, 2004 | Herley Receives $2.5 Million Contract Award; Herley Will Supply Microwave Hardware for the F-18 E/F Super Hornet' Aircraft; 2nd Quarter Bookings on Target to Reach Record Level |
| February 9, 2004 | Herley Announces Contract Awards Totaling $6.5 Million; The Awards Include ICAP III, F-16, and AMRAAM Follow-On Production Programs to Be Delivered Within One Year |
| April 20, 2004 | Herley Receives $2.1 Million Contract Award from the U.S. Navy (radar tracking transponders for Navy test ranges) |

58

| | |
|---|---|
| April 20, 2004 | Herley Receives a $2.9 Million Contract Award; Herley Will Supply Microwave Hardware for the SLQ-32 Electronic Warfare Systems |
| April 22, 2004 | Herley Receives a $1.5 Million Contract Award From the U.S. Army; Herley Will Develop a New Ground Station System For White Sands Missile Range |
| June 16, 2004 | Herley Receives a $2.3 Million Follow-On Contract Award and a $2.3 Million Option (Sensor Fuzed Weapon) |
| June 17, 2004 | Herley Announces $19.7 Million ID/IQ Contract Award From the U.S. Air Force; Herley Will Supply Low Noise Assemblies for the F-16 Fire Control Radar |
| December 1, 2004 | Herley Announces Contract Awards Totaling $7.2 Million (F-16 microwave assemblies; microwave hardware for missile test applications; avionics system hardware for AFSAT) |
| March 11, 2005 | Herley Announces $6.5 Million in Contract Awards; -- $4.2 Million to Supply Flight Termination Receivers for the AMRAAM Missile Program, the 12th Year of Production for This Program |
| March 23, 2005 | Herley Receives Follow-On Contract Award In Excess of $1.7 Million From U.S. Navy; Herley to Supply APN-245 Beacon Sets for the F/A-18 E/F Aircraft |
| March 28, 2005 | Herley Receives Follow-On Contract Award in Excess of $3.3 Million From U.S. Navy; Herley to Supply AN/ARA-63 Tactical Instrument Landing Systems for F/A-18F and E-2C Aircraft |

59

| | |
|---|---|
| May 2, 2005 | Herley Announces $3.0 Million in Contract Awards (integrated microwave assemblies for radar warning receivers; radio beacons for F/A-18 E/F Super Hornet aircraft) |
| May 12, 2005 | Herley Announces $8.5 Million Contract Modification Increasing Existing Contract to $17.1 Million; -- Innovative Concepts, Inc. Awarded Contract to Develop Next Generation of Improved Data Modem (IDM) Technology(R) to U.S. Army Aviation |
| May 31, 2005 | Herley Receives Approximately $3.6 Million in Contract Awards; Strong Bookings Expected For The Remainder Of Fiscal 2005 (Air Force air-to-air missile; Navy Coyote supersonic sea-skimming target missile) |
| June 22, 2005 | Herley Receives $1.2 Million Contract Award for U.S. Ballistic Missile Defense (BMD); Herley's Farmingdale Division to Supply Microwave Assemblies for the Phased Array Radar |
| June 23, 2005 | Herley Receives $1.8 Million Contract Award to Supply Amplifiers for U.S. Army Improvised Explosive Device Countermeasures; Herley Expects Farmingdale's Amplifier Business to Be a Catalyst for a Strong Fiscal Year 2006 |
| June 29, 2005 | Herley Receives Multi-Year Navy Contract Award to Repair Aircraft Landing Systems; $1.3 Million in First Year Delivery Orders With the Total Award Expected to Exceed $6 Million |
| July 22, 2005 | Herley Receives Contract Award from Office of Naval Research; Herley Subsidiary, Innovative Concepts, Inc., will provide Communication Systems to Unmanned Vehicles |

| July 29, 2005 | Herley Receives Contract Awards Totaling $4.5 Million;Herley Subsidiary, Micro Systems, Will Supply Products to New and Legacy Customers (DSQ-50A Sensor and Telemetry Downlink Airborne for Navy; hardware for Airforce unmanned airborne vehicle) |
| --- | --- |
| August 1, 2006 | Herley Receives Contract Awards Totaling $4.3 Million (microwave hardware for a major U.S. weapons program; unidentified contract with international defense company) |
| August 8, 2005 | Herley Receives $11.8 Million in High Power Amplifier Contract Awards; Herley Farmingdale Positioned to Generate Increased Power Amplifier Revenues in Fiscal 2006 |
| November 2, 2005 | Herley Announces Contract Awards Totaling $5.1 Million (synthesizers and multi-function microwave assemblies to two international defense contractors) |
| December 8, 2005 | Herley Receives $7.6 Million in Contract Awards; New England Division Continues Its Success in EW Markets EWST Contract Awards Include Simulator Upgrades and an Order for an RSS 8000 SYSTEM |
| January 3, 2006 | Herley Receives $2.4 Million Contract Award to Supply Microwave Hardware to the AMRAAM Program; Approval of U.S. Defense Budget Should Spark Herley's 2006 Bookings in the 2nd Quarter |
| January 5, 2006 | Herley Receives $9.1 Million Contract Award for a Major U.S. Missile Program; Herley Will Provide Telemetry Instrumentation for Flight Analysis Requirements |

| | |
|---|---|
| January 19, 2006 | Herley Announces Contract Awards Totaling $5.6 Million (Integrated Microwave Assemblies (IMA) for the EA-18G; command and control instrumentation for U.S. Air Force Subscale Aerial Target (AFSAT) program) |
| February 1, 2006 | Herley Receives a $2.2 Million Follow-On Contract Award to Supply Carrier Landing Systems to the U.S. Navy; Preliminary Bookings Numbers for Herley's Second Quarter Exceed $50 Million; Preliminary Q2 Revenues Are Approximately $45 Million |
| March 6, 2006 | Herley Announces Contract Award With U.S. Army; Army Exercises Options for IDM 304(TM) |
| March 13, 2006 | Herley Receives Approximately $3.1 Million in Contract Awards; Contract From Wright Patterson AFB for ECM/Target Simulator; Provide Telemetry Instrumentation to Prime Defense Contractor |
| April 3, 2006 | Herley Receives $2.8 Million Contract Award; Contract Award Represents the 1st Release of a 5 Year Agreement (Sensor Fuzed Weapon) |
| April 6, 2006 | Herley to Receive $3.4 Million Contract Award; Will Represent the First Half of a Software Contract From the U.S. Army |

| April 25, 2006 | Herley Receives Multi-Year Contract Totalling Approximately $18 Million; Herley to Supply Tactical Instrument Landing System for U.S. Navy; First Year Revenues Expected to Exceed 3.5 Million; First Year Delivery Order Expected to Exceed $3 Million; Legacy Program Has 30 Year History With Herley |
|---|---|
| May 9, 2006 | Herley Receives $2 Million Contract Award to Supply Avionics to Major Domestic Contractor; Expect Future Sales Growth From International Markets |

81.    The Government Defense Contract Press Releases were materially false and misleading because of their failure to disclose, *inter alia*:

(a) Defendants' above-mentioned fraudulent business practices in sole-source Government contracting;

(b) the inflated, illegitimate and unsustainable revenues resulting from Defendants' fraudulent business practices; and

(c) the liabilities to which Defendants' fraudulent business practices were exposing Herley, including:

(i)    potential and actual loss of further Government business as a result of Defendants' above-mentioned fraudulent business practices

(ii)    disgorgement of millions of dollars of ostensible "revenues" that were recorded only through Defendants' undisclosed fraud; and

(iii)    the necessity to use such revenues to pay fines and penalties consequent upon Defendants' fraud, and to pay for increased legal, regulatory and compliance costs

63

(see, e.g., ¶¶ 106-107, 135).

82.    Near the beginning of each calendar year, at the Company's annual meeting of shareholders, Defendant Blatt gave a speech (the "Chairman's Address"). The text of each Chairman's Address was simultaneously disseminated to the market and broader public in press releases issued by Herley. The Chairman's Addresses, as detailed below, were materially false and misleading for reasons detailed below.

