|  |  |  |  |  |
|---|---|---|---|---|
|  | 10/22/2001 | 12,500 | $16.90 | $211,250 |
|  | 10/24/2001 | 25,000 | $16.46 | $411,500 |
|  | 10/31/2001 | 25,000 | $16.46 | $411,500 |
| **total** |  | **125,000** |  | **$2,091,750** |
|  |  |  |  |  |
| Garefino | 10/2/2001 | 20,000 | $17.00 | $340,000 |
|  | 10/16/2001 | 17,000 | $17.00 | $289,000 |
|  | 10/21/2003 | 19,239 | $18.23 | $350,727 |
|  | 6/14/2005 | 9,000 | $18.05 | $162,450 |
|  | 6/14/2005 | 9,000 | $18.05 | $162,450 |
|  | 6/14/2005 | 7,200 | $18.05 | $129,960 |
|  | 6/14/2005 | 2,250 | $18.05 | $40,612 |
|  | 6/14/2005 | 2,250 | $18.05 | $40,612 |
|  | 1/10/2006 | 3,000 | $17.50 | $52,500 |
| **total** |  | **88,939** |  | **$1,568,312** |
|  |  |  |  |  |
| Kelley | 3/14/2006 | 12,000 | $19.35 | $232,200 |
| **total** |  | **12,000** |  | **$232,200** |
|  |  |  |  |  |
| **TOTAL** |  | **273,939** |  | **$4,790,096** |

142.    Although the above-mentioned sales gave rise to a legal duty to disclose all known material information, Defendants opted instead for profitable silence. The April 24, 2002 secondary stock offering, in which Defendants sold 3 million Herley shares to the Class at $23.00 per share, allowed Defendants to monetize Herley shares during their peak Class Period prices: a brief window in April 2002 during which time Herley shares traded at prices of between $23.00 and above. The

Individual Defendants' insider sales were completed at inflated prices – e.g., prices approximately double the price of Herley's shares following disclosure of the Government Indictment in June 2006.

## XI.
## CLASS ACTION ALLEGATIONS

143.    Plaintiffs bring this lawsuit pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and on behalf of a class of persons who purchased Herley stock from October 1, 2001 through June 14, 2006, inclusive (the "Class"). Excluded from the Class are Defendants herein, members of the immediate families of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party

144.    This action is properly maintainable as a class action for the following reasons:

(a)    The Class is so numerous that joinder of all Class members is impracticable. As of October 18, 2006, Herley had approximately 13.86 million shares outstanding, and an average of more than 120,000 Herley shares traded per day during the Class Period. Members of the Class are scattered throughout the United States.

(b)    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to members of the Class predominate over any questions affecting only individual Class members. These common questions include, inter alia:

(i)    Whether the Defendants' acts as alleged herein violated the federal securities laws;

103

(ii)    Whether Defendants participated in and pursued the common course of conduct complained of herein;

(iii)    Whether documents, SEC filings, press releases and other statements disseminated to the investing public and Herley's common stockholders during the Class Period misrepresented material facts about the operations, prospects, financial condition and financial results of Herley;

(iv)    Whether Defendants' statements omitted material facts necessary to make the statements made, in light of circumstances under which they were made, not misleading;

(v)    Whether Defendants knew or deliberately disregarded that their statements were false or misleading;

(vi)    Whether the market prices of Herley stock during the Class Period were artificially inflated due to material misrepresentations and the failure to correct the material misrepresentations complained of herein; and

(vii)    To what extent the members of the Class have sustained damages and the proper measure of damages.

(c)    Plaintiffs' claims are typical of the claims of other members of the Class. Plaintiffs and the Class sustained damages from Defendants' wrongful conduct, which caused all Herley shares to trade at artificially inflated prices throughout the Class Period.

(d)    Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in litigation of this nature. Plaintiffs have no interests that are adverse or antagonistic to the interests of the Class. Accordingly, plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class.

104

(e)     Plaintiffs anticipate that there will not be any difficulty in the management of this litigation as a class action.

145.    For the reasons stated herein, a class action is superior to other available methods for the fair and efficient adjudication of this action and the claims asserted herein. Because of the size of the individual Class members' claims, few, if any, Class members could afford to seek legal redress individually for the wrongs complained of herein.

**COUNT I**
**For Violation of Section 10(b) of the Exchange Act**
**and Rule 10b-5 Promulgated Thereunder Against All Defendants**

146.    Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

147.    This Count is brought by plaintiffs pursuant to §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against all Defendants.

148.    The Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Herley stock in an effort to maintain artificially high market prices for Herley stock in violation of §10(b) of the Exchange Act and Rule 10b-5. Defendants are sued as primary participants in the wrongful and illegal conduct charged herein and/or as controlling persons as alleged below.

149.    In addition to the duties of full disclosure imposed on the Defendants by their status as controlling persons of Herley, as a result of their affirmative statements and reports, or

105

participation in the making of affirmative statements and reports to the investing public, and as a result of their sales of Herley stock during the Class Period, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC regulations S-X (17 C.F.R. §210.01, et seq.) and S-K (17 C.F.R. §229.10, et seq.) and other SEC regulations, including accurate and truthful information with respect to Herley's stock, operations, financial condition and earnings so that the market price of Herley stock would be based on truthful, complete and accurate information.

150. Defendants, individually and in concert, directly and indirectly, by using the means and instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Herley as specified herein. The Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Herley's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Herley and its business operations and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Herley stock during the Class Period.

151. The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or recklessly disregarded the same. Defendants' material misrepresentations or omissions were done knowingly or recklessly and for the purpose and effect

106

of concealing Herley's true operations, results and future business prospects from the investing public and supporting the artificially inflated price of Herley's stock.

152.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts by all Defendants, as set forth above, the market price of Herley stock was artificially inflated during the Class Period. In ignorance of the fact that the market price for Herley stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the shares trade, and the truth of any representations made to appropriate agencies and to the investing public, at the times at which any statements were made, and/or on the absence of material adverse information that was known by Defendants but not disclosed in public statements by Defendants during the Class Period, plaintiffs and the other members of the Class acquired Herley stock during the Class Period at artificially high prices and were damaged thereby as the market price of Herley stock declined in response to disclosures of Herley's true state of affairs.

153.    At the time of said misrepresentations and omissions, plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true. Had plaintiffs and the other members of the Class and the marketplace known of Defendants' fraudulent business practices and of the revenues, profits and margins that such practices had generated and of the liabilities to which such practices exposed Herley and Herley investors, which were not disclosed by Defendants, plaintiffs and other members of the Class would not have purchased Herley stock during the Class Period, or, if they had purchased such stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

107

154.    By virtue of the foregoing, Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

155.    As a direct and proximate result of the wrongful conduct of the Defendants, plaintiffs and the other members of the Class suffered damages in connection with their purchases of Herley stock during the Class Period.

## COUNT II
### For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

156.    Plaintiffs repeat and reallege the allegations set forth above as if set forth fully herein.

157.    The Individual Defendants acted as controlling persons of Herley within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, substantial stock holdings, participation in and/or awareness of Herley's operations and/or intimate knowledge of its business practices, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Herley, including the content and dissemination of the various statements which plaintiffs contend are false and misleading.  Herley controlled the Individual Defendants and all of its employees. Each of the Individual Defendants was provided with or had unlimited access to copies of Herley's internal reports, press releases, public filings and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. In particular, each of the Individual Defendants had direct involvement in or intimate knowledge of the day-to-day operations of Herley and therefore is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

108

158.    As set forth above, Defendants violated §10(b) of the Exchange Act and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

159.    As a direct and proximate result of the wrongful conduct of the Individual Defendants, plaintiffs and other members of the Class suffered damages in connection with their purchases of Herley stock during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs, on behalf of themselves and the Class, pray for judgment as follows:

A.    Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding plaintiffs and other members of the Class damages together with interest thereon;

C.    Awarding plaintiffs and other members of the Class costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

D.    Awarding plaintiffs and other members of the Class such equitable/injunctive and/or other and further relief as may be just and proper under the circumstances.

