UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA


IN RE:  HERLEY INDUSTRIES INC. :CIVIL ACTION

      SERVICES LITIGATION     :

                      :

                      :

                      :

                      :

                      :NO. 06-2596 (JRS)

                      :

                      :CLASS ACTION


- - -

Wednesday, September 16, 2009

- - -

Videotape deposition of ALBERT S.

DANDRIDGE, III, held at the law offices of BLANK

ROME LLP, One Logan Square, floor 11,

Philadelphia, Pennsylvania, on the

above-mentioned date, commencing at 10:17 a.m.,

before Kimberly Pepper, RPR.


- - -

HUDSON REPORTING & VIDEO         1-800-310-1769

1   A.   Yes.

2   Q.   Which party did Mr. Pressman represent?

3   A.   The defendant.

4   Q.   And what was the subject on which you opined

5   in this action?

6   A.   I'd have to look at the report.

7   Q.   Sure.

8   A.   I guess there was a series of questions that

9   were asked and a series of answers to those

10  questions basically dealing with stock options

11  and disclosure thereof.

12  Q.   Was this the only report you provided in

13  connection with the Gallo action?

14  A.   Yes.

15  Q.   Did you testify at trial in the Gallo action?

16  A.   No.

17  Q.   Were any motions made to exclude your

18  testimony in the Gallo action?

19  A.   No.

20  Q.   Were you deposed in the Gallo action?

21  A.   No.

22  Q.   Now, the Gallo action I see is in Superior

23  Court of New Jersey.  Have you or was in the

24  Superior Court in New Jersey.  Have you provided

25  testimony in any securities actions in federal

1    court prior to this action?

2    A.  No.

3    Q.  So all of the securities actions in which you

4    provided testimony previously were in state

5    courts?

6    A.  The security actions where I was an expert

7    witness were in federal or state courts all of

8    which -- probably none of which I testified in in

9    court.  I provided expert reports.  I may have

10    been deposed.  I at no time actually testified in

11    court.  The case had never got that far.

12    Q.  And you do not recall sitting here the names

13    of the federal securities cases in which you

14    provided expert reports?

15    A.  That's what I said.

16    Q.  Is there any information or is there any way

17    that you could refresh your recollection in any

18    information that you could obtain?

19    A.  They were years ago.  I just don't recall,

20    no.

21    Q.  Were you a partner at the same law firm where

22    you currently work?

23    A.  Yes and no.  Some of them I was, some of them

24    I don't think I ever was.

25    Q.  Do you know if -- well, how long ago were

1    conversation with Evan Lechtman that you think

2    you said was initiated by Mr. Lechtman?

3    A.    The first call or the second call?

4    Q.    The second call.

5    A.    Correct.

6    Q.    Was anybody else on the call?

7    A.    Not to my knowledge.

8    Q.    How long did the call last?

9    A.    I don't recall.

10    Q.    What was discussed?

11    A.    Did I get the stuff.

12    Q.    And your response?

13    A.    Got it, read it, and then they told me what

14    they were looking for as far as an expert report.

15    And I said, well, let me read further and I'll

16    get back to you and see whether or not I could

17    provide the kind of report and answer the

18    questions that you are posing.

19    Q.    What did they tell you they were looking for?

20    A.    Looking to answer questions as to whether or

21    not the disclosure in the, I guess the documents,

22    whether or not it was reasonable that the

23    attorneys I guess for Herley indicated to them,

24    indicated to people at Herley that they did not

25    have to disclose the uncharged criminal conduct

Page 26

1    and they did not have to disclose the underlying

2    aspects of the uncharged criminal conduct.

3    Q.  Was there anything else that you were asked

4    to opine on?

5    A.  No.

6    Q.  And you said you told Mr. Lechtman that you

7    would look further at the documents and get back

8    to him at that point?

9    A.  Correct.

10   Q.  When did you next communicate with anybody at

11   Blank Rome?

12   A.  I guess later that day or the next day.

13   Q.  So this is around August 4th?

14   A.  Somewhere around that time.

15   Q.  And what documents did you look at?

16   A.  The documents that Mr. Lechtman sent me.

17   Q.  And you said those documents are identified

18   in your expert report?

19   A.  Correct.

20   Q.  And who initiated the next communication?

21   A.  I don't recall whether it was him or I.

22   Probably me.

23   Q.  What was the substance of that communication?

24   A.  That I read some of the material and I think

25   I could give a report.

Page 44

1   Q.  Do you frequently advise corporations about

2   disclosures that should or shouldn't be made in

3   SEC files?

4   A.  I do it all the times.

5   Q.  Did you ever provide advice to a client that

6   was the target of a criminal fraud investigation

7   concerning what should be disclosed in SEC

8   filings?

9                    MR. SMITH:  Objection.

10                   THE WITNESS:  I'm sure that I

11  have.  I just don't recall.

12  BY MR. PRESS:

13  Q.  Do you have any recollection of advising a

14  client that was the subject as opposed to target

15  of a criminal fraud investigation concerning --

16                   MR. SMITH:  Objection.

17  BY MR. PRESS:

18  Q.  -- disclosures?

19  A.  I probably have.  I just don't recall.

20  Q.  Do you recall ever advising a client on

21  disclosures that should or shouldn't be made

22  about criminal investigations?

23  A.  I probably have.  I just don't recall.

24  Q.  You don't recall.  Is there anything you

25  could look at that would refresh your

1    recollection?

2    A.  No.

3    Q.  How many public companies have you advised in

4    the last five years about disclosures in SEC

5    filings?

6    A.  Dozens.

7    Q.  Any particular industries?

8    A.  No, not particularly.

9    Q.  Any in the defense industry, defense

10   contractors?

11   A.  I don't recall.

12   Q.  Is -- are there any documents that you could

13   look at that could help you refresh your

14   recollection?

15   A.  No.

16   Q.  Do you know who the judge is in this

17   proceeding?

18   A.  I believe it's Judge Sanchez.

19   Q.  Have you ever met Judge Sanchez?

20   A.  Not that I recall.

21   Q.  Have you ever before this action provided any

22   reports in any actions that were pending before

23   Judge Sanchez?

24   A.  No.

25   Q.  On pages one to two of your report you list

Page 52

1    securities litigation that you reviewed in

2    connection with making your report?

3    A.  Correct.

4    Q.  Are there any other documents relating to

5    Herley Industries generally that you reviewed

6    besides items A through N?

7    A.  No.

8    Q.  When you say -- I'm sorry, your reference in

9    item A, "The Complaint entitled In Re Herley

10   Industries, Inc. Security Litigation," do you

11   know whether that was the original complaint or

12   the amended complaint?

13   A.  I don't recall.

14   Q.  It had the caption In Re Herley Industries,

15   Inc. Securities Litigation on it though?

16   A.  Yes.

17   Q.  Previously, I had asked you about advice that

18   you had ever given to companies concerning

19   disclosure and SEC filings of criminal

20   investigations; and I don't want to

21   mischaracterize your testimony, but I think you

22   said you might have, you don't recall?

23   A.  That's what I said.

24   Q.  Do you have any recollection if you gave

25   advice to companies about disclosure of criminal

Page 53

1    investigations where the U.S. Government was

2    their largest customer?

3    A.  I don't recall.

4    Q.  Now, in your report you say that you reviewed

5    documents that are listed as A through N, and we

6    have already established that I through N you

7    reviewed just portions of them.

8                    Which of these documents did you

9    rely on in issuing your report?

10   A.  I relied on all of them.

11   Q.  You relied on all of them.  Did anybody

12   assist you in drafting your report?

13   A.  No.

14   Q.  Was there anybody who reviewed other

15   documents relating to Herley Industries or this

16   litigation and told you about them?

17   A.  You mean at my firm?

18   Q.  Well, we will start with at your firm.

19   A.  No.

20   Q.  Anywhere else?

21   A.  I'm sure Mr. Lechtman and Mr. Smith reviewed

22   the documents.

23   Q.  Were there any additional documents that you

24   requested from Mr. Lechtman besides the ones

25   listed as A through N?

Page 57

1    A.   I don't think so.

2    Q.   Is there any way to check?

3    A.   I guess you could ask Mr. Lechtman.

4    Q.   Probably can't but be that as it may.

5                    Have your opinions about this

6    action changed at all since you issued your

7    report?

8    A.   No.

9    Q.   Do you have any additional opinions about

10   legal duties related to Herley Industries besides

11   those set forth in your report?

12   A.   That's all I was asked to do.   No.

13   Q.   And in your report you pose an answer two

14   questions; is that correct?

15   A.   I put down the questions that were asked me

16   and I answered them, yes.

17   Q.   Questions that were asked to you by whom?

18   A.   By Mr. Lechtman.

19   Q.   And there were two such questions; is that

20   correct?

21   A.   Correct.

22   Q.   One of them set forth on page two of your

23   report and the other on page ten; is that

24   correct?

25   A.   Correct.

Page 60

1   corporation not have a duty to disclose the

2   existence of an investigation into possible

3   criminal wrongdoing in its public filings with

4   the SEC pursuant to the federal securities laws

5   and the regulations promulgated thereunder until

6   someone was charged with -- until someone was

7   charged reasonable under the circumstances.   I

8   think I read that correctly.

9                     When you say by its attorneys,

10   which attorneys are you referring to?

11   A.   The attorneys that advised the management of

12   Herley Industries as to what their disclosure

13   obligations were.

14   Q.   Do you know who those attorneys were?

15   A.   No.

16   Q.   Did you ever speak to any of them?

17   A.   No.

18   Q.   And you say that you were referring to advice

19   given to Herley Industries by its attorneys that

20   a corporation does not have a duty to disclose.

21   Why does your report refer just to a corporation

22   as opposed to Herley specifically?

23   A.   I don't understand the question.

24   Q.   The reference here is was the advice given to

25   Herley by its attorneys that a corporation does

1  not have the duty to disclose.  I'm wondering is

2  there any specific reason why you referenced a

3  corporation generally rather than Herley

4  Industries specifically?

5  A.  Well, I think it applies to both.  I think a

6  corporation generally does not have to disclose

7  under those circumstances and specifically it

8  referred to Herley Industries.

9  Q.  Do you have any understanding of whether

10  Herley Industries was actually advised by its

11  attorneys that it did not have to disclose the

12  existence of an investigation into possible

13  wrongdoing in its SEC filings until someone was

14  charged?

15  A.  That appears to be what the transcripts say.

16  Q.  So your understanding is based on what you

17  have read in the deposition transcripts?

18  A.  Yeah, and in the other documents that was

19  provided.

20  Q.  Do you recall which other documents?

21  A.  No.  Somewhere within A to N.

22  Q.  And the transcripts, you are referring to the

23  transcripts of the depositions of -- do you

24  remember which depositions?

25  A.  Primarily Mr. Levy, but I think the others as

1    well.

2    Q.  And other than as you just testified, there

3    are no other facts that form your belief as to

4    whether or not Herley was given advice by its

5    attorneys?

6                        MR. SMITH:   Objection.

7    BY MR. PRESS:

8    Q.  That it did not have to disclose the

9    existence of an investigation into possible

10   wrongdoing of its SEC filings?

11   A.  I'm lost.  I don't understand the question.

12   Q.  I had asked you if you had any understanding

13   of whether that advice, the advice recounted in

14   question one was actually given to Herley by its

15   attorneys, and you said you had an understanding

16   based on some of the transcripts and some of the

17   other documents listed in A to N.

18                       And I'm just asking you if your

19   understanding is based on anything other than the

20   documents you just mentioned?

21   A.  As to what Herley's attorneys may have told

22   the management of Herley?

23   Q.  That's correct.

24   A.  Correct.

25   Q.  Do you know how this advice was conveyed by

Page 63

1    Herley -- by the attorneys to Herley?

2    A.   No.

3    Q.   And you've never seen any documents that

4    constitute the advice?

5    A.   I saw what is within the ambit of A through

6    N.

7    Q.   And are you aware of anything within the

8    ambit of A through N that constitutes

9    communications from Herley's corporate attorneys

10   to Herley?

11               MR. SMITH:  Objection.

12               THE WITNESS:  That's what the

13   transcripts say that they were told.

14   BY MR. PRESS:

15   Q.   I'm asking whether you saw anything within A

16   through N that constituted the advice, a letter

17   from counsel, an e-mail?

18               MR. SMITH:  Objection.

19               THE WITNESS:  Again, Mr. Levy

20   and other depositions say -- I assume they were

21   under oath -- that this is what they were told.

22   BY MR. PRESS:

23   Q.   And that's the sole basis for your

24   understanding about what and whether Herley was

25   advised by counsel that it should disclose the

1    SEC filings?

2    A.  I'm assuming the client knows what the

3    counsel told them.

4    Q.  But you don't know of -- you don't have any

5    other basis other than reading the transcripts

6    for what counsel was told?

7    A.  Correct.

8    Q.  And when you referred in question one to

9    public filings with the SEC, what documents are

10   you referring to?

11   A.  Any filing required under the Securities Act

12   of 1934 from early 10-K's, 10-Q's or A-K's.

13   Q.  But the only SEC filings of Herley that you

14   looked at were items I and J.

15   A.  Correct.

16   Q.  And I and J are the 2004 and 2005 10-K's?

17   A.  They are public filings, yes.

18   Q.  And those documents you had only reviewed in

19   part?

20   A.  Correct.

21   Q.  In your question one and also in -- I'm

22   sorry, in question one you conclude with the term

23   reasonable under the circumstances.  I think

24   those are the last four words of question one on

25   page two of your report.

Page 73

1          THE WITNESS:  Yeah.  I think

2    they knew about it.

3    BY MR. PRESS:

4    Q.  Do you know whether Herley had any knowledge

5    of a pending indictment of Herley or any of its

6    officers or directors at that time?

7          MR. SMITH:  Objection.

8          THE WITNESS:  I don't think they

9    knew.

10   BY MR. PRESS:

11   Q.  And what is the basis of that assertion?

12   A.  You usually don't know about an indictment

13   until it's handed down.

14   Q.  Other than that is there any basis for your

15   belief that they did not know?

16   A.  Not that I recall.  It may have been

17   something in the transcripts.  I don't recall.

18   Q.  Do you have any understanding of counsel's

19   knowledge of the conduct underlying the

20   investigation -- the conduct at the heart of the

21   investigation at the time that this advice was

22   rendered?

23          MR. SMITH:  Objection.

24          THE WITNESS:  No.

25   BY MR. PRESS:

Page 75

1    in rendering your opinion?

2    A.  No.

3    Q.  In your report you discuss items 103, 401(f)

4    and 303 of SEC Regulation S-K and then that they

5    are referenced at pages three, five and nine of

6    your report; is that correct, sir?

7    A.  Correct.

8    Q.  How did you choose those three items of the

9    regulation to discuss in your report?

10   A.  Because those are the three items under the

11   SEC's rules that may have required any discussion

12   of the underlying aspects of what we are talking

13   about.

14   Q.  What do you mean by the underlying aspects of

15   what we are talking about?

16   A.  We are talking about a grand jury

17   investigation.

18   Q.  So those are the only SEC regulations that

19   would govern disclosure of a grand jury

20   investigation into uncharged criminal conduct in

21   an SEC filing?

22   A.  Well, as a security practitioner, those are

23   the three items that one would look to to make a

24   determination as to whether or not disclosure

25   would be required.

1    THE WITNESS:  I don't recall.

2  BY MR. PRESS:

3  Q.  And just to be clear, the briefs that I was

4  referring to are the ones listed in your report

5  on pages one and two as items D and E.  Those are

6  the documents that I believe you said previously

7  that you read.

8  A.  Is that a question?

9  Q.  I'm just wondering whether your answer

10  changes if I clarify that those are the two

11  documents that I'm referring to?

12  A.  I don't recall.

13  Q.  Other than items 103, 303 or 401, are there

14  any regulations or circumstances that would

15  require a company to disclose an investigation

16  into criminal conduct or the underlying conduct

17  in its SEC filings?

18  A.  Well, it's my belief that you would look to

19  three different circumstances as to the

20  disclosure requirements.  You would look at what

21  the regs require, those being items 103, 401(f)

22  and 303.

23    There may be some circumstances

24  where the defendant is charged with insider

25  trading, and there may be some circumstances

Page 78

1    where there is previous disclosure and that gives

2    a duty to disclosure, I believe the brief

3    disclosure.

4    Q.  So if you could turn your attention to page

5    eight of your report, the first full paragraph,

6    you refer to a case called Roeder, R-o-e-d-e-r,

7    and you say, "In Roeder the court found that

8    there was no duty to disclose" -- and quote now

9    you have quotation marks in your report, "'if

10   there is no insider trading, no statute or

11   regulation requiring disclosure and no

12   inaccurate, incomplete or misleading prior

13   disclosure.'"  And are those the three

14   circumstances that you just referred to?

15   A.  Correct.

16   Q.  You go on to say on page eight of your

17   report, "Such is the case with the company.

18   There was no insider trading, no statute or

19   regulation requiring disclosure and no

20   inaccurate, incomplete or misleading disclosure

21   in connection with the company's filings with the

22   SEC."

23                So it's your understanding that

24   Herley had no duty to disclose the investigation

25   or any underlying criminal conduct because it's

1  not required under items 103, 303 or 401 and

2  there was no insider trading and no inaccurate,

3  incomplete or misleading prior disclosures; is

4  that correct?

5              MR. SMITH:  Objection.

6              THE WITNESS:  Right.

7  BY MR. PRESS:

8  Q.  When you say, "Such is the case with the

9  company.  There was no insider trading, no

10  statute or regulation requiring disclosure, and

11  no inaccurate, incomplete or misleading

12  disclosure in connection with the company's

13  filings with the SEC," are those findings you had

14  made or are those conclusions that -- are those

15  assumptions that you have in making your report?

16  A.  I saw nothing to dispute that.

17  Q.  Nothing in the documents that you reviewed --

18  A.  Correct.

19  Q.  -- A through N?

20  A.  Correct.

21  Q.  Now, the statute or regulation requiring

22  disclosure which I guess is the second of the

23  three circumstances that you list that might

24  trigger a duty to disclose, are there any -- the

25  statutes and regulations, that refers to items

2a28621e-1991-46a6-bf45-5ce1b727e7a2

1    103, 303 and 401 that you discuss in the report?

2    A.  Correct.

3    Q.  Now, what do you mean by insider trading?

4    What do you -- how do you define insider trading?

5    A.  Insider trading is the purchase of sale of

6    security in the possession of material nonpublic

7    information.

8    Q.  And would a criminal investigation constitute

9    material information if it's not known to the

10   public?

11   A.  That's not what I was saying.  It's not what

12   I was opining to.

13   Q.  I'm sorry?

14   A.  I didn't opine to materiality.

15   Q.  Well, you define insider trading as purchase

16   or selling of securities while in the possession

17   of material nonpublic information.

18   A.  Correct.

19   Q.  If you opine that there was no insider

20   trading that requires an opinion as to --

21   A.  Go ahead.

22   Q.  -- as to whether there was a purchase or sale

23   while in possession of material nonpublic

24   information?

25   A.  No, it wouldn't.  Insider trading wasn't

1    charged in this case.

2    Q.  So your opinion that there was no insider

3    trading is based on your understanding that

4    insider trading was not charged?

5    A.  Correct.

6    Q.  What do you mean when you say insider trading

7    was not charged?

8    A.  Was there a charge of insider trading in this

9    case?  I don't think so.

10   Q.  And that's the basis of your conclusion that

11   there was no insider trading here?

12   A.  I said that three times now.

13   Q.  You defined insider trading as a purchase or

14   sale?

15   A.  Only because you asked me to.

16   Q.  Yes.  I'm asking you a series of questions

17   here, sir.  I'm sorry, and I don't want to

18   mischaracterize your definition.  I believe you

19   said purchase or sale of securities while in

20   possession of material nonpublic information?

21   A.  That is generally deemed to be the definition

22   of insider trading, yes.

23   Q.  And any person that trades securities while

24   in possession of material nonpublic information

25   might have liability for insider trading?

1      MR. SMITH:  Objection.

2      THE WITNESS:  Might.

3  BY MR. PRESS:

4  Q.  And how about a corporation that trades

5  securities?

6      MR. SMITH:  Objection.

7      THE WITNESS:  It might.

8  BY MR. PRESS:

9  Q.  What circumstances would it or would it not

10  have insider trading liability?

11  A.  I have no idea.  I don't want to go through

12  the permutations right now.  I don't want to go

13  through all the permutations.

14  Q.  And you don't have an opinion as to whether

15  or not the criminal investigation of Herley was

16  material information?

17  A.  No.

18  Q.  Do you have any opinion on whether a criminal

19  investigation can ever constitute material

20  information?

21      MR. SMITH:  Objection.

22      THE WITNESS:  I assume that it

23  could, but that's not what I was asked to opine

24  on.

25  BY MR. PRESS:

Page 87

1    whether at the time the company filed the 2004 or

2    2005 10-K's of the documents that were enumerated

3    as items I and J in your report, whether any

4    officers of the company of Herley had any

5    knowledge of conduct that constituted criminal

6    violations with respect to Herley's power head or

7    VCO contracts with the government?

8                          MR. SMITH:  Objection.

9                          THE WITNESS:  I don't know.  I

10   mean perhaps they did but, again, that was still

11   not -- did not trigger a duty to disclose.

12   BY MR. PRESS:

13   Q.  What do you mean by inaccurate, incomplete or

14   misleading disclosure in connection with the

15   company's filings with the SEC?  And that's a

16   quote from page eight of your report.

17   A.  Whether previous disclosure was inaccurate,

18   incomplete or misleading.

19   Q.  And you conclude that there was no

20   inaccurate, incomplete or misleading disclosure

21   by Herley in connection with its filings with the

22   SEC?

23   A.  Correct.

24   Q.  Inaccurate, incomplete or misleading

25   disclosure concerning the investigation or the

1    underlying conduct or both?

2    A.   Both.

3    Q.   And what is the basis for that conclusion?

4    A.   They didn't say anything about the grand jury

5    investigation or the underlying conduct.

6    Q.   And is it your understanding that in order to

7    have the duty to disclose the grand jury

8    investigation or the underlying conduct the

9    company had to have said something that it was

10    inaccurate about the grand jury investigation or

11    the underlying conduct?

12    A.   Correct.

13    Q.   So if the SEC filing said we are not subject

14    to any criminal investigations right now, that

15    would be inaccurate in your opinion?

16    A.   I'm assuming so, yes.

17    Q.   And if they said we are in compliance with

18    all government contracting regulations?

19                        MR. SMITH:   Objection.

20                        THE WITNESS:   In full

21    compliance, in compliance or in material

22    compliance?

23                        MR. SMITH:   Objection.

24    BY MR. PRESS:

25    Q.   Take them one at a time.   Full compliance.

1   A.  I don't recall.  I think Matthews dealt with

2   Rule 14 a)(9) under the 1934 Act again which is

3   analogous to 10(b) except it's not the purchase

4   and sale of security.  It's the solicitation of

5   proxies.

6   Q.  But the disclosure duties are the same under

7   Rule 14(a)(9) and Section 10(b)?

8   A.  Basically, yes.

9   Q.  And when you say basically, can you tell me

10  what the differences are?

11  A.  Again, one is the solicitation of proxy, the

12  other is the purchase and sale of security.

13  Q.  That's the only difference you are aware of?

14  A.  That I recall, yes.

15  Q.  Does Bolger, B-o-l-g-e-r, v. First State

16  Financial Services which is discussed at page

17  five of your report discuss claims under Section

18  10(b)?

19  A.  I don't recall.

20  Q.  The cases that you cited though all discuss

21  whether a company has a duty to disclose criminal

22  investigation or uncharged criminal conduct in

23  its SEC filings?

24  A.  Most of them, yes.

25  Q.  Do you know if any involved a situation where

1    Q.  Do you know whether any of the cases cited in

2    your report were covered by the PSLRA, the

3    Private Securities Litigation Reform Act of 1995?

4    A.  I think the majority of the cases were prior

5    to the PSLRA.

6    Q.  Do you know if any of the cases dealt with

7    Section 10(b) post PSLRA?

8    A.  Again, I believe that most of these cases

9    were prior to PSLRA.

10   Q.  Now you said, I'm asking you do you know

11   whether any of the cases dealt with Section 10(b)

12   post PSLRA?

13   A.  And my answer is the same.  I think most of

14   these are prior to PSLRA so there may be a case

15   posted, but I don't think so.  I don't know.

16   Q.  So was Matthews a 10(b) case?

17   A.  Matthews, as I said before, was a 14(a)(9)

18   case.

19   Q.  You say on page seven of your report that,

20   "Some of the other decisions after Matthews

21   suggest wrongdoing by officers and directors

22   regardless of whether or not criminal proceedings

23   have been commenced should be disclosed."  And

24   you go on to discuss -- I see the rest of that

25   section a case called Par Pharmaceutical, a case

Page 114

1   addressed by the court in the opinion in

2   Amalgamated Clothing and Textile Workers Union

3   versus J.P. Stevens & Co.?

4   A.   Again I believe they were.  I just don't

5   recall specifically.

6   Q.   I show you a copy of it.  Mark this as

7   Exhibit 7, and this is a copy of an opinion

8   Amalgamated Clothing and Textile Workers Union v.

9   J.P. Stevens & Co, Inc.

10                  (At this time, Dandridge Exhibit

11  7 was marked for identification.)

12  BY MR. PRESS:

13  Q.   I ask you to look at Exhibit 7.  Is that what

14  we are up to, 7?

15                  Do you recognize this opinion?

16  A.   Yes.

17  Q.   And is this the opinion that you refer to at

18  pages eight to nine of your report?

19  A.   Correct.

20  Q.   If you look at it, and I direct your

21  attention to the page that is numbered in the

22  upper right, page four of seven, does that

23  refresh your recollection in any way as to

24  whether or not this action involved alleged

25  violations of Section 10(b) of the 1934 Act?

Page 115

1    A.  This action alleged violations of Section 14

2    (a)(9) of the Securities and Exchange Act of 1934

3    which again is analogous to Section 10(b) under

4    the same act.

5    Q.  And analogous in that they both have the same

6    standards for disclosure for what has to be

7    disclosed, but one is in a proxy solicitation and

8    the other is in connection with a purchase or

9    sale of securities?

10   A.  They both maintain what is fraudulent conduct

11   in the disclosure pertaining to either a purchase

12   and sale of securities or the solicitation of a

13   proxy.

14   Q.  So but they both have the same standard for

15   what has to be disclosed, one just in proxy

16   solicitations, one in connection with the

17   purchase and sale of securities?

18   A.  You could say that.

19   Q.  So you would disagree with me then if I would

20   argue that the Amalgamated case is

21   distinguishable from the Herley situation because

22   the Herley case is a 10(b) case and the

23   Amalgamated is a 14(a) case, the disclosure duty

24   is the same?

25   A.  The disclosure duty is the same.  All I'm

1  Q.  Okay.  The end -- on page ten of your report,

2  second full paragraph which is the paragraph

3  right before we get to question two you say,

4  "Based upon the SEC disclosure requirements and

5  the weight of the cases cited above, it is my

6  view that the company was given reasonable advice

7  by its attorneys that it was not required to

8  disclose the grand jury investigation until

9  someone was charged."  And that is your opinion,

10  correct, sir?

11  A.  Correct.

12  Q.  And I believe you testified before, I want to

13  make sure about this, you have never actually

14  seen any transcription of the substance of the

15  company's advice?  You have never seen any letter

16  constituting the advice or memo?

17  A.  Correct.

18  Q.  And your understanding that there was advice

19  given and what the advice was comes from your

20  reading of the documents that you enumerated as

21  items A through N on pages one to two of your

22  report?

23              MR. SMITH:  Objection.

24              THE WITNESS:  Correct.

25  BY MR. PRESS: