Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

-------------------------------------------------

IN RE HERLEY INDUSTRIES INC.        Action No.

SECURITIES LITIGATION               #06-2596(JRS)

----------

IN RE DERIVATIVE LITIGATION        Action No.

HERLEY INDUSTRIES INC.,             #06-2596(JRS)

-------------------------------------------------

CONFIDENTIAL

One Logan Square

Philadelphia, Pennsylvania

May 13, 2009

9:36 a.m.


VIDEOTAPED DEPOSITION of MYRON LEVY, before S.

Arielle Santos, Certified Shorthand Reporter, Certified

LiveNote Reporter and Notary Public.




HUDSON REPORTING & VIDEO              1-800-310-1769

c725325e-6b4c-424a-8c52-f48e4bcad82a

```
 1              MYRON LEVY - CONFIDENTIAL
 2      a date up there but page 21, I don't know.
 3                    MR. SMITH:  It starts with
 4          the sentence, "Our level of
 5          intercompany sales increased from
 6          approximately 6.1 million."  I think
 7          that's it.
 8                    MR. MCNEELA:  Yeah, that is
 9          the page.
10                    THE WITNESS:  Am I missing
11          something?
12      BY MR. MCNEELA:
13          Q      Are you looking at Exhibit 16?
14          A      Yes.
15          Q      Okay.
16                 (Whereupon a discussion is
17          held off the record.)
18      BY MR. MCNEELA:
19          Q      Now, I would like to direct your
20      attention down to about two-thirds of the way down,
21      the last paragraph with the double dashes in front of
22      it, do you see that paragraph that begins "an
23      increase"?
24          A      Yes.
25          Q      Okay.  I am going to read that
```

c725325e-6b4c-424a-8c52-f48e4bcad82a

1          MYRON LEVY - CONFIDENTIAL

2     paragraph out loud, "An increase of approximately

3     935,000 in legal costs associated with Robinson

4     Laboratories and a continuing investigation by the

5     U.S. Attorneys Office in Pennsylvania which inter

6     alia involves pricing under two contracts with the

7     U.S. Department of Defense relating to voltage

8     control oscillators and a contract relating to power

9     heads."

10                    Did I read that correctly, Mr. Levy?

11         A      Yes, you did.

12         Q      Is that the first time that Herley

13    ever disclosed the existence of the investigations in

14    a corporate filing?

15         A      I believe so.

16         Q      Why didn't Herley reveal the

17    existence of the investigation in its prior corporate

18    filings?

19         A      Well, let me relate as to why we

20    disclosed this and maybe that will lead into why we

21    didn't disclose in the past.

22                    In reviewing the financial

23    statements, our legal expenses have escalated

24    substantially and it was one of the major reasons why

25    our SGNA, if you will, was increasing.  And based on

c725325e-6b4c-424a-8c52-f48e4bcad82a

1          MYRON LEVY - CONFIDENTIAL

2     what was going on in '05, we saw them potentially

3     increasing as we proceeded forward and was

4     appropriate disclosure to say, Hey, my legal expenses

5     went up almost a million dollars which is a

6     significant number within the SGNA category and

7     therefore we disclosed what caused it, the

8     investigation and the Robinson suit.

9          Q     So it was just related to legal

10    expenditures?

11         A     That is correct.

12         Q     Did you think that the information

13    was related to any of the other representations that

14    Herley made in its corporate filings?

15              MR. SMITH:  Objection.

16              THE WITNESS:  I don't know

17         what representations you are

18         referring to.

19    BY MR. MCNEELA:

20         Q     Okay.  We will get into that.  The

21    first -- let's turn to Exhibit 15, which is the 2004

22    10-K for the year ended August 1st, 2004.

23              Now, based on your prior testimony, I

24    assume you agree that there was no disclosure of the

25    government investigation in this corporate filing; is

1                    MYRON LEVY - CONFIDENTIAL

2        that correct?

3                    A       That is correct.

4                    Q       So let's turn back -- I'm sorry -- to

5        Exhibit 16, which is a 2005 corporate filing.

6                    Now, you agree that as of the time of

7        this filing, Herley was aware that there was a grand

8        jury investigation into its business activities at

9        least as early as April of 2004; is that correct?

10                   A       Yes.

11                   Q       And Herley had received subpoenas

12       from the United States Attorney's Office in

13       furtherance of that investigation; correct?

14                   A       Yes.

15                   Q       And those subpoenas were seeking

16       among other things of the hard drives of the

17       computers of the two most senior people from Herley;

18       is that correct?

19                   A       Yes.

20                   Q       In addition to other officers of

21       Herley; is that correct?

22                   A       Yes.

23                   Q       Okay.  And in October 2004, the

24       chairman of Herley was notified that he was a target

25       of the investigation; is that also correct?

c725325e-6b4c-424a-8c52-f48e4bcad82a

1                    MYRON LEVY - CONFIDENTIAL

2              A      Yes.

3              Q      Okay.  And he also retained separate

4    counsels to defend him in connection with that

5    investigation from Herley in or about October 2004;

6    is that also correct?

7              A      Yes.

8              Q      And you view these events as serious

9    turns of event for Herley, did you not?

10             MR. SMITH:  Objection.

11             THE WITNESS:  I thought it

12   was serious.

13   BY MR. MCNEELA:

14             Q      So why wasn't any of that information

15   included in Herley's 2005 disclosure?

16             A      Based upon the fact that it was

17   strictly an investigation and the outcome was totally

18   speculative at best, there was no other further

19   information, discussions with company counsel -- SEC

20   counsel and discussions with the auditors who knew

21   all of this was happening.  It was -- we felt it was

22   not appropriate at that time.  It was a speculative

23   nature and corporate counsel and that's why it's not

24   in legal proceedings, if you will, that it doesn't

25   have to be disclosed.  There's no requirement to

1                     MYRON LEVY - CONFIDENTIAL
2       disclose that.  It could be -- you know, many times,
3       disclosure goes both ways, good and bad, and there
4       was no disclosure.  It was totally speculative.  We
5       didn't have the slightest idea which way it was going
6       or -- or what may happen.
7              Q       Okay.  But you are aware of the --
8       the -- the individual steps that I outlined for you;
9       right, for the chronology of the Grand Jury
10      investigation being in existence, that the Grand Jury
11      was investigating Herley; right?
12                     That's not speculative that there was
13      in fact an investigation going on?
14                     That's correct?  You knew that that's
15      a fact?
16             A       Definitely, sure.
17             Q       And the fact that the government
18      called the chairman of the company, "You are under
19      investigation," that -- that's not speculative, that
20      is a fact?
21             A       That is correct.
22             Q       And the fact that he went and retain
23      separate counsels; right, that is a fact too; is that
24      correct?
25             A       Correct.

1                MYRON LEVY - CONFIDENTIAL

2         Q     And the fact that he sought to have

3  Herley pay for his separate counsels, that was a fact

4  as well?

5         A     That's true.

6         Q     And the fact that Herley received

7  subpoenas pursuant to the investigation was a fact?

8         A     Right.

9         Q     And the fact that two of the most

10  senior people in the company, their documents being

11  asked for by the government, that is a fact; right?

12         A     Right.

13         Q     And the fact that this investigation

14  has started in July 2002 and was continuous until the

15  time of this corporate filing, that is a fact as

16  well?

17               MR. FRANK:  Objection.

18               MR. SMITH:  Objection.

19               THE WITNESS:  Yes.

20  BY MR. MCNEELA:

21         Q     Okay.  So if you're considering in

22  whether to invest in Herley stock, wouldn't you want

23  to know that Herley's chairman was a target of a

24  Federal investigation?

25               If you were considering whether to

c725325e-6b4c-424a-8c52-f48e4bcad82a

1           MYRON LEVY - CONFIDENTIAL

2     invest in Herley stock, wouldn't you want to know

3     that Herley's chairman was a target of a federal

4     criminal investigation?

5                    MR. RUSSO:  Objection.

6                    MR. FRANK:  Objection.

7                    THE WITNESS:  Stockholders

8               would like to know everything that's

9               going on in the corporation, what

10              time I get up in the morning, what

11              time I go to bed at night, too, and

12              they would like to also know that I

13              am presently talking to people about

14              a present acquisition or maybe a

15              divestiture.  Just because a

16              stockholder would like to know

17              doesn't mean the regulations require

18              disclosure.  So stockholders do want

19              to know everything.  Of course, they

20              love to know when I am talking to

21              someone about an acquisition,

22              divestiture or merger.  But there

23              are rules and regulations on what

24              has to be disclosed and not

25              disclosed and we follow those rules

1                  MYRON LEVY - CONFIDENTIAL

2              and regulations.  So stockholders

3              want to know everything.  But that's

4              why we have legal counsel and that's

5              why we have independent auditors

6              that are aware of these situations

7              and also partake in what we should

8              disclose and not -- not disclose.

9                  I mean, I would like to know

10             everything.  I would like to know

11             before any major public corporation

12             is going to announce an award of

13             $500 billion, I would be a fool to

14             say, no, I don't want to know that.

15             I am a stockholder.  Of course, I

16             want to know the requirements or

17             such that you don't have to report

18             those things.

19        BY MR. MCNEELA:

20             Q     And those -- you are saying the

21        requirements are such that you don't have to report

22        those things.

23                  Is that your understanding of the

24        requirements based on the advice of counsel?

25             A     Yes.

1           MYRON LEVY - CONFIDENTIAL

2           Q       And based on anything else?

3           A       Advice of counsel and knowledge,

4    general knowledge.  You don't have to report

5    everything.  That's why there are rules and

6    regulations.

7           Q       Sure.  And acquisitions and -- and --

8    and deals, was that commonplace for Herley?

9                   This was part of their general

10   business activity?

11          A       Yes.

12          Q       Okay.  How about investigations by

13   the federal government for contract fraud, was that

14   part of Herley's common place?

15          A       Whether it's -- whether it's

16   commonplace or not, it's irrelevant.  I may have

17   never done an acquisition and I am sitting here and

18   I'm going to acquire a company.  I am in the throes

19   of trying to acquire a company that's greater than

20   Herley is, I have no obligation to disclose.

21          Q       Does the fact that an acquisition

22   generally threaten relationships with Herley's

23   largest customer?

24                  MR. FRANK:  Objection.

25                  THE WITNESS:  It's not a

c725325e-6b4c-424a-8c52-f48e4bcad82a

Page 227

MYRON LEVY - CONFIDENTIAL

1

2          question whether it may threaten.

3          It is a question what the

4          stockholder wants to know.  Your

5          comment was about the stockholder.

6          Does the stockholder want to know?

7          Yeah, he want -- he wants to know if

8          I am going to acquire a company

9          that's twice my size.  But do I have

10         an obligation to tell him?  No.

11         That's why you have the safe harbor

12         regulations within the securities

13         laws and everything else.  So we

14         comply with the laws and

15         regulations.  There was no

16         obligation after discussions with

17         Counsel, independent auditors, to

18         disclose it.  When the legal

19         expenses got to be to the level they

20         were, we disclosed that.  And that's

21         why it's disclosed in the company

22         section, in the MBNA, if you would.

23     BY MR. MCNEELA:

24         Q     Is it your testimony that the

25     prospect of a corporate acquisition by Herley is of

1          MYRON LEVY - CONFIDENTIAL

2    the same importance to shareholders if the prospect

3    of a federal criminal investigation of Herley?

4                    MR. FRANK:  Objection.

5                    MR. SMITH:  Objection.

6                    THE WITNESS:  In my opinion,

7              they are one and the same.  It is

8              the same principal.

9    BY MR. MCNEELA:

10             Q     And you don't think that the

11   possibility of a criminal investigation that can

12   threaten Herley's relationship with its largest

13   customer is any more material than the prospect of a

14   random acquisition?

15                   MR. FRANK:  Objection.

16                   THE WITNESS:  What happens is

17             your random acquisition goes sour

18             and the company goes out of

19             business.  You don't think that's

20             important, I do.  It's just as

21             important.  You know, not every

22             acquisition comes to be very

23             successful.  There are many

24             companies that have been bought and

25             have destroyed companies.  So they

1              MYRON LEVY - CONFIDENTIAL

2              all -- they all have importance, but

3              it's not for me to differentiate.

4              What I am saying is we comply with

5              what the rules and regulations are.

6       BY MR. MCNEELA:

7              Q      Well, of course, that begets the

8       question as to what the rules and regulations do in

9       fact require?

10             MR. SMITH:  Is that a

11             question?

12             MR. MCNEELA:  It's going to

13             lead into a question.

14             MR. SMITH:  Move to strike

15             that colloquy there.

16             Wait for the question.

17      BY MR. MCNEELA:

18             Q      Mr. Levy, can we please direct your

19      attention to page -- to page 6 of the 2000 -- 2004

20      10-K?

21             A      Yes.

22             Q      Do you see the paragraph entitled,

23      "Diverse Product and Customer Base"?

24             A      Yes.

25             Q      Okay.  That reads, We have a diverse

1          MYRON LEVY - CONFIDENTIAL

2    product and customer base with only the U.S.

3    Government in approximately 17 percent in rating of

4    approximately 10 percent representing 10 percent of

5    more of our fiscal 2004 revenues."

6               Did I read that correctly?

7         A     Yes.

8         Q     So you're informing the investing

9    public that the government is the single largest

10   customer of Herley?

11        A     That is correct.

12        Q     But at the same time, you did not

13   think it was misleading to exclude the fact in this

14   2004 10-K that Herley was in fact being investigated

15   by its very -- by its largest customer for criminal

16   violations?

17              MR. FRANK:  Objection.

18              THE WITNESS:  I believe I

19              answered that, and I will answer it

20              the same way again.  There were

21              rules, regulations based upon

22              Counsel, based upon corporate

23              counsel, based upon our SEC expert,

24              based upon meetings with my

25              auditors, we elected not to disclose

MYRON LEVY - CONFIDENTIAL

1
2          it and we comply with the rules and
3          regulations.
4    BY MR. MCNEELA:
5          Q       Jumping down the following paragraph
6    where it says, "Long standing industry relationships.
7    We have established long standing relationships with
8    the U.S. Government and other key organizations in
9    the aerospace and defense industry after 38 years in
10   the defense electronic industry."
11              Now, again, you're informing
12   investors about this longstanding relationship you
13   have with your single largest customer.  But again,
14   you don't see fit to disclose the fact that you are
15   being criminally investigated by your single largest
16   customer.  Again, why not?
17              MR. FRANK:  Objection.
18              MR. SMITH:  Objection.
19              THE WITNESS:  Same reason as
20          before.  If you want me to repeat
21          it, I will repeat it.  But it is the
22          same -- it is the same principle and
23          we, in fact, do have a good standing
24          relationship with our -- with the
25          U.S. Government.

1        MYRON LEVY - CONFIDENTIAL

2    BY MR. MCNEELA:

3            Q      Turn your attention to page 14 of the

4    document.  Do you see the paragraph entitled,

5    "government Regulation"?

6            A      Yes.

7            Q      Okay.  The first sentence of that

8    paragraph reads, "Because of our participation in the

9    defense industry, we are subject to audits by various

10   government agencies for our compliance with the

11   government" -- "with government regulations."  And

12   the last two sentences of that paragraph read, "We

13   believe that we operate our business in material

14   compliance with applicable laws and regulations.

15   However, any failure to comply with existing or

16   future laws or regulations could have material

17   adverse impact on our business financial conditions

18   and results of operations."

19            Did I read that correctly?

20            A      Yes.

21            Q      Okay.  What was your basis for

22   concluding that you were in material compliance with

23   government regulations at the time you certified the

24   statement?

25            A      My state of mind and the company's

1               MYRON LEVY - CONFIDENTIAL

2       state of mind was when this document was filed.  At

3       that time, we were in compliance to the rules and

4       regulations of the U.S. Government, and the statement

5       is totally true.  That's why I make the statement,

6       "We believe that we operate our business in material

7       compliance with applicable laws and regulations."

8       When this was certified, and that's when it was back

9       in 2004, we believed that.

10               Q       Even though you were being

11      investigated by a federal Grand Jury?

12               A       I believe you are still innocent

13      until proven guilty in this country.

14               Q       So you are saying you have no

15      obligation to reveal any information relating to a

16      criminal investigation until you're proven guilty?

17                       MR. SMITH:  Objection.

18                       THE WITNESS:  I am going to

19                       go back and repeat myself.  We have

20                       counsel, we have what is required to

21                       be disclosed based on discussions

22                       with corporate counsel and SEC

23                       counsel, and it is not required to

24                       be disclosed.  The auditors never

25                       raised it, counsel never raised it,

Page 234

MYRON LEVY - CONFIDENTIAL

1

2          we discussed it.  And the fact that

3          it's totally speculative, what will

4          happen, if anything, was not

5          disclosed.

6     BY MR. MCNEELA:

7          Q     Was the suspension of Herley in 2006

8     something that you would consider a material adverse

9     impact on Herley's business?

10               MR. SMITH:  Objection.

11               THE WITNESS:  At that

12          particular -- that day?

13    BY MR. MCNEELA:

14          Q     Yeah.

15          A     I wouldn't -- I wouldn't consider it

16    a material adverse fact on what happened in the past.

17          Q     I'm asking you just when the

18    suspension came down, would you consider that a

19    material adverse impact on Herley's business?

20               MR. SMITH:  Objection.

21               THE WITNESS:  That we're

22          indicted, we were now indicted.

23          Something happened.  Okay.  The

24          effect of which you still don't

25          know.

Page 235

1                   MYRON LEVY - CONFIDENTIAL
2        BY MR. MCNEELA:
3                Q       Okay.  I am just looking for an
4        answer to my question which is, did you believe the
5        suspension of Herley by the Navy was a material
6        adverse impact on Herley's business?
7                        MR. SMITH:  Objection.
8                        THE WITNESS:  No.
9        BY MR. MCNEELA:
10               Q       Did you believe the indictment of
11       Herley Industries, Inc. was a material adverse impact
12       on Herley's business?
13                       MR. SMITH:  Objection.
14                       THE WITNESS:  I don't believe
15               it was a material adverse impact on
16               the business, but I do believe it
17               should be disclosed.
18       BY MR. MCNEELA:
19               Q       Was the indictment of Mr. Blatt in
20       your opinion material adverse impact on Herley's
21       business?
22                       MR. FRANK:  Objection.
23                       MR. SMITH:  Objection.
24                       THE WITNESS:  I don't believe
25               so, but it should be disclosed.

Page 236

1                    MYRON LEVY - CONFIDENTIAL

2        BY MR. MCNEELA:

3              Q       Now, in the 2005 10-K, when you

4        disclosed the existence of the investigation, was it

5        not still speculative at that point in time?

6              A       In 2005?

7              Q       Right.

8              A       Are you referring to the same?

9              Q       Right.

10             A       You are referring to the MDNA?

11             Q       Right, to page 21.

12             A       (Reviewing.)  That had to do with the

13       materiality within the MDNA of selling and general

14       administrative expenses.  And whereby I believe --

15       and I don't have it -- I can't tell if this is page

16       21.  But in the MDNA, it was $965,000, was an

17       increase in our legal expenses, and that was a

18       significant number and we disclosed why it increased

19       because of Robinson Labs and the investigation.

20             Q       So if the investigation had not

21       resulted in an increase in legal fees that were being

22       paid out, is it your testimony that otherwise would

23       not have been disclosed in the 2005 10-K?

24                     MR. FRANK:  Objection.

25                     THE WITNESS:  That's

Page 237

1       MYRON LEVY - CONFIDENTIAL
2               speculative.  But if it was totally
3               immaterial and the difference was
4               $2, it probably wouldn't have been
5               disclosed in the MDNA either.
6    BY MR. MCNEELA:
7               Q      Well, that's not what I'm asking you.
8    Putting aside my -- the legal fee issue and talking
9    about the state of the investigation as of the filing
10   of the 2005 10-K, which was July 31st, 2005, did you
11   believe the investigation was still speculative at
12   that point in time?
13              THE WITNESS:  No, I didn't
14              say the investigation was
15              speculative.  That was real.
16   BY MR. MCNEELA:
17              Q      The outcome of the investigation, was
18   that still speculative?
19              A      Still speculative.
20              Q      So then if we take away the increase
21   in legal expenditures, it's your testimony then that
22   the investigation in 2005 was still -- the results
23   were still speculative and you would not have
24   included in your disclosure?
25              A      That is correct.

Page 238

1          MYRON LEVY - CONFIDENTIAL

2          Q       Now, turning your attention back to

3     Exhibit 15.

4          A       Yes.

5          Q       Back to the government regulation

6     portion.

7          A       Do you have the page, please?

8          Q       Sure, sorry.  It would be page 14 on

9     that document.

10         A       Okay.

11         Q       Now, the last sentence of that

12    paragraph reads, "However, any failure to comply with

13    the existing or future laws or regulations could have

14    material adverse impact on our business financial

15    condition and results of operations."

16              Is -- isn't that statement taking

17    into account the possibility of findings that Herley

18    wasn't in compliance with rules and regulations?

19              MR. SMITH:  Objection.

20              MR. FRANK:  Objection.

21              THE WITNESS:  No, it is just

22              -- it is a statement that's saying

23              making the reader aware, could have.

24              It doesn't say would.  It just

25              could.  It may have, may or may not

1           MYRON LEVY - CONFIDENTIAL

2               have.

3       BY MR. MCNEELA:

4           Q      So you are saying that that certain

5       -- certain occurrences could have material adverse

6       effect on Herley's business, the things that could

7       would be finding that they weren't in material

8       compliance with rules and regulations; right?

9                   MR. FRANK:  Objection.

10                  MR. SMITH:  Objection.

11                  THE WITNESS:  I read it as

12              could have, which means may.

13      BY MR. MCNEELA:

14          Q      All right.  And --

15          A      And was speculative.

16          Q      Well, right, could have.

17                  And in saying the things that could

18      have happened, doesn't the criminal investigation

19      relate to that?

20                  MR. FRANK:  Objection.

21                  MR. SMITH:  Objection.

22                  THE WITNESS:  I am going to

23              go back to, as I told you before, if

24              it was required to be disclosed, we

25              would have disclosed it.  Based upon

c725325e-6b4c-424a-8c52-f48e4bcad82a

1           MYRON LEVY - CONFIDENTIAL

2           discussions with Counsel, with our

3           independent auditors, it was not

4           required to be disclosed and

5           therefore we did not disclose it.

6           That's why we pay attorneys and

7           auditors big money because we -- we

8           use our areas of expertise

9           throughout the -- with our Counsel

10          and our auditors.

11               MR. MCNEELA:  Let's take a

12          two-minute break.

13               THE VIDEOGRAPHER:  Going off

14          the record at 2:53 p.m.

15               (Whereupon a recess is

16          taken.)

17               THE VIDEOGRAPHER:  Going back

18          on the record at 3:08 p.m.

19     BY MR. MCNEELA:

20          Q     Mr. Levy, I believe you previously

21     mentioned that you received certifications from the

22     heads of divisions within Herley; is that correct?

23          A     Yes, that's true.

24          Q     Who sent you those certifications?

25          A     All the general managers, Mitch

c725325e-6b4c-424a-8c52-f48e4bcad82a

1                   MYRON LEVY - CONFIDENTIAL

2      Tuckman, Howard Eckstein, whoever was running, if it

3      was Lancaster, Rich Pourier if it was New England,

4      Yonah Adelman; if it was our Israeli operation, then,

5      you know, the general managers of the various

6      entities.

7                Q       And was that practice in place in

8      2004, 2005, 2006?

9                A       Yes, that practice came in place when

10     Sorbanes-Oxley came in.

11               Q       Now, those certifications, what did

12     they contain?

13               A       Effectively the same certification

14     that I signed both for, as CEO and as my CFO signed,

15     their -- their financial officer signed the same

16     certification to -- and by the way, they all went to

17     my CFO.  Okay.  And, you know, he would say, I got

18     the certification from Mitch, I got it from Howard, I

19     got it from Rich, you know, that we have those.  I am

20     looking to find the certification.  I don't think we

21     have the '04.  I don't think -- has it.  Let me take

22     a look at '05.  (Reviewing.)

23               Q       I will cut to the chase here.  Please

24     mark this as Exhibit 17.

25                        (Whereupon the exhibit is