# Exhibit "B"

Page 1

U.S. DISTRICT COURT FOR THE

EASTERN DISTRICT OF PENNSYLVANIA


IN THE MATTER OF:     :   Civil Action

HERLEY INDUSTRIES     :   No. 06-2596 (JRS)

SECURITY LITIGATION   :


- - -

Tuesday, October 6, 2009

- - -

Deposition of PATRICK A. McGEEHIN, taken
pursuant to notice, was held at the law offices of
Blank Rome LLP, Watergate, 600 New Hampshire Avenue,
Northwest, Washington, D.C., commencing at 10:00 a.m.,
on the above date, before Karen Young, Notary Public.

MAGNA LEGAL SERVICES
Seven Penn Center, 8th Floor
1635 Market Street
Philadelphia, Pennsylvania 19103
(866) 624-6221

93adf20f-b971-4cf2-9ac5-35203b1a8d56

Page 2

```
 1  APPEARANCES:
 2     KIRBY McINERNEY LLP
 3     BY:  IRA M. PRESS, ESQUIRE
 4         ANDREW McNEELA, ESQUIRE
 5     825 Third Avenue
 6     New York, New York 10022
 7     (212) 371-6600
 8     ipress@kmllp.com
 9         Counsel for the Plaintiff
10
11     BLANK ROME LLP
12     BY:  JAMES T. SMITH, ESQUIRE
13     One Logan Square
14     130 North 18th Street
15     Philadelphia, Pennsylvania 19103-6998
16     (215) 589-5643
17     Smith-JT@BlankRome.com
18         Counsel for the Defendants
19
20
21
22
23
24
```

Page 4

```
 1              EXHIBITS
 2              - - -
 3   1  McGeehin Deposition Binder ................. 11
 4   2  Billing Records ............................ 15
 5   3  McGeehin e-mail to Giddings, 6/5/09 ......... 20
 6   4  Handwritten Notes .......................... 30
 7   5  Expert Report of Patrick A. McGeehin ........ 35
 8   6  Krafft e-mail to McGeehin and McNeela, ...... 60
 9      7/5/09
10   7  Giddings e-mail to McGeehin and Krafft, ..... 74
11      6/12/09
12   8  Giddings e-mail to McNeela, 6/22/09 ......... 80
13   9  Giddings e-mail to Krafft, 6/24/09 .......... 86
14  10  Giddings e-mail to McGeehin, 6/24/09 ....... 105
15  11  Giddings e-mail to McGeehin, 6/26/09 ....... 113
16  12  Giddings e-mail to McGeehin and Krafft, .... 118
17      6/26/09
18  13  Giddings e-mail to Gaskin, 6/29/09 ......... 120
19  14  Krafft e-mail to McGeehin and Giddings, .... 123
20      6/30/09
21  15  Expert Report of Ralph C. Nash, Jr. ........ 130
22  16  FAR Part 2, Definitions of Words and Terms .. 134
23
24
```

Page 3

```
 1              - - -
 2            INDEX
 3              - - -
 4   TESTIMONY OF:  PATRICK A. McGEEHIN
 5     By Mr. Smith ................................ 6
 6
 7
 8              - - -
```

Page 5

```
 1              - - -
 2       PATRICK A. McGEEHIN, after having
 3       been duly sworn, was examined and
 4       testified as follows:
 5              - - -
 6           EXAMINATION
 7   BY MR. SMITH:
 8     Q.  Mr. McGeehin, good morning.  My name is Jim
 9   Smith and I represent the defendants in the securities
10   action pending in the U.S. District Court for the
11   Eastern District of Pennsylvania.  You're here to give
12   a deposition today.  You're aware of that obviously.
13     A.  I am.
14     Q.  And I take it you've been deposed in your
15   capacity as an expert many times in the past?
16     A.  Yes.
17     Q.  About how many?
18     A.  I know the total deposition and live
19   testimony is in excess of a hundred, so for ball park
20   purposes, somewhere in excess of 50 I would estimate.
21     Q.  Okay, so you know the rules.  You don't need
22   me to review them?
23     A.  I think I do.
24     Q.  Okay, good.  I want to ask you first about
```

Page 6

1  the circumstances under which you were engaged as an
2  expert in this case. Do you recall how it came to be
3  that you were engaged?
4      A.   Generally, yes, I remember getting a phone
5  call from counsel for the plaintiffs in the case.
6      Q.   Who called you?
7      A.   I believe Mr. Press and Mr. McNeela,
8  probably both of them.
9      Q.   Had you ever worked with either Mr. McNeela
10 or Mr. Press before?
11     A.   No.
12     Q.   When was that that you got the call?
13     A.   I don't remember exactly, but sometime about
14 a month or so before the expert report was filed,
15 which was -- expert report is dated July 1, so
16 somewhere I want to say late May or early June.
17     Q.   Okay. And what is that you're thumbing
18 through that's in front of you?
19     A.   I have in front of me what I refer to as a
20 deposition binder. It's just extracts from documents
21 that have been produced. Some might have some
22 handwritten notes of mine on it that I typically bring
23 with me, as I have here today to help facilitate
24 answering questions in a deposition.

Page 7

1      Q.   Have you produced this document to us in
2  response to the subpoena, or this binder?
3      A.   Yeah, I have copies of the binder with me
4  here today. There's no new documents. All the
5  underlying documents as far as I know have been
6  produced.
7      Q.   And the copy that your lawyer -- or the
8  lawyer for the plaintiffs wants to hand me, does that
9  include the notes that you have?
10     A.   Yes, sir.
11     Q.   Okay. Let's mark it.
12         MR. PRESS:  And just for the record, it's my
13 understanding that this binder was not in existence at
14 the time of the subpoena and is something that the
15 witness compiled thereafter.
16 BY MR. SMITH:
17     Q.   Did you compare -- or compile this binder,
18 sir?
19     A.   Yes, this was compiled by myself and the
20 people that worked for me on the engagement.
21         MR. PRESS:  I'd also state for the record
22 that it's my understanding that other than handwritten
23 notes of the witness, all of the documents in there
24 are documents that have been produced previously.

Page 8

1  BY MR. SMITH:
2      Q.   Okay, that's good to know. And when was
3  this binder created?
4      A.   It wasn't really finished until yesterday
5  afternoon, and that's when I had it copied.
6      Q.   How much time did you spend creating the
7  binder?
8      A.   That's a difficult question to answer. I
9  mean --
10     Q.   Do you keep records of the time that you
11 spend on the engagement?
12     A.   Yes, but it wouldn't go into the detail like
13 that in terms of creating -- you know, differentiating
14 between creating a binder, as an example.
15     Q.   When did you start working on the binder?
16     A.   I think it's safe to say that getting ready
17 for a deposition is my typical practice, so we would
18 have known I was going to put a binder together. When
19 Ed Giddings, which is one of the primary people that
20 worked with me on this, when he started putting this
21 together, you know, might have been a week or so ago,
22 would be my guess, but as I said, I put notes in here
23 as recently as yesterday and had it copied. I didn't
24 want to copy it until all the notes were done because

Page 9

1  it would have been an iterative process if I did.
2      Q.   Just going forward so that the record is
3  clear, if I ask you a question that refers to you,
4  what I don't want you to do is to refer to what other
5  people did.
6      A.   Sure.
7      Q.   I'll ask you what others did. So how many
8  hours do you think you spent, you personally spent
9  with this binder?
10     A.   Spent with the binder.
11     Q.   Yeah, organizing it, reviewing it.
12     A.   I don't know.
13     Q.   Can you approximate?
14     A.   It's a difficult question to answer because
15 part of my deposition prep would be just having -- you
16 know, going back through these documents, reading
17 these documents, so it would be difficult for me to
18 estimate that.
19     Q.   Okay, and you're saying there's no
20 difference between the copy of the binder that you
21 handed me and the binder that's before you?
22     A.   Yeah, that's -- in terms of -- that's why I
23 waited until yesterday afternoon to instruct for it to
24 be copied.

93adf20f-b971-4cf2-9ac5-35203b1a8d56

## Page 10

1   Q.  Okay, so you would have no objection if I
2  marked yours as the original exhibit and gave you a
3  copy.
4   A.  Sure.
5   MR. PRESS:  I think that actually makes more
6  sense.
7  BY MR. SMITH:
8   Q.  Yeah, that's fine.  That's fine.  Let me
9  then mark for the record as McGeehin Exhibit 1 a copy
10  of a binder entitled McGeehin Deposition Binder.
11  Okay, who else worked on the binder?
12   A.  As I indicated, primarily a fellow by the
13  name of Mr. Giddings, Ed Giddings.
14   Q.  Okay, all right.  Now, let me -- I'm going
15  to come through -- go to tab 1 of the binder.
16   A.  Yes.
17   Q.  That appears to contain some excerpts from
18  the deposition of Mr. Blatt dated May 27, 2009; is
19  that correct?
20   A.  That is correct.
21   Q.  Did you read that deposition transcript?
22   A.  I read exerpts from that deposition
23  transcript.
24   Q.  Okay.  Which excerpts did you read?

## Page 11

1   A.  Well, certainly the ones that are in the
2  deposition binder, and then other pages that would
3  have been brought to my attention by Mr. Giddings, but
4  I don't know exactly every page.
5   Q.  Okay.  Who isolated the parts of the
6  deposition transcript of Mr. Blatt for you to review?
7   A.  Well, as I just testified, Mr. Giddings
8  would have indicated the parts that he thought that I
9  should focus on.
10   Q.  So to the extent that you focused on the
11  transcript of Mr. Blatt, it was the information that
12  Mr. Giddings told you to look at.
13   A.  Yes.
14   Q.  Is that his name, Giddings?
15   A.  Yeah, it's Giddings, G-I-D-D-I-N-G-S, yeah.
16   Q.  Is that right?
17   A.  Generally.  The way it would have worked is
18  for a particular issue that we were talking about, I
19  would ask him where in the deposition transcript, as
20  an example, that was discussed, and he would highlight
21  or indicate those pages for me and then we would -- I
22  would look at it and then we would discuss it.
23   Q.  Okay, but -- so the record is clear, at
24  least with respect to Blatt, it was Giddings who

## Page 12

1  directed you to excerpts from at least the Blatt
2  deposition, right?
3   A.  Yeah, I think I -- just to state it more
4  fully, yes in accordance with the way that I just said
5  the process went.  With respect to a particular issue,
6  I would ask him where was that discussed in the
7  transcript, and then he would identify the pages.
8   Q.  In which transcript?
9   A.  The Blatt transcript.
10   Q.  Okay, all right.  And would the same be true
11  for all the other transcripts?
12   A.  Yes.
13   Q.  Okay.  So to the extent that you looked at
14  Rounsaville's deposition transcript dated April 8th,
15  2009 or any other transcripts, it would be based upon
16  the process that you just described and then the
17  selection by Mr. Giddings.
18   A.  That's generally right, yeah.
19   Q.  Did you do anything to make sure that the
20  passages that he was referring you to were the correct
21  passages?
22   A.  I don't know what you mean by correct.
23   Q.  Well, that he wasn't missing anything.
24   A.  The process that we -- I did not go back and

## Page 13

1  try to read more of the deposition than had been
2  indicated to me by Mr. Giddings.
3   Q.  Okay.  Did counsel direct you to any
4  particular transcripts or parts of transcripts?
5   A.  Yes.
6   Q.  Were they in addition to what Giddings had
7  directed you to?
8   A.  No, that was part of the same process, but
9  counsel worked more in terms of with Mr. Giddings, and
10  then I relied primarily on Mr. Giddings.
11   Q.  Well, did counsel and Mr. Giddings work?
12   A.  The same process.  So the process was we
13  have this body of deposition transcripts.
14  Mr. Giddings and I sat with counsel and asked them
15  what -- where is the background or the explanation of
16  these particular issues.  They identified deposition
17  transcripts.  They helped us identify passages in the
18  deposition transcripts where those issues were
19  discussed, and then we reviewed those identified
20  passages.
21   Q.  Okay, so this process started as a meeting
22  among counsel and you and Mr. Giddings?
23   A.  I don't recall -- I don't think initially it
24  was a meeting, sir.  I think it was a phone

93adf20f-b971-4cf2-9ac5-35203b1a8d56

Page 14

1 conversation in terms of how are we going to identify
2 from this body of evidence where these things are
3 discussed in the various deposition transcripts, and
4 then those depositions and identifications were
5 forwarded to us.
6     Q.   Okay.  Now, let's go back.  You say you got
7 a telephone call from Mr. Press and Mr. McNeela; is
8 that right?
9     A.   That's what I remember.
10     Q.   Okay, and the call came in to you?
11     A.   That's what I remember.
12     Q.   Okay, and you think it was approximately one
13 month before your report was prepared and submitted in
14 the case?
15     A.   Yeah, the time records might indicate the
16 exact date, but I would say give or take, it was -- I
17 just remember it being somewhere in that time frame.
18     Q.   Okay.  Let me show you what we'll mark as
19 the next exhibit, McGeehin Exhibit Number 2.  Maybe
20 you could be kind enough to slide a copy over for the
21 lawyers.
22     A.   Sure.
23     Q.   Do you recognize Exhibit Number 2?
24     A.   Yes.

Page 15

1     Q.   What is it?
2     A.   This is a copy of the billing records that I
3 just referred to.
4     Q.   Okay, and do these -- Exhibit Number 2
5 represent your billings up until when?
6     A.   The last invoice reflected on McGeehin
7 Deposition Exhibit 2 is 9/9/2009 for time through
8 August.
9     Q.   And to the extent that you've incurred time
10 in September and October, you just haven't billed for
11 it yet?
12     A.   That's correct, the September time would
13 just be being closed this week and we would bill in
14 the next week or so typically.
15     Q.   And the time spent preparing the binder
16 would be in the September bill?
17     A.   There may be some started in the August
18 bill, might have referenced the initial effort toward
19 preparing a deposition binder, but the final
20 preparation of the deposition binder, as I testified,
21 wouldn't have been completed until yesterday, so all
22 the way through October.
23     Q.   Okay, so let's go back then, looking at
24 Exhibit Number 2, does it refresh your recollection

Page 16

1 about when you got the call from Messrs. Press and
2 McNeela?
3     A.   Not specifically with respect to getting the
4 call, but it had to be sometime before it looks like
5 June the 8th, which is the first time entry on the
6 invoice activity list.
7     Q.   Okay, and you just don't remember how much
8 more before at this point?
9     A.   Yeah, like I testified already, I think if
10 anything, this generally corroborates what I said,
11 that it was sometime about a month before the expert
12 report was final.
13     Q.   I'm just trying to see if we can establish
14 with more precision.  Was it in June?
15     A.   I think -- we could go back and forth, but I
16 think we would not establish with more precision based
17 upon what I remember or these time records.
18     Q.   Would it be fair to state that you didn't
19 start working on the case until June 11th?
20     A.   I didn't charge any time until June 11th.
21 Whether I had a, you know, passing discussion with Ed
22 or counsel that I didn't bill I don't remember.
23     Q.   Did you start working on the case before
24 June 11th?

Page 17

1     A.   I think I just answered that question.
2     Q.   You didn't.
3     A.   I did, but I'll try it again.  The first
4 time I charged time was June 11th.
5     Q.   Mr. McGeehin, I'm not asking you when you
6 first started charging time.
7     A.   If you'll let me finish my question, I'll be
8 happy to answer.
9     Q.   But you're giving me the same answer you
10 gave me last time, which I could have objected and
11 said it was nonresponsive and I didn't want to do
12 that.  Just trying to understand if you started
13 working on the case before June 11th.
14     A.   And I testified that I may have had some
15 passing reference or discussion in the case prior to
16 June 11th.  I don't remember, and the first time
17 entry's on June 11th.
18     Q.   Okay.
19     A.   For instance, there's a comment at the
20 bottom of the page from Mr. Giddings, discussions with
21 Pat McGeehin on June 8th.  I didn't charge time for
22 that discussion, but it would appear based on that
23 entry there it was in fact some effort put forth by me
24 prior to June 11th.

93adf20f-b971-4cf2-9ac5-35203b1a8d56

Page 18

1    Q.   Do you remember what you and he talked about
2  on June 8th?
3    A.   No.
4    Q.   Okay.  Now, after the initial -- strike it.
5  Tell me your best memory of what was discussed in that
6  initial call.
7    A.   As I -- the best I can remember, there was
8  just a general introduction about the case, that is,
9  that there was a, you know, class action suit
10 involving Herley Industries.  We discussed at that
11 point conflicts, whether we had any conflicts with
12 Herley, and I think at that point, a general
13 discussion about that it involved an indictment and a
14 guilty plea and it generally involved government
15 contract proposal and costing type issues.
16   Q.   Okay.  Have you ever worked with Mr. Press'
17 law firm before?
18   A.   Not that I recall, no.
19   Q.   Okay.  Did you take notes during the call?
20   A.   Not that I remember.
21   Q.   Is it your practice to take notes?
22   A.   Not typically unless I have something I've
23 got to write down that I'm trying to remember.
24   Q.   There was nothing about the call that you

Page 19

1  wanted to try to remember?
2    A.   I think the only point -- the only thing I
3  remember at that point, as I said, was that it was
4  Herley Industries and we would have to clear the
5  conflict.
6    Q.   Okay.  And during the course of that call,
7  was there any discussion about what it was that the
8  plaintiffs' lawyers were asking you to do as a
9  consultant or expert?
10   A.   Probably.  I don't specifically recall the
11 conversation, but, you know, they were asking me
12 about, you know, my background, as I remember, and as
13 I said, talked to me generally about the notion of,
14 you know, costing issues, federal government contract
15 pricing, and so -- and they explained the indictment
16 and the guilty plea, so we would have circled around
17 those types of topics.
18   Q.   Let me show you what we'll mark as the next
19 exhibit, which will be McGeehin Exhibit Number 3.  For
20 the record, McGeehin Exhibit Number 3 is an e-mail or
21 actually, a thread of e-mails starting with an e-mail
22 from Ira Press to I believe you dated June 5th, and
23 then an e-mail from you to Ed Giddings, also dated
24 June 5th, and it attaches a copy of the superseding

Page 20

1  indictment that was handed down by the United States
2  government in connection with a matter entitled United
3  States of America versus Lee Blatt et al.  Are you
4  familiar with this document?
5    A.   Yes.
6    Q.   Do you recall the circumstances under which
7  you got this e-mail from Mr. Press?  Was it before the
8  original call, after the original call that you just
9  described?
10   A.   I would assume -- well, as it says here, on
11 June 5th, Mr. Press is saying further to our recent
12 discussion, so it would have been after that first
13 call.
14   Q.   Okay, and what was the purpose in getting
15 this indictment?  Do you remember?
16   A.   Well, this was -- we had asked for it
17 because we were told that there was an indictment.
18   Q.   Uh-huh.
19   A.   And that that had relevance to the case in
20 terms of the -- the overall litigation.
21   Q.   Okay, and did you ultimately investigate the
22 disposition of this indictment?
23   A.   Yes.
24   Q.   Okay.  What do you understand the

Page 21

1  disposition to be?
2    A.   Well, I might not have the legal words
3  exactly right, but there was a payment made by Herley
4  and maybe by -- maybe by two divisions of Herley in
5  settlement, and there was a plea to -- I might not
6  have the words exactly right, but obstructing a
7  federal audit, something to that extent, and Mr. Blatt
8  I think was sentenced to a probation and some level of
9  fine.
10   Q.   Did the government withdraw all of the
11 charges against Mr. Blatt that are contained in what's
12 marked as Exhibit Number 3?
13   A.   Again, I'm not a lawyer, whether they're
14 withdrawn or dismissed or anything, but I know -- I
15 don't think they were pursued after the settlement.
16   Q.   Okay.  Do you know if Mr. Blatt pleaded
17 guilty to anything?
18   A.   I don't remember.
19   Q.   You see on the second page of Exhibit 3
20 there are the violations?
21   A.   Yes.
22   Q.   Do you know if any of these charges -- if
23 Mr. Blatt pleaded guilty to any of these charges?
24   A.   Well, as I said, I don't know whether he

93adf20f-b971-4cf2-9ac5-35203b1a8d56

Page 22

1   pled guilty to any of the charges.
2      Q.   Do you know if the company, Herley
3   Industries, pleaded guilty to any of the charges?
4      A.   I know they pled guilty, and I thought it
5   was to the obstruction of federal audit.
6      Q.   Who told you that?
7      A.   We actually got the -- a copy of the
8   transcripts of the plea hearing.
9      Q.   Now, let's go back. After the initial call,
10  what was the action plan, if any, with respect to this
11  potential engagement?
12     A.   I don't know if we'd call it action plan,
13  but the way we proceeded on the engagement was to go
14  through the indictment, find out at least from the
15  government's original perspective what types of
16  allegations had been made in the indictment, and then
17  go through those items and find out which of those
18  items were something that there were continuing issues
19  with respect to and/or documents or allegations as
20  part of the new litigation that were relevant.
21     MR. SMITH: Could you read back the witness'
22  answer please?
23           - - -
24     THE REPORTER: Answer: "I don't know if

Page 23

1   we'd call it action plan, but the way we proceeded on
2   the engagement was to go through the indictment, find
3   out at least from the government's original
4   perspective what types of allegations had been made in
5   the indictment, and then go through those items and
6   find out which of those items were something that
7   there were continuing issues with respect to and/or
8   documents or allegations as part of the new litigation
9   that were relevant."
10          - - -
11  BY MR. SMITH:
12     Q.   So if I understand correctly, in a nutshell,
13  you had to go back, check conflicts and make sure you
14  didn't have any, right?
15     A.   Right.
16     Q.   You did that obviously.
17     A.   Right.
18     Q.   Right? And then you reviewed the indictment
19  to identify the issues and then determine what the
20  what you refer to as continuing issues were.
21     A.   I think generally that's right.
22     Q.   What were the continuing issues?
23     A.   Well, as outlined in our report or in my
24  report, the continuing issues focused on the power

Page 24

1   heads contracts, so the original indictment had more
2   than those issues laid out. There were something
3   referred to as VCO issues as well as power head
4   issues, and the resultant issues that were of concern
5   in this immediate litigation that we're involved with
6   focused on the power heads.
7      Q.   Okay, so who made a determination that
8   matters pertaining to VCOs were not, as you referred
9   to, a continuing issue?
10     A.   Counsel. No one asked us to look at them,
11  so through -- through that, they would have made that
12  decision.
13     Q.   Well, you're aware that in an earlier draft
14  of your report, there's a reference to VCOs. You
15  remember that?
16     A.   Yeah, I think -- we can look at it, but
17  Mr. Giddings, because we were on a fairly short time
18  frame here, the original way he approached it, he just
19  went through and listed out all of the items that were
20  in the indictment without having the benefit of
21  knowing what particular issues were in -- continuing
22  in part of this litigation.
23     Q.   Okay, so did he start preparing a report
24  without knowing what the precise issues were that you

Page 25

1   were being asked to address?
2      A.   Yeah, I mean, I think it's safe to say he
3   started to prepare an outline of issues for possible
4   report purposes, you know, kind of parallel with
5   counsel accumulating information for us on the case.
6      Q.   Okay. So we're talking about I guess a
7   fairly short period of time here, about 20 days from
8   the time you focused in earnest until the time that
9   you generated a report. Is that a fair statement?
10     A.   I think that's fair.
11     Q.   Okay, and somewhere along the way, there was
12  the initial call and then a series of communications
13  in which the issues where your assistance was needed
14  was refined.
15     A.   I think that's fair.
16     Q.   Do you have a memory -- I'm assuming you
17  participated in those discussions.
18     A.   Yeah, I participated in the discussions as I
19  remember or with Mr. Giddings after he had some
20  discussions with counsel.
21     Q.   Okay. Do you have a memory of any
22  communications you had with counsel in which you
23  attempted to refine these issues during this 20-day
24  period?

7  (Pages 22 to 25)

93adf20f-b971-4cf2-9ac5-35203b1a8d56

Page 26

1    A.   I think -- I don't have a specific
2  recollection. It was -- as I said, what we wanted to
3  find out is where did they want input from me in terms
4  of opinions and on what issues.
5    Q.   Okay, beyond that, you just don't have a
6  memory?
7    A.   Yeah, again, unless -- we produced all the
8  back and forth to you, so if there's something in
9  there that might refresh my recollection, but I don't
10  just sitting remember a particular day or anything
11  like that.
12    Q.   How much time did you spend getting ready
13  for your deposition?
14    A.   That's always a tough question.  In terms of
15  immediately in the last day or three or, I mean, you
16  know, in total?  I mean, writing a report, doing all
17  the work is ultimately preparing for a deposition,
18  but, you know, in the last week or two, obviously I
19  would have spent more time getting ready for specific
20  deposition prep.
21    Q.   Okay.  Mr. McGeehin, in the last two weeks,
22  how much time have you spent getting ready for your
23  deposition?
24    A.   In the last two weeks, I'm going to guess --

Page 27

1  I'd estimate about 30 hours maybe.
2    Q.   Now, when you say your guess, does that mean
3  your approximation or are you just guessing?
4    A.   Somewhere in between.  I don't have a
5  particular -- any reference to go to to give you an
6  exact number, so I'm just trying to give you a rough
7  order of magnitude.
8    Q.   Okay, all right.  And before that, how much
9  time did you spend preparing for your deposition?
10    A.   I would say -- again, it would be in time
11  records for the month of September, but I don't know,
12  maybe -- maybe another 20 hours, something like that.
13    Q.   So your approximation is you spent about 50
14  hours to get ready for today?
15    A.   And again, just trying to give you a rough
16  order of magnitude.
17    Q.   I understand.  Approximations are
18  acceptable.  Is that your approximation?
19    A.   Yeah, I mean, it's -- it should be somewhere
20  in the ball park.
21    Q.   Okay.  Did you ever compare how much time
22  you spent on the matter versus how much time
23  Mr. Giddings spent on the matter?
24    A.   Yes.

Page 28

1    Q.   And what is the sort of percentage?
2    A.   He would have spent considerably more time
3  than I did, and you know, if you look at the time
4  records, for instance, in -- in June, he spent a
5  little more than twice as much time as I did.
6    Q.   Uh-huh.
7    A.   And then in -- let's say, in July, he spent
8  20 hours, I spent 11 hours, and then in August, I
9  spent more time than he did.  I spent 13 hours and he
10  spent eight hours.  So I don't know what that all adds
11  up to, but he spent more hours than I did.
12    Q.   Approximately for every hour you spent,
13  would it be fair to say that he spent approximately
14  two, in round numbers?
15    A.   Well, I mean, that's something we actually
16  could calculate here I guess.
17    Q.   Approximations are fine.  I could get my
18  calculator out if I was that interested, but I'm just
19  trying to understand as a rough order of magnitude.
20    A.   I don't think it's that high.  Let's see.
21  In the first month, as I indicated, that would be
22  true, but then in the second two months, it's close,
23  but maybe if you add it all up, you get in that ball
24  park.  I don't know.

Page 29

1    Q.   Okay.  I've handed to you what's been marked
2  as Exhibit Number 4.  It is -- it's a one-page
3  document.  It bears Bates numbers MCGE40734.  It's on
4  stationery from the Loews Hotel in New Orleans.  Do
5  you recognize this document?
6    A.   Yeah, it looks like actually my notes from
7  an early conversation.
8    Q.   Okay.  Notes that you took of a discussion
9  you had with whom?
10    A.   With -- it looks like with Ira Press.
11    Q.   Okay, and do you see -- is all of the
12  handwritten information your handwriting?
13    A.   It looks like it.
14    Q.   Okay.  It looks like it may have been
15  written on more than one occasion.  Was all this
16  written on one day or was this an accumulation of
17  communications?
18    A.   No idea.
19    Q.   You don't remember?
20    A.   I don't even remember, as I testified
21  earlier, writing this, but we certainly produced it
22  because you asked for it.
23    Q.   You did produce it, okay.  Do you see where
24  it says referred from Mike B-E-H-N?

93adf20f-b971-4cf2-9ac5-35203b1a8d56

Page 30

```
1     A.   Yes.
2     Q.   Who's that?
3     A.   Mike Behn is a lawyer in Chicago I think.
4     Q.   Uh-huh.  Have you had dealings with
5  Mr. Behn?
6     A.   Yeah, I worked on a case for Mike a while
7  back.
8     Q.   Okay, all right.  And then do you see in the
9  upper right-hand corner, it says file and then it's
10 circled and there's a hyphen, Ed.
11    A.   Yes.
12    Q.   You wrote that?
13    A.   Yes.
14    Q.   What does that mean?
15    A.   Ed, for the file.
16    Q.   Whose file?
17    A.   For his file, you know, just to hold onto.
18    Q.   Oh, I see.  You were preparing this and
19 giving it to --
20    A.   Ed.
21    Q.   Okay, and why were you doing that?
22    A.   I'm not sure I gave a whole lot of thought.
23 Just to introduce him to the case and to tell him to
24 hold onto this.  It had certain information on it
```

Page 31

```
1  about e-mail addresses for Mr. Press --
2     Q.   Uh-huh.
3     A.   -- and Mr. McNeela.
4     Q.   Okay.  Do you see three quarters of the way
5  down references made to reports due July 1?  Do you
6  see that?
7     A.   Yes.
8     Q.   Counsel told you that?
9     A.   Yes.
10    Q.   And then under that, it says, if I'm reading
11 it correctly, it says procedure slash potential?
12    A.   Protocol.
13    Q.   Protocol, FAR and TINA.
14    A.   Yeah.
15    Q.   Why did you write that?
16    A.   Well, as I testified earlier, this -- my
17 recollection, and this would tend to support it, is
18 that there were the discussions in the initial
19 conversation.
20    Q.   Okay, and then reading on the top of the
21 page but toward the right side, do you see where it
22 says, "Violate regs"?
23    A.   Yes.
24    Q.   Why did you write that?
```

Page 32

```
1     A.   I don't know why I wrote it, but apparently
2  somebody must have said that it had to do with
3  violating the regs.
4     Q.   Okay.  Was there a discussion about that
5  subject matter with counsel?
6     A.   I would assume so.
7     Q.   Do you remember it?
8     A.   Nothing further than what I've already
9  testified based on my recollection.
10    Q.   Okay, and then you see it says one half of
11 value?  You see that?
12    A.   I do.
13    Q.   Did you write that?
14    A.   Yes, I wrote everything on this sheet.
15    Q.   Okay.  Why did you write it?
16    A.   I don't know why I wrote it, but apparently
17 somebody must have mentioned something about half of
18 value.
19    Q.   Do you have any memory of that discussion?
20    A.   No.
21    Q.   Half of value of what?
22    A.   I don't remember.
23    Q.   Don't remember?
24    A.   Yeah.
```

Page 33

```
1     Q.   Okay, all right.  There came a point in
2  time, I take it, when you were being -- when you
3  realized that you were being asked to perhaps consider
4  giving opinions about whether or not there were
5  violations of the FAR.  Is that a fair statement?
6     A.   Yeah, yes, or that -- yeah, in my
7  experience, were there -- would these matters
8  constitute violations, yes.
9     Q.   Okay.  When did that thought crystallize in
10 your brain?
11    A.   I don't know that it didn't crystallize
12 right from the beginning.  From the beginning, the
13 intent was for me to give testimony based upon my
14 experience and practices, whether what I was about to
15 look into would in fact constitute pricing violations
16 in the government contract industry.
17    Q.   Okay, so at a certain point, you realized
18 that you were being asked to at least as a consultant
19 and perhaps then as a testifying expert, to offer
20 opinions about whether or not there had been potential
21 or actual violations of the federal acquisition
22 regulations or FAR.  It's all caps, F-A-R.
23    A.   Yeah, but again, within -- within the
24 government contract industry, in my experience, again,
```

9  (Pages 30 to 33)

Page 34

1    not as a lawyer or not as a, you know, giving a legal
2    opinion, but just in my experience, would I view these
3    as violations of the FAR within the government
4    contract industry.
5        Q.    Okay.  Have you been an expert previously on
6    the subject matter of the FAR and whether or not
7    certain activities ran afoul of the FAR?
8        A.    I'd say yes.
9        Q.    Okay.  Can you tell me which cases?
10       A.    It would be easier if I looked at my --
11       Q.    Sure.
12       A.    -- resume.
13       Q.    Yeah, absolutely.  We can do that.  Let me
14   mark as the next exhibit, which will be McGeehin
15   Exhibit Number 5, a copy of your report, which also
16   contains in the back your C.V.  Did I accurately
17   describe Exhibit Number 5?
18       A.    I think you did.
19       Q.    Okay, and I believe as attachment 1, if I
20   recall correctly, your C.V. -- your resume --
21       A.    Yes.
22       Q.    -- is appended.
23       A.    Yes.
24       Q.    And somewhere in that resume is a list of

Page 35

1    cases.
2        A.    Yes.
3        Q.    Listing of expert testimony, okay.
4        A.    Yes.
5        Q.    Could you just tell me, sir, in which of
6    these matters -- well, first of all, what does this
7    list represent?
8        A.    Right.  This list represents to the best of
9    my knowledge of cases that I've -- that have gone
10   either to deposition stage or live hearing and expert
11   testimony stage.
12       Q.    Okay, so these are cases in which you agreed
13   to be an expert, and along the way, you prepared a
14   report and whether at least you gave a deposition and
15   you may have even offered testimony in a courtroom or
16   in an administrative proceeding, fair?
17       A.    I think that's right with one asterisk if
18   you will.
19       Q.    Okay.
20       A.    I think there's a couple references here to
21   some binding DRB, dispute resolution boards.
22       Q.    Okay.
23       A.    And they may not have had reports involved.
24       Q.    Okay, so which ones did you offer opinions

Page 36

1    that concerned the FAR and whether or not conduct ran
2    afoul of the FAR?
3        A.    Yeah, if it's okay with you, it's easier to
4    go backwards from the last page just because that's
5    the most recent, so back on page 11 of my resume --
6        Q.    Okay.
7        A.    The first one is that Midwest Transport,
8    U.S. District Court --
9        Q.    Okay.
10       A.    -- in the Northern District of Texas.  That
11   involves a -- that's an ongoing matter.  I can't go
12   into a lot of details, but that does involve an
13   allegation with respect to a violation of the FAR by
14   the -- by the government.
15       Q.    Okay, so you've given an opinion to one of
16   the parties in that dispute that there's been or
17   hasn't been a violation of the FAR?
18       A.    Yeah, I mean, some -- maybe not stated just
19   that way, but I've given an opinion with respect to
20   whether -- whether or not someone -- you used the
21   phrase run afoul of the FAR.  Whether I viewed that as
22   something from an industry perspective, whether it was
23   or was not, quote, you know, running afoul of the FAR.
24       Q.    Uh-huh, and --

Page 37

1        A.    I'm sorry.
2        Q.    Have you been deposed in that case or is
3    this a criminal case?
4        A.    I don't think it has any criminal aspects.
5    It's a civil.
6        Q.    Okay.
7        A.    But I have been deposed.  Just two things
8    might be helpful.  My client is in italicized -- in
9    italics --
10       Q.    Okay.
11       A.    -- on these sheets, and secondly, if you see
12   a reference to a 2, that's a deposition versus a 1
13   would be a live hearing, and that's under the forum
14   column on the right side.
15       Q.    That's helpful.  Thanks.  So the court has
16   not accepted your opinion that you're a qualified
17   expert at least in that matter.
18       A.    I haven't testified --
19       Q.    Got it.
20       A.    -- in live.  Just deposition on that one.
21       Q.    Okay.  Anything else on that page?
22       A.    Yeah, hold on now.  I've got to go one at a
23   time here.  Yeah, I wouldn't think any of the others,
24   even though they involve government contract issues,

93adf20f-b971-4cf2-9ac5-35203b1a8d56

Page 38

1  they're not running afoul of the FAR, as you said.
2      Q.   And if we go to page 10 of Exhibit Number 5,
3  that's page 10 of your resume attached as attachment
4  1.
5      A.   Halfway up the page, there's a case there
6  involving Lockheed Martin.  Maybe right --
7      Q.   Yeah.
8      A.   Maybe 40 percent.
9      Q.   I see.
10     A.   And that's a case where the government
11  alleged that Lockheed Martin violated an aspect of FAR
12  part 31, cost principles, and I was representing
13  Lockheed Martin on that case.
14     Q.   Okay, and 1 means you testified in court?
15     A.   Yes, and in fact, I think I produced a copy
16  of that -- that was one -- one of the ones that was
17  not under a protective order.
18     Q.   Okay.
19     A.   And with redaction, I could produce for you.
20     Q.   All right, and do you remember what opinions
21  you gave in the case other than there was no violation
22  of part 31?
23     A.   Yeah, yeah, that in my experience, that the
24  -- there were several things that I did in that case,

Page 39

1  but under -- as an accountant, it was a very
2  complicated accounting case, but the opinion was that
3  the manner in which Lockheed accounted for those costs
4  was appropriate, and that was relevant to the
5  treatment under the FAR, in a very general sense.  We
6  also did some calculations for them.
7      Q.   So you were not attempting to quantify
8  damages in the case.
9      A.   No, I think they had been pretty much
10  stipulated.
11     Q.   Okay.
12     A.   Yeah.
13     Q.   And did the scope of your engagement in the
14  Lockheed Martin matter focus exclusively on whether or
15  not the FAR had been violated, or the provisions of
16  the FAR, or not, as the case may be?
17     A.   Yeah, the cost principles.  The government's
18  position that under the cost principles you would
19  reach this result. Lockheed's was under the cost
20  principles, no, you would reach this result, and so
21  that was -- that was the gist of what I was testifying
22  about in that case.
23     Q.   So this was an interpretation of a provision
24  of the FAR and what its impact would be on accounting

Page 40

1  procedures.
2      A.   In a sense.  Again, there's a fine line in
3  terms of, you know, not -- not interpreting the FAR as
4  giving a legal opinion with respect to a particular
5  provision, but in my experience, how that particular
6  issue in the government contract community under, you
7  know, customary practices would be had.
8      Q.   Okay.  Any other cases on page 10?
9      A.   The item right above it, I did not testify
10  in court on that case, but I gave a deposition,
11  Science Application International Corporation, SAIC.
12  I testified in a deposition for SAIC.
13     Q.   Okay, and what opinions did you give?
14  Again, focusing on the FAR.
15     A.   Yeah, yeah, focus on the FAR, that was an
16  organizational conflict of interest case where the
17  government was alleging damages relating to the
18  organizational conflict of interest, and my testimony
19  was that the damages that they were calculating were
20  improper.
21     Q.   Why?
22     A.   Because there was no cause-effect in my mind
23  between the -- what they were alleging and what the
24  damages were calculated.

Page 41

1      Q.   How did the FAR get implicated?
2      A.   Well, the organizational conflict of
3  interest provisions are under the federal acquisition
4  regulations where companies have to follow those
5  rules, where they can't -- they can't wear two hats,
6  if you will --
7      Q.   Uh-huh.
8      A.   -- with respect to two different agencies.
9      Q.   Well, did your opinion focus on that
10  provision of the FAR or whether or not there was a
11  causal relation?
12     A.   More the latter.
13     Q.   Okay.
14     A.   My opinion in that case focused more on
15  damages.
16     Q.   Okay.  Any other cases on page 10?
17     A.   I don't think so.
18     Q.   Page 9?
19     A.   The fourth item from the top, Daewoo
20  Engineering and Construction.
21     Q.   Uh-huh.
22     A.   I gave rebuttal testimony in that case, and
23  the gist of that testimony was the context in which
24  certain pricing violations had been alleged against

93adf20f-b971-4cf2-9ac5-35203b1a8d56

Page 42

1  Daewoo, so I was testifying that in order to assess a
2  violation of the FAR or a false claim, you have to
3  look at the context of the damage calculation to
4  really understand whether or not there was a
5  violation.
6      Q.   What was the principle in Daewoo that you
7  were rebutting?
8      A.   The principle was -- there were about six or
9  seven pricing actions that the government alleged were
10 false.
11     Q.   That constituted false claims?
12     A.   Yes, yes, on a counterclaim, so it was
13 originally a claim by Daewoo.  Government then alleged
14 a false claim.
15     Q.   Okay.
16     A.   And so I was trying to put some context into
17 the violations that the government was alleging on the
18 pricing end of things.  They had another -- they had
19 other false claims dealing with bait and switch and
20 other items, but on the pricing issues, I was trying
21 to identify and explain in the industry the context
22 for some of those alleged violations.
23     Q.   What opinions did you offer about the FAR in
24 the Daewoo case?

Page 43

1      A.   Well, they were -- the opinions -- as an
2  example, there was a reference to FAR part 31 in terms
3  of the pricing under the FAR of construction
4  equipment, and it gets kind of detailed, but the usage
5  of Corps of Engineer equipment raised some -- and how
6  those are used or should be used, so that -- that was
7  one aspect of the FAR.  There was allegations about
8  unallowable costs for things like entertainment
9  included in overhead pools of the contractor, which --
10 which the government alleged were violations of the
11 FAR.  Those types of things.
12     Q.   And you offered an opinion that those
13 unallowable costs were not violations of the FAR?
14     A.   No, I offered -- well, on the first one,
15 yes, okay.
16     Q.   That's on the construction equipment?
17     A.   On the equipment, yeah.  On the
18 entertainment, those were the ones that I was
19 explaining the context of a construction -- not that
20 in and of themselves an entertainment cost is not a
21 violation of FAR.  It was, but that when you look at a
22 $2,000 item on a hundred million dollar construction
23 project, trying to put that into context --
24     Q.   Okay.

Page 44

1      A.   -- is what I was discussing there.
2      Q.   All right.  Have we covered what you did in
3  the Daewoo case as a rebuttal expert?
4      A.   I think so.
5      Q.   Okay.  Any other cases on page 9?
6      A.   I don't think so.
7      Q.   Page 8?
8      A.   There's a case -- there's a case, the second
9  item from the top, United States Department of State,
10 which is our client, versus Perini Corporation.
11     Q.   Uh-huh.
12     A.   In that case I offered testimony and
13 calculations that the costs included by Perini in its
14 overhead pools were unallowable in accordance with the
15 provisions of the FAR, and there was a subsequent
16 false claims case that was settled in that matter, but
17 I didn't offer any testimony with respect to that
18 case.
19     Q.   But you did testify in USA versus Perini
20 about the subject matter you just described?
21     A.   Yeah.
22     Q.   And you were qualified as an expert by the
23 court?
24     A.   Oh, yes.

Page 45

1      Q.   On the issue of -- well, strike that.  On
2  what matter were you qualified, or matters?
3      A.   You know, every proffer is a little bit
4  different, as you may know, and I don't remember the
5  exact wording of the proffer in that case.
6      Q.   Anything else on 8?
7      A.   Yeah, the next item under that is a Northrop
8  Grumman false claims case, where I represented the
9  U.S. Attorney's office and plaintiffs' lawyers in the
10 case that was tried out of Chicago, and I don't
11 exactly remember -- I know -- I know I offered
12 testimony with respect to damages calculations.  The
13 FAR violation in that case had to do with having an
14 acceptable or appropriate material handling system
15 under progress payments under the FAR, but I don't
16 remember if -- if they solicited an opinion with
17 respect to that issue from me.
18     Q.   So you don't remember if your opinions
19 implicated the FAR, at least in the Northrop Grumman
20 matter?
21     A.   Yeah, I think that's right.
22     Q.   Okay.  Anything else on page 8?
23     A.   A little further down, the Newport News
24 Shipbuilding is another false claim action where I

93adf20f-b971-4cf2-9ac5-35203b1a8d56

Page 46

1  represented the government, and that case had to do
2  with -- and that would be kind of the same answer as
3  the other one. The violations had to do with IR and
4  D, independent research and development and bid and
5  proposal costs and damages, and again, as I sit here,
6  I don't remember whether my testimony was just limited
7  to the damages or also to my opinions with respect to
8  those FAR part 31 issues.
9     Q.   Okay. Anything else -- any other cases on
10 page 8 which concern the FAR?
11    A.   Well, yeah. And just to be clear, there's a
12 couple -- there's a legend on the far right hand that
13 talks about E -- it's E, it says federal related. The
14 ones that I was trying to hit here were ones where
15 there was violations of the FAR rather than just
16 generically related to the FAR. As an example,
17 there's a couple of cases I haven't touched on that
18 have to do with lost profits cases where somebody
19 leaves a company, a government contractor, and they
20 get sued because they took business and they have a
21 claim for lost profits, or I'm defending them. So
22 they sometimes have FAR references to them in terms of
23 how you calculate damages, but it wasn't a pure run of
24 -- run afoul of the FAR --

Page 47

1     Q.   Right.
2     A.   -- as we've been discussing.
3     Q.   That's what I want -- appreciate that.
4     A.   Yeah, okay, and then -- so that's it on page
5  8.
6     Q.   Okay. Page 7?
7     A.   On page 7, I represented Honeywell, about
8  the middle of the page, on a false claims violation --
9  or allegation by the government that just went through
10 deposition, and as I recall, my testimony had to do
11 with the appropriateness of allocating costs under the
12 FAR, how you allocate certain costs under the FAR.
13    Q.   Do you have any further recollection of what
14 opinions you gave in the Honeywell case?
15    A.   That's all I remember right now. The case
16 settled, so I don't remember.
17    Q.   Okay, and that -- you gave those opinions in
18 a deposition.
19    A.   Yes, and I think that's all on page 7.
20    Q.   Okay. Anything on 6?
21    A.   On page 6, the Safeco case about halfway
22 down involved the -- as I remember, the government
23 alleging that Safeco -- Safeco's calculation of
24 equipment costs again was not in accordance with the

Page 48

1  FAR part 31, and my testimony was that it was.
2     Q.   Which provisions of the FAR were implicated
3  in that engagement?
4     A.   It's a FAR part 31 that deals with --
5  there's a provision, I don't remember the exact number
6  right now, but it deals with how you price
7  construction equipment under a federal government
8  contract.
9     Q.   All right, and you offered those opinions in
10 connection with an administrative proceeding?
11    A.   Yes, sir.
12    Q.   Okay. Anything else on 6?
13    A.   The mediation -- there's a mediation
14 reference there with the Big Dig up in Boston. Those
15 involved allegations by DCAA that the designer had
16 included costs in its overhead pools and allocated
17 costs that were noncompliant with the FAR. I
18 represented the Big Dig and consulted with the Defense
19 Contract Audit Agency in terms of preparing and
20 presenting and resolving those issues during
21 mediation, but I didn't testify per se.
22    Q.   Did you offer opinions relating to the FAR?
23    A.   Yes.
24    Q.   Which opinions?

Page 49

1     A.   The opinions that I offered there were in
2  terms of the method to allocate overhead under FAR
3  provisions, because the FAR had been referenced in the
4  contracts for the designers at the Big Dig, so DCAA's
5  position -- I don't remember all the details, but was
6  that in accordance with the FAR, that the allocation
7  was not proper under the FAR and some of the guidance
8  under the cost accounting standards. Parson's
9  position was of course the opposite, and I presented
10 at that mediation.
11    Q.   Okay. Anything else on 6?
12    A.   Essex Electro, that was a deposition, as I
13 recall, that had to do with the government's
14 allegation that Essex' method of allocating overhead
15 and claiming overhead under something called an
16 unabsorbed overhead claim was improper, and I -- my
17 opinion -- I offered opinion and calculations about
18 how that should be done, but that didn't go to trial.
19 That was a deposition.
20    Q.   Uh-huh, and you offered opinions about
21 whether or not certain accounting did or didn't run
22 afoul of the FAR?
23    A.   Yeah, and again, I should -- I should
24 tighten that up a little bit. On that one, it's as

93adf20f-b971-4cf2-9ac5-35203b1a8d56

Page 50

1   much case law under the Armed Services Board of
2   Contract Appeal as the FAR per se because the FAR
3   doesn't have -- FAR has a more generic description,
4   but there's been case law over time that helped define
5   that a little bit better.
6       Q.   Okay. Anything else on that page?
7       A.   The bankruptcy case at the bottom of the
8   page, Wells Fargo Bank, my deposition testimony had to
9   do with under government contract regulations, what
10  costs can appropriately be put into a termination for
11  convenience claim or not. The issue there was whether
12  the termination for convenience claim of Kitty Hawk
13  was appropriate as part of the evaluation of the
14  bankruptcy court and the trustees in that case.
15      Q.   What opinions did you offer?
16      A.   I don't remember the exact details, but
17  generally that the -- certain amounts that were
18  included in the claim were either appropriate or not
19  appropriate under -- under, you know, government
20  procurement regulations.
21      Q.   Under the FAR?
22      A.   Yeah, that -- that case I think actually was
23  U.S. Postal Service, which has its own set of
24  regulations. I won't say they mirror the FAR, but

Page 51

1   they're similar to the FAR in terms of --
2       Q.   Okay.
3       A.   -- those types of issues.
4       Q.   Page 5?
5       A.   The second to the last item on the page,
6   U.S. versus Jacobs Engineering, that was a case that
7   generally had to do with an allegation by the
8   government that Jacobs had violated the provision of
9   FAR 31.205, I want to say 46, it's either 46 or 42,
10  with respect to -- it's called the rental cost
11  principle --
12      Q.   Uh-huh.
13      A.   -- where they were renting from an
14  intercompany division and -- I mean, didn't do it
15  right under the FAR, and I offered deposition
16  testimony in terms of that issue and also calculated
17  damages.
18      Q.   Did you offer an opinion about whether or
19  not there was or wasn't compliance with the FAR?
20      A.   That's kind of like one of those -- one of
21  the other ones. I'm not sure exactly of that. I seem
22  to remember that coming up in the deposition, but I
23  just -- I just don't remember. It's back a while.
24      Q.   Okay. Anything else on that page?

Page 52

1       A.   I don't think so.
2       Q.   Okay. Page 4?
3       A.   Second one from the top of the page, that
4   Diverco case was similar to the Essex Engineers case
5   that I talked earlier.
6       Q.   I'm sorry, Diverco. Oh, second one from the
7   top.
8       A.   From the top, yeah. Similar to that Essex
9   Engineering case I talked about earlier that had to do
10  with not purely the FAR, but the FAR as refined by
11  case law on the calculation of unabsorbed overhead
12  under a government contract.
13      Q.   Can you tell me what opinion you offered in
14  Diverco?
15      A.   As I remember, and that's about 15 years
16  ago, but as I remember that, it had to do with how you
17  make the -- how you -- how you make the calculation of
18  what you're trying to measure as unabsorbed overhead
19  and impact as a result of a delay.
20      Q.   And how was the FAR implicated? What
21  provision or what opinion did you offer relating to
22  the FAR?
23      A.   As I said, it's more like that Essex
24  Engineer case. It was more an opinion that --

Page 53

1   something called the Eichleay formula and Byrd
2   fluctuation formulas have evolved in the Armed
3   Services Board of Contract Appeals, and they fall out
4   of FAR part 31 allocation principles and requirements,
5   so it's tangentially related to that.
6       Q.   So Diverco was more about a methodology that
7   was utilized for a damage model?
8       A.   I think that's fair, yeah.
9       Q.   Anything else on page 4?
10      A.   The Ryan-Walsh matter, which is the third
11  from the bottom, had to do with -- it had to do with
12  many things. One of the issues had to do with
13  large -- a large part of the dispute had to do with
14  the calculation and appropriateness under CAS -- the
15  cost accounting standard 416 for the appropriateness
16  of -- of the inclusion of about five and a half
17  million dollars of workmen's comp costs that the
18  government alleged was inappropriate under FAR part 31
19  and CAS standard 416, and I gave testimony that I did
20  not think that it was inappropriate under those
21  standards.
22      Q.   Okay. Anything else on that page?
23      A.   The General Dynamics Corporation at the
24  bottom of the page, that -- I testified at deposition

93adf20f-b971-4cf2-9ac5-35203b1a8d56

Page 54

1  but not in live hearing, and one of the issues in that
2  case was -- maybe all the issues in that case had to
3  do with the allowability and appropriateness of costs
4  under government contract procurement regulations,
5  specifically FAR part 31, saying whether or not in my
6  interpretation in the industry, would these be
7  appropriate costs to include in an overhead pool or
8  were they -- I mean appropriate costs to include in
9  direct charges to the contract or not.
10     Q.    Were you offering an opinion in that case
11  about the applicability of a particular FAR provision
12  or the construction of a particular FAR provision?
13  I'm not understanding what you're saying.
14     A.    Okay, we'll try it again.  This was a
15  termination for -- well, it was a termination for
16  default.
17     Q.    Okay.
18     A.    General Dynamics and McDonnell Douglas was
19  putting in a claim under termination for convenience.
20     Q.    Okay.
21     A.    Under termination for convenience, you
22  submit all the costs that you incur under a contract.
23  Some of those costs the government alleged were not,
24  quote, allowable under the Federal Procurement

Page 55

1  Regulations, the FAR.
2     Q.    Right.
3     A.    And my testimony had to do with that -- that
4  in my opinion -- it was two general issues.  My
5  opinion that they were, and then secondly, there were
6  some sampling methods that were used by the
7  government's expert that I felt were inappropriate.
8     Q.    Okay.  Anything else on page 4?
9     A.    I don't think so.
10     Q.    Page 3?
11     A.    Page 3 at the top of the page, the Northrop
12  Corporation case, as I remember, had to do with an
13  issue of inappropriate bidding process by Northrop
14  that resulted in them understating their estimated
15  costs that they were going to complete the contract.
16     Q.    What opinions did you give about the FAR in
17  that case?
18     A.    I don't remember.  I think most of what I
19  did on that case had to do with just damages.
20     Q.    Okay.
21     A.    I think -- I just don't remember.
22     Q.    Any opinions about whether or not the FAR
23  had been run afoul of in any of the other cases that
24  appear on page 3?

Page 56

1     A.    Let me just -- let me just look.  I see that
2  there's a JAK Construction case.  They're part of the
3  Army.  I know it had to do with issues by the Army
4  about costs that they felt were not appropriate, but I
5  don't -- I don't remember any of the details in that.
6     Q.    Okay.  Should we move to page 2?
7     A.    Sure.
8     Q.    Any cases mentioned on page 2 where you
9  offered opinions about whether or not provisions of
10  the FAR had been run afoul?
11     A.    Yeah, the second item from the top.
12     Q.    Yes.
13     A.    That Litton Systems case, that involved
14  allegations of CAS, cost accounting standard, and FAR
15  part 31 allocation issues, and that was the subject of
16  my testimony.
17     Q.    What opinions did you offer?
18     A.    Again, it's a while ago, but generally it
19  had to do with that -- I believe that the allocation
20  approaches that Litton had used in terms of its
21  computer cost allocations under the FAR and the CAS
22  were inappropriate.
23     Q.    So you testified for the U.S.?
24     A.    Yes.

Page 57

1     Q.    Anything else on page 2?
2     A.    At the bottom of the page there, the second
3  from the bottom was a criminal case.
4     Q.    This is Tempest Products?
5     A.    Yes, and that case -- that case had to do
6  with anti-kickback, and I didn't -- as I recall, I did
7  give a specific opinion about the FAR, but just about
8  the inappropriate conclusion that DCAA had reached in
9  terms of how much money the company had made on that
10  project that they were alleging a kickback.
11     Q.    Was this in connection with a sentencing
12  proceeding?
13     A.    No, it was actually part of the main -- the
14  main hearing.
15     Q.    Okay.  Anything else on 2?
16     A.    The last one on the page was a -- as I
17  recall that case, had to do with calculation of costs
18  under a -- the case I think was originally terminated
19  for default, and I don't remember all the details, but
20  it had FAR termination for convenience and termination
21  for default issues.  I remember -- the only thing I
22  remember about the case was doing some calculations.
23  I don't remember the exact thrust of the testimony.  I
24  think that was a jury trial, but I'm not sure.

15  (Pages 54 to 57)

Page 58

1    Q.   Okay, and you don't remember if you offered
2    opinions about the FAR?
3    A.   I don't.
4    Q.   Okay. Page 1?
5    A.   The third item down, Engineering, Inc., that
6    was a NASA Board of Contract Appeals case, and in that
7    case I offered testimony about, again, the rental cost
8    principle under FAR part 31 and violation of FAR.
9    There was an allegation that what they had done
10   violated the FAR. It gets kind of complicated, but --
11   and I offered opinion that I believed that it did not.
12   Q.   Okay. Anything else on page 1?
13   A.   Down the page a bit, TDC Management, that
14   was another termination for convenience case, and in
15   that case, the government alleged that the costs that
16   had been included by TDC Management were improper, and
17   we -- our firm and me -- and I reviewed that -- the
18   costs, and agreed with certain costs that we felt were
19   unallowable and then disagreed with certain others
20   that we thought were allowable under the FAR.
21   Q.   Did you testify in that case?
22   A.   Yes.
23   Q.   Okay. Anything else on page 1?
24   A.   I don't think so.

Page 59

1    Q.   Okay. Have you ever offered an opinion in
2    any matter about whether data constitutes or doesn't
3    constitute cost and pricing data within the meaning of
4    the FAR?
5    A.   I don't think I've ever asked to give that
6    specific opinion.
7    Q.   Okay.
8    A.   Whenever you're -- take a quick break?
9         MR. SMITH:  Oh, sure.
10        (Recessed at 11:09 a.m.)
11        (Reconvened at 11:15 a.m.)
12   BY MR. SMITH:
13   Q.   Mr. McGeehin, we're going to hand to you
14   what we're going to mark as the next exhibit, Exhibit
15   Number 6. Exhibit Number 6 represents a thread of
16   e-mails starting with one from a Rita Gaskin to you
17   dated June 6th, and continuing right up from -- or to
18   July 5th from a Matt Krafft, K-R-A-F-F-T, to you and
19   Mr. McNeela. Are you familiar with these e-mails,
20   sir?
21   A.   Yeah, they look like they were produced from
22   our offices.
23   Q.   Okay, and I take it you gathered up
24   everything you had in response to the subpoena that

Page 60

1    was served?
2    A.   Yes.
3    Q.   You didn't withhold anything?
4    A.   No.
5    Q.   Okay. In the -- or on the second page of
6    the e-mail thread, reference is made there to the
7    engagement letter and retainer check, and that's --
8    you see that, the e-mail dated June 11th?
9    A.   Yes.
10   Q.   Okay. Does that refresh your recollection
11   about when precisely you were engaged?
12   A.   Yeah, I think that -- it refreshes my
13   recollection as to when the engagement letter was
14   signed and we received a check.
15   Q.   Okay, and I don't remember, did you start
16   working on the matter before you got the retainer
17   check in?
18   A.   Yeah, I think as I indicated earlier, that
19   Ed Giddings has some time on June 8th.
20   Q.   Okay.
21   A.   Again, I may have had some time but didn't
22   charge it prior to opening up the matter officially
23   with the signed LOE.
24   Q.   Okay, okay. Keep next to you if you would

Page 61

1    Exhibit Number 2, all right? We know the engagement
2    letter gets signed sometime on or about June 11th,
3    right? You with me?
4    A.   At least by June 11th, yes.
5    Q.   Okay. Now -- now, can you tell me, sir,
6    between the time that engagement letter was signed and
7    the time your report was prepared and signed by you,
8    can you tell me which documents you reviewed in this
9    case?
10   A.   We would have reviewed --
11   Q.   I'm not on the we.
12   A.   Yeah, okay.
13   Q.   I'm on the you.
14   A.   Got you, got you. I would have reviewed the
15   -- let me take a look at my report to refresh my
16   recollection.
17   Q.   Your report is dated -- or it's marked
18   Exhibit 5. It's right there if you want to look at
19   it.
20   A.   Yeah, I have it here also. Yes, it's the
21   same copy. Attachment 3 indicates the documents that
22   had been considered in forming opinions, and on those,
23   I had read excerpts of some of those and all of
24   others.

93adf20f-b971-4cf2-9ac5-35203b1a8d56

Page 62

1    Q.    Okay.
2    A.    So for example, the indictment I had read.
3    Q.    All right.
4    A.    The consolidated complaint, whether I read
5    every word of it I don't know, but I know -- I recall
6    seeing that and reading it. All of the depositions
7    that we talked about there, as we talked about a
8    little bit earlier, I did not read those depositions
9    entirely. I read excerpts from those depositions.
10   Q.    Had you read those excerpts before the
11   report dated -- I think your report's dated July 1st,
12   2009.
13   A.    I believe so.
14   Q.    You read the excerpts before then.
15   A.    I believe so.
16   Q.    Okay.
17   A.    Again, as we talked this morning, it was
18   pretty -- it's now October, so this is in June, so by
19   July 1, in those three weeks, I would think that I
20   did, but I don't remember specifically.
21   Q.    So you may have read the excerpts, you may
22   not have. You just don't remember.
23   A.    Yeah, I think -- my guess would be that I
24   did because when we talk about specific issues in the

Page 63

1    report, we -- we talk about sometimes specific
2    documents, so in that case, those excerpts I would
3    have read.
4    Q.    Okay. There are DCIS interview memos listed
5    as 8, 9, 10, 11. Had you read them before the report?
6    A.    I had not read all of them. The only one --
7    I remember having read one excerpt from one of the
8    DCIS interview notes, and that was the one with Joe
9    Gallagher. I don't remember reading -- personally
10   reading the others.
11   Q.    Okay. Who selected these DCIS interview
12   memos for you to review?
13   A.    Pretty much with the depositions, all of the
14   documentation we -- just to go back over, I said this
15   morning, we asked for what documentation might be
16   available to support the issues that are relevant in
17   the case, and that's how all of this was provided to
18   us.
19   Q.    So the items that are identified on
20   attachment 3, 1 through 66, they were selected by
21   counsel.
22   A.    I think initially the depositions, the
23   interviews, the identification of who was deposed, who
24   was interviewed, that definitely would have come from

Page 64

1    counsel. Now, there was -- as the process, as we went
2    through and my discussions with Mr. Giddings and his
3    discussions with counsel, we would follow up to
4    certain things. As an example, if in the deposition
5    there was a reference to somebody, as an example,
6    providing the SF-1411 on a given date, we would ask to
7    see a copy of that if it wasn't attached as an exhibit
8    to the depo.
9    Q.    Do you have any memory of asking counsel to
10   see any documents, you personally?
11   A.    Yes, and I asked counsel with respect to
12   seeing all of the documents. In other words, the
13   starting point was I want to see anything that you
14   have that relates to the issues that you want me to
15   opine about.
16   Q.    And then they gave you some information,
17   correct?
18   A.    They gave us a lot of information.
19   Q.    They gave you a lot of information.
20   A.    Right.
21   Q.    Do you there -- in any subsequent
22   communication, do you have a memory of asking counsel,
23   you personally, I would like to see X document, or was
24   it Giddings who was doing all the asking?

Page 65

1    A.    Well, a little bit of both. I would
2    sometimes ask Mr. Giddings for something and then he
3    would get it from counsel.
4    Q.    Okay.
5    A.    So I don't -- whether -- you know, just like
6    McGeehin Deposition Exhibit 4 that you showed me had
7    some notes from an initial meeting that I didn't even
8    remember. Whether there are specific e-mail traffic
9    that talk about those particular issues I don't know.
10   Q.    Sure.
11   A.    There may or may not be, but whether there
12   was or there wasn't, we would just go through an
13   iterative process of saying okay, what is this,
14   where's the SF-1411 for this, where's that?
15   Q.    Do you have a memory of directing
16   Mr. Giddings to ask for any specific documents?
17   A.    I have a recollection of directing
18   Mr. Giddings to follow up on lots of documents through
19   the report. I don't remember a specific one, but
20   everything that's in this deposition binder and
21   everything that's referenced in my report, either
22   Mr. Giddings had that or I asked him for it and we
23   followed up on that.
24   Q.    Okay. And are you generally familiar with

17 (Pages 62 to 65)

Page 66

1  all the documents that are referred to in attachment
2  3, items 1 through 66?
3      A.   I don't know about every one of them.  These
4  are -- what we did here was listed out the documents
5  that were provided to us, and therefore, we wanted to
6  make sure we had an all-inclusive list of what we had
7  received.
8      Q.   Okay.
9      A.   The documents that I felt were perhaps of
10  more significance are organized as part of the
11  deposition binder, McGeehin Deposition Exhibit 1 that
12  I brought with me here today.
13      Q.   When did counsel produce these documents to
14  you?
15      A.   It would have been --
16      Q.   Do you remember?
17      A.   Well, certainly before July 1 when I signed
18  the report, so sometime between the period of early
19  June when they first contacted us and July 1.
20      Q.   How were they produced?
21      A.   I think some of them were produced
22  electronically.  As we looked at McGeehin Deposition
23  Exhibit 3, that was sent to me electronically.  Some
24  may have come electronically and others came in hard

Page 67

1  copy.
2      Q.   And to whom were they sent?  To you or to
3  Mr. Giddings?
4      A.   I mean, they would have come to the office.
5  Whether they were addressed -- the box would have been
6  addressed or the letter was addressed to Mr. Giddings
7  or not I don't remember.
8      Q.   Was there -- or were there transmittal
9  letters when the documents arrived, if they came hard
10  copy?
11      A.   If they were, we've, you know, copied them
12  and given them to you.  We didn't hold anything back
13  in terms of what we --
14      Q.   Do you remember seeing any transmittal
15  letters?
16      A.   Well, the one you showed me here, this is a
17  bit of transmittal letter, McGeehin Deposition Exhibit
18  3.  It's in the form of an e-mail, but it is a
19  transmittal.  Whether there were others like this, I
20  don't specifically recall a particular document.
21      Q.   Okay.  How many witnesses were interviewed
22  by the government in connection with the grand jury
23  investigation?
24      A.   I don't know.

Page 68

1      Q.   How many times was Mr. Rounsaville -- strike
2  that.  Do you know if Rounsaville was interviewed by
3  the government?
4      A.   Yes, as indicated on attachment 3 item 11,
5  we have the DCIS interview notes for Mr. Rounsaville.
6      Q.   Okay.  And do you remember what he was
7  interviewed about that day?
8      A.   No.
9      Q.   Okay.  Do you know if he was interviewed on
10  any other day?
11      A.   No.
12      Q.   And same question with respect to Allan
13  Coon.  You see item 10 there?
14      A.   Yes.
15      Q.   It references an interview by DCIS on 4/10
16  of '04.  Do you see that?
17      A.   Yes.
18      Q.   Do you know how many times Mr. Coon was
19  interviewed by the government?
20      A.   No.
21      Q.   Do you know if it was -- if there were any
22  times in addition to April 10th of 2004?
23      A.   No.
24      Q.   And just so I understand, were you

Page 69

1  interested in knowing everything that Mr. Coon had
2  said to the government?
3      A.   I think we were interested in everything
4  that he said that was relevant to the issues that had
5  been identified by counsel that they wanted my opinion
6  on.
7      Q.   Okay, and who made the determination about
8  relevancy?  Counsel?
9      A.   I would say as a general rule, that would be
10  true here, as in most cases when you're dealing with
11  this kind of volume of documents.
12      Q.   Okay.  So to the extent that these documents
13  appear on this three-page attachment, you largely
14  relied upon the advice of counsel to give you what
15  they thought were the relevant documents.
16      A.   I'm repeating myself, but I think initially
17  in terms of identifying who was deposed, who was
18  interviewed on the issues that were relevant, the
19  answer would be yes.  Then in terms of any follow-up
20  that we might have, you know, for example, asking a
21  question about well, what -- how much was -- was there
22  a quote from -- from -- from Lancaster to Farmingdale
23  on this, we would follow up and be provided
24  information with that, but initially, no question that

Page 70

1  -- that the identification of who was deposed and who
2  was interviewed and what the relevant issues and
3  documents were came from counsel.
4     Q.   Okay. And I think you said you've never
5  been an expert for Kirby McInerney before, for any
6  lawyer?
7     A.   I don't believe so.
8     Q.   Okay, and have you heard about a firm,
9  Labaton, L-A-B-A-T-O-N?
10    A.   Not ringing a bell.
11    Q.   Okay. I want to talk to you about your
12  decisions regarding staffing. Did you make the
13  decision to involve Matthew Krafft and Edwin Giddings?
14    A.   Yes, sir.
15    Q.   Why?
16    A.   Both Matt and Ed have a very extensive
17  background in government contracts and have worked
18  with me, so those would be the general reasons.
19    Q.   Okay. Tell me about Mr. Krafft's background
20  in government contracting.
21    A.   Mr. Krafft has been with me for about 20 --
22  I guess about 20 some years, and during that time,
23  both in terms of advising clients with respect to
24  government contract matters, cost accounting

Page 71

1  standards, cost and pricing issues, FAR unallowable
2  cost issues, he's worked with me on many occasions and
3  by himself with clients on many occasions, both in a
4  litigation and nonlitigation environment on issues in
5  the government contract accounting, costing, pricing
6  arena.
7     Q.   Do you know if he has any experience, prior
8  experience before this engagement about what
9  constitutes or doesn't constitute cost and pricing
10  data within the meaning of the FAR?
11    A.   Yes.
12    Q.   Okay, and what experience is that?
13    A.   Well, I just touched on. He and I routinely
14  work with clients and advise them in terms of what
15  types of issues would be problematic in terms of being
16  supplied or not supplied. We've worked on cases where
17  those -- or where those issues are relevant in terms
18  of somebody alleging a violation of cost and pricing
19  data. Sometimes that would rise to the level of
20  testimony, as we went through here this morning, but
21  sometimes it would not, where we would just consult
22  with a client or advise them with respect to that.
23    Q.   So you're saying that he has experience
24  advising clients about what does or what doesn't

Page 72

1  constitute cost and pricing data within the meaning of
2  the FAR.
3     A.   Sure.
4     Q.   And you do too.
5     A.   Sure.
6     Q.   I think you said that you've never offered
7  opinions about that as an expert.
8     A.   I think I said I've never given a specific
9  opinion on that matter. Not to say of course that I
10  don't deal with that, you know --
11    Q.   Okay, but you advise clients on that --
12    A.   -- routinely on those issues.
13    Q.   Routinely.
14    A.   Yes.
15    Q.   So you have some matters going now?
16    A.   Yes.
17    Q.   What matters?
18    A.   The matter involves -- I'm not going to give
19  you the names of them, but the --
20    Q.   We'll call it company X.
21    A.   Yeah, company X, one that involves a project
22  that they're bidding down south in terms of what --
23  when they're putting their labor rates together, what
24  they need to do and what's an acceptable and not

Page 73

1  acceptable amount to include for certain insurance
2  costs as part of their cost and pricing data. Company
3  B in terms how they allocate their overhead for
4  purposes of bid and proposal and whether if they tell
5  -- what they need to disclose to the government, and
6  if they disclose something to the government, what are
7  the ramifications with respect to potential defective
8  pricing issues that might come up on that issue.
9  Those are two I can think of right now that are
10  ongoing.
11    Q.   Okay. Let's focus on Mr. Giddings. What
12  background does he have in government contracting?
13    A.   Ed -- Ed Giddings has been with me during
14  some of the same types of issues that we just
15  described for Mr. Krafft and myself. I think he's
16  been with me, I want to say seven years plus or minus.
17  Prior to that he worked with Honeywell. He was a
18  compliance officer for a while with Honeywell. He
19  also worked with Sprint in their government contract
20  area, and in addition, he's got consulting experience
21  prior to Rubino & McGeehin and FTI with I want to say
22  Coopers & Lybrand and one of the other big -- well,
23  back then big big eight, but big four now.
24    Q.   Okay, all right. Let me hand to you what

19 (Pages 70 to 73)

93adf20f-b971-4cf2-9ac5-35203b1a8d56

Page 74

1  we'll mark as the next exhibit, which we'll mark as
2  Exhibit Number 7, and for the record, it is an e-mail
3  from Ed Giddings to you and to Matt Krafft. "Attached
4  is an early first draft. Please let me know if I'm on
5  the right path." You see that e-mail?
6      A.   Yeah.
7      Q.   And then of course there's a draft of the
8  report -- an expert report; is that right?
9      A.   Yes.
10     Q.   Now, I think we figured out that the
11 engagement letter was drafted -- strike that, was
12 agreed to on or about June 12th, right?
13     A.   I think -- did we say 12th or 11? Somewhere
14 in there. Well, I think the transmittal --
15 transmittal was --
16     Q.   The signed engagement letter. I'm looking
17 at Exhibit Number 6, okay. There's an e-mail from
18 McNeela to you saying that he's sending PDF copies of
19 the signed engagement letter and retainer check.
20     A.   11th.
21     Q.   The original agreement is coming to the
22 Bethesda office via FedEx.
23     A.   Yeah, the 11th. As I said, the e-mail was
24 on the 11th.

Page 75

1      Q.   So you got the original and the check on the
2  12th, I take it, right?
3      A.   I don't -- I don't know. I would assume we
4  got it on the 12th.
5      Q.   Yeah.
6      A.   But it's of no moment to me.
7      Q.   Okay, and by the 12th, Mr. Giddings was
8  already preparing a draft of the report.
9      A.   Well, if you look at it, it's really not --
10 there's nothing specific about this case in it. What
11 he's doing is he calls it a draft of a report, but
12 it's really just setting up the format of what a
13 report would look like.
14     Q.   Had you directed him to do that?
15     A.   I don't specifically remember saying do
16 that. I think he -- but we discussed saying all
17 right, as we talked earlier, we've got a fairly short
18 period of time, so he may have asked me what format of
19 a report was I thinking about, and then he took a pass
20 at this.
21     Q.   Do you have a memory of discussions you had
22 with Mr. Giddings before he sent you this e-mail?
23     A.   Not really.
24     Q.   No? Okay. He asked if you would let him

Page 76

1  know if you thought he was on the right path, right?
2      A.   Yes.
3      Q.   Did you?
4      A.   Well, ultimately, certainly, because the
5  final report that we issued on July 1 was -- would be
6  what I would consider to be what I want it to be.
7  This --
8      Q.   I understand that.
9      A.   Yeah.
10     Q.   But did you respond to his request with a
11 direction?
12     A.   If there's an e-mail to that extent, I did.
13 I don't remember doing that.
14     Q.   Don't remember one way or the other.
15     A.   No.
16     Q.   Okay, all right. Now, let's look at the
17 draft that he put together marked as Exhibit Number 7.
18 There's a -- part 1 is entitled expert's background
19 and qualifications. Do you know where he got this
20 information?
21     A.   Probably lifted from another report.
22     Q.   Okay. Does that ring true to you?
23     A.   Does what ring true?
24     Q.   That he lifted this from another report?

Page 77

1      A.   I said probably. I don't know.
2      Q.   Okay. And then item number 2, scope of work
3  performed, and that's just left blank, right?
4      A.   Yes.
5      Q.   Okay, and then item number 3, Federal
6  Acquisition Regulations, paren, FAR, closed paren,
7  requirements. Do you see that?
8      A.   I do.
9      Q.   Okay. And then there's about three and a
10 half or so pages of information in that section.
11     A.   Yes.
12     Q.   Do you know where he got this information?
13     A.   I believe he drafted this. As you see, some
14 of it is lifted from the FAR, the certification
15 language out of the FAR, and then he puts some
16 examples in of items that could lead the government to
17 bring defective pricing actions. That may have been
18 -- as I look at it, that may have even been lifted out
19 of a -- we from time to time, we meaning myself and
20 actually Matt and Ed worked with me on doing seminars
21 and presentations to clients and law firms and various
22 professional organizations where we talk about with
23 those clients the kinds of issues and ramifications
24 that come with cost and pricing requirements under FAR

93adf20f-b971-4cf2-9ac5-35203b1a8d56

Page 78

1  part 15, defective pricing, and I seem to remember
2  some of these being lifted out of perhaps a
3  presentation that we gave that had to do with a
4  construction matter.  You see some of these are --
5  they're geared more towards construction, so I think
6  Ed was --
7     Q.   So you think he may have cut and pasted from
8  another document?
9     A.   Yeah, all he was trying to do here was to
10  try and get a format.  He was trying to say hey, Pat,
11  is this kind of the format, call it an outline,
12  format, skeleton sketch, whatever you want to call it,
13  but I would -- I would call -- I would fall short of
14  calling it really a draft report.
15     Q.   When you -- when he asked you that question,
16  how did you respond?
17     A.   I don't -- as I've already testified, I
18  don't remember a specific response in, you know,
19  mid-June.  I know that over time, my response was to
20  make changes to the report, to actually --
21     Q.   Understood, okay.
22     A.   -- actually put the guts into the report and
23  --
24     Q.   So when he asked you for a reaction to this

Page 79

1  draft, you don't remember if you gave him one.  Is
2  that your testimony?
3     A.   No, I didn't say that.
4     Q.   Okay.
5     A.   I said I don't remember what I specifically
6  said to him.  I certainly would -- would react to him,
7  and the reaction would evolve over the point of the
8  next couple weeks.
9     Q.   I'm not asking you for the evolution.  You
10  understand that, all right?
11     A.   I thought you were.
12     Q.   I'm just trying to do the step by step.
13     A.   I actually thought you were.
14     Q.   No, what I'm asking you is he gave you
15  Exhibit Number 7 and he wanted to know if you thought
16  he was on the right path, and I'm not asking you to
17  collapse all of your communications up through July
18  1st.  I'm asking you if on or about June 12th or
19  shortly thereafter, you responded to his inquiry, and
20  if so, what was your response.  And if you don't
21  remember, you don't remember.
22     A.   No, and I'll testify for the third time, I
23  don't have a specific recollection of responding to
24  this particular e-mail at that time.

Page 80

1     Q.   Okay.  Let me hand to you what we'll mark as
2  the next exhibit.  This is an e-mail.  It's marked as
3  Exhibit 8 from Ed Giddings to Andrew McNeela.  Do you
4  see that?
5     A.   I do.
6     Q.   And there's also an e-mail from McNeela to
7  Giddings dated June 22nd as well.  Do you see that?
8     A.   I do.
9     Q.   Had you seen this before today?
10     A.   I was copied on it, so yes.
11     Q.   Okay.  Do you see in the e-mail from
12  Mr. McNeela, it says, "Ed, I am about to leave the
13  office to attend a meeting and then will be headed
14  directly to the train station to travel to D.C. in
15  advance of our 9:00 meeting tomorrow.  Should you need
16  to reach me, my cell phone number is," and then he
17  gives a number.  "I look forward to meeting you in
18  person."  Do you see that?
19     A.   Yes.
20     Q.   Was there such a meeting on June 23rd?
21     A.   Yes.
22     Q.   Were you present?
23     A.   I don't think I was.
24     Q.   Where were you on June 23rd?

Page 81

1     A.   I don't remember.
2     Q.   Okay.  Let's get the billings out.
3     A.   I'm looking at them.
4     Q.   Okay.  You billed an hour to the file on
5  June 23rd, right?
6     A.   Correct.
7     Q.   Follow-up on issues.  Do you see that?
8     A.   I do.
9     Q.   What issues were you following up on?
10     A.   I don't remember.
11     Q.   Do you remember why you didn't attend this
12  meeting?
13     A.   No.
14     Q.   Do you remember what the purpose of the
15  meeting was?
16     A.   Generally, yes.
17     Q.   Okay.  It says under Giddings' entry, expert
18  report, eight hours.  Do you see that?
19     A.   Yes.
20     Q.   On June 23rd?  And then Krafft has meeting
21  with Andrew McNeela and review documents received,
22  five hours.  Do you see that?
23     A.   I do.
24     Q.   Okay.  Do you know what documents Mr. Krafft

21 (Pages 78 to 81)

Page 82

1  was reviewing on June 23rd?
2      A.  I don't know what specific document he
3  reviewed on the 23rd.
4      Q.  Do you know any documents that he was
5  reviewing on the 23rd?
6      A.  Well, as I testified earlier, I don't know
7  specific documents, but this was during the time
8  frame, the last two weeks of June when we're getting
9  in documents, reviewing them, synthesizing them and
10 trying to get ready to issue a report on July 1.
11     Q.  So you don't know if, for example,
12 Mr. McNeela sent documents on the 22nd or brought them
13 with him to the meeting on the 23rd?
14     A.  He may have done both.
15     Q.  You just don't know?
16     A.  Not without looking at any other
17 correspondence that might be around here.
18     Q.  I don't know of any other correspondence,
19 but that's why they call this discovery.
20     A.  Right.
21     Q.  Do you know of any?
22     A.  No, what I mean was we provided it all to
23 you.  You know, I don't have it with me, and if there
24 is correspondence or e-mails to indicate that he sent

Page 83

1  stuff on the 22nd or 23rd, I don't remember that.
2      Q.  Got it.
3      A.  But it very well could be.
4      Q.  Do you have any understanding of what
5  happened at the meeting on the 23rd?
6      A.  I know they went over documents, and
7  Mr. McNeela I assume provided additional documents and
8  showed them documents, as we talked about earlier in
9  terms of documents that are relevant to the opinions,
10 but I don't know specifically which documents on that
11 date.
12     Q.  How do you know he did that?
13     A.  Just based on him saying, when he said he
14 had a follow-up meeting with Andrew McNeela to review
15 documents, so Mr. Krafft said that's what he did, and
16 that's what Mr. McNeela was coming down here in his
17 e-mail, McGeehin Exhibit 8 --
18     Q.  So you're giving us an interpretation of the
19 e-mails as opposed to your personal knowledge.
20     A.  Well, I think I was trying to give you both.
21     Q.  Okay, I want --
22     A.  Yeah.
23     Q.  I want to just confine you to your personal
24 knowledge.

Page 84

1      A.  Okay.
2      Q.  Do you know if McNeela brought documents
3  that day?
4      A.  I don't know --
5      Q.  Okay.
6      A.  -- as I've testified twice, whether he
7  specifically brought documents that day, and I thought
8  I answered that question, but I'm happy to answer it
9  again.
10     Q.  What's causing me to go back and ask these
11 questions again is that sometimes you're giving me
12 what you think may have happened, and I want to make
13 sure that we have a record about what your personal
14 knowledge is, so -- and that's what I'm interested in
15 learning today, unless I ask you to go beyond your
16 personal knowledge.  You don't know what was discussed
17 at the meeting, right?
18     A.  The only thing I know that was discussed at
19 the meeting was that they were going over the
20 documents.  I don't know what particular documents --
21     Q.  Got it.
22     A.  -- that they went over in the meeting.
23     Q.  And beyond going over the documents, you
24 have no knowledge of what happened at the meeting.

Page 85

1      A.  I think that is what happened at the
2  meeting.  They went over documents.
3      Q.  Did they go over anything else?
4      A.  I don't know.
5      Q.  Okay.  Do you know, sir -- go back to
6  Exhibit Number 7, page -- I don't know what page.  The
7  eighth page in.
8      A.  Got it.
9      Q.  Do you see parts 4 and part 5 there?  Part 4
10 is actions taken by Herley Industries, Inc.  Part 5,
11 expert opinions and discussions?
12     A.  Do I see that?  Yes.
13     Q.  Yes.  Do you know if at the meeting on June
14 23rd, there was discussion among Mr. McNeela and
15 Mr. Giddings and Krafft about what information should
16 be inserted into the report in those two sections?
17     A.  As I said, I don't know what specific
18 discussion they had.
19     Q.  Okay.  Let me hand to you what we'll mark as
20 the next exhibit, which is Exhibit 9.  Exhibit Number
21 9 for the record is a series of e-mails, one from
22 Mr. Krafft to Mr. Giddings, and then one from
23 Mr. Giddings to Mr. Krafft, cc you, and it attaches --
24 actually, there's another e-mail too dated June 23rd

93adf20f-b971-4cf2-9ac5-35203b1a8d56

Page 86

1  from Mr. Giddings to Mr. McNeela, and it attaches a
2  draft of your expert report; is that correct?
3      A.   Yes.
4      Q.   Have you seen this document before today?
5      A.   Yes.
6      Q.   When did you see it?
7      A.   Let's see. I was copied on June 24th, so I
8  would assume I saw it then.
9      Q.   Let's turn to the second page of the
10 exhibit. It's the first e-mail, dated June 23rd at
11 3:52 from Giddings to McNeela. Do you see where it
12 says, "Andrew, attached is a revised draft including
13 the items we discussed during our meeting. I will
14 call you to discuss." Do you see that?
15     A.   Yes.
16     Q.   At any time from the time you received this
17 document until today did you have occasion to ask
18 Mr. Giddings about the items that were discussed at
19 the meeting?
20     A.   I don't remember specifically beyond -- I
21 don't remember it, but obviously I would have asked
22 him about what are the areas that we are being asked
23 to opine on as part of the thing, but I don't remember
24 a specific discussion outside of, you know, that they

Page 87

1  just went over the relevant documents during the
2  meeting.
3      Q.   Okay. As of July 23rd, 2009, had you put a
4  pen to a piece of paper relating in any way to
5  drafting this report?
6          MR. PRESS: Objection.
7      A.   Well, I mean, I wouldn't write it down pen
8  -- you're using that just as a phrase, pen to paper?
9      Q.   Yeah, if you do it on your computer.
10     A.   I don't think I at that point would have --
11 would have, outside of just commenting back to them, I
12 don't think -- but again, the e-mail -- if you have
13 e-mail traffic there, it would show all of that back
14 and forth, but if it doesn't, I'm not recalling that
15 as of here, since we just finished with this initial
16 meeting, that I would have had input in terms of
17 changes to this -- to this draft.
18     Q.   So to the extent that you participated in
19 the creation of the report at least up to June 23rd,
20 it was comments that you gave to either Mr. Giddings
21 or to Mr. Krafft.
22     A.   That's what I remember.
23     Q.   Is that your memory?
24     A.   That's my recollection, because if you see

Page 88

1  in this draft there's even discussions about VCOs.
2  That is stuff just lifted out of the complaint, so --
3  and we weren't even asked to say anything about the
4  VCOs, so I don't -- this wasn't -- this wasn't very
5  far along still.
6      Q.   I'm not asking you about being far along or
7  not. I'm just focused on the question of what
8  participation you had in the creation of the draft up
9  through June 23rd, and your best memory is that you
10 may have given comments to either Mr. Giddings or
11 Mr. Krafft or both; is that right?
12     A.   I think that's generally right.
13     Q.   Do you have any memory of any of those
14 comments?
15     A.   Again, the time -- the only trouble, I'm
16 hesitating is the timing. Certainly I had comments by
17 the time we issued a week later, but as of this
18 particular date, I don't remember --
19     Q.   Okay.
20     A.   -- what comments I would have had.
21     Q.   All right. And then let's go to the first
22 page of Exhibit 9 where it says e-mail from Krafft,
23 "Ed, Please see red line changes attached and call me
24 to discuss after you have reviewed them. Pat would

Page 89

1  like to receive a draft today," paren, "before 5:00,"
2  closed paren, "so that he can review it on his flight
3  to D.C." Do you see that?
4      A.   Yes.
5      Q.   Do you have a memory of where you were on
6  June 24th?
7      A.   No.
8      Q.   Is your office in D.C. or in Maryland?
9      A.   My office is in Maryland.
10     Q.   Do you fly into D.C. when you have occasion
11 to be on the road?
12     A.   I guess technically it's Virginia, but yeah,
13 it's a D.C. airport, National Airport.
14     Q.   Okay, got it, okay. So does this refresh
15 your recollection in any way that as of June 24th, you
16 were on the road, you were coming in that night?
17     A.   Yeah, that's what it would appear here.
18     Q.   And how long had you been on the road?
19     A.   I don't know.
20     Q.   Is that why you weren't at the meeting the
21 day before?
22     A.   I don't know.
23     Q.   Well, sometimes these things help refresh
24 your recollection.

93adf20f-b971-4cf2-9ac5-35203b1a8d56

Page 90

```
 1     A.   I know they do, but I'm telling you I don't
 2  know. I don't know where I was on June 23rd and 24th.
 3     Q.   Okay, in the e-mail above it, it says,
 4  quote, "Matt, This draft is not ready for comments.
 5  It includes additional bullets based on the meeting
 6  today. I sent it to you FYI. As we discussed with
 7  Andrew McNeela yesterday, I will discuss this revised
 8  draft with him and make revisions. After that has
 9  been complete, I will send out a draft that will be
10  ready for comments. I am not sure at this point that
11  draft will be complete by 5:00 p.m." Do you see that?
12     A.   Uh-huh.
13     Q.   Do you have any understanding of the
14  discussions that took place between Mr. McNeela and
15  Mr. Giddings relating to the draft?
16     A.   I don't remember specifically what they
17  were.
18     Q.   Okay. Do you have any -- any understanding
19  of what they were?
20     A.   I would assume some one of them was that they
21  weren't asking us to do anything about the VCOs. They
22  weren't asking us to comment.
23     Q.   You don't know that one way or the other?
24     A.   Well, I know that they didn't ask us to do
```

Page 91

```
 1  anything with the VCOs and that's still in the draft
 2  on page 5 of the -- of the report.
 3     Q.   Any further understanding?
 4     A.   I think that's about it.
 5     Q.   Okay. Now, turn if you would to what's
 6  marked as page 5 of the draft report of Exhibit 9.
 7  You see there's a section 4 there, actions taken by
 8  Hurley Industries, Inc.?
 9     A.   Yes.
10     Q.   Okay. Who prepared this information?
11     A.   The first draft of this, as we just
12  discussed, was prepared by Mr. Giddings.
13     Q.   Okay. Are you sure that Giddings wrote the
14  information that's in this section?
15     A.   Yes.
16     Q.   And how do you know that?
17     A.   Because he told me he did.
18     Q.   Okay. He told you that he was the one who
19  either went to his computer or put a pen to a piece of
20  paper?
21     A.   Went to his computer.
22     Q.   Okay, all right. Now, let's look at the
23  bullets. Strike that. Go just above the bullets. It
24  says, "Specific examples of such defective pricing are
```

Page 92

```
 1  listed below." Do you see that?
 2     A.   I do.
 3     Q.   And then there's reference in the first
 4  bullet to VCOs.
 5     A.   Yes.
 6     Q.   Where did that information come from?
 7     A.   As I said, I don't know specifically. I
 8  think it was lifted out of the complaint -- I mean,
 9  I'm sorry, the indictment.
10     Q.   Okay. I think we marked the indictment as
11  an exhibit, if I recall. Yeah, it's marked as Exhibit
12  Number 3.
13     A.   Yeah.
14     Q.   Could you show me where in Exhibit Number 3
15  this information appears?
16     A.   The discussion of the VCO begins on page 9.
17     Q.   Well, actually, there's discussion of the
18  VCO before page 9, but we can start at page 9 if you
19  want.
20     A.   That's where the header is, paragraph 30.
21     Q.   Okay.
22     A.   But I don't know exactly where he lifted
23  this language or if he paraphrased language out of the
24  indictment.
```

Page 93

```
 1     Q.   Now, you knew as of the date of this draft,
 2  June 24th, 2009, that the government had withdrawn the
 3  allegations in the indictment about VCOs, right?
 4     A.   I don't know if I knew it on that date or
 5  not. Oh, did they -- oh, yeah, that they had not --
 6  they dismissed them.
 7     Q.   Okay.
 8     A.   That they weren't pursuing them, yes, I was
 9  aware of that.
10     Q.   Okay.
11     A.   Strike that. Let me be clear. I knew -- I
12  know that -- I knew that at some point. Whether I had
13  focused on it at June 23rd, that I don't remember.
14     Q.   Okay. What I'm trying to understand then is
15  knowing that whatever was alleged against Herley and
16  Mr. Blatt related to VCOs was essentially abandoned by
17  the government. Do you know if the government
18  abandoned the charges relating to VCOs?
19     MR. PRESS:  Objection.
20     A.   Again, I'm not a lawyer. Phrases like
21  abandoned or -- you know, all I know is that they did
22  not pursue those matters after the settlement.
23     Q.   Okay. So you knew by certainly June of 2009
24  that the government was no longer contending that
```

93adf20f-b971-4cf2-9ac5-35203b1a8d56

Page 94

1  there was any wrongdoing associated with VCOs. Fair
2  statement?
3        MR. PRESS: Objection.
4    A.    As of when in June of 2009? That's what I
5  just said, I don't know whether as of June 24th I knew
6  that or I knew that June 25th or 26th.
7    Q.    Okay. Were you concerned in any way that
8  Mr. Giddings was relying upon or may be relying upon
9  an indictment that made allegations that were
10  withdrawn by the government?
11    A.    No, we discussed that. I knew that some of
12  the allegations were not pursued by the government.
13  Again, rather than me repeat this every time, I'm not
14  sure that they were, quote, withdrawn. I just think
15  that they didn't pursue those after Herley pled guilty
16  to the counts that they pled guilty to, so again, I'm
17  not --
18    Q.    Sure.
19    A.    -- saying they were withdrawn.
20    Q.    In your report, you said, if I recall
21  correctly, that you read the transcript of the plea
22  and sentencing.
23    A.    Yeah.
24    Q.    What did the government say about what they

Page 95

1  were doing with the VCO charges in that transcript?
2    A.    I don't remember.
3    Q.    All right, so let's go back then to Exhibit
4  Number 9. There are on page 6 four bullet points of
5  information relating to power heads. Do you see that?
6    A.    Yes.
7    Q.    Okay. Where did that information come from?
8    A.    Again, I don't have a specific recollection
9  except to say that I believe it was based at least in
10  part upon information in the indictment.
11    Q.    In the indictment, okay. And where -- you
12  said in part. What would the other parts be?
13    A.    Whether at this point Mr. Giddings had
14  started to digest any of the transcripts from this
15  case as of this date, I don't know.
16    Q.    Okay. So let's -- let me direct your
17  attention to the bottom bullet point where it says,
18  "At the time Herley prepared its cost estimate for 139
19  power heads in October 2001, it had accumulated six
20  months of actual power head cost data. Herley did not
21  use this historic data as a part of its cost estimate
22  and did not disclose the fact that it had six months
23  of actual power head manufacturing cost data to the
24  government." Do you see that?

Page 96

1    A.    I do.
2    Q.    Where did you get that factual information
3  from?
4        MR. PRESS: Objection.
5    A.    The factual information is an assumption on
6  our part. We are assuming that Herley did not
7  disclose that cost data to the government, so that
8  will either be proven at trial or it won't.
9    Q.    Okay. Who told you to assume this fact or
10  these facts?
11    A.    Counsel.
12    Q.    Okay. So for purposes of preparing this
13  bullet, was this something that -- strike that. Do
14  you know if Mr. McNeela or Mr. Press said assume these
15  facts?
16    A.    Again, just to give you my thinking, this
17  was extracted, as I remember, best I can remember,
18  primarily from the indictment.
19    Q.    Can you show me where in the indictment --
20    A.    Let me -- it may be paraphrased, but that --
21    Q.    That's why we have this thing called
22  discovery. So show me where in the indictment we
23  could find allegations that would either support in
24  summary or in fact the allegations on the last bullet

Page 97

1  point on page 6.
2    A.    Again, I'd have to go through each one of
3  these, but -- yeah, I mean, it either is in here or it
4  came from deposition transcripts. I know -- or we
5  were informed of that.
6    Q.    Well, that's what I'm trying to understand,
7  and if that's the best you can do today, I'll accept
8  that and we'll move on.
9    A.    Yeah, I don't -- I don't know whether
10  there's a specific reference in the indictment to that
11  actual cost data. I know that we reviewed a document
12  which showed the cost data, you know, labor cost data
13  for the period through December of 2001, and I know I
14  reviewed that. I reviewed information that Herley
15  sent to the government that was purportedly based on
16  that information and e-mail traffic with respect to
17  that -- that issue, but on your fundamental question,
18  I'm not proving that Herley did or did not provide
19  that information to the government. That's -- that's
20  an assumption.
21    Q.    Okay.
22    A.    And that's why in our report, we say we have
23  been informed.
24    Q.    Okay, so the we have been informed may be

25  (Pages 94 to 97)

93adf20f-b971-4cf2-9ac5-35203b1a8d56

Page 98

1   we've been informed based upon a review of deposition
2   transcripts or grand jury testimony, or it may be that
3   the source of your information is counsel, right?
4     A.   That's right, and again, that's why it's an
5   assumption.
6     Q.   Sure.
7     A.   Either it was or was not.
8     Q.   Okay.  So would it be fair to state at least
9   with respect to section 4 of the draft, that the
10  bullet point -- the information contained in the
11  bullet points, these are all facts that you're
12  assuming to be true?
13    A.   I think -- I think generally -- I can't --
14  if you look at part 4 of the report, that's not what
15  ended up in the report, so I would say the report that
16  I issued on July 1 of 2009 would state what is opinion
17  versus what is fact and where I'm relying upon a fact
18  that counsel needs to prove at trial.  I have looked
19  at certain documents that may in fact be corroborating
20  or relevant to that conclusion or the testimony that
21  counsel is going to elicit from other witnesses and we
22  can discuss each of those, but in terms of part 4 of a
23  draft, before I'm even involved with it, I wouldn't
24  make a generic kind of statement but I haven't studied

Page 99

1   it for that particular purpose.
2     Q.   Well, I'm not sure I understand your
3   question -- or your answer, so I'm going to ask the
4   question slightly differently I think.
5     A.   Okay.
6     Q.   You had two of your staffers working on a
7   draft of a report, and the form that it was in July --
8   as of June 24th is marked as Exhibit 9, right?
9     A.   Yes.
10    Q.   It was seven days before you had to release
11  and serve an expert report in this case.
12    A.   Yes.
13    Q.   Right?  Somebody, and you think it was
14  Mr. Giddings, was putting down factual information in
15  part 4 of that draft report in the form of those
16  bullets that appear on pages 5 through 8, right?
17    A.   Yeah, factual information or assumptions
18  that would have to be proven.
19    Q.   Okay, and obviously they weren't sitting
20  there wasting their time, right?
21         MR. PRESS:  Objection.
22  BY MR. SMITH:
23    Q.   There was a reason why at least at that
24  moment in time they thought it was important to put

Page 100

1   those facts in the report; is that right?
2         MR. PRESS:  Objection.
3     A.   I would assume that's right.  They're trying
4   to get -- they're trying to get the outline and the
5   skeleton --
6     Q.   Okay.
7     A.   -- and the guts of the report together so we
8   can file it, as you said, a week later.
9     Q.   And I'm just trying to see if we can do this
10  in summary form and maybe we can move a little faster.
11  To the extent that this factual information at least
12  at that moment in time was contained in the report,
13  these are facts that you were assuming would be proven
14  at trial in order for your opinions to come in, right?
15        MR. PRESS:  Objection.
16    A.   As a general notion, we were assuming that
17  certain facts have to be proven at trial.
18    Q.   Are these the facts?  That's what I'm trying
19  to understand, at least as of June 24th.
20        MR. PRESS:  Objection.
21    A.   Some of them are facts and assumptions and
22  others are documents that we looked at.  As an
23  example, if a number -- if we say that there was a 30
24  percent and 40 percent markup, we went and looked at a

Page 101

1   deposition transcript on that one as an example and
2   that's what your witness -- that's what Herley's
3   witness had said.  So it's a mixture of things that
4   we're assuming, but we did ask the questions in terms
5   of okay, what do we know with respect to these issues
6   that we can rely on or look at to help try to kind of
7   fill out the story.
8     Q.   Well, were you concerned at the time about
9   whether or not there was evidentiary support for each
10  of these assumed facts, or was that something you just
11  left up to the lawyers?
12    A.   I think as in any case, we would ask about
13  that and where we were concerned and asked the
14  question and certain things we were told we would --
15  you know, that either is going to be proven at trial
16  or it's not, but assuming that the underlying fact is
17  what it's laid out to be, what is my opinion with
18  respect to in the industry, whether that's an
19  appropriate pricing action or it's not.
20    Q.   Okay, and which facts were you told to
21  assume and which facts did you want to drill down to
22  see if there was evidentiary support?
23    A.   I think it's a -- you know, we can go
24  through each of the items in my report and I can tell

26  (Pages 98 to 101)

**Page 102**

1  you where we drilled down and found additional
2  relevant kind of information, where our investigation
3  took us and what we're, quote, relying on in terms of
4  trying to get comfortable with the underlying
5  principle, but there's no question that in certain of
6  these instances, this being one of them, if it -- if
7  the underlying fact is not right, the opinion might be
8  subject to modification.
9  Q.  Mr. McGeehin, do you remember what question
10  I asked you?
11  A.  Yeah.
12  Q.  What did I ask you?
13  A.  You said do I -- do I know which one of
14  these facts -- where did I -- where was it just a fact
15  and where did I drill down and decide to go for more
16  information.
17  Q.  Okay.
18  A.  I thought I answered that.
19  Q.  Were there facts that you remembered to say
20  look, I'll assume those to be true, but these other
21  facts, I want to drill down and see evidentiary
22  support?  Was that part of your thought process?
23      MR. PRESS:  Are we talking about this draft
24  or are we talking about the report that was filed

**Page 103**

1  right now?
2      MR. SMITH:  We're only talking about Exhibit
3  9 so far.
4      MR. PRESS:  Okay.
5      THE WITNESS:  Yeah, well, with respect to
6  Exhibit 9, as I already testified, that's the
7  beginning of the identification of the issues where
8  counsel is eventually going to want some testimony
9  with respect to my opinions.  The opinion found their
10  way into a report dated July 1, and in there, I think
11  I pretty clearly indicate where we looked at
12  additional information and where it's an underlying
13  fact that there's nothing for us to look at.
14  BY MR. SMITH:
15  Q.  So as of June 24th, you just don't remember.
16  A.  On that -- on that question, I don't know
17  specifically, no.
18  Q.  All right.  Do you have a memory of
19  providing any comments to the draft marked as Exhibit
20  Number 9?
21  A.  I know I've -- I had lots of comments to
22  drafts.  I don't know at this point whether I have a
23  particular written or, you know, edits on the draft at
24  this point yet.

**Page 104**

1  Q.  So you have no memory.
2  A.  I don't remember as I'm sitting here without
3  looking at any additional e-mail correspondence or
4  documents.
5  Q.  What e-mails would you like to look at?
6  A.  Any of the e-mails in the box of information
7  that we produced to you.
8  Q.  Well, you know it's not -- we'll be here for
9  three days if I start doing that, so -- okay, so
10  sitting here, you just have no memory and you think if
11  you looked at an e-mail or two, you may have a memory,
12  but you can't direct me to any of those e-mails.
13  A.  That's a long -- let me give you the answer
14  that I gave you.  As of June 24th, I don't
15  particularly remember responding with any particular
16  edits to this draft that's been designated as McGeehin
17  Exhibit 9.  Obviously by July 1, a week later, we
18  issued a report.  I had substantive comments between
19  this date and that date, but I can't say specifically
20  with respect to this draft.
21  Q.  Okay.  Let's hand to you what we'll mark as
22  the next exhibit, which is Exhibit 10.
23      MR. PRESS:  Can we go off the record for one
24  second?

**Page 105**

1          - - -
2      (Discussion off the record)
3          - - -
4  BY MR. SMITH:
5  Q.  Do you have Exhibit 10 before you, sir?
6  A.  Yes.
7  Q.  For the record, Exhibit 10 is an e-mail from
8  Ed Giddings to you dated June 24th, 2009.  It also
9  attaches some other e-mails as well as a copy of the
10  draft expert report.  Do you recall receiving a copy
11  of this document?
12  A.  Yes.
13  Q.  Okay.  Now, the e-mail to you from
14  Mr. Giddings dated June 24 at 2:49 p.m., I'm going to
15  read it in.  It says, "Subject, re Herley comments.
16  Okay, Ira Press has some overall suggestions for the
17  report, which I will not have time to incorporate by
18  then," period.  "I am working with Andrew on part 4
19  bullets this afternoon and should have them for you by
20  6:00.  However, at this point, he is the source.  I
21  will not be able to verify by 6:00."  Do you see that?
22  A.  I do.
23  Q.  What did you understand by that phrase, at
24  this point, he is the source?

Page 106

1    A.   I think my recollection is what Ed was
2  meaning is that at that point, we have now identified
3  what we think are the issues that counsel would like
4  us to opine on, and the source for those was
5  identification, as you -- as I would have guessed,
6  would be counsel telling us what are the ten issues
7  that they wanted us to look at.
8    Q.   Mr. McGeehin, I want to make sure the
9  record's clear here.  In the preceding sentence, it
10  says, "I am working with Andrew on the part 4 bullets
11  this afternoon and should have them for you by 6:00.
12  However, at this point, he is the source."  Do you see
13  a relationship between those two sentences?
14    A.   He is the source for the bullet points
15  identified in item 4 for the areas that they want us
16  to testify about.
17    Q.   So did you understand this to mean that the
18  source for the information that appears on those
19  bullet points was in fact Mr. McNeela?
20    A.   That is what Mr. Giddings is saying in the
21  cover note, and then if you look at part 4, you'll see
22  that that's not quite the case with respect to all of
23  that.
24    Q.   Okay.

Page 107

1    A.   But I -- I think, just to be clear so I
2  don't think there's anything particularly fascinating
3  about all that, my understanding of what he meant is
4  he is the source for identifying these areas and
5  giving us the skeleton of what the allegation is with
6  respect to each of these issues.
7    Q.   I'll ask again, did Mr. McNeela draft the
8  bullets contained in section 4 of the report or did
9  Mr. Giddings?
10    MR. PRESS:  Objection.
11    A.   My understanding is Mr. Giddings drafted
12  them.
13    Q.   Okay.
14    A.   Mr. McNeela would have been the source for
15  the issue and the allegation that is being made with
16  respect to Herley on each of these issues.
17    Q.   Okay, and it also says in the final
18  sentence, "I will not be able to verify by 6:00,"
19  right?
20    A.   Yes.
21    Q.   Okay, and what verification did you
22  understand him to be talking about?
23    A.   Well, for example, in item 6 here --
24    Q.   Item 6.

Page 108

1    A.   Yeah.
2    Q.   You mean --
3    A.   On page 7, item 6 in part 4.
4    Q.   Yes.
5    A.   There's a note that Mr. Giddings has
6  written, source, guilty plea to obstructing federal
7  audit to be provided by Andrew, so we may -- it
8  appears that we may not have had the guilty plea at
9  this date, and that probably explains why, in answer
10  to your prior question, that the June 23rd draft still
11  had the VCO information in it.  We may not have had a
12  copy of the guilty plea, and that we were waiting to
13  get from counsel.
14    Q.   Okay.  Let's stay with item 6 for a second.
15  It says in there on page 7 of Exhibit 10, "In
16  connection with the pre-award audit, Herley failed to
17  report complete data regarding element yield rates to
18  the government."  Do you see that?
19    A.   Yes.
20    Q.   What wasn't reported to the government?
21    A.   I think it was called run 4.
22    Q.   Okay.  What is run 4?  Do you know?
23    A.   It's the fourth run of some data on the
24  power head elements where they were doing some failure

Page 109

1  rates with respect to the elements, as I understand
2  it.
3    Q.   Who told you that?
4    A.   I looked at the e-mails, internal e-mails to
5  -- among the Herley people that showed the four runs
6  and showed success rates on each of the four runs.
7    Q.   Okay.  Who told you to look at that?
8    A.   Well, in -- in the indictment, this was one
9  of the allegations in the indictment.
10    Q.   What?  About run 4?
11    A.   About not sharing run data with DCAA.
12    Q.   Show me where it says that in the
13  indictment.
14    A.   On page 20, they talk about the auditors
15  asking for data on Defendant Herley Industries'
16  divisions' costs, expenses and yields.  In response,
17  on February 18th, Lee Blatt replaced a negotiator with
18  no knowledge of the yields and costs.
19    Q.   What?  You're reading from 20?
20    A.   Page --
21    Q.   Page 20.
22    A.   -- 20, item 74 has a reference to the
23  yields.
24    Q.   Okay.  What witness said that Mr. Blatt

93adf20f-b971-4cf2-9ac5-35203b1a8d56

Page 110

1  replaced the negotiator with someone who had no direct
2  knowledge?
3      A.   I don't know.  This is just out of the
4  indictment.
5      Q.   Oh, okay.
6      A.   Yeah, I don't know where the specific
7  reference is in here to the yields, but I know that
8  they -- they pled guilty.  I don't have the exact
9  guilty language, but my understanding was it had to do
10  with obstructing an audit process, and that that had
11  to do with the --
12      Q.   Are you finished your answer?
13      A.   Yes, yes, sorry.
14      Q.   As of the date of this e-mail marked as
15  Exhibit 10, focusing on those -- the section of the
16  report, section 4, items 1 through 10, which of these
17  ten items had you or your -- the members of your staff
18  assumed that counsel would provide evidentiary support
19  as opposed to independently determine that there was
20  evidentiary support?
21      MR. PRESS:  We're talking as of the date of
22  this document, Jim?
23  BY MR. SMITH:
24      Q.   Uh-huh.

Page 111

1      A.   I don't remember as of that date.  I just
2  remember that we were in the process of going through
3  and trying to figure out which items might have some
4  information that we could look at.
5      Q.   Okay.  The e-mail makes reference to
6  comments by Ira Press or overall suggestion.  Do you
7  see that?
8      A.   I do.
9      Q.   Do you remember any of the suggestions that
10  Mr. Press was referring to?
11      A.   I don't know whether it was particularly
12  Mr. Press or Mr. McNeela, but there's some comments
13  about, as you go through, there's a reference that
14  says they want more of a discussion of this or that
15  somewhere.  For instance, on page 8.
16      Q.   Do you have any memory of discussions with
17  Mr. Press about the draft and what should or shouldn't
18  be in it?
19      A.   At some point.  I don't know whether I did
20  at this time, at this point.
21      Q.   Okay.
22      A.   For instance, Mr. Press wanted this written
23  in the first person I think.
24      Q.   I'm going to get to all that.  I'm asking

Page 112

1  you as of this time, June 24th, do you have any
2  memory?
3      A.   Just by looking at, there's a comment here,
4  as of June 24th, it says they want this written in the
5  first person.
6      Q.   But I'm asking you if you have a memory of
7  discussions with Press.  I'm not asking you to read
8  from a document where comments are given.  You with
9  me?
10      A.   That's -- that's a somewhat different
11  question, but yes, I'm with you now.
12      Q.   Okay.  Do you have a memory of discussions
13  with Mr. Press about suggestions that he had to the
14  draft as of June 24?
15      A.   I don't know that I have a specific
16  recollection as of this time frame.
17      MR. SMITH:  Okay.  Why don't we take a break
18  for lunch.
19          (Recessed at 12:22 p.m.)
20          (Reconvened at 1:20 p.m.)
21  BY MR. SMITH:
22      Q.   Mr. McGeehin, you ready to proceed?
23      A.   I am, sir.
24      Q.   Okay.  Let me hand to you what we'll mark as

Page 113

1  the next exhibit, which is Exhibit 11.  It's a thread
2  of e-mails, some of which you're the author, some of
3  which you're the recipient.  The top e-mail on the
4  first page is from Ed Giddings to you dated June 26th,
5  2009.  Do you recognize Exhibit 11?
6      A.   Yes.
7      Q.   These are e-mails that were either sent or
8  received by you?
9      A.   Yes.
10      Q.   I think when we left off, we were talking
11  about -- we had Exhibit 10 and it was June 24th, and
12  that was a draft that was put together, right?
13      A.   Yeah.
14      Q.   And I want to direct your attention to the
15  e-mail on the third page of Exhibit 11 --
16      A.   Yes.
17      Q.   -- on the bottom.  This is an e-mail from
18  you to Mr. Giddings and others, including yourself.
19  Do you see that?
20      A.   I do.
21      Q.   Okay, and in there, you say, quote, "Report
22  looking good, will call later with a couple of nits
23  and nats, add in for each of the examples of the
24  violations in section 3 the phrase," comma, "without