83.    Each Chairman's Address was materially false and misleading as a result of its failure to disclose *inter alia*:

(a) Defendants' above-mentioned fraudulent business practices in sole-source Government contracting;

(b) the inflated, illegitimate and unsustainable revenues resulting from Defendants' fraudulent business practices; and

(c) the liabilities to which Defendants' fraudulent business practices were exposing Herley, including:

(i)    potential and actual loss of further Government business as a result of Defendants' above-mentioned fraudulent business practices

(ii)    disgorgement of millions of dollars of ostensible "revenues" that were recorded only through Defendants' undisclosed fraud; and

(iii)    the necessity to use such revenues to pay fines and penalties consequent upon Defendants' fraud, and to pay for increased legal, regulatory and compliance costs (see, e.g., ¶¶ 106-107, 135).

64

84.    On January 10, 2002, Defendants caused Herley to issue a press release of the 2002

Chairman's Address, which stated in relevant part:

> **Lee Blatt, Chairman of Herley Industries, Inc. Address to Stockholders**
>
> January 10, 2002 Business Wire
>
> Herley Industries, Inc., Chairman of the Board, Mr. Lee Blatt addressed stockholders at the company's Annual Stockholders Meeting held at the Le Meridien hotel in Boston.
>
> \*\*\*\*\*
>
> **"Well, it is one year later, and it is amazing how much better we seem to have become at managing our Company.** We recently released the results of our first quarter of this fiscal year to the plaudits of our major shareholders and analysts.
>
> **"Analysts have forecasted that Herley will have revenues ranging between $92 and $94 million for fiscal year 2002. That represents internal growth of 15% or more. We're comfortable with that and are hoping to do a little better. Analysts have also forecasted earnings of $.82 to $.84 per share, representing an earnings growth rate of more than 20%. Again, we're comfortable, and again we will try to do better.** Double-digit growth excluding acquisitions is a lofty goal for any defense industry company, but we expect to accomplish that goal this year and next year.
>
> \*\*\*\*\*
>
> **"Last June, Myron Levy, John Kelley and I went to the Paris Air Show to receive this award from Aviation Week, one of the premier publications in the defense industry. Herley was honored for being the best managed small aerospace company. It is extremely gratifying to be so honored by one's peers; so much so that we're going to try to win again.**
>
> **"Among the many criteria evaluated for Aviation Week's "Best Managed" awards are those that are important to us, as well as those to which we attach secondary importance.** Key to us is net income, followed by revenue growth. Less important to us, but not to

many analysts, is return on investment and return on assets.

**"We believe that what distinguishes Herley from other small defense/aerospace companies is our batting average.**

"For those of you here who follow the Red Sox, please accept my sympathies. If you follow baseball locally you know that Nomar Garciapara has a batting average. So does Herley.

**"Earlier in this address, I mentioned that we are working on business for 2004. Our success in this process, and in making the right choices now, at this time, will result in our batting average in 2004. Herley's deep, experienced management team begins by targeting a selection of defense programs in which we want to participate.** Not all government programs thrive, and those that do grow, don't grow equally. At management meetings we perform what we could call 'microwave triage'.

-- Based on our experience;

-- **based on our customer relationships;**

-- based on our particular microwave expertise;

-- based on published government documents;

-- based on Aviation Week and Defense News inputs; and

-- based on marketing forecasts;

we make decisions on which defense programs we want to pursue;

-- where we should allocate our R & D resources; and

-- which programs have the possibility of becoming Dynasty programs like the F16, which will afford 50 years of production to Herley.

**"We often have competition at the start of a new radar, new missile systems or new communication program.** Our customer may not be able to fully fund the necessary engineering development. An expensive and time-consuming engineering proposal may be required. We do not have the engineering resources to handle all of the business opportunities we receive. We cannot treat all

66

opportunities equally. We have to focus on the programs we want to win. We may invest our engineering dollars to win a program that our customer cannot fully fund. Once we have won a program, we have to produce. We have to meet our engineering commitments and do it in a timely manner. **If we succeed, we often will face no further competition during the entire life of the program. We are assured of our share of the production work at fair, negotiated prices. But, we have to pick the right programs, and it is not a single decision that we make.** At this time, we probably have over 50 programs in various stages of development that will make up a good part of our fiscal 2004 and beyond revenues. We've turned down 50 other business opportunities because we just don't have the microwave engineers or manufacturing capability to do it all. **Our ability to pick the right program and then perform makes up our batting average...**

Thank you,
Lee Blatt, Chairman

(Emphasis Added)

85.    The January 10, 2002 Chairman's Address – specifically (i) the representations concerning Herley's purported revenues, profits and growth; (ii) the representations attributing Herley's purported revenues, profits and growth to Herley's management quality; (iii) the representations concerning the 'batting average' of Herley's management, including the skills required for such batting average and the revenues resulting from such batting average; and (iv) the representations distinguishing Herley from the contemporary wave of accounting fraud (e.g., " We do not believe in pro forma earnings.  We have real earnings and real cash flow") – was materially false and misleading, given (a) the fact that Herley's purported revenues, profits and growth were in part the result of Defendants' undisclosed and fraudulent business practices (rather than solely the result of and the measure of management quality and batting average) and (b) the fact that Herley's management was itself engaged in elaborate fraudulent schemes while at the same time publicly

67

claiming to distinguish itself from other companies whose frauds were then being discovered.

86.    On January 14, 2003, Defendants caused Herley to issue a press release of the 2003

Chairman's Address, which stated in relevant part:

**Chairman's Address at Herley Annual Meeting January 14, 2003**

PR Newswire January 14, 2003 Tuesday

Herley Industries, Inc. (Nasdaq: HRLY), Chairman of the Board, Mr. Lee Blatt addressed stockholders at the company's Annual Stockholders' Meeting held at the Grand Hyatt Hotel in New York.

\*\*\*\*\*

**"At last year's shareholders meeting, this address focused on Herley's 'batting average' of selecting long term, profitable defense programs on which to participate. That ability to select the right programs comes from long experience in the defense industry...**

\*\*\*\*\*

**"A business is only good if it is profitable. Business is most often profitable when demand is present and competition is absent. That's where the defense industry is today.**

"The government approved consolidation of the largest companies in the defense business; and has reduced the top tier of U. S. defense companies from more than 50 to just four: Lockheed, Boeing, Northrop Grumman and Raytheon. Mid level, and small companies such as Herley, have been part of the same consolidation process, and Herley itself is now an amalgam of eight companies. We are told that the government approved the consolidation of the number of companies in the defense business due to the expected downsizing of the defense budget after the peak spending of the Reagan era. The number of companies has been drastically reduced, but, in reality, the U. S. defense budget today, at $355 billion, is not materially different in spending dollars than it was during the Reagan era. **All of the companies left in the defense business have each evolved into either the only supplier, or one of the very few suppliers of some**

68

necessary defense technology.

"Herley, which is focused almost completely on the defense business, has evolved through acquisitions and divestitures into one of the largest microwave technology companies in the world. In most of our business areas, we are the sole supplier of the products in which we specialize. For the balance of our business, we may have one or two competitors -- an easily manageable situation if your focus is on profit, as is ours. Where did our competition go? We, or one of the other few remaining defense suppliers, have acquired many of them. Other microwave companies have exited the defense business for the commercial telecommunication industry. It is fair to say, that for the past several years, business conditions for Herley have been as good, or better, than they have ever been in our history.

"So, for Herley, the defense business is stable and profitable. Can it grow? For the past five years, we've grown at a compounded annual growth rate of over 23%. During the same period, our operating income, EBIT has averaged 18% of revenue. Those are excellent results for any business.

"Where will that kind of profitable growth come from in the future? In addition to organic growth, the main driver, we have adopted three strategic initiatives: acquisitions, increasing our international business, and increasing our technical resources to handle more outsourcing by our customers.

"Last year at our annual meeting this address was limited to a detailed accounting of our ability to grow organically at a 15% or better rate, which is approximately double the projected growth rate of the defense business. Selection of long-term production programs, our teaming arrangements with the top-tier companies, and our ability to attract good engineering talent has made that possible. Our organic growth during this past year was 21.4%, maintaining our record...

\*\*\*\*\*

"Let's talk about the future. Herley is now in its 38th year of existence, a long time for any company. We've had almost eight years of consecutive profitable quarters. We are experiencing strong

69

organic revenue growth. **Our profit margins are among the highest, if not the highest, in the defense industry.** We have approximately $80 million in cash in the bank. We have no real debt. Our backlog is at record levels, up over $100 million. By any measure, we are a financially solid, well-established, profitable business. We happen to specialize in microwave technology. We happen to practice our microwave technologies primarily in the defense business, but you have made an investment in us as a business, and that is the way you should judge us.

\*\*\*\*\*

**"Well, if everything looks so rosy, what could possibly go wrong? What could go wrong is a large, bad acquisition. We could pay far too much; select a technology unknown to us; or buy a promising but unproven business. These are not likely scenarios, given our proven track record. Seasoned, experienced, technically proficient executives run every Herley facility. We have made some mistakes in the past, but we are not given to leaps of faith, and our mistakes have been small and isolated. Our acquisition track record is available to allow for your individual review and conclusions.** We must caution any investor to remember that the past may be an indicator of the future, not a guarantee. The last three years in the stock market proved that there are no guarantees.

87.    The January 14, 2003 Chairman's Address – specifically (i) the description of Herley's profitability as a function of management's batting average and of non-competitive sole-source procurement; (ii) the attribution of Herley's organic growth to the quality of Herley's management and engineers; (iii) the depiction of Herley as a "cautiously-managed business" wary of downside risk; and (iv) the proffered list of "what could possibly go wrong" – was materially false and misleading, given (a) the undisclosed role of Defendants' undisclosed and fraudulent business practices in Herley's non-competitive sole-source Government contracting, and in generating part of Herley's purported growth, and (b) the tremendous undisclosed risks and downside to which Defendants' undisclosed and fraudulent business practices had exposed Herley and Herley's investors.

70

88.     On January 15, 2004, Defendants caused Herley to issue a press release of the 2004

Chairman's Address, which stated in relevant part:

> Herley Chairman Addresses Shareholders at Annual Meeting of
> Shareholders January 15, 2004
>
> PR Newswire January 15, 2004 Thursday
>
> Herley Industries, Inc. Chairman of the Board Lee N. Blatt addressed
> stockholders at the company's Annual Stockholders' Meeting today
> at the Waldorf Astoria in New York.
>
> \*\*\*\*\*
>
> **"This year's address will focus on the value of the shares of
> Herley stock we all hold, and our plans to enhance shareholder
> value. We believe that good management of Herley, and the
> utilization of our assets effectively in a stable, growing industry,
> will result in greater shareholder value.**
>
> **"Reviewing briefly, Herley had a great year. Revenues, profits,
> EPS and backlog reached record levels. Our business is sound;
> our margins are the highest, or among the highest of any
> company in the defense industry. We achieved our goal to reach
> $100 million in annual revenues. We accomplished everything
> that we had set as a goal for this past year** except for one thing --
> we did not complete any major acquisitions. That one failing, we
> believe, is keeping our stock price from reflecting an excellent
> performance. **While our earnings margins are the envy of our peer
> companies,** analysts and shareholders have expressed disappointment
> about our top line growth - our revenue line.
>
> \*\*\*\*\*
>
> "Herley's senior management team is comprised of our Chairman, our
> CEO, Myron Levy; John Kelley, our President, and Bill Wilson, our
> Chief Operating Officer. Working with the key people at our five
> major facilities, we have formulated a business plan that we believe
> is best for Herley to achieve its objective of enhancing shareholder
> value and increasing our top-line growth.
>
> \*\*\*\*\*

71

3. So, business is good, and looks like it will continue to be good, with minimum competition. All of these factors will help to increase Herley's organic growth rate. To expand our participation in new business opportunities and find additional teaming relationships, we will need to increase our investments in marketing and engineering. This is a considered, risk-reward judgment that we have reached. Our top line growth has been modest; **our earnings margins are probably double any other defense company's, and yet the market's response is measured. We believe that higher top line growth will result in a favorable reaction from Wall Street.** We have a deep, talented, experienced management team, and we have excellent financial resources, with over $80 million in cash. So, we've adopted this aggressive growth plan, but be assured, we will continue to watch earnings carefully.

\*\*\*\*\*

"Those are our plans. We expect to make Herley a bigger, better company - more valuable to employees and shareholders...

(Emphasis added)

89.    The January 15, 2004 Chairman's Address – specifically (i) the repeated references to the superiority of Herley's margins; (ii) the claims that the market was undervaluing Herley's stock given, *inter alia*, Herley's superior margins; (iii) the depiction of Herley's business as stable and predictable; and (iv) the congratulatory references to Herley's previous revenues, revenue growth and revenue goals – was materially false and misleading, given (a) the undisclosed role of Defendants' undisclosed and fraudulent business practices in generating the high margins and revenue and revenue growth reported by Herley, and (b) the tremendous undisclosed risks and downside to which Defendants' undisclosed and fraudulent business practices had exposed Herley and Herley's investors, which, when disclosed, would decimate market valuation of Herley's stock.

90.    On February 23, 2006, Defendants caused Herley to issue a press release of the 2006 Chairman's Address, which stated in relevant part:

72

**Herley Chairman Addresses Shareholders at Annual Meeting of Shareholders February 23, 2006**

Herley Industries, Inc. Chairman of the Board, Lee N. Blatt, addressed stockholders at the company's Annual Stockholders' Meeting today at The Waldorf-Astoria Hotel in New York. His comments follow:

\*\*\*\*\*

"Herley is now important to Lockheed; we are important to Northrop Grumman; we are important to Boeing; we are important to Raytheon. What we do is critical technology for all branches of the Defense Department. **Some critical part, made only by Herley, is in almost every major defense system fielded by the United States. We have always needed our customers, and still do. What is gratifying to this Board, to our managers, and every single one of our employees, is that they need us as much.**

"**Attaining this relationship is critical to our future**...

\*\*\*\*\*

"To review, **what have we done right? We have transformed Herley into a necessary and desired partner of our customer base. Our backlog is at an all time high; business prospects are excellent; we are on the right long-term defense programs.** However, engineering staffing to handle the business we already have and are expecting to get this year is a bigger problem than finding new opportunities. Acquisition of engineering talent is the largest single problem we face...

\*\*\*\*\*

"**Three years ago we set a goal of reaching an operating rate of $250 million annually by the end of 2007. That means, roughly, having regular revenues of $20 million per month in about 1-1/2 years. It is still our goal, but it will be tough to get there without another acquisition or two. What we do expect though, is that we will have very strong organic growth that would at least get us pretty close.**

"As we near that $250 million annual goal, Herley must look beyond

73

2007. Herley will need new technologies and will need to seek new opportunities in our ever changing defense business...

\*\*\*\*\*

"The test of our success will be higher profits, improved cash flow, and greater inter-company transactions. These are our key indicators. We are just as focused on the bottom line as we are on the top line. **We've acquired what we need to, in order to go forward. We've invested, and will continue to invest as needed to ensure our future. The ball is in our court. Now we have to perform. We accept that challenge.**"

(Emphasis added)

91.     The February 23, 2006 Chairman's Address – specifically (i) the representations concerning how Herley had positioned itself well with its Defense customers; (ii) the representations that Herley has positioned itself well for future organic growth; and (iii) the comments on Wall Street's valuation of Herley shares – was materially false and misleading, given (a) the fact that Defendants' undisclosed and fraudulent business practices were exposing Herley to potential and actual loss of Defense contracting business and thus to material diminishment of Herley's future growth, and (b) the tremendous undisclosed risks and downside to which Defendants' undisclosed and fraudulent business practices had exposed Herley and Herley's investors, which, when disclosed, would decimate market valuation of Herley's stock.

92.     Finally, during the Class Period, Defendants made various other materially false and/or misleading public representations, including:

(a)     In a Herley press release issued on April 13, 2005 announcing Herley's $20 million acquisition of Innovative Concepts, Inc., and discussing Herley's relationship with the Government, Defendant Blatt stated:

74

"The acquisition of ICI is an excellent fit for Herley and will provide immediate benefits for both business operations. **Herley has strong relationships with the U.S. Navy and Air Force while ICI has strong ties with the U.S. Army.**

(b)     In a Herley press release issued on June 9, 2005 announcing results for the third quarter of fiscal 2005, and noting Herley's "excellent business relationships with all branches of the U.S. military", Defendant Kelley stated:

Innovative Concepts continues to benefit from market acceptance of its IDM Technology (R), as today's military thinking parallels ICI's product offering of mobile, interoperable, tactical data communications in hostile environments. **Herley plans to leverage its excellent business relationships with all branches of the U.S. military which should generate new program and platform opportunities for ICI products.**

(c)     In a Herley press release issued on July 29, 2005 announcing new defense contract wins, and commenting on Herley's Government contracting, Defendant Kelley stated:

John M. Kelley, Herley President, stated, "These contracts are very good examples of the type of business that defines Herley and the way we operate. Herley seeks programs where we begin a manufacturing cycle that we believe will become a Defense Department staple. We analyze opportunities in our market segments and select those that we want to pursue. While there is engineering development up-front, once on the program, Herley reaps the benefits of our early involvement with multi-year manufacturing contracts."

Kelley continued, "The exercise of Lot 11 for the U.S. Air Force is our bread and butter business. This is the eleventh annual contract award received by MSI, and we expect the USAF will exercise options for an additional four years."

(d)     In a Herley press release issued on April 25, 2006 announcing $18 million in new defense contract wins, and commenting on Herley's relationship with the Government, Herley and Defendant Kelley stated:

75

Herley Receives Multi-Year Contract Totalling Approximately $18 Million; Herley to Supply Tactical Instrument Landing System for U.S. Navy; First Year Revenues Expected to Exceed 3.5 Million; First Year Delivery Order Expected to Exceed $3 Million; Legacy Program Has 30 Year History With Herley

Herley Industries, Inc. announced today that it has been awarded a follow-on five year contract with the U.S. Navy to supply the Tactical Instrument Landing System ("TILS"). The TILS is used on all carrier aircraft including the F/A-18E/F, E/A-18G, E-2C and E-2D. The TILS is able to provide flight guidance information to the pilot under all weather conditions day or night... This contract is a follow-on to a previously awarded five year Navy contract with Herley providing support to all Navy carrier aircraft programs. The previous five year contract was awarded in 2001 and is nearing completion.

**John Kelley, Herley President, commented, "Herley has a long and valued history with the U.S. Navy on this very important legacy program.** With our acquisition of Stewart-Warner in 1995, Herley added this key product technology to our already growing list of business with the Navy."

(e)    In a Herley press release issued on May 10, 2006 announcing the creation of a new corporate position within Herley – Director of Administration and Governance, the appointment of an individual to that position, and commenting on Herley's Government contracting, Herley and Defendant Kelley stated:

Charles Pourciau, Jr. Joins Herley as Director of Administration and Governance

Herley Industries, Inc. announced that Charles Pourciau, Jr., has joined Herley as Director of Administration and Governance, a newly created, corporate position. Mr. Pourciau will oversee contract administration and direct corporate governance, reporting to the President.

John Kelley, Herley's President, said, "Herley has grown to be a large, complex company, that must deal with new compliance and administration issues on a daily basis. **It is vitally important that Herley manage both the contract and compliance areas from a**

76

**corporate level**, and are very pleased to have Charles join us in this position. **His twenty-four years of experience in the electronics industry with government contracting, export compliance, and governance, as well as his legal background will be invaluable to the Company. Charles will be the Company's point of contact for all Herley facilities, responsible for ensuring the compliance with contract regulations and governmental legislation as it applies with defense contractors."**

93.     The statements and representations made by Defendants in the press releases quoted in ¶ 92 above – statements concerning Herley's Government contracting; Herley's relationship with the Government; and Herley's revenues, profits, margins, backlog, the growth of each of the foregoing, and the sources of each of the foregoing – were materially false and or misleading because they created a duty to disclose and yet failed to disclose:

(a) Defendants' above-mentioned fraudulent business practices in sole-source Government contracting;

(b) the inflated, illegitimate and unsustainable revenues resulting from Defendants' fraudulent business practices; and

(c) the liabilities to which Defendants' fraudulent business practices were exposing Herley, including:

(i)     potential and actual loss of further Government business as a result of Defendants' above-mentioned fraudulent business practices

(ii)    disgorgement of millions of dollars of ostensible "revenues" that were recorded only through Defendants' undisclosed fraud; and

77

(iii)    the necessity to use such revenues to pay fines and penalties consequent upon Defendants' fraud, and to pay for increased legal, regulatory and compliance costs (see, e.g., ¶¶ 106-107, 135).

# VII
## MATERIALITY

94.    In purchasing Herley stock during the Class Period, plaintiffs and other Class members assumed – in the absence of any disclosure to the contrary – that Herley's reported revenues, profits and margins were the straightforward result of normal, legitimate and proper business operations. Unbeknownst to plaintiffs and other Class members, Defendants' undisclosed and fraudulent business practices, intended and employed by Defendants to effectively 'price-gouge' the Government, allowed Herley to report revenues, profits and margins higher than would have been possible had Defendants not employed such undisclosed and fraudulent business practices.

95.    Defendants' Class Period statements and omissions concerning Herley's regulatory compliance were highly material to investors. In purchasing Herley stock during the Class Period, plaintiffs and other investors relied upon Defendants' materially false and misleading statements concerning Herley's regulatory compliance, relationship with the government, and the integrity and honesty of the business practices supposedly employed by Defendants in connection with Herley's government contracting.

96.    The quality, legitimacy and integrity of a company's management and business practices are central factors in investors' assessments of a company's "investment quality". Investors are rightly concerned not only that a lack of integrity in business practices may cost a company

78

business, since potential customers and/or clients may avoid doing business with the company, but also that improper practices may expose the company to fines, penalties or other liabilities, and public opprobrium. Such factors form part of the publicly available information that is reflected in the price at which investors are willing to buy or sell a stock, and thus directly and forseeably impact the price of a company's stock traded on an efficient market.

97.    Facts concerning whether a government contractor – and especially a government contractor such as Herley for whom the government was its single largest customer – is engaging in practices that violate government contracting regulations unquestionably would be material to a reasonable investor in deciding to invest in the stock of such a firm. Such facts would form part of the publicly available information about that firm's stock that would determine its price in an open, active and efficient market such as the NASDAQ.

98.    Here, Defendants engaged in improper business practices, made false statements regarding those practices, and omitted to disclose important, highly material information regarding those practices, all of which had the reasonably forseeable and direct effect of artificially inflated the prices of Herley common stock during the Class Period. As a consequence, there was a disparity between the transaction prices that plaintiffs and the Class paid for their Herley shares during the Class Period and the true value or "investment quality" of those securities that plaintiffs and the Class acquired. Herley's shares would have traded at prices significantly lower during the Class Period had Defendants timely and fully disclosed the truth about their government contracting practices detailed in the Government Indictment announced to the public on June 6, 2006.

99.    Had plaintiffs and the Class known the truth concerning Herley's actual business practices during the Class Period, including Defendants' elaborate and long-standing violations of

federal contracting regulations (FAR), they would not have acquired Herley stock at all and/or at the inflated prices at which they did.

100.    As alleged below, once the truth concerning – and the consequences of – Herley's actual business practices and regulatory compliance began to emerge, investor confidence in Herley was shattered and a steep slide in the price of Herley's common stock ensued.  Between June 6, 2006 and June 13, 2006 – as the Government Indictment was announced, tens of millions in potential liability quantified, Blatt resigned, and three Herley divisions responsible for more than 50% of Herley's revenues were barred from any further government work – Herley's shares lost nearly 50% of their value, falling from $17.50 per share on June 5, 2006 to $9.21 per share on June 14, 2006. This clearly demonstrates the impact that Defendants' improper business practices and materially false and misleading public statements had on the market's assessment of the value of Herley's stock.

101.    This sharp and immediate market reaction is an extremely practical and clear indicator of materiality.

102.    Additionally, materiality is further supported by the fact that the Government was, throughout the Class Period, Herley's single largest customer, responsible for between 17% and 26% of Herley's annual revenues for its fiscal years 2001-2006.  Anything that threatened Herley's business relationship with such a customer was certainly material, a conclusion which Defendants themselves espoused in their Forms 10-K, each of which informed investors that: (i) because of its participation in the defense industry, Herley was "subject to audits by various government agencies for our compliance with government regulations"; (ii) that Herley "operate[d] our business in material compliance with applicable laws and regulations"; (iii) that "failure to comply with existing

or future laws or regulations could have a material adverse impact on [Herley's] business, financial condition and results of operations"; but (iv) that Herley was "not aware of any events which are reasonably likely to result in any cancellation of its government contracts".

## VIII
## LOSS CAUSATION

103.    Defendants' above-mentioned, undisclosed and fraudulent business practices allowed Herley to report misleading, false and inflated financial revenues, income, profits, margins and growth. Defendants omitted to disclose the illegitimate practices underlying Herley's reported and purported financial results, and instead attributed such revenues, earnings, profits, margins and growth to Herley's managerial, strategic and operational quality. Believing Herley to be a well-managed, well-run, fast-growing company, the market consequently so valued Herley's shares, which increased from their 2001 trading range of $8-$10 per share to more than double in price by early 2002 (when they closed as high as $24.62 per share on April 16, 2002) and to plateau thereafter during 2003, 2004, 2005 and the first half of 2006 at a trading range of between $16 and $22 per share.

104.    Although the market and the investing public did not then know it, Herley was not as it seemed. The revenues, profits, income and margins, and the growth in the foregoing, which formed the basis for the market's doubling the value of the Herley's shares, were underwritten not by operational excellence but by Defendants' above-mentioned, undisclosed and fraudulent business practices, which, as described below, exposed Herley to undisclosed and highly material liabilities including fines and penalties, disgorgement, increased legal and regulatory costs, and loss of further business with the Government.

81

105.    On April 24, 2002, before any of Herley's problems were disclosed to the investing

public, Defendants took advantage of Herley's inflated stock price and completed a secondary stock

offering, selling 23 million shares of Herley stock to plaintiffs and the Class at a price of $23.00 per

share, very close to Herley's peak price of $24.62 per share (reached on April 16, 2002). Herley used

the $69 million in proceeds from this offering to fund its growth-by-acquisition strategy and to

acquire five other companies (detailed in ¶140 below). Additionally, the Individual Defendants also

took advantage of Herley's share price inflation to sell more than 270,000 of their own Herley shares

for proceeds of more than $4.79 million.

106.    Disclosure of the Government Indictment on June 6, 2006 was preceded by a

seemingly innocuous disclosure one month earlier, on May 10, 2006, when Herley issued a press

release announcing that it had created a new corporate position – the Director of Administration and

Governance, in charge of contract administration and corporate governance – and appointed to it an

individual with long experience in government contracting and legal/regulatory compliance:

> *Charles Pourciau, Jr. Joins Herley as Director of Administration and Governance*
>
> Herley Industries, Inc. announced that Charles Pourciau, Jr., has joined Herley as Director of Administration and Governance, a newly created, corporate position. Mr. Pourciau will oversee contract administration and direct corporate governance, reporting to the President.
>
> John Kelley, Herley's President, said, "Herley has grown to be a large, complex company, that must deal with new compliance and administration issues on a daily basis. **It is vitally important that Herley manage both the contract and compliance areas from a corporate level, and are very pleased to have Charles join us in this position**. His twenty-four years of experience in the electronics industry with government contracting, export compliance, and governance, as well as his legal background will be invaluable to the

Company. Charles will be the Company's point of contact for all Herley facilities, responsible for ensuring the compliance with contract regulations and governmental legislation as it applies with defense contractors."

Mr. Pourciau comes to Herley from TRAK Microwave Corporation, a Smiths Technologies North America company. He has over twenty years experience with the Federal Acquisition Regulations (FAR), Defense Federal Acquisition Regulations (DFAR), International Traffic in Arms Regulation (ITAR), Export Administration Regulations (EAR), Office of Federal Contract Compliance Programs (OFCCP), Equal Employment Opportunity Commission (EEOC), Environmental Protection Agency (EPA), and Occupational Safety Health Administration (OSHA) as an in-house attorney and contracts manager.

107.    On June 6, 2006, the U.S. Attorney's office for the Eastern District of Pennsylvania announced the criminal indictment of Herley and Defendant Blatt for using Herley's "advantage as a sole supplier to systematically gouge the U.S. military", and Herley issued a press release announcing and acknowledging the Government Indictment.  As the Government Indictment revealed, Herley and Defendant Blatt were charged with 29 counts of wire fraud, three counts of lying to the Government, two counts of obstruction, two counts of aiding and abetting, and one charge of major fraud against the United States.  Based upon the conduct and charges detailed in the Government Indictment, Blatt faced as many as 185 years in prison and Herley faced more than $13 million in fines as well as the disgorgement of millions of dollars of profits illegitimately gained through Defendants' fraudulent business practices.  Additionally, as analysts and the financial press speculated, Herley's relationship with its largest customer – i.e., the Government – was obviously damaged and strained, and Herley's future with the Government was uncertain and imperiled.

108.    In response to the June 6, 2006 disclosure of the Government Indictment and market assessment of the potential consequences to Herley, Herley's shares fell from their June 5, 2006

closing price of $17.50 per share to close on June 6, 2006 at $16.52 per share and, continuing to

decline, to close on June 7, 2006 at $15.04 per share, a two-day decline of $2.46 per share, or 14.1%.

109.    As Marketwatch reported on June 8, 2006 in an article titled "Herley Shares Tumble

on Fraud Charges":

> Shares of Herley Industries Inc. tumbled Wednesday after the company and its chairman Lee N. Blatt were charged with devising a scheme to defraud the U.S. military of millions of dollars on contracts for electronic components of aircraft radar systems.
>
> The company and Blatt denied any wrong-doing and vowed to prove their innocence in court.
>
> *****
>
> "Blatt abused his position and used his company's advantage as a sole supplier to systematically gouge the U.S. military," said U.S. Attorney Pat Meehan in a statement.
>
> *****
>
> Blatt, 78, co-founded the company and has served as its chairman since 1965. If convicted, **he faces a maximum sentence of 185 years in prison. In addition, Blatt and the company each face a maximum fine of $13.5 million. Herley might also forfeit more than $2.8 million in payments it received under the contracts included in the indictment.**
>
> Contracts with U.S. government agencies, including the Department of Defense and NASA, accounted for about 25% of the company's net sales in fiscal 2005, according to Herley's latest 10-K report.
>
> **"We're concerned that there may be some impact," Kelley said, referring to relations between his company and the government in the wake of the indictment. "We consider our government contracts very important to us. We'll hopefully continue to be a qualified, good supplier to the U.S. government."**
>
> **Raymond James downgraded Herley's stock to underperform from market perform Wednesday.**

> **"Considering that the government is Herley's primary customer, bad blood between the two groups could result in a material degradation of "goodwill," both with respect to customer relationships and value on the balance sheet," analyst Chris Quilty said in a note to investors.**
>
> **Kelley acknowledged that the company's shares may suffer as a result of the suit....**

(Emphasis added)

110.    Although Herley's share price fell sharply in response disclosure of the Government Indictment and the consequent market revisioning of Herley's past and future, the decline was mitigated by takeover rumors and actual takeover offers pursuant to which Herley would be acquired, presumably at a premium.

111.    For instance, despite disclosure of the Government Indictment, Thomas Weisel analyst David Gremmels did not downgrade his rating for Herley, explaining that despite all the negatives "[o]n the positive side, these issues might accelerate a sale of the company. Numerous potential buyers exist and a sale would likely yield a significant premium to the current valuation, even with the overhangs."

112.    One of the Company's largest shareholders, Discovery Group I LLC, filed a Form 13D with the SEC on June 7, 2006, attaching a letter that it had sent to Herley's Board of Directors. That letter, whose contents were reported widely in the financial press between June 8, 2006 and June 10, 2006, stated:

> Dear Directors:
>
> ...on June 6, 2006, the Company and its Chairman, Lee Blatt were indicted on multiple charges in connection with purported activities

resulting in alleged excessive profits by the Company on three contracts with the United States Department of Defense.

\*\*\*\*\*

...**The costs to the public shareholders, for whom the Board members are fiduciaries, are mounting. Indeed, the viability of the Company may now be at stake. You must be concerned that the allegations of cheating the government might preclude Herley from doing future business with the government and its contractors.**

Here is the action plan that the Board must now adopt:

1. **Seek to remove Lee Blatt from the Board.** Mr. Blatt cannot possibly serve as an effective director under these circumstances and he will surely be turning his attention to his personal legal defense.

2. **Name a new Chairman that is independent and has interests that are aligned with public shareholders.** Note that other than Lee Blatt, Chairman, and Myron Levy, Vice Chairman, the current directors own less than 1% of the Company's outstanding stock. This is a particularly opportune time to add a director with a real and substantial economic interest in the Company. If any other large shareholders have expressed interest in serving in a director capacity, we would support their candidacy. If no other large shareholder has stepped forward, we would be willing to lend a qualified member of our management team to serve in such capacity.

3. Appoint a Special Committee of the Board to evaluate the future viability of Herley. **A committee of independent directors must be formed to assess the strength of the Company's legal defense and strategic alternatives for preserving shareholder value.**

4. **Hire an independent investment bank and independent legal counsel to assist the Special Committee.** Qualified advisors can help the Board understand the risks of the present situation and explore all strategic alternatives, including a possible sale to any of the many interested strategic parties identified in our First Letter.

5. **Consider a sale of the Company. The Board must consider the real possibility that Herley's future, the continuing livelihoods of its employees and the security of its investors may now require**

86

**that it become part of another company that can restore the integrity necessary to continue its business with the U.S. Department of Defense.** The Directors have no choice but to pursue such a course of action given the fiduciary responsibility they have to the Company's constituents and to avoid personal culpability in the event of an unraveling of the Company.

With an investment of over 5% of Herley's outstanding shares, we have a strong alignment of interest with all the unaffiliated shareholders. On the behalf of all the Company's non-management shareholders, we hereby request a timely meeting with the Board to learn directly of your plans to address this grave situation. **We would also present to you the information and analysis that supports contention in the First Letter that there are logical strategic suitors willing to pay a significant premium to shareholders in order to acquire Herley.**

(Emphasis Added)

113.    As reported in the financial press between June 8, 2006 and June 10, 2006, numerous potential suitors had expressed an interest in acquiring Herley, including L-3 Communications, Crane Co., DRS Technologies Inc., EDO Corp., Honeywell International Inc., Cobham PLC, Teledyne Technologies Inc., and Tyco International Ltd.

114.    Absent the market's taking into account such takeover possibilities, Herley's share price declines following disclosure of the Government Indictment would have been even steeper.

115.    On June 9, 2006, Herley issued a press release announcing that Defendant Blatt had resigned his position as Chairman of Herley's Board of Directors. The June 9, 2006 press release made no mention of the Government Indictment, but quoted Defendant Blatt as having "decided that the time is particularly appropriate for me to step down as Chairman and Director of the Company" and having stated that " it is long past time for me to leave Herley".

87

116.    On June 12, 2006, Herley issued a press release announcing the appointment of Kevin J. Purcell as Vice President and Chief Financial Officer. Purcell replaced Defendant Garefino, who had been serving since September 2005 as Herley's "acting" CFO after the sudden and unexplained resignation of Gilboy, who himself had been hired to replaced Garefino as CFO in September 2004.

117.    Thus, after Blatt's resignation, the replacement of Herley's CFO, the Company's protestations of innocence, and swirling possibilities of an attempt to purchase Herley at a premium, Herley's share price (temporarily) stabilized after June 7, 2006, closing at $15.26 on June 8, 2006, $15.19 on June 9, 2006, and $15.25 on June 12, 2006.

118.    On June 13, 2006, however, Herley disclosed that the Government had decided to preclude certain of Herley's facilities – i.e., the ones which the Government identified as having participated in the above-mentioned fraudulent contracting practices (Herley-Lancaster, Herley-Farmingdale, Herley-Woburn, and Herley-Chicago) – from receiving any further Government contracts.

> *Three of Nine Herley Manufacturing Facilities Suspended by the U.S. Federal Government*
>
> Herley Industries, Inc. announced today that **certain of its operations have been suspended from receiving new contract awards from the U.S. Government.** The affected operations include facilities in Lancaster, Pennsylvania, Woburn, Massachusetts, Chicago, Illinois and Herley's subsidiary in Farmingdale, New York. The Chicago, Illinois location is a two-person marketing office. **The result of this suspension is that these facilities will not be solicited for or awarded new contracts or contract extensions without special exceptions, pending the outcome of legal proceedings.** The suspended facilities may receive contract awards or subcontracts from the Federal Government if the head of the agency states in writing the compelling reason to do so. A significant portion of Herley's business is received where the company is the only qualified supplier on critical defense programs. For this reason the effect of the suspension

88

> on these manufacturing facilities cannot easily be determined at this time. Currently, Herley has a funded backlog of approximately $142 million, which is not affected by this action, and which will be delivered to customers within the next year or two.

119.    In response to the news that Herley's largest customer would not be granting Herley any new business (at least at certain of Herley's facilities which accounted for more than 50% of Herley's revenues) as a result of the ongoing investigation into fraudulent overcharges by Herley and Blatt, Herley shares fell from their June 12, 2006 closing price of $15.25 per share to close on June 13, 2006 at $10.06 per share and, continuing to decline, to close on June 14, 2006 at $9.21 per share, a two-day decline of $6.04 per share, or 39.6%.

120.    After the market closed on June 14, 2006 and after Herley's shares had closed at $9.21 per share, Herley then announced disappointing financial results for its third quarter of fiscal 2006, about which it had warned the market on June 5, 2006.

121.    In sum, disclosure of the Government Indictment and its consequences between June 6, 2006 and June 13, 2006 caused Herley shares to decline from $17.50 per share on June 5, 2006 (the last closing price of the shares prior disclosure of the Government Indictment) to $9.21 per share on June 14, 2006, a decline of $8.29 per share, representing the loss of 47.4% of the value Herley shares possessed prior to disclosure of the Government Indictment.

122.    Absent the buoyancy provided by takeover speculation, Herley's share price declines would have been even greater.

123.    In sum, during the Class Period, by failing to disclose that Herley's financial performance was the result of improper, illegitimate and illegal business practices engaged in by Defendants in their contracting with the Government , Defendants engaged in a course of conduct

that deceived the market, that artificially inflated the prices of Herley's shares, and that operated as a fraud and deceit upon plaintiffs and the Class. Defendants' failure to disclose their above-mentioned, undisclosed and fraudulent business practices misled plaintiffs and the Class not only as to Herley's contemporary financial results, but also Herley's future prospects. As a result of Defendants' undisclosed, fraudulent business practices, investors did not know of the sizeable liabilities to which Defendants' conduct had exposed Herley, nor of the possible and actual loss of Government business, nor of the Government scrutiny that would fall upon Herley and Herley's operations. Therefore, by concealing rather than disclosing such risks (and the conduct which gave rise to those risks), Defendants presented to plaintiffs and the Class a misleading picture of Herley's business and prospects. The June 2006 disclosure had a substantial and material corrective effect on the value of and artificial inflation in Herley's shares, causing plaintiffs and other Class members economic losses and thus damages under the federal securities laws.

124.    The near-50% decline in the value of Herley's shares following the above-detailed disclosures was the direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing, speed and magnitude of Herley's price declines negate any inference that the losses suffered by plaintiffs and the Class were caused by changed market conditions, macroeconomic or industry-wide factors, or Company-specific facts unrelated to Defendants' fraudulent conduct (e.g., Herley's poor financial results for the third quarter of fiscal 2006). The economic losses and legal damages suffered by plaintiffs and the Class were the direct result of Defendants' artificial inflation of Herley's share price and the subsequent decline in the value of Herley's shares when Defendants' Class-Period misrepresentations and other fraudulent conduct were revealed.

## IX
## DEFENDANTS' MISREPRESENTATIONS PROXIMATELY CAUSED PLAINTIFFS' DAMAGES THROUGH A FRAUD ON THE MARKET

125.    At all relevant times, the market for Herley's stock was an efficient market that promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in Herley's stock price.

126.    The common stock of Herley met the requirements for listing, and was listed and actively traded, on the NASDAQ, a highly developed and efficient market. During the Class Period, Herley stock was heavily traded, with volume averaging exceeding 120,000 shares daily. Herley filed periodic public reports with the SEC, and was followed by analysts from brokerages including Bear Stearns & Co., Inc., Raymond James & Associates, Inc., Thomas Weisel Partners, and Roth Capital Partners, Inc. The reports of these analysts were redistributed to their customers and the public at large, and Herley regularly issued press releases, which were carried by national newswires. Thus, the analyst reports and Herley's press releases entered the public marketplace. As a result, the market for Herley's stock promptly digested current information with respect to Herley from all publicly-available sources, and reflected such information in Herley's stock price. Plaintiffs and other members of the Class relied on the integrity of the market price of Herley's publicly traded stock.

127.    As would be expected where a security is traded in an efficient market, material news concerning Herley's operations, financial results, and prospects had an immediate effect on the market price of Herley stock. Disclosure of the Government Indictment and its consequences in June 2006, and the consequent halving of the value of Herley's common stock, vividly so demonstrate.

91

128.    At the times plaintiffs purchased or otherwise acquired the Company's stock, plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts.

## X.
## SCIENTER ALLEGATIONS

129.    As alleged herein, Defendants acted with scienter in that Defendants knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading, knew that such statements and documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants either knew or recklessly disregarded the fact that the illegal acts and practices and misleading statements and omissions described herein would artificially inflate or maintain the price of Herley's stock. Each of the Defendants, by acting as herein described, did so knowingly or in such a reckless manner as to constitute a fraud and deceit upon plaintiffs and members of the Class that plaintiffs seek to represent.

130.    The Government Indictment, as alleged in detail above at section V, evidences Blatt's scienter, together with the scienter of other unnamed Herley executives, by detailing at length the fraudulent cost submissions and paper trails created by Blatt and other Herley executives in furtherance of their scheme to price-gouge the Government and thereby allow Herley to report fraudulently-inflated revenues, earnings and margins.

131.    An inference of scienter is further supported by the conjunction of: (i) the fact that Herley was a relatively small company with relatively few employees (600 employees at the

92

beginning of the Class Period; 1,000 employees at the end of the Class Period) and (ii) the fact that the Government was Herley's single largest and most important customer. Given the centrality of the Government to Herley's operations and financial condition and results, and given Herley's relatively small size, the scienter of the Company's senior executives may be inferred.

132.    Such inference for Defendants Blatt and Levy is further supported by Herley's admission, in each of the Forms 10-K that it filed during the Class Period, that:

> the Company's chief operating decision makers are considered to be the Chairman and the Chief Executive Officer (CEO). The Company's Chairman and CEO evaluate both consolidated and disaggregated financial information consisting of revenue information in deciding how to allocate resources and assess performance. The Chairman and CEO also use certain disaggregated financial information for the Company's product groups...

133.    An inference of scienter is further supported by the Blatt's resignation from his position as Chairman, the Government's demand that Herley sever all ties to Blatt in order to be eligible to receive new Government contracts, the replacement of Garefino with Kevin Purcell as Herley's Chief Financial Officer after disclosure of the Government Indictment, and the unexplained resignation of Gilboy as Chief Financial Officer prior to disclosure of the Government Indictment.

134.    An inference of scienter is additionally supported by creation within Herley of an executive-level position for a Director of Governance and Administration, originally announced by Herley on May 10, 2006 – just one month prior to disclosure of the Government Indictment.

> Herley Industries, Inc. announced that Charles Pourciau, Jr., has joined Herley as Director of Administration and Governance, a newly created, corporate position. Mr. Pourciau will oversee contract administration and direct corporate governance, reporting to the President.
>
> John Kelley, Herley's President, said, "Herley has grown to be a large,

93

complex company, that must deal with new compliance and administration issues on a daily basis. **It is vitally important that Herley manage both the contract and compliance areas from a corporate level**, and are very pleased to have Charles join us in this position. **His twenty-four years of experience in the electronics industry with government contracting, export compliance, and governance, as well as his legal background will be invaluable to the Company. Charles will be the Company's point of contact for all Herley facilities, responsible for ensuring the compliance with contract regulations and governmental legislation as it applies with defense contractors."**

135.    An inference of scienter is also supported by the numerous conditions imposed upon Herley by the Government in an agreement reached between Herley and the Government (the "Compliance Agreement") on or about October 12, 2006 allowing Herley to contract for further Government work. A copy of the Compliance Agreement was attached as an exhibit to the Form 8-K filed by Herley with the SEC on October 13, 2006. As stated therein, the Compliance Agreement's goal is to "ensur[e] that Herley has and will continue a program of acceptable contracting practices and procedures", which goal is to be reached, verified and enforced "by establishing and implementing a program of compliance reviews, audits, and reports". Among the conditions imposed on Herley by the Compliance Agreement are:

(a)    that Herley neither employ Defendant Blatt (the company's founder and longtime CEO and Chairman) in any capacity nor conduct any business with him in any way;

(b)    that Herley formulate, institute and implement a multi-pronged Compliance Program "by which Herley can and will adhere to lawful and ethical procedures and practices in all areas of and relating to its provision of goods and services as a Government contractor";

94

(c)     that Herley establish a "written Corporate Code of Business Ethics", reviewed on an annual basis by Herley's Vice President of Administration and Governance and by duly appointed legal counsel, updated as required for compliance with statutory and/or regulatory changes

(d)     that all Herley directors, officers, employees, and consultants shall be required each year to sign a certificate stating that they have read the Corporate Code of Business Ethics and agree to abide by its provisions;

(e)     that Herley establish and maintain a position of VP, Administration and Governance, designated as the Ethics and Compliance Officer, reporting to the CEO and to Herley's Board, and that individuals cannot be appointed to such position without having received Navy approval;

(f)     that the Governance and Ethics Committee of the Board of Directors, in conjunction with the Ethics and Compliance Officer, must investigate all instances of suspected misconduct and shall report in writing the findings to the Board of Directors for management response, which response must be in writing and must be provided to the Ethics and Compliance Officer within thirty days; and that both report and response must be provided to the Navy;

(g)     that the Ethics and Compliance Officer must, within 10 working days after the end of each fiscal quarter (July, October, January and April), deliver to the Navy a Quarterly Report, including, in addition to a synopsis of each instance of suspected and/or confirmed misconduct which became known to the Ethics and Compliance Officer or the Governance and Ethics Committee of the Board of Directors during the fiscal quarter, and disclosure of any remedial action taken to date: (1) all instances of disciplinary action for violations of the Corporate Code of Business Ethics, Government Contracts Overview, or Truth In Negotiations Act Policy; (2) all

95

known, ongoing criminal investigations; (3) all known qui tam suits; (4) all known or suspected defective pricing cases; (5) all hotline reports (*see* h, *infra*) received by the Ethics and Compliance Officer including a description of the complaint and any remedial action taken or planned; (6) a summary of audit findings as required by paragraph 4.E.5.c (*see* j *infra*).; (7) reports of new employee training as required by paragraph 4.F.4 (*see* l *infra*); and (8) any other matter which might affect Herley's present responsibility status, including but not limited to actual or potential suspension and/or debarment actions by other Government and quasi-governmental agencies;

(h)    that Herley establish and maintain a "hot line" to facilitate the reporting of misconduct by or within Herley;

(i)    that Herley establish written contracting policies and procedures, in the form of a Government Contracts Overview and Truth In Negotiations Act Policy, which contain the regulatory standards and acceptable practices for doing business with the Government and/or Government prime contractors, which must be applied to all of Herley's business dealings involving Government contracts or subcontracts; and that any revisions to such written contracting policies and procedures are subject to review and disapproval by the Navy;

(j)    that Herley establish and maintain certain Audit and Compliance Review Procedures, subject at all times to Navy approval/disapproval, instituting yearly audits, conducted in December of each year, by the Ethics and Compliance Officer in conjunction with the appropriate Herley management personnel, of every procedure that is a component of the Compliance Program, and that a report describing and discussing the findings made during the audits must be included in the Ethics and Compliance Officer's Quarterly Report (*see* g *supra*);

96

(k)     that Herley create and implement a curriculum – subject at all times to Navy approval/disapproval, and to the review and comments and improvements of compliance experts retained by Herley and approved of by the Navy – of classroom-style training designed to familiarize each of its directors, officers, employees, and consultants with the concepts and precepts of each component of the Compliance Program;

(l)     that anyone who misses such classroom training must read a course syllabus, pass a written test on its salient contents, and sign a certification that the reading has been completed (and that any such certification and the completed tests be maintained in a file kept by the Ethics and Compliance Officer, who, in his Quarterly Report (*see* g *supra*), must identify each such person, the date when the person joined Herley, and whether the person has successfully met the training requirements;

(m)     that Herley hire an outside entity to survey/interview Herley's employees about the organizational culture related to ethics, specifically the atmosphere on reporting misconduct within Herley on or before December 31, 2006, and that Herley provide a report of the survey/interview results to the Navy by January 31, 2007;

(n)     that Herley include an ethics and compliance component in the performance evaluation criteria of management employees;

(o)     that Herley allow Navy representatives to interview Herley personnel and to examine Herley's financial books, records, and other company documents for the purpose of evaluating Herley's compliance with the agreement;

(p)     that Herley disclose to the Government, within 30 calendar days of any alleged occurrence, all instances in which there are reasonable grounds to suspect that Herley and/or

97

Government personnel have violated procurement regulation, and that Herley must take immediate corrective measures to remedy any such matter disclosed, and to notify the Government of the corrective action taken and of Herley's opinion regarding any impact the matter may have on the Government;

(q)    that Herley cooperate fully with any future Government investigations other than matters that are the subject of the Government Indictment;

(r)    that (i) upon an indictment of any Herley employee for violation of any criminal statute, which violation occurred in connection with the individual's performance of duties for or on behalf of Herley, Herley immediately remove the employee from active status relating to any dealings with the Government; and (ii) upon an unappealed conviction of, or after an unsuccessful appeal by any Herley employee for violation of any criminal statute, which violation occurred in connection with the individual's performance of duties for or on behalf of Herley, Herley promptly terminate the employment of such employee;

(s)    that Herley shall neither (i) knowingly enter into any subcontract or other business relationship relating to Federal Government contracts with any individual or business entity listed as debarred, suspended, or otherwise ineligible for contracting by the Government, nor (ii) knowingly employ, engage or accept the services of an individual who is listed by the Government as debarred, suspended, or otherwise ineligible for Federal contracting; and

(t)    that failure by Herley to meet any of its obligations under the terms or spirit of the agreement, not cured to the reasonable satisfaction of the Navy, shall constitute a cause for Herley's debarment subject to the procedures established by FAR.

98

136.    Finally, an inference of scienter is further supported by Herley's management's refusal to conduct the sort of customary, independent internal investigation capable of determining, as Herley's former auditor stated, "the impact of the alleged illegal acts on the financial statements of the Company" or of "identify[ing] the potential involvement of other Company personnel involved" in those acts. Indeed, Herley's now-former auditor BDO Seidman resigned in July 2006 after witnessing Defendants' attempts to constrict the investigation suggested by the auditor, concluding that it was "no longer able to rely on the representations of management provided to date".

137.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company were able to and did control the contents of the various quarterly and annual financial reports, SEC filings, press releases, and presentations to securities analysts pertaining to Herley. Each Individual Defendant was provided with copies of Herley's press releases and SEC filings alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their board membership and/or executive and managerial positions with Herley, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group published" information, the result of the collective actions of the Individual Defendants.

138.    Defendants possessed strong motives to engage in the fraud alleged herein.

139.    First, and quite directly, the unusual employment agreements given to Defendants Blatt and Levy gave them direct incentive to inflate Herley's reported earnings.  Pursuant to Defendant Blatt's employment agreement, Defendant Blatt's annual "incentive compensation" – over and above his cost-of-living-adjusted base salary and any option and stock grants – was set at an amount equaling 4% of Herley's annual pre-tax income.  Pursuant to Defendant Levy's employment agreement, Defendant Levy's annual "incentive compensation" – over and above his cost-of-living-adjusted base salary and any option and stock grants – was set at an amount equaling 3% of Herley's annual pre-tax income.  Thus, any increases in Herley's earnings would flow directly to the pockets of Defendants Blatt and Levy in the form of "incentive compensation".  The incentive compensation so received by Defendants Blatt and Levy, as set forth in the table below, was quite substantial:

| Incentive Compensation | | |
|---|---|---|
| | **Blatt** | **Levy** |
| 2005 | $   650,131 | $ 487,598 |
| 2004 | $1,207,680 | $ 987,010 |
| 2003 | $  898,000 | $ 673,000 |
| 2002 | $ 546,000 | $ 410,000 |

140.    Defendants, knowing better than anyone the fraudulent derivation of Herley's reported revenues, earnings, and margins, and knowing the potential material adverse impact to Herley's operations, finances and stock price should their fraud be disclosed, successfully completed a secondary stock offering of 3 million shares at an inflated price of $23.00 per share on April 24, 2002, allowing the Company to raise approximately $69 million.  The proceeds from the April 24, 2002 offering were intended for use in funding, and in fact funded, Herley's strategic acquisitions of other companies, including:

100

(a)  the September 23, 2002 acquisition of EW Simulation Technology Ltd. for an undisclosed cash sum;

(b)  the March 29, 2004 acquisition of Communication Techniques Inc. for $15 million in cash;

(c)  the acquisition, announced on August 10, 2004 and completed on September 29, 2004, of Reliable System Serviced Corp. for an undisclosed cash sum;

(d)  the acquisition, announced on December 9, 2004 and completed on February 1, 2005, of Micro Systems Inc. for $20 million in cash;

(e)  the April 13, 2005 acquisition of Innovative Concepts Inc. for $20 million in cash.

141.  Furthermore, the Individual Defendants received more than $4.79 million from their aggregate sales of more than 270,000 of their Herley shares during the Class Period, as detailed in the table below:

|  | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| Blatt | 10/11/2001 | 20,000 | $17.32 | $346,000 |
|  | 12/28/2001 | 2,000 | $16.21 | $ 32,420 |
|  | 3/1/2002 | 3,000 | $18.96 | $ 56,880 |
|  | 11/26/2003 | 3,000 | $19.31 | $ 57,930 |
|  | 4/16/2004 | 9,810 | $20.20 | $198,162 |
|  | 4/19/2004 | 10,190 | $20.22 | $206,042 |
| **total** |  | **48,000** |  | **$897,834** |
|  |  |  |  |  |
| Levy | 10/16/2001 | 12,500 | $17.00 | $212,500 |
|  | 10/19/2001 | 50,000 | $16.90 | $845,000 |