109

# Appendix A:
# Federal Acquisition Regulations (excerpts)

### 15.403 -- Obtaining Cost or Pricing Data.

15.403-1 -- Prohibition on Obtaining Cost or Pricing Data (10 U.S.C. 2306a and 41 U.S.C. 254b).

(a) Cost or pricing data shall not be obtained for acquisitions at or below the simplified acquisition threshold.

(b) Exceptions to cost or pricing data requirements. **The contracting officer shall not require submission of cost or pricing data to support any action (contracts, subcontracts, or modifications) (but may require information other than cost or pricing data to support a determination of price reasonableness or cost realism) --**

**(1) When the contracting officer determines that prices agreed upon are based on adequate price competition** (see standards in paragraph (c)(1) of this subsection);

(2) When the contracting officer determines that prices agreed upon are based on prices set by law or regulation (see standards in paragraph (c)(2) of this subsection);

(3) When a commercial item is being acquired (see standards in paragraph (c)(3) of this subsection);

(4) When a waiver has been granted (see standards in paragraph (c)(4) of this subsection); or

(5) When modifying a contract or subcontract for commercial items (see standards in paragraph (c)(3) of this subsection).

(c) Standards for exceptions from cost or pricing data requirements --

(1) Adequate price competition. A price is based on adequate price competition if --

(i) Two or more responsible offerors, competing independently, submit priced offers that satisfy the Government's expressed requirement and if --

(A) Award will be made to the offeror whose proposal represents the best value (see 2.101) where price is a substantial factor in source selection; and

(B) There is no finding that the price of the otherwise successful offeror is unreasonable. Any finding that the price is unreasonable must be supported by a statement of the

1

# Appendix A:
# Federal Acquisition Regulations (excerpts)

facts and approved at a level above the contracting officer;

(ii) There was a reasonable expectation, based on market research or other assessment, that two or more responsible offerors, competing independently, would submit priced offers in response to the solicitation's expressed requirement, even though only one offer is received from a responsible offeror and if --

(A) Based on the offer received, the contracting officer can reasonably conclude that the offer was submitted with the expectation of competition, e.g., circumstances indicate that --

(1) The offeror believed that at least one other offeror was capable of submitting a meaningful offer; and

(2) The offeror had no reason to believe that other potential offerors did not intend to submit an offer; and

(B) The determination that the proposed price is based on adequate price competition, is reasonable, and is approved at a level above the contracting officer; or

(iii) Price analysis clearly demonstrates that the proposed price is reasonable in comparison with current or recent prices for the same or similar items, adjusted to reflect changes in market conditions, economic conditions, quantities, or terms and conditions under contracts that resulted from adequate price competition.

(2) Prices set by law or regulation. Pronouncements in the form of periodic rulings, reviews, or similar actions of a governmental body, or embodied in the laws, are sufficient to set a price.

(3) Commercial items.

(i) Any acquisition of an item that meets the commercial item definition in 2.101, or any modification, as defined in paragraph (3)(i) of that definition, that does not change the item from a commercial item to a noncommercial item, is exempt from the requirement for cost or pricing data. If the contracting officer determines that an item claimed to be commercial is, in fact, not commercial and that no other exception or waiver applies, the contracting officer must require submission of cost or pricing data.

(ii) The following requirements apply to minor modifications defined in paragraph (3)(ii) of the definition of a commercial item at 2.101 that do not change the item from a commercial item to a noncommercial item:

2

# Appendix A:
# Federal Acquisition Regulations (excerpts)

(A) For acquisitions funded by any agency other than DoD, NASA, or Coast Guard, such modifications of a commercial item are exempt from the requirement for submission of cost or pricing data.

(B) For acquisitions funded by DoD, NASA, or Coast Guard, such modifications of a commercial item are exempt from the requirement for submission of cost or pricing data provided the total cost of all such modifications under a particular contract action does not exceed the greater of $500,000 or 5 percent of the total price of the contract.

(C) For acquisitions funded by DoD, NASA, or Coast Guard such modifications of a commercial item are not exempt from the requirement for submission of cost or pricing data on the basis of the exemption provided for at FAR 15.403-1(c)(3) if the total price of all such modifications under a particular contract action exceeds the greater of $500,000 or 5 percent of the total price of the contract.

(iii) Any Acquisition for noncommercial supplies or services treated as commercial items at 12.102(f)(1), except sole source contracts greater then $16 million, is exempt from the requirements for cost or pricing data (41 U.S.C. 428a).

(4) Waivers. The head of the contracting activity (HCA) may, without power of delegation, waive the requirement for submission of cost or pricing data in exceptional cases. The authorization for the waiver and the supporting rationale shall be in writing. The HCA may consider waiving the requirement if the price can be determined to be fair and reasonable without submission of cost or pricing data. For example, if cost or pricing data were furnished on previous production buys and the contracting officer determines such data are sufficient, when combined with updated information, a waiver may be granted. If the HCA has waived the requirement for submission of cost or pricing data, the contractor or higher-tier subcontractor to whom the waiver relates shall be considered as having been required to provide cost or pricing data. Consequently, award of any lower-tier subcontract expected to exceed the cost or pricing data threshold requires the submission of cost or pricing data unless--

(i) An exception otherwise applies to the subcontract; or

(ii) The waiver specifically includes that subcontract and the rationale supporting the waiver for that subcontract.

3

# Appendix A:
# Federal Acquisition Regulations (excerpts)

## 15.403-4 -- Requiring Cost or Pricing Data (10 U.S.C. 2306a and 41 U.S.C. 254b).

(a)

(1) The contracting officer must obtain cost or pricing data only if the contracting officer concludes that none of the exceptions in 15.403-1(b) applies. However, if the contracting officer has sufficient information available to determine price reasonableness, then the contracting officer should consider requesting a waiver under the exception at 15.403-1(b)(4). The threshold for obtaining cost or pricing data is $650,000. **Unless an exception applies, cost or pricing data are required before accomplishing any of the following actions expected to exceed the current threshold or, in the case of existing contracts, the threshold specified in the contract:**

(i) The award of any negotiated contract (except for undefinitized actions such as letter contracts).

(ii) The award of a subcontract at any tier, if the contractor and each higher-tier subcontractor were required to furnish cost or pricing data (but see waivers at 15.403-1(c)(4)).

(iii) The modification of any sealed bid or negotiated contract (whether or not cost or pricing data were initially required) or any subcontract covered by paragraph (a)(1)(ii) of this subsection. Price adjustment amounts must consider both increases and decreases (e.g., a $200,000 modification resulting from a reduction of $500,000 and an increase of $300,000 is a pricing adjustment exceeding $650,000). This requirement does not apply when unrelated and separately priced changes for which cost or pricing data would not otherwise be required are included for administrative convenience in the same modification. Negotiated final pricing actions (such as termination settlements and total final price agreements for fixed-price incentive and redeterminable contracts) are contract modifications requiring cost or pricing data if--

(A) The total final price agreement for such settlements or agreements exceeds the pertinent threshold set forth at paragraph (a)(1) of this subsection, or

(B) The partial termination settlement plus the estimate to complete the continued portion of the contract exceeds the pertinent threshold set forth at paragraph (a)(1) of this subsection (see 49.105(c)(15)).

(2) Unless prohibited because an exception at 15.403-1(b) applies, the head of the contracting activity, without power of delegation, may authorize the contracting officer to obtain cost or pricing data for pricing actions below the pertinent threshold in paragraph (a)(1) of this subsection, provided the action exceeds the simplified acquisition threshold. The head of the

# Appendix A:
# Federal Acquisition Regulations (excerpts)

contracting activity shall justify the requirement for cost or pricing data. The documentation shall include a written finding that cost or pricing data are necessary to determine whether the price is fair and reasonable and the facts supporting that finding.

**(b) When cost or pricing data are required, the contracting officer shall require the contractor or prospective contractor to submit to the contracting officer (and to have any subcontractor or prospective subcontractor submit to the prime contractor or appropriate subcontractor tier) the following in support of any proposal:**

**(1) The cost or pricing data.**

**(2) A certificate of current cost or pricing data, in the format specified in 15.406-2, certifying that to the best of its knowledge and belief, the cost or pricing data were accurate, complete, and current as of the date of agreement on price or, if applicable, an earlier date agreed upon between the parties that is as close as practicable to the date of agreement on price.**

(c) If cost or pricing data are requested and submitted by an offeror, but an exception is later found to apply, the data must not be considered cost or pricing data as defined in 2.101 and must not be certified in accordance with 15.406-2.

(d) The requirements of this subsection also apply to contracts entered into by an agency on behalf of a foreign government.

5

# Appendix A:
# Federal Acquisition Regulations (excerpts)

## 15.403-5 -- Instructions for Submission of Cost or Pricing Data or Information Other Than Cost or Pricing Data.

(a) Taking into consideration the policy at 15.402, **the contracting officer shall specify in the solicitation (see 15.408 (l) and (m)) --**

**(1) Whether cost or pricing data are required;**

(2) That, in lieu of submitting cost or pricing data, the offeror may submit a request for exception from the requirement to submit cost or pricing data;

(3) Any information other than cost or pricing data that is required; and

**(4) Necessary preaward or postaward access to offeror's records.**

(b)

(1) Unless required to be submitted on one of the termination forms specified in Subpart 49.6, the contracting officer may require submission of cost or pricing data in the format indicated in Table 15-2 of 15.408, specify an alternative format, or permit submission in the contractor's format.

(2) Information other than cost or pricing data may be submitted in the offeror's own format unless the contracting officer decides that use of a specific format is essential and the format has been described in the solicitation.

(3) Data supporting forward pricing rate agreements or final indirect cost proposals shall be submitted in a form acceptable to the contracting officer.

6

# Appendix A:
# Federal Acquisition Regulations (excerpts)

### 15.404 -- Proposal Analysis.

### 15.404-1 -- Proposal Analysis Techniques.

(a) **General. The objective of proposal analysis is to ensure that the final agreed-to price is fair and reasonable.**

(1) The contracting officer is responsible for evaluating the reasonableness of the offered prices. The analytical techniques and procedures described in this section may be used, singly or in combination with others, to ensure that the final price is fair and reasonable. The complexity and circumstances of each acquisition should determine the level of detail of the analysis required.

(2) Price analysis shall be used when cost or pricing data are not required (see paragraph (b) of this subsection and 15.404-3).

(3) **Cost analysis shall be used to evaluate the reasonableness of individual cost elements when cost or pricing data are required. Price analysis should be used to verify that the overall price offered is fair and reasonable.**

(4) **Cost analysis may also be used to evaluate information other than cost or pricing data to determine cost reasonableness or cost realism.**

(5) The contracting officer may request the advice and assistance of other experts to ensure that an appropriate analysis is performed.

(6) Recommendations or conclusions regarding the Government's review or analysis of an offeror's or contractor's proposal shall not be disclosed to the offeror or contractor without the concurrence of the contracting officer. Any discrepancy or mistake of fact (such as duplications, omissions, and errors in computation) contained in the cost or pricing data or information other than cost or pricing data submitted in support of a proposal shall be brought to the contracting officer's attention for appropriate action.

(7) The Air Force Institute of Technology (AFIT) and the Federal Acquisition Institute (FAI) jointly prepared a five-volume set of Contract Pricing Reference Guides to guide pricing and negotiation personnel. The five guides are: I Price Analysis, II Quantitative Techniques for Contract Pricing, III Cost Analysis, IV Advanced Issues in Contract Pricing, and V Federal Contract Negotiation Techniques. These references provide detailed discussion and examples applying pricing policies to pricing problems. They are to be used for instruction and professional guidance. However, they are not directive and should be considered informational only. They are

7

# Appendix A:
## Federal Acquisition Regulations (excerpts)

available via the internet at http://www.acq.osd.mil/dpap/contractpricing/index.htm.

(b) Price analysis.

(1) Price analysis is the process of examining and evaluating a proposed price without evaluating its separate cost elements and proposed profit.

(2) The Government may use various price analysis techniques and procedures to ensure a fair and reasonable price. Examples of such techniques include, but are not limited to the following:

(i) Comparison of proposed prices received in response to the solicitation. Normally, adequate price competition established price reasonableness (see 15.403-1(c)(1)).

(ii) Comparison of previously proposed prices and previous Government and commercial contract prices with current proposed prices for the same or similar items, if both the validity of the comparison and the reasonableness of the previous price(s) can be established.

(iii) Use of parametric estimating methods/application of rough yardsticks (such as dollars per pound or per horsepower, or other units) to highlight significant inconsistencies that warrant additional pricing inquiry.

(iv) Comparison with competitive published price lists, published market prices of commodities, similar indexes, and discount or rebate arrangements.

(v) Comparison of proposed prices with independent Government cost estimates.

(vi) Comparison of proposed prices with prices obtained through market research for the same or similar items.

(vii) Analysis of pricing information provided by the offeror.

(3) The first two techniques at 15.404-1(b)(2) are the preferred techniques. However, if the contracting officer determines that information on competitive proposed prices or previous contract prices is not available or is insufficient to determine that the price is fair and reasonable, the contracting officer may use any of the remaining techniques as appropriate to the circumstances applicable to the acquisition.

(4) Value analysis can give insight into the relative worth of a product and the Government may use it in conjunction with the price analysis techniques listed in paragraph (b)(2) of this

8

# Appendix A:
## Federal Acquisition Regulations (excerpts)

section.]

(c) Cost analysis.

(1) Cost analysis is the review and evaluation of the separate cost elements and profit in an offeror's or contractor's proposal (including cost or pricing data or information other than cost or pricing data), and the application of judgment to determine how well the proposed costs represent what the cost of the contract should be, assuming reasonable economy and efficiency.

(2) The Government may use various cost analysis techniques and procedures to ensure a fair and reasonable price, given the circumstances of the acquisition. Such techniques and procedures include the following:

(i) Verification of cost or pricing data and evaluation of cost elements, including--

(A) The necessity for, and reasonableness of, proposed costs, including allowances for contingencies;

(B) Projection of the offeror's cost trends, on the basis of current and historical cost or pricing data;

(C) Reasonableness of estimates generated by appropriately calibrated and validated parametric models or cost-estimating relationships; and

(D) The application of audited or negotiated indirect cost rates, labor rates, and cost of money or other factors.

(ii) Evaluating the effect of the offeror's current practices on future costs. In conducting this evaluation, the contracting officer shall ensure that the effects of inefficient or uneconomical past practices are not projected into the future. In pricing production of recently developed complex equipment, the contracting officer should perform a trend analysis of basic labor and materials, even in periods of relative price stability.

(iii) Comparison of costs proposed by the offeror for individual cost elements with--

(A) Actual costs previously incurred by the same offeror;

(B) Previous cost estimates from the offeror or from other offerors for the same or similar items;

9

# Appendix A:
# Federal Acquisition Regulations (excerpts)

(C) Other cost estimates received in response to the Government's request;

(D) Independent Government cost estimates by technical personnel; and

(E) Forecasts of planned expenditures.

(iv) Verification that the offeror's cost submissions are in accordance with the contract cost principles and procedures in part 31 and, when applicable, the requirements and procedures in 48 CFR Chapter 99 (Appendix to the FAR looseleaf edition), Cost Accounting Standards.

(v) Review to determine whether any cost or pricing data necessary to make the contractor's proposal accurate, complete, and current have not been either submitted or identified in writing by the contractor. If there are such data, the contracting officer shall attempt to obtain them and negotiate, using them or making satisfactory allowance for the incomplete data.

(vi) Analysis of the results of any make-or-buy program reviews, in evaluating subcontract costs (see 15.407-2).

**(d) Cost realism analysis.**

**(1) Cost realism analysis is the process of independently reviewing and evaluating specific elements of each offeror's proposed cost estimate to determine whether the estimated proposed cost elements are realistic for the work to be performed; reflect a clear understanding of the requirements; and are consistent with the unique methods of performance and materials described in the offeror's technical proposal.**

(2) Cost realism analyses shall be performed on cost-reimbursement contracts to determine the probable cost of performance for each offeror.

(i) The probable cost may differ from the proposed cost and should reflect the Government's best estimate of the cost of any contract that is most likely to result from the offeror's proposal. The probable cost shall be used for purposes of evaluation to determine the best value.

(ii) The probable cost is determined by adjusting each offeror's proposed cost, and fee when appropriate, to reflect any additions or reductions in cost elements to realistic levels based on the results of the cost realism analysis.

(3) Cost realism analyses may also be used on competitive fixed-price incentive contracts or, in exceptional cases, on other competitive fixed-price-type contracts when new requirements may

10

# Appendix A:
# Federal Acquisition Regulations (excerpts)

not be fully understood by competing offerors, there are quality concerns, or past experience indicates that contractors proposed costs have resulted in quality or service shortfalls. Results of the analysis may be used in performance risk assessments and responsibility determinations. However, proposals shall be evaluated using the criteria in the solicitation, and the offered prices shall not be adjusted as a result of the analysis.

(e) Technical analysis.

(1) The contracting officer may request that personnel having specialized knowledge, skills, experience, or capability in engineering, science, or management perform a technical analysis of the proposed types and quantities of materials, labor, processes, special tooling, facilities, the reasonableness of scrap and spoilage, and other associated factors set forth in the proposal(s) in order to determine the need for and reasonableness of the proposed resources, assuming reasonable economy and efficiency.

(2) At a minimum, the technical analysis should examine the types and quantities of material proposed and the need for the types and quantities of labor hours and the labor mix. Any other data that may be pertinent to an assessment of the offeror's ability to accomplish the technical requirements or to the cost or price analysis of the service or product being proposed should also be included in the analysis.

(f) Unit prices.

(1) Except when pricing an item on the basis of adequate price competition or catalog or market price, unit prices shall reflect the intrinsic value of an item or service and shall be in proportion to an item's base cost (e.g., manufacturing or acquisition costs). Any method of distributing costs to line items that distorts the unit prices shall not be used. For example, distributing costs equally among line items is not acceptable except when there is little or no variation in base cost.

(2) Except for the acquisition of commercial items, contracting officers shall require that offerors identify in their proposals those items of supply that they will not manufacture or to which they will not contribute significant value, unless adequate price competition is expected (10 U.S.C. 2304 and 41 U.S.C. 254(d)(5)(A)(i)). Such information shall be used to determine whether the intrinsic value of an item has been distorted through application of overhead and whether such items should be considered for breakout. The contracting officer may require such information in all other negotiated contracts when appropriate.

(g) Unbalanced pricing.

11

# Appendix A:
# Federal Acquisition Regulations (excerpts)

(1) Unbalanced pricing may increase performance risk and could result in payment of unreasonably high prices. Unbalanced pricing exists when, despite an acceptable total evaluated price, the price of one or more contract line items is significantly over or understated as indicated by the application of cost or price analysis techniques. The greatest risks associated with unbalanced pricing occur when --

(i) Startup work, mobilization, first articles, or first article testing are separate line items;

(ii) Base quantities and option quantities are separate line items; or

(iii) The evaluated price is the aggregate of estimated quantities to be ordered under separate line items of an indefinite-delivery contract.

(2) All offers with separately priced line items or subline items shall be analyzed to determine if the prices are unbalanced. If cost or price analysis techniques indicate that an offer is unbalanced, the contracting officer shall --

(i) Consider the risks to the Government associated with the unbalanced pricing in determining the competitive range and in making the source selection decision; and

(ii) Consider whether award of the contract will result in paying unreasonably high prices for contract performance.

(3) An offer may be rejected if the contracting officer determines that the lack of balance poses an unacceptable risk to the Government.

12

# Appendix A:
# Federal Acquisition Regulations (excerpts)

## 15.404-2 -- Information to Support Proposal Analysis.

(a) Field pricing assistance.

(1) The contracting officer should request field pricing assistance when the information available at the buying activity is inadequate to determine a fair and reasonable price. The contracting officer must tailor requests to reflect the minimum essential supplementary information needed to conduct a technical or cost or pricing analysis.

(2) The contracting officer must tailor the type of information and level of detail requested in accordance with the specialized resources available at the buying activity and the magnitude and complexity of the required analysis. Field pricing assistance is generally available to provide—

(i) Technical, audit and special reports associated with the cost elements of a proposal, including subcontracts;

(ii) Information on related pricing practices and history;

(iii) Information to help contracting officers determine commerciality and price reasonableness, including—

(A) Verifying sales history to source documents;

(B) Identifying special terms and conditions;

(C) Identifying customarily granted or offered discounts for the item;

(D) Verifying the item to an existing catalog or price list;

(E) Verifying historical data for an item previously not determined commercial that the offeror is now trying to qualify as a commercial item; and

(F) Identifying general market conditions affecting determinations of commerciality and price reasonableness.

(iv) Information relative to the business, technical, production, or other capabilities and practices of an offeror.

(3) When field pricing assistance is requested, contracting officers are encouraged to team with appropriate field experts throughout the acquisition process, including negotiations. Early

13

# Appendix A:
# Federal Acquisition Regulations (excerpts)

communication with these experts will assist in determining the extent of assistance required, the specific areas for which assistance is needed, a realistic review schedule, and the information necessary to perform the review.

(4) When requesting field pricing assistance on a contractor's request for equitable adjustment, the contracting officer shall provide the information listed in 43.204(b)(5).

(5) Field pricing information and other reports may include proprietary or source selection information (see 2.101). This information must be appropriately identified and protected accordingly.

(b) Reporting field pricing information.

(1) Depending upon the extent and complexity of the field pricing review, results, including supporting rationale, may be reported directly to the contracting officer orally, in writing, or by any other method acceptable to the contracting officer.

(i) Whenever circumstances permit, the contracting officer and field pricing experts are encouraged to use telephonic and/or electronic means to request and transmit pricing information.

(ii) When it is necessary to have written technical and audit reports, the contracting officer shall request that the audit agency concurrently forward the audit report to the requesting contracting officer and the administrative contracting officer (ACO). The completed field pricing assistance results may reference audit information, but need not reconcile the audit recommendations and technical recommendations. A copy of the information submitted to the contracting officer by field pricing personnel shall be provided to the audit agency.

(2) Audit and field pricing information, whether written or reported telephonically or electronically, shall be made a part of the official contract file (see 4.807(f)).

(c) **Audit assistance for prime contracts or subcontracts.**

(1) **The contracting officer may contact the cognizant audit office directly, particularly when an audit is the only field pricing support required. The audit office shall send the audit report, or otherwise transmit the audit recommendations, directly to the contracting officer.**

(i) The auditor shall not reveal the audit conclusions or recommendations to the offeror/contractor without obtaining the concurrence of the contracting officer. However, the

14

# Appendix A:
## Federal Acquisition Regulations (excerpts)

auditor may discuss statements of facts with the contractor.

(ii) The contracting officer should be notified immediately of any information disclosed to the auditor after submission of a report that may significantly affect the audit findings and, if necessary, a supplemental audit report shall be issued.

(2) The contracting officer shall not request a separate preaward audit of indirect costs unless the information already available from an existing audit, completed within the preceding 12 months, is considered inadequate for determining the reasonableness of the proposed indirect costs (41 U.S.C. 254d and 10 U.S.C. 2313).

(3) The auditor is responsible for the scope and depth of the audit. Copies of updated information that will significantly affect the audit should be provided to the auditor by the contracting officer.

(4) General access to the offeror's books and financial records is limited to the auditor. This limitation does not preclude the contracting officer or the ACO, or their representatives, from requesting that the offeror provide or make available any data or records necessary to analyze the offeror's proposal.

(d) Deficient proposals. The ACO or the auditor, as appropriate, shall notify the contracting officer immediately if the data provided for review is so deficient as to preclude review or audit, or if the contractor or offeror has denied access to any records considered essential to conduct a satisfactory review or audit. Oral notifications shall be confirmed promptly in writing, including a description of deficient or denied data or records. The contracting officer immediately shall take appropriate action to obtain the required data. Should the offeror/contractor again refuse to provide adequate data, or provide access to necessary data, the contracting officer shall withhold the award or price adjustment and refer the contract action to a higher authority, providing details of the attempts made to resolve the matter and a statement of the practicability of obtaining the supplies or services from another source.

15

# Appendix A:
# Federal Acquisition Regulations (excerpts)

### 15.404-4 -- Profit.

**(a) General. This subsection prescribes policies for establishing the profit or fee portion of the Government prenegotiation objective in price negotiations based on cost analysis.**

(1) Profit or fee prenegotiation objectives do not necessarily represent net income to contractors. Rather, they represent that element of the potential total remuneration that contractors may receive for contract performance over and above allowable costs. This potential remuneration element and the Government's estimate of allowable costs to be incurred in contract performance together equal the Government's total prenegotiation objective. Just as actual costs may vary from estimated costs, the contractor's actual realized profit or fee may vary from negotiated profit or fee, because of such factors as efficiency of performance, incurrence of costs the Government does not recognize as allowable, and the contract type.

(2) It is in the Government's interest to offer contractors opportunities for financial rewards sufficient to stimulate efficient contract performance, attract the best capabilities of qualified large and small business concerns to Government contracts, and maintain a viable industrial base.

(3) Both the Government and contractors should be concerned with profit as a motivator of efficient and effective contract performance. Negotiations aimed merely at reducing prices by reducing profit, without proper recognition of the function of profit, are not in the Government's interest. Negotiation of extremely low profits, use of historical averages, or automatic application of predetermined percentages to total estimated costs do not provide proper motivation for optimum contract performance.

(b) Policy.

(1) Structured approaches (see paragraph (d) of this subsection) for determining profit or fee prenegotiation objectives provide a discipline for ensuring that all relevant factors are considered. Subject to the authorities in 1.301(c), agencies making noncompetitive contract awards over $100,000 totaling $50 million or more a year --

(i) Shall use a structured approach for determining the profit or fee objective in those acquisitions that require cost analysis; and

(ii) May prescribe specific exemptions for situations in which mandatory use of a structured approach would be clearly inappropriate.

(2) Agencies may use another agency's structured approach.

16

# Appendix A:
# Federal Acquisition Regulations (excerpts)

**(c) Contracting officer responsibilities.**

(1) When the price negotiation is not based on cost analysis, contracting officers are not required to analyze profit.

**(2) When the price negotiation is based on cost analysis, contracting officers in agencies that have a structured approach shall use it to analyze profit. When not using a structured approach, contracting officers shall comply with paragraph (d)(1) of this subsection in developing profit or fee prenegotiation objectives.**

(3) Contracting officers shall use the Government prenegotiation cost objective amounts as the basis for calculating the profit or fee prenegotiation objective. Before applying profit or fee factors, the contracting officer shall exclude any facilities capital cost of money included in the cost objective amounts. If the prospective contractor fails to identify or propose facilities capital cost of money in a proposal for a contract that will be subject to the cost principles for contracts with commercial organizations (see subpart 31.2), facilities capital cost of money will not be an allowable cost in any resulting contract (see 15.408(i)).

(4)

(i) The contracting officer shall not negotiate a price or fee that exceeds the following statutory limitations, imposed by 10 U.S.C. 2306(d) and 41 U.S.C. 254(b):

(A) For experimental, developmental, or research work performed under a cost-plus-fixed-fee contract, the fee shall not exceed 15 percent of the contract's estimated cost, excluding fee.

(B) For architect-engineer services for public works or utilities, the contract price or the estimated cost and fee for production and delivery of designs, plans, drawings, and specifications shall not exceed 6 percent of the estimated cost of construction of the public work or utility, excluding fees.

(C) For other cost-plus-fixed-fee contracts, the fee shall not exceed 10 percent of the contract's estimated cost, excluding fee.

(ii) The contracting officer's signature on the price negotiation memorandum or other documentation supporting determination of fair and reasonable price documents the contracting officer's determination that the statutory price or fee limitations have not been exceeded.

(5) The contracting officer shall not require any prospective contractor to submit breakouts or

17

# Appendix A:
# Federal Acquisition Regulations (excerpts)

supporting rationale for its profit or fee objective but may consider it, if it is submitted voluntarily.

(6) If a change or modification calls for essentially the same type and mix of work as the basic contract and is of relatively small dollar value compared to the total contract value, the contracting officer may use the basic contract's profit or fee rate as the prenegotiation objective for that change or modification.

**(d) Profit-analysis factors --**

**(1) Common factors. Unless it is clearly inappropriate or not applicable, each factor outlined in paragraphs (d)(1)(i) through (vi) of this subsection shall be considered by agencies in developing their structured approaches and by contracting officers in analyzing profit, whether or not using a structured approach.**

(i) Contractor effort. This factor measures the complexity of the work and the resources required of the prospective contractor for contract performance. Greater profit opportunity should be provided under contracts requiring a high degree of professional and managerial skill and to prospective contractors whose skills, facilities, and technical assets can be expected to lead to efficient and economical contract performance. The subfactors in paragraphs (d)(1)(i)(A) through (D) of this subsection shall be considered in determining contractor effort, but they may be modified in specific situations to accommodate differences in the categories used by prospective contractors for listing costs --

(A) Material acquisition. This subfactor measures the managerial and technical effort needed to obtain the required purchased parts and material, subcontracted items, and special tooling. Considerations include the complexity of the items required, the number of purchase orders and subcontracts to be awarded and administered, whether established sources are available or new or second sources must be developed, and whether material will be obtained through routine purchase orders or through complex subcontracts requiring detailed specifications. Profit consideration should correspond to the managerial and technical effort involved.

(B) Conversion direct labor. This subfactor measures the contribution of direct engineering, manufacturing, and other labor to converting the raw materials, data, and subcontracted items into the contract items. Considerations include the diversity of engineering, scientific, and manufacturing labor skills required and the amount and quality of supervision and coordination needed to perform the contract task.

(C) Conversion-related indirect costs. This subfactor measures how much the indirect

18

# Appendix A:
# Federal Acquisition Regulations (excerpts)

costs contribute to contract performance. The labor elements in the allocable indirect costs should be given the profit consideration they would receive if treated as direct labor. The other elements of indirect costs should be evaluated to determine whether they merit only limited profit consideration because of their routine nature, or are elements that contribute significantly to the proposed contract.

(D) General management. This subfactor measures the prospective contractor's other indirect costs and general and administrative (G&A) expense, their composition, and how much they contribute to contract performance. Considerations include how labor in the overhead pools would be treated if it were direct labor, whether elements within the pools are routine expenses or instead are elements that contribute significantly to the proposed contract, and whether the elements require routine as opposed to unusual managerial effort and attention.

(ii) Contract cost risk.

(A) This factor measures the degree of cost responsibility and associated risk that the prospective contractor will assume as a result of the contract type contemplated and considering the reliability of the cost estimate in relation to the complexity and duration of the contract task. Determination of contract type should be closely related to the risks involved in timely, cost-effective, and efficient performance. This factor should compensate contractors proportionately for assuming greater cost risks.

(B) The contractor assumes the greatest cost risk in a closely priced firm-fixed-price contract under which it agrees to perform a complex undertaking on time and at a predetermined price. Some firm-fixed-price contracts may entail substantially less cost risk than others because, for example, the contract task is less complex or many of the contractor's costs are known at the time of price agreement, in which case the risk factor should be reduced accordingly. The contractor assumes the least cost risk in a cost-plus-fixed-fee level-of-effort contract, under which it is reimbursed those costs determined to be allocable and allowable, plus the fixed fee.

(C) In evaluating assumption of cost risk, contracting officers shall, except in unusual circumstances, treat time-and-materials, labor-hour, and firm-fixed-price, level-of-effort term contracts as cost-plus-fixed-fee contracts.

(iii) Federal socioeconomic programs. This factor measures the degree of support given by the prospective contractor to Federal socioeconomic programs, such as those involving small business concerns, small business concerns owned and controlled by socially and economically disadvantaged individuals, women-owned small business concerns, veteran-owned, HUBZone, service-disabled veteran-owned small business concerns, handicapped sheltered workshops, and energy conservation. Greater profit opportunity should be provided contractors that have

19

# Appendix A:
# Federal Acquisition Regulations (excerpts)

displayed unusual initiative in these programs.

(iv) Capital investments. This factor takes into account the contribution of contractor investments to efficient and economical contract performance.

(v) Cost-control and other past accomplishments. This factor allows additional profit opportunities to a prospective contractor that has previously demonstrated its ability to perform similar tasks effectively and economically. In addition, consideration should be given to measures taken by the prospective contractor that result in productivity improvements, and other cost-reduction accomplishments that will benefit the Government in follow-on contracts.

(vi) Independent development. Under this factor, the contractor may be provided additional profit opportunities in recognition of independent development efforts relevant to the contract end item without Government assistance. The contracting officer should consider whether the development cost was recovered directly or indirectly from Government sources.

(2) Additional factors. In order to foster achievement of program objectives, each agency may include additional factors in its structured approach or take them into account in the profit analysis of individual contract actions.

# Appendix A:
# Federal Acquisition Regulations (excerpts)

### 15.405 -- Price Negotiation.

(a) **The purpose of performing cost or price analysis is to develop a negotiation position that permits the contracting officer and the offeror an opportunity to reach agreement on a fair and reasonable price.** A fair and reasonable price does not require that agreement be reached on every element of cost, nor is it mandatory that the agreed price be within the contracting officer's initial negotiation position. Taking into consideration the advisory recommendations, reports of contributing specialists, and the current status of the contractor's purchasing system, the contracting officer is responsible for exercising the requisite judgment needed to reach a negotiated settlement with the offeror and is solely responsible for the final price agreement. However, when significant audit or other specialist recommendations are not adopted, the contracting officer should provide rationale that supports the negotiation result in the price negotiation documentation.

(b) **The contracting officer's primary concern is the overall price the Government will actually pay. The contracting officer's objective is to negotiate a contract of a type and with a price providing the contractor the greatest incentive for efficient and economical performance. The negotiation of a contract type and a price are related and should be considered together with the issues of risk and uncertainty to the contractor and the Government. Therefore, the contracting officer should not become preoccupied with any single element and should balance the contract type, cost, and profit or fee negotiated to achieve a total result -- a price that is fair and reasonable to both the Government and the contractor.**

(c) **The Government's cost objective and proposed pricing arrangement directly affect the profit or fee objective. Because profit or fee is only one of several interrelated variables, the contracting officer shall not agree on profit or fee without concurrent agreement on cost and type of contract.**

(d) **If, however, the contractor insists on a price or demands a profit or fee that the contracting officer considers unreasonable, and the contracting officer has taken all authorized actions (including determining the feasibility of developing an alternative source) without success, the contracting officer shall refer the contract action to a level above the contracting officer. Disposition of the action should be documented.**

21

# Appendix A:
# Federal Acquisition Regulations (excerpts)

### 15.406-2 -- Certificate of Current Cost or Pricing Data.

(a) When cost or pricing data are required, the contracting officer must require the contractor to execute a Certificate of Current Cost or Pricing Data, using the format in this paragraph, and must include the executed certificate in the contract file.

Certificate of Current Cost or Pricing Data

This is to certify that, to the best of my knowledge and belief, the cost or pricing data (as defined in section 2.101 of the Federal Acquisition Regulation (FAR) and required under FAR subsection 15.403-4) submitted, either actually or by specific identification in writing, to the Contracting Officer or to the Contracting Officer's representative in support of ____* are accurate, complete, and current as of ____**. This certification includes the cost or pricing data supporting any advance agreements and forward pricing rate agreements between the offeror and the Government that are part of the proposal.

Firm _____

Signature _____

Name _____

Title _____

Date of execution*** _____

* Identify the proposal, request for price adjustment, or other submission involved, giving the appropriate identifying number (e.g., RFP No.).

** Insert the day, month, and year when price negotiations were concluded and price agreement was reached or, if applicable, an earlier date agreed upon between the parties that is as close as practicable to the date of agreement on price.

*** Insert the day, month, and year of signing, which should be as close as practicable to the date when the price negotiations were concluded and the contract price was agreed to.

(End of certificate)

22

# Appendix A:
# Federal Acquisition Regulations (excerpts)

**(b) The certificate does not constitute a representation as to the accuracy of the contractor's judgment on the estimate of future costs or projections. It applies to the data upon which the judgment or estimate was based. This distinction between fact and judgment should be clearly understood. If the contractor had information reasonably available at the time of agreement showing that the negotiated price was not based on accurate, complete, and current data, the contractor's responsibility is not limited by any lack of personal knowledge of the information on the part of its negotiators.**

(c) The contracting officer and contractor are encouraged to reach a prior agreement on criteria for establishing closing or cutoff dates when appropriate in order to minimize delays associated with proposal updates. Closing or cutoff dates should be included as part of the data submitted with the proposal and, before agreement on price, data should be updated by the contractor to the latest closing or cutoff dates for which the data are available. Use of cutoff dates coinciding with reports is acceptable, as certain data may not be reasonably available before normal periodic closing dates (e.g., actual indirect costs). Data within the contractor's or a subcontractor's organization on matters significant to contractor management and to the Government will be treated as reasonably available. What is significant depends upon the circumstances of each acquisition.

(d) Possession of a Certificate of Current Cost or Pricing Data is not a substitute for examining and analyzing the contractor's proposal.

(e) If cost or pricing data are requested by the Government and submitted by an offeror, but an exception is later found to apply, the data shall not be considered cost or pricing data and shall not be certified in accordance with this subsection.

# Appendix A:
# Federal Acquisition Regulations (excerpts)

### 15.408 -- Solicitation Provisions and Contract Clauses.

### Table 15-2 -- Instructions for Submitting Cost/Price Proposals When Cost or Pricing Data Are Required

This document provides instructions for preparing a contract pricing proposal when cost or pricing data are required.

Note 1: There is a clear distinction between submitting cost or pricing data and merely making available books, records, and other documents without identification. The requirement for submission of cost or pricing data is met when all accurate cost or pricing data reasonably available to the offeror have been submitted, either actually or by specific identification, to the Contracting Officer or an authorized representative. As later information comes into your possession, it should be submitted promptly to the Contracting Officer in a manner that clearly shows how the information relates to the offeror's price proposal. The requirement for submission of cost or pricing data continues up to the time of agreement on price, or an earlier date agreed upon between the parties if applicable.

Note 2: By submitting your proposal, you grant the Contracting Officer or an authorized representative the right to examine records that formed the basis for the pricing proposal. That examination can take place at any time before award. It may include those books, records, documents, and other types of factual information (regardless of form or whether the information is specifically referenced or included in the proposal as the basis for pricing) that will permit an adequate evaluation of the proposed price.

I. -- General Instructions

A. You must provide the following information on the first page of your pricing proposal:

(1) Solicitation, contract, and/or modification number;

(2) Name and address of offeror;

(3) Name and telephone number of point of contact;

(4) Name of contract administration office (if available);

(5) Type of contract action (that is, new contract, change order, price revision/redetermination, letter contract, unpriced order, or other);

24

# Appendix A:
# Federal Acquisition Regulations (excerpts)

(6) Proposed cost; profit or fee; and total;

(7) Whether you will require the use of Government property in the performance of the contract, and, if so, what property;

(8) Whether your organization is subject to cost accounting standards; whether your organization has submitted a CASB Disclosure Statement, and if it has been determined adequate; whether you have been notified that you are or may be in noncompliance with your Disclosure Statement or CAS (other than a noncompliance that the cognizant Federal agency official has determined to have an immaterial cost impact), and, if yes, an explanation; whether any aspect of this proposal is inconsistent with your disclosed practices or applicable CAS, and, if so, an explanation; and whether the proposal is consistent with your established estimating and accounting principles and procedures and FAR Part 31, Cost Principles, and, if not, an explanation;

(9) The following statement:

**This proposal reflects our estimates and/or actual costs as of this date and conforms with the instructions in FAR 15.403-5(b)(1) and Table 15-2. By submitting this proposal, we grant the Contracting Officer and authorized representative(s) the right to examine, at any time before award, those records, which include books, documents, accounting procedures and practices, and other data, regardless of type and form or whether such supporting information is specifically referenced or included in the proposal as the basis for pricing, that will permit an adequate evaluation of the proposed price.**

(10) Date of submission; and

(11) Name, title, and signature of authorized representative.

B. In submitting your proposal, you must include an index, appropriately referenced, of all the cost or pricing data and information accompanying or identified in the proposal. In addition, you must annotate any future additions and/or revisions, up to the date of agreement on price, or an earlier date agreed upon by the parties, on a supplemental index.

C. As part of the specific information required, you must submit, with your proposal, cost or pricing data (that is, data that are verifiable and factual and otherwise as defined at FAR 2.101). You must clearly identify on your cover sheet that cost or pricing data are included as part of the proposal. In addition, you must submit with your proposal any information reasonably required to explain your estimating process, including --

25

# Appendix A:
# Federal Acquisition Regulations (excerpts)

(1) The judgmental factors applied and the mathematical or other methods used in the estimate, including those used in projecting from known data; and

(2) The nature and amount of any contingencies included in the proposed price.

**D. You must show the relationship between contract line item prices and the total contract price. You must attach cost-element breakdowns for each proposed line item, using the appropriate format prescribed in the "Formats for Submission of Line Item Summaries" section of this table. You must furnish supporting breakdowns for each cost element, consistent with your cost accounting system.**

E. When more than one contract line item is proposed, you must also provide summary total amounts covering all line items for each element of cost.

F. Whenever you have incurred costs for work performed before submission of a proposal, you must identify those costs in your cost/price proposal.

G. If you have reached an agreement with Government representatives on use of forward pricing rates/factors, identify the agreement, include a copy, and describe its nature.

**H. As soon as practicable after final agreement on price or an earlier date agreed to by the parties, but before the award resulting from the proposal, you must, under the conditions stated in FAR 15.406-2, submit a Certificate of Current Cost or Pricing Data.**

II. -- Cost Elements

Depending on your system, you must provide breakdowns for the following basic cost elements, as applicable:

**A. Materials and services. Provide a consolidated priced summary of individual material quantities included in the various tasks, orders, or contract line items being proposed and the basis for pricing (vendor quotes, invoice prices, etc.). Include raw materials, parts, components, assemblies, and services to be produced or performed by others. For all items proposed, identify the item and show the source, quantity, and price.** Conduct price analyses of all subcontractor proposals. Conduct cost analyses for all subcontracts when cost or pricing data are submitted by the subcontractor. Include these analyses as part of your own cost or pricing data submissions for subcontracts expected to exceed the appropriate threshold in FAR 15.403-4. Submit the subcontractor cost or pricing data as part of your own cost or pricing data as required in paragraph IIA(2) of this table. These requirements also apply to all subcontractors if required to submit cost or pricing data.

26

# Appendix A:
# Federal Acquisition Regulations (excerpts)

(1) Adequate Price Competition. Provide data showing the degree of competition and the basis for establishing the source and reasonableness of price for those acquisitions (such as subcontracts, purchase orders, material order, etc.) exceeding, or expected to exceed, the appropriate threshold set forth at FAR 15.403-4 priced on the basis of adequate price competition. For interorganizational transfers priced at other than the cost of comparable competitive commercial work of the division, subsidiary, or affiliate of the contractor, explain the pricing method (see FAR 31.205-26(e)).

(2) All Other. Obtain cost or pricing data from prospective sources for those acquisitions (such as subcontracts, purchase orders, material order, etc.) exceeding the threshold set forth in FAR 15.403-4 and not otherwise exempt, in accordance with FAR 15.403-1(b) (i.e., adequate price competition, commercial items, prices set by law or regulation or waiver). Also provide data showing the basis for establishing source and reasonableness of price. In addition, provide a summary of your cost analysis and a copy of cost or pricing data submitted by the prospective source in support of each subcontract, or purchase order that is the lower of either $11.5 million or more, or both more than the pertinent cost or pricing data threshold and more than 10 percent of the prime contractor's proposed price. The Contracting Officer may require you to submit cost or pricing data in support of proposals in lower amounts. Subcontractor cost or pricing data must be accurate, complete and current as of the date of final price agreement, or an earlier date agreed upon by the parties, given on the prime contractor's Certificate of Current Cost or Pricing Data. The prime contractor is responsible for updating a prospective subcontractor's data. For standard commercial items fabricated by the offeror that are generally stocked in inventory, provide a separate cost breakdown, if priced based on cost. For interorganizational transfers priced at cost, provide a separate breakdown of cost elements. Analyze the cost or pricing data and submit the results of your analysis of the prospective source's proposal. When submission of a prospective source's cost or pricing data is required as described in this paragraph, it must be included along with your own cost or pricing data submission, as part of your own cost or pricing data. You must also submit any other cost or pricing data obtained from a subcontractor, either actually or by specific identification, along with the results of any analysis performed on that data.

B. Direct Labor. Provide a time-phased (e.g., monthly, quarterly, etc.) breakdown of labor hours, rates, and cost by appropriate category, and furnish bases for estimates.

C. Indirect Costs. Indicate how you have computed and applied your indirect costs, including cost breakdowns. Show trends and budgetary data to provide a basis for evaluating the reasonableness of proposed rates. Indicate the rates used and provide an appropriate explanation.

D. Other Costs. List all other costs not otherwise included in the categories described above (e.g., special tooling, travel, computer and consultant services, preservation, packaging and packing, spoilage and rework, and Federal excise tax on finished articles) and provide bases for pricing.

27

# Appendix A:
# Federal Acquisition Regulations (excerpts)

E. Royalties. If royalties exceed $1,500, you must provide the following information on a separate page for each separate royalty or license fee:

(1) Name and address of licensor.

(2) Date of license agreement.

(3) Patent numbers.

(4) Patent application serial numbers, or other basis on which the royalty is payable.

(5) Brief description (including any part or model numbers of each contract item or component on which the royalty is payable).

(6) Percentage or dollar rate of royalty per unit.

(7) Unit price of contract item.

(8) Number of units.

(9) Total dollar amount of royalties.

(10) If specifically requested by the Contracting Officer, a copy of the current license agreement and identification of applicable claims of specific patents (see FAR 27.204 and 31.205-37).

F. Facilities Capital Cost of Money. When you elect to claim facilities capital cost of money as an allowable cost, you must submit Form CASB-CMF and show the calculation of the proposed amount (see FAR 31.205-10).

III. -- Formats for Submission of Line Item Summaries

A. New Contracts (Including Letter Contracts)

Cost Elements

(1)

Proposed Contract Estimated – Total Cost

(2)

28

# Appendix A:
# Federal Acquisition Regulations (excerpts)

Proposed Contract Estimate -- Unit Cost

(3)

Reference

(4)

Column and Instruction

(1) Enter appropriate cost elements.

(2) Enter those necessary and reasonable costs that, in your judgment, will properly be incurred in efficient contract performance. When any of the costs in this column have already been incurred (e.g., under a letter contract), describe them on an attached supporting page. When preproduction or startup costs are significant, or when specifically requested to do so by the Contracting Officer, provide a full identification and explanation of them.

(3) Optional, unless required by the Contracting Officer.

(4) Identify the attachment in which the information supporting the specific cost element may be found. (Attach separate pages as necessary.)

B. Change Orders, Modifications, and Claims

Cost Elements

(1)

Estimated Costs of all Work Deleted

(2)

Cost of Deleted Work Already Performed

(3)

Net Cost to be Deleted

(4)

# Appendix A:
# Federal Acquisition Regulations (excerpts)

Cost of Work Added

(5)

Net Cost of Change

(6)

Reference

(7)

Column and Instruction

(1) Enter appropriate cost elements.

(2) Include the current estimates of what the cost would have been to complete the deleted work not yet performed (not the original proposal estimates), and the cost of deleted work already performed.

(3) Include the incurred cost of deleted work already performed, using actuals incurred if possible, or, if actuals are not available, estimates from your accounting records. Attach a detailed inventory of work, materials, parts, components, and hardware already purchased, manufactured, or performed and deleted by the change, indicating the cost and proposed disposition of each line item. Also, if you desire to retain these items or any portion of them, indicate the amount offered for them.

(4) Enter the net cost to be deleted, which is the estimated cost of all deleted work less the cost of deleted work already performed. Column (2) minus Column (3) equals Column (4).

(5) Enter your estimate for cost of work added by the change. When nonrecurring costs are significant, or when specifically requested to do so by the Contracting Officer, provide a full identification and explanation of them. When any of the costs in this column have already been incurred, describe them on an attached supporting schedule.

(6) Enter the net cost of change, which is the cost of work added, less the net cost to be deleted. Column (5) minus Column (4) equals Column (6). When this result is negative, place the amount in parentheses.

30

# Appendix A:
# Federal Acquisition Regulations (excerpts)

(7) Identify the attachment in which the information supporting the specific cost element may be found. (Attach separate pages as necessary.)

C. Price Revision/Redetermination

Cutoff Date

(1)

Number of Units Completed

(2)

Number of Units to be Completed

(3)

Contract Amount

(4)

Redeter- mination Proposal Amount

(5)

Difference

(6)

Cost Elements

(7)

Incurred Cost Preprodu-ction

(8)

Incurred Cost Completed Units

(9)

31

# Appendix A:
## Federal Acquisition Regulations (excerpts)

Incurred Cost Work in Progress

(10)

Total Incurred Cost

(11)

Estimated Cost to Complete

(12)

Estimated Total Cost

(13)

Reference

(14)

(Use as applicable).

Column and Instruction

(1) Enter the cutoff date required by the contract, if applicable.

(2) Enter the number of units completed during the period for which experienced costs of production are being submitted.

(3) Enter the number of units remaining to be completed under the contract.

(4) Enter the cumulative contract amount.

(5) Enter your redetermination proposal amount.

(6) Enter the difference between the contract amount and the redetermination proposal amount. When this result is negative, place the amount in parentheses. Column (4) minus Column (5) equals Column (6).

32

# Appendix A:
# Federal Acquisition Regulations (excerpts)

(7) Enter appropriate cost elements. When residual inventory exists, the final costs established under fixed-price-incentive and fixed-price-redeterminable arrangements should be net of the fair market value of such inventory. In support of subcontract costs, submit a listing of all subcontracts subject to repricing action, annotated as to their status.

(8) Enter all costs incurred under the contract before starting production and other nonrecurring costs (usually referred to as startup costs) from your books and records as of the cutoff date. These include such costs as preproduction engineering, special plant rearrangement, training program, and any identifiable nonrecurring costs such as initial rework, spoilage, pilot runs, etc. In the event the amounts are not segregated in or otherwise available from your records, enter in this column your best estimates. Explain the basis for each estimate and how the costs are charged on your accounting records (e.g., included in production costs as direct engineering labor, charged to manufacturing overhead). Also show how the costs would be allocated to the units at their various stages of contract completion.

(9) Enter in Column (9) the production costs from your books and records (exclusive of preproduction costs reported in Column (8)) of the units completed as of the cutoff date.

(10) Enter in Column (10) the costs of work in process as determined from your records or inventories at the cutoff date. When the amounts for work in process are not available in your records but reliable estimates for them can be made, enter the estimated amounts in Column (10) and enter in Column (9) the differences between the total incurred costs (exclusive of preproduction costs) as of the cutoff date and these estimates. Explain the basis for the estimates, including identification of any provision for experienced or anticipated allowances, such as shrinkage, rework, design changes, etc. Furnish experienced unit or lot costs (or labor hours) from inception of contract to the cutoff date, improvement curves, and any other available production cost history pertaining to the item(s) to which your proposal relates.

(11) Enter total incurred costs (Total of Columns (8), (9), and (10)).

(12) Enter those necessary and reasonable costs that in your judgment will properly be incurred in completing the remaining work to be performed under the contract with respect to the item(s) to which your proposal relates.

(13) Enter total estimated cost (Total of Columns (11) and (12)).

(14) Identify the attachment in which the information supporting the specific cost element may be found.

(Attach separate pages as necessary.)

# Appendix A:
# Federal Acquisition Regulations (excerpts)

### 52.215-2 -- Audit and Records – Negotiation.

As prescribed in 15.209(b), insert the following clause:

Audit and Records -- Negotiation (Jun 1999)

(a) As used in this clause, "records" includes books, documents, accounting procedures and practices, and other data, regardless of type and regardless of whether such items are in written form, in the form of computer data, or in any other form.

(b) Examination of costs. If this is a cost-reimbursement, incentive, time-and-materials, labor-hour, or price redeterminable contract, or any combination of these, the Contractor shall maintain and the Contracting Officer, or an authorized representative of the Contracting Officer, shall have the right to examine and audit all records and other evidence sufficient to reflect properly all costs claimed to have been incurred or anticipated to be incurred directly or indirectly in performance of this contract. This right of examination shall include inspection at all reasonable times of the Contractor's plants, or parts of them, engaged in performing the contract.

**(c) Cost or pricing data. If the Contractor has been required to submit cost or pricing data in connection with any pricing action relating to this contract, the Contracting Officer, or an authorized representative of the Contracting Officer, in order to evaluate the accuracy, completeness, and currency of the cost or pricing data, shall have the right to examine and audit all of the Contractor's records, including computations and projections, related to --**

    **(1) The proposal for the contract, subcontract, or modification;**
    **(2) The discussions conducted on the proposal(s), including those related to negotiating;**
    **(3) Pricing of the contract, subcontract, or modification; or**
    **(4) Performance of the contract, subcontract or modification.**

(d) Comptroller General --

    (1) The Comptroller General of the United States, or an authorized representative, shall have access to and the right to examine any of the Contractor's directly pertinent records involving transactions related to this contract or a subcontract hereunder.

    (2) This paragraph may not be construed to require the Contractor or subcontractor to create or maintain any record that the Contractor or subcontractor does not maintain in the ordinary course of business or pursuant to a provision of law.

(e) Reports. If the Contractor is required to furnish cost, funding, or performance reports, the

34

# Appendix A:
# Federal Acquisition Regulations (excerpts)

Contracting Officer or an authorized representative of the Contracting Officer shall have the right to examine and audit the supporting records and materials, for the purpose of evaluating --

(1) The effectiveness of the Contractor's policies and procedures to produce data compatible with the objectives of these reports; and

(2) The data reported.

(f) Availability. The Contractor shall make available at its office at all reasonable times the records, materials, and other evidence described in paragraphs (a), (b), (c), (d), and (e) of this clause, for examination, audit, or reproduction, until 3 years after final payment under this contract or for any shorter period specified in Subpart 4.7, Contractor Records Retention, of the Federal Acquisition Regulation (FAR), or for any longer period required by statute or by other clauses of this contract. In addition --

(1) If this contract is completely or partially terminated, the Contractor shall make available the records relating to the work terminated until 3 years after any resulting final termination settlement; and

(2) The Contractor shall make available records relating to appeals under the Disputes clause or to litigation or the settlement of claims arising under or relating to this contract shall be made available until such appeals, litigation, or claims are finally resolved.

(g) The Contractor shall insert a clause containing all the terms of this clause, including this paragraph (g), in all subcontracts under this contract that exceed the simplified acquisition threshold, and --

(1) That are cost-reimbursement, incentive, time-and-materials, labor-hour, or price-redeterminable type or any combination of these;

(2) For which cost or pricing data are required; or

(3) That require the subcontractor to furnish reports as discussed in paragraph (e) of this clause.

The clause may be altered only as necessary to identify properly the contracting parties and the Contracting Officer under the Government prime contract.

(End of Clause)

35