Page 114

1  disclosure," comma, "at the end or somewhere in the
2  sentence or blurb for each one, and add in the failure
3  to disclose actual labor hour and cost history from
4  prior performance relating to the product being
5  manufactured." Do you see that?
6      A.  I do.
7      Q.  Do you recall that you thought that by June
8  26th at 8:03 a.m. in the morning, that the report
9  looked good?
10     A.  That's what I said.
11     Q.  Okay, and that you were down to a couple of
12  nits and nats.
13         MR. PRESS:  Objection.
14     A.  Yeah, I did say with a couple of nits and
15  nats, yes.
16     Q.  Okay.  Take your time sheets out.
17     A.  What's the exhibit again?
18     Q.  It's Exhibit Number 2.
19     A.  Yeah.
20     Q.  Do you see in Exhibit Number 2 your time
21  entries, I think on the 25th, you had billed four
22  hours to the file?
23     A.  Yeah.
24     Q.  Right?  Now, what I'm trying to get to is

Page 115

1  how much time had you spent, you personally spent on
2  this report before you got to the conclusion as stated
3  in the e-mail that the report was looking good with
4  the exception of some nits and nats that you had?
5      A.  Well, if you just look at the time records,
6  you can see I'm through, whatever that date is, June
7  -- say close of business June 25th, early June 26th,
8  just add it up, somewhere over 20 it looks like.
9      Q.  How much of that 20 hours that you're adding
10 up was spent actually on the report itself?
11     A.  Well, as you pointed out, I think we were
12 doing with the --
13     Q.  Not the we.  We're on the you.
14     A.  Obviously I don't have total recall on every
15 day and what we were doing.  I can only go by looking
16 at these time records, so I think the first time we
17 had a draft that was even, or whatever these exhibits
18 say that we went over this morning, it was a few days
19 before that in terms of a draft of the report, so I
20 don't know, around ten.
21     Q.  You're saying --
22     A.  On the draft.
23     Q.  -- you have a memory that you personally
24 worked about ten hours on the draft?

Page 116

1      A.  No, I think what I just said, based on
2  looking at my time records and given the schedule that
3  we went over this morning in terms of when drafts even
4  came about, it looks like about ten.
5      Q.  Ten what?
6      A.  Hours.
7      Q.  Ten hours for what?
8      A.  For report-related type of issues.
9      Q.  Okay.
10     A.  Again, and just to be clear, when we're
11 talking about report issues, there's really the report
12 and the file and doing it back and forth, they're all
13 interconnected, so I'm just trying to give you my best
14 recollection based upon looking at the time records
15 and the time frames that you're asking about.
16     Q.  Okay, and you actually believe that you
17 spent somewhere in the neighborhood of ten hours
18 reviewing the draft report, revising, editing and
19 providing comments to the draft report by June 25th.
20     A.  Well, looking at my time sheet, that's --
21     Q.  I'm not asking you to read from your time
22 sheet.
23     A.  That's the only basis I have for the
24 recollection, so either I'll look at the time sheet

Page 117

1  and give you my recollection or I'll say I have no
2  recollection as to how many hours I had.
3      Q.  Well, I can read from the time sheet too.
4      A.  Then go ahead.
5      Q.  Okay, so you have no independent memory.
6      A.  No.
7      Q.  Okay.  What were the nits and nats?  Do you
8  remember?
9      A.  No.
10     Q.  Your time entry indicates that you had a
11 discussion with counsel on June 25th.  Do you see
12 that?
13     A.  Yes.
14     Q.  Did you have such a discussion?
15     A.  Well, that's what the -- that's what the
16 time sheet indicates.  I don't specifically recall one
17 way or the other from other recollection beyond
18 reading my time sheet.
19     Q.  Okay.  Do you have any memory of what you
20 talked about?
21     A.  No.
22     Q.  Okay, all right.  Let me hand to you what
23 we'll mark as the next exhibit, which will be McGeehin
24 Exhibit 12.  For the record, it's an e-mail from Ed

Page 118

1  Giddings to you and Mr. Krafft dated June 26th, 2009.
2  Do you recognize this document?
3     A.   Yes.
4     Q.   Okay.  It says in the e-mail -- well, you
5  received a copy.  You received this e-mail, I take it,
6  right?
7     A.   It shows that I was copied on it.
8     Q.   Okay.  It says, quote, "I have faxed the
9  report to K and M," period.  "They would like to
10 discuss it with us at 2:00 this afternoon.  Pat, on
11 what number can you be reached?"  Do you see that?
12    A.   I do.
13    Q.   Was Mr. Giddings' office in the same office
14 complex as yours?
15    A.   We both work out of the Bethesda, Maryland
16 office, yes.
17    Q.   Okay, okay.  And do you recall, were you in
18 the office on June 26th?
19    A.   I don't recall.
20    Q.   Okay.  Do you have more than one number at
21 your office in Bethesda?
22    A.   Probably.  Do I have more than one line,
23 yes.
24    Q.   Well --

Page 119

1     A.   In my office, there are two phones, there
2  are two lines, if that's what you're asking me.
3     Q.   So it's separated by one digit, I take it?
4     A.   Yeah, I know -- I usually use the 4160.  I
5  don't even know what the other line is.
6     Q.   The fact that Mr. Giddings is asking for a
7  number where he can reach you, does that suggest to
8  you you weren't in the office that day?
9     A.   Yes.
10    Q.   Because he would know your telephone number
11 after 20 years together, right?
12    A.   Again, Mr. Giddings wasn't 20 years
13 together, but he would know my telephone number after
14 how long he's been.
15    Q.   How long have you been with Giddings?
16    A.   I think Giddings has been with me for about
17 seven years, plus or minus, as I testified this
18 morning.
19    Q.   Okay, all right.  Do you have any memory of
20 any discussions with counsel on June 26th about the
21 draft report?
22    A.   Not specifically, no.
23    Q.   Do you know if the draft that was faxed was
24 in any way materially different than what became your

Page 120

1  ultimate opinions in this case in the report that has
2  been marked as Exhibit Number 5?
3     A.   I don't know.
4     Q.   Okay.  Let me hand to you what we'll mark as
5  the next exhibit, which will be McGeehin Exhibit 13.
6     A.   Thanks.
7     Q.   Sure.  Do you recognize this document, sir?
8     A.   Yes.
9     Q.   What is it?
10    A.   Well, it's two e-mails, looks like one from
11 Ed Giddings to Rita Gaskin, who's one of our
12 administrative people, with some of the changes, and
13 then one from me to Ed Giddings attaching certain
14 comments to the report.
15    Q.   Okay, and whose comments are these?
16    A.   Well, the e-mail seems to indicate that the
17 attachments would be my comments on here, although
18 they're not red lined.  The only thing red lined is
19 two items on page 9.
20    Q.   Well, there's actually --
21    A.   Maybe there's some other.
22    Q.   I think there are actually.
23    A.   Okay.
24    Q.   But you don't remember if these are your

Page 121

1  comments or someone else's?
2     A.   Let me just look at -- well, I don't see the
3  other ones you're talking about.  I'm seeing on page 9
4  two -- I don't remember on item 3 there whether those
5  were my -- my comments or not.  They're kind of minor,
6  so I don't know.
7     Q.   Okay.  Do you see where on the first page,
8  it says, quote, "Ed, here are my comments.  I think we
9  are basically there now.  Just need to add documents
10 considered and make sure we are comfortable with all
11 the support," period.  Do you see that?
12    A.   Yes.
13    Q.   What did you mean by add documents
14 considered?
15    A.   There's a section of this, section 3 that we
16 went over, attachment 3 --
17    Q.   Uh-huh.
18    A.   -- saying add all the documents considered.
19    Q.   Well, as of June 29th, the date of this
20 draft, had you considered more documents than those
21 that are identified in attachment 3?
22    A.   It looks like attachment 3 that's attached
23 to this draft looks like after all changes were
24 accepted, and it looks like that Mr. Giddings' draft

Page 122

1 that he's sending to Rita saying go ahead and
2 finalize. So whether there are -- I could compare
3 each item in attachment 3 of this draft with what we
4 had in the final report and see whether we added
5 certain documents to this that hadn't yet been listed,
6 but I don't recall. In fact, there are. There's 26
7 items listed here, and it turns out there are 66 items
8 in our report.
9    Q.   Well, had you considered -- in the final
10 report, there are 66 items, I agree, and I'm looking
11 at them. Why weren't they contained in the draft that
12 has been marked as Exhibit Number 13?
13    A.   I don't know. That's why I think we want to
14 make sure we listed everything out. I don't
15 specifically remember if Ed and I had a discussion as
16 to whether we needed to list all the items out or not,
17 and that may have contributed to what was the final
18 listing of every document. I just don't -- I just
19 don't remember the timing.
20    Q.   Okay. Hand to you what we'll mark as the
21 next document, which is Exhibit 14. Do you recognize
22 this document?
23    A.   Just from being copied on it, yeah.
24    Q.   Do you know if this -- well, strike that.

Page 123

1 For the record, Exhibit Number 14 is an e-mail from
2 Matt Krafft to you and Mr. Giddings dated June 30th,
3 2009 attaching a copy of the draft report; is that
4 right?
5    A.   Yes.
6    Q.   Okay. Do you recognize this as being the
7 next or another iteration of the draft?
8       MR. PRESS: Objection.
9    A.   Yeah, I don't know whether it was the next
10 or another or the same, but the two red lines that we
11 talked about in that last draft are shown -- the same
12 red lines are shown on page 9. I don't know the
13 timing of when those comments would have been.
14    Q.   Okay.
15    A.   Because he mentions here on June 30 that he
16 -- he's made some edits on 3 and 9.
17    Q.   Uh-huh.
18    A.   So I don't know whether he made those two.
19 They're obviously minor, but I don't know whether he
20 made those here or whether they were carried forward.
21    Q.   Okay. Now, was there a procedure in place
22 at the time for how to deal with the drafts?
23       MR. PRESS: Objection.
24    A.   I don't know what you mean by procedure.

Page 124

1    Q.   That's a fair question. Was there a
2 procedure in place to make sure that everybody was
3 working off of one draft?
4    A.   Ultimately that's the goal.
5    Q.   Okay, I understand that's the goal.
6    A.   Right.
7    Q.   And we lawyers do it all the time, and the
8 worst thing you could have is you have three lawyers
9 putting edits into a draft and there are three
10 different drafts floating around, and that can be a
11 problem, particularly when you have sign-off
12 authority. Did your place of business have a
13 procedure to make sure that there was one place where
14 the draft was kept and all edits would go into that
15 draft at that one place?
16    A.   Yes and no.
17    Q.   Okay.
18    A.   Okay.
19    Q.   Do you want to explain?
20    A.   Yes.
21    Q.   Go ahead.
22    A.   Yes in terms of on the server, the copy that
23 Matt and Ed would be dealing with and sending to Rita
24 should be working off that same server draft; however,

Page 125

1 when they attach it to an e-mail and send it to
2 someone, then obviously that could be a second draft
3 or a separate draft.
4    Q.   Okay.
5    A.   Or if I -- or if I attach something to an
6 e-mail, that would be the same case.
7    Q.   Okay. Do you see where it says in the
8 e-mail, "If not already done, you may want to
9 cross-reference a copy of the action paragraphs in
10 report section 4 to the documents in the notebook for
11 the depo binder." Do you see that?
12    A.   Yes.
13    Q.   What did you understand that to mean?
14    A.   I think that's Matt just generally saying to
15 Ed hey, as we often do and as I did in this case, for
16 the depo binder, you take a copy of the report and
17 cross-reference it back to some of the documents that
18 we've looked at that relate to the specific -- each of
19 the ten specific items.
20    Q.   What are the action paragraphs?
21    A.   I don't know what -- that's a phrase, I
22 don't know what he meant by the phrase action
23 paragraph, but report section 4 is the -- each of the
24 -- should have said 3 I think, were the actions --

Page 126

1  where it's actions taken. I don't think action
2  paragraph meant anything except as we said actions
3  taken by Herley, but it should say report section 3.
4     Q.   Uh-huh.
5     A.   In fact, I think the way -- let me just
6  double-check this, but -- yeah, it should have
7  actually been -- there's a typo there that should say
8  report section 4, but in the draft on page 7, it says
9  report section 3, so that was just a typo, so Matt had
10 it right, but this -- what was attached to it says 3.
11    Q.   Okay. Do you have any memory of having any
12 discussions with Mr. Krafft or Mr. Giddings about the
13 draft marked as Exhibit 14?
14    A.   And again, with respect to any of these
15 drafts, I don't have specific recollections on each
16 draft. This was just a continuous process.
17    Q.   And as you see on the last page, attachment
18 3, at least as of what he's sending around, he being
19 Mr. Krafft is circulating as of June 30th, 2009, there
20 are only 26 documents identified.
21    A.   Yes.
22    Q.   Do you know why?
23    A.   Same answer as I gave earlier. I don't
24 know.

Page 127

1     Q.   You've heard of Professor Nash, haven't you?
2     A.   Yes.
3     Q.   How is it that you've heard of him?
4     A.   He is a -- was a professor at George
5  Washington University in the government contracts
6  program.
7     Q.   Did you attend any of his classes?
8     A.   I don't think I ever attended any of his
9  classes.
10    Q.   He has authored a number of books on
11 government contracting. You're aware of that?
12    A.   Yes, sir.
13    Q.   Are you familiar with those books?
14    A.   I'm familiar that they're out there, yes.
15    Q.   Okay. Do you know what they're called?
16    A.   I know some of them. He's got several, one
17 on contract formation I think or something like that
18 and changes and claims. I think he's authored or
19 coauthored three or four books, maybe more.
20    Q.   With his -- with Professor Cibinic --
21    A.   With John, yes.
22    Q.   -- who used to be with us.
23    A.   Yes, he's passed away.
24    Q.   You don't quarrel that he's an expert in

Page 128

1  government contracting, do you?
2     A.   No.
3     Q.   Is one of the books "Federal Procurement
4  Law," third edition, volume 1, 1977, volume 2, 1980?
5     A.   Again, I haven't memorized them, but that
6  sounds right.
7     Q.   Do you own copies of the books?
8     A.   I know we have some of them in our offices.
9  Whether those two particular ones, I don't know, but I
10 know we have some in our office.
11    Q.   Do you refer to his books from time to time
12 as recognized authority?
13    A.   I don't remember a specific reference to
14 them in a particular case, but I wouldn't quibble,
15 again, with him -- with him being, you know, well
16 known and an expert in government contracts.
17    Q.   Including the FAR.
18    A.   Yeah.
19    Q.   Okay.
20    A.   Yeah.
21    Q.   And from time to time when you're doing
22 research about whether or not something does or
23 doesn't run afoul of certain provisions of the FAR,
24 you go and look at the treatises that he authored with

Page 129

1  Professor Cibinic?
2     A.   I wouldn't exclude them, but as I said, I
3  don't remember ever going particularly and, you know,
4  referencing one or relying upon it, if that's what
5  you're asking, but again, I'm not quibbling with his
6  expertise.
7     Q.   Okay, and you know, you and he disagree on
8  certain matters in this case.
9     A.   Apparently.
10    Q.   Have you read his report?
11    A.   I have.
12    Q.   In fact, you prepared a draft of a rebuttal
13 report, didn't you?
14    A.   Yes.
15    Q.   Well, did you prepare it or did the other
16 guys prepare it?
17    A.   Actually, that report, I think I probably
18 prepared the bulk of that.
19    Q.   Okay, all right, just trying to understand
20 --
21    A.   I mean, as with any report, it's kind of an
22 iterative process, but I'm certainly very involved
23 with that.
24    Q.   Okay, all right. Let me hand to you what we

33 (Pages 126 to 129)

Page 130

1  marked as Exhibit 15.
2      A.  Got it.
3      Q.  Let's get your report out, which is Exhibit
4  5.
5      A.  Got it.
6      Q.  Let's start with page 2 of your report,
7  Exhibit 5, page 2.
8      A.  Okay.
9      Q.  Do you see in the second paragraph, it says
10 certain things that you relied upon?
11     A.  Yes.
12     Q.  Okay.  Is there anything else that you
13 relied upon?  And I'm not trying to trick you.
14     A.  Yeah.
15     Q.  So let me tell you what I'm focused in on.
16 Are you relying upon that certain matters which are
17 alleged as a fact will in fact be -- evidence will be
18 offered and a fact-finder will accept as a fact those
19 facts?
20     A.  Yes.
21     Q.  Okay.  Can you tell me which facts you're
22 relying upon for proof of the fact and acceptance by
23 the fact-finder of the fact, and if it's all of
24 section 4, you can just say so and that will make

Page 131

1  things go quicker.  If it's not, you'll point it out
2  to me.
3      A.  Right, so it's all listed I think within
4  section 4, and then each of the ten items would have
5  specific issues that are -- that are relying upon a
6  particular fact.
7      Q.  Okay.
8      A.  So I can go through each one of those if
9  that will be helpful.
10     Q.  I think it would actually, and I'm going to
11 ask you to -- here's a marker.  I want you to
12 highlight for each of the ten paragraphs what you are
13 relying upon for either evidence and slash or
14 acceptance by a fact finder.
15     A.  Do you want me to mark it on the copy that's
16 been -- that's in the record or just on my side copy?
17     Q.  You should be looking at Exhibit Number 5,
18 not the notebook.
19     A.  Oh, oh, oh, oh, got you, got you.
20     Q.  And that's the original.
21     A.  They're the same thing.  That's fine, that's
22 fine.
23         MR. PRESS:  Although the notebook is in the
24 record also.

Page 132

1          THE WITNESS:  That's fine.
2          MR. PRESS:  But we'll go with Exhibit 5.
3  Can you just read back the last question or
4  instruction actually please?
5              - - -
6          THE REPORTER:  Question:  "I want you to
7  highlight for each of the ten paragraphs what you are
8  relying upon for either evidence and slash or
9  acceptance by a fact finder."
10             - - -
11         THE WITNESS:  I think actually, after
12 looking at it, I think in general, the ten items that
13 we're listing there, each of those has to be proved by
14 -- as evidence in court.
15 BY MR. SMITH:
16     Q.  Okay, there has to be proof of the
17 fact-finder would have to accept them.
18     A.  Yes.
19     Q.  Okay, all right.  So we don't need to go
20 over each one.  We don't need to highlight it.  I'll
21 take my highlighter back unless you want it.  If you
22 want it --
23     A.  I thought I was going to steal it.
24     Q.  You can have it if you want.

Page 133

1      A.  That's all right.
2      Q.  All right.
3      A.  Yeah, I think just so the record's clear,
4  there may be issues in here, sir, that I looked at
5  documents relating to the underlying factual issue,
6  but ultimately that -- the ten issues will have to be
7  -- some of them will have to decide that these things
8  in fact happened.
9      Q.  And Mr. McGeehin, just to state the obvious,
10 I can see by your C.V. that you're not new to this
11 business and you probably Googled me and realized that
12 I'm not new to this business, and it's perfectly
13 acceptable for experts to rely or to assume facts to
14 be true.
15     A.  No.
16     Q.  We're not breaking any new ground here.
17     A.  Okay.
18     Q.  Okay?
19         MR. PRESS:  Objection.
20 BY MR. SMITH:
21     Q.  So I just wanted to get a clear record about
22 what you are assuming to be true, and now I have.
23 Let's go to page 3 of your report.  You put a
24 definition of cost and pricing data there, right?

34  (Pages 130 to 133)

Page 134

1    A.   Yes.
2    Q.   Were you the one who actually did the
3  cutting and the pasting and moved this definition into
4  the report?
5    A.   I think Mr. Giddings did this.
6    Q.   Okay, and do you know -- strike that.  Do
7  you remember revising or editing the definition that's
8  set forth on page 3 of your report about cost or
9  pricing data?
10    A.   I don't remember editing it.
11    Q.   Is it a complete definition?
12    A.   No, but in my binder, I do have a complete
13  definition.
14    Q.   Okay.  Excuse me for one second.  I'm
15  looking for a document that I know I have.  Let me
16  hand to you what we'll mark as the next exhibit, which
17  is Exhibit Number 16.  Do you recognize Exhibit Number
18  16?
19    A.   Yes.
20    Q.   What is it?
21    A.   This is an interim FAR part 2 that gives
22  definitions of certain words and phrases.
23    Q.   And is there a definition of cost or pricing
24  data contained in Exhibit 16?

Page 135

1    A.   Yes, page -- well, there's no page on it,
2  but these are alphabetical, so --
3    Q.   Yeah, they are.
4    A.   It's in the C's.
5    Q.   About eight pages in.  That's my
6  approximation.  Now, can you tell me why your
7  definition of cost or pricing data doesn't conform
8  with the definition that's actually in the FAR?
9        MR. PRESS:  Objection.
10  BY MR. SMITH:
11    Q.   Or maybe in your mind it does.  Does it?
12    A.   Yeah, it's -- it is not -- it doesn't have
13  the entirety of the definition included in there.
14    Q.   Okay.  Let's highlight -- I'll give you
15  another opportunity to make off with this highlighter.
16  Highlight for me in Exhibit Number 16 the language
17  that was omitted.
18        MR. PRESS:  Objection.
19    A.   Okay, so in Exhibit 16, highlight what's not
20  included.
21    Q.   Uh-huh.
22    A.   Is that what you're saying?
23    Q.   Yeah.
24    A.   Okay.

Page 136

1    Q.   Now, you know what an ellipses is, right?
2    A.   A what?
3    Q.   See those three little dots there?
4    A.   Yes.
5    Q.   You know what that represents, right?
6    A.   Yeah, that there's stuff in between there.
7    Q.   I'm on Exhibit 5, page 3 in the definition
8  of cost and pricing data.  So -- well, first of all,
9  did you highlight the information that was omitted?
10    A.   Yes, I've highlighted in Exhibit 16 the
11  information that we did not summarize in our report on
12  page 3.
13    Q.   Okay.  When you say summarize, you were
14  quoting verbatim, right?
15    A.   The language that is reflected on the bottom
16  of page 3 are verbatim out of the FAR.
17    Q.   Right.
18    A.   But it's not the complete definition of cost
19  and pricing data in FAR part 2.
20    Q.   Okay.  Well, in your report, you say, "Cost
21  or pricing data is defined at FAR 2.101 as follows,"
22  and then you have a block quote there, right?
23    A.   Right.
24    Q.   And then you give a signal to the reader

Page 137

1  through those three dots that information was
2  eliminated, right?
3    A.   Because it's in the middle of a sentence.
4    Q.   Okay, but then there's other information
5  that was eliminated and you don't give the three dots.
6    A.   Yeah.  Not -- not by any intention.
7  Certainly anybody can look at the definition of FAR
8  part -- of the FAR definition of cost and pricing
9  data.  What we were just trying to do was highlight
10  the salient points that we thought were important in
11  terms of the point we were trying to make at the
12  bottom of page 3.
13    Q.   Okay, so you thought that the information
14  that you eliminated was irrelevant.
15    A.   I'm not saying irrelevant.  It's just that
16  we were trying to highlight a particular point at the
17  bottom of page 3, and so there's an excerpt from the
18  definition.
19    Q.   No, but you give a partial definition of
20  cost and pricing data, right?
21        MR. PRESS:  Objection.
22    A.   Yeah, the definition at FAR part 2.101
23  includes more than what's reflected at the bottom of
24  page 3.

35  (Pages 134 to 137)

93adf20f-b971-4cf2-9ac5-35203b1a8d56

Page 138

1   Q.   Well, if we wanted to be a hundred percent
2   accurate, the sentence that says, "Cost or pricing
3   data is defined at FAR 2.101 as follows," it's not
4   defined that way at 2.101, correct?
5        MR. PRESS: Objection.
6   A.   Well, the language included at page 3 is
7   included in that definition.
8   Q.   Right. It's a part of the definition.
9   A.   Yeah.
10  Q.   Okay. So if we wanted to be a hundred
11  percent accurate, we would say that cost or pricing
12  data is defined, comma, in part, comma, at FAR 2.101
13  as follows.
14  A.   Sure, but I mean, my only point is, you
15  know, obviously by us putting the reference to FAR
16  2.101, we're not trying to -- trying to disguise the
17  fact that there could be more there than that.
18  Q.   Okay. Why didn't you include the whole
19  sentence or the whole -- I'm sorry, the whole
20  explanation, whole definition?
21  A.   We could have. It's just that this is the
22  point that we were trying to highlight, and that's why
23  we included it.
24  Q.   Okay. I'm just trying to understand why you

Page 139

1   were highlighting this point as opposed to the whole
2   point.
3   A.   Well, I mean, we could have.
4   Q.   Okay. I understand that, and you didn't,
5   and I'm trying to understand why.
6   A.   I'm not sure a lot of thought was given to
7   that.
8   Q.   Okay. Were you involved in the decision to
9   define cost and pricing data this way, or was this
10  Giddings' idea?
11       MR. PRESS: Objection.
12  A.   I don't -- I don't recall. He might have --
13  he might have had more, I took some out, I don't
14  remember, or vice versa.
15  Q.   Okay, now, some of the language that you
16  took out is as follows. "Cost or pricing data are
17  factual, not judgmental and are verifiable." Did you
18  think that that sentence was relevant to any of the
19  issues that are at issue in this litigation?
20  A.   Could be.
21  Q.   You just don't know one way or the other as
22  you sit here?
23  A.   It all could be relevant, and you can
24  include the next sentence where it says they do

Page 140

1   include the data forming the basis of the judgment on
2   a contract. Yeah, so all of it can be relevant, and
3   there was -- I don't recall any specific reasoning as
4   to why something was taken out or left in except that
5   we were just trying to highlight this aspect of FAR 2
6   dash 101, but as I said, not a lot of -- at least a
7   lot of my gray matter was put into excluding or
8   inputting language. It was just to kind of frame it
9   out in terms of what the issues were.
10  Q.   Okay, all right. Turn if you would to page
11  7 of your report.
12  A.   Okay.
13  Q.   Okay. In the introductory part of section
14  4, you make reference to defective pricing, right?
15  A.   Let's take a look. Yes.
16  Q.   What is defective pricing?
17  A.   It's pricing that is not current, accurate
18  or complete.
19  Q.   Okay. And as I appreciate you're citing ten
20  examples with respect to the power heads in which
21  you're of the opinion that there was defective
22  pricing, and thus, a -- the company, Herley, ran afoul
23  of FAR principles?
24  A.   I would say either defective pricing or a

Page 141

1   FAR violation.
2   Q.   Okay, okay. Now let's focus on each one,
3   and I'm going to try to understand why it is that you
4   and Professor Nash disagree with each other.
5   A.   Yeah.
6   Q.   Okay? Let's start with your report, item
7   number 1. "In response to the Navy's December 20" --
8   I'm sorry, "December 2000 solicitation for power
9   heads, Herley established a target price in the range
10  of 19,000 to 20,000 based on, among other things, an
11  undisclosed contingency cost," period. Let me stop
12  right there. What do you mean, a target price?
13  A.   The target price, again, as I understand the
14  deposition testimony of Mr. Blatt, was that he came up
15  with -- he thought this thing should cost about
16  $20,000, somewhere between 19 and 20 thousand, so
17  that's in my view what I meant by the phrase "target
18  price."
19  Q.   Okay, so it wasn't as if someone picked a
20  number out of the air and then said all right, now
21  let's figure out a way how we can justify this number,
22  right?
23  A.   I think it's exactly Mr. Blatt picked the
24  number out of the air and then said how are we going

36 (Pages 138 to 141)

Page 142

1  to justify. That's my understanding, pick the number,
2  said 20 grand is what I want the number to be, and
3  then back-fill.
4    Q.   What witness said that Mr. Blatt did that?
5    A.   I think Mr. Blatt himself in his deposition.
6    Q.   You're saying that Mr. Blatt testified that
7  he picked a number out of the air for the power heads;
8  is that right?
9    A.   No, I didn't say out of the air. You asked
10  -- you asked -- you asked -- you asked me did -- who
11  testified about that issue.
12    Q.   No, let's make sure we're real clear here.
13  Let's first define target price. What do you
14  understand target price to be?
15    A.   As it being used in this context, target
16  price was what Mr. Blatt wanted to sell these items
17  for.
18    Q.   Okay, and so Mr. Blatt -- so target price
19  means to you the price that Mr. Blatt indicated that
20  he wanted to charge the government for a particular
21  power head.
22    A.   Right.
23    Q.   That's right? Okay.
24    A.   Yes.

Page 143

1    Q.   And in that -- using that definition, there
2  is nothing that runs afoul of the FAR about having a
3  target price, right?
4    A.   No.
5    Q.   Your target price could be the result of
6  sitting down doing an estimate and coming up with a
7  price, right?
8    A.   Could be.
9    Q.   Okay. Now, are you saying that Mr. Blatt
10  came up with his target price in some way other than
11  sitting down doing an estimate and coming up with a
12  price?
13    A.   Yeah, my understanding is that he did not go
14  through a detailed coming down and estimating and
15  coming up with a price, that he picked a number that
16  he wanted to sell the power head for and that was --
17  he thought he said 20,000. The testimony said 19 to
18  20 thousand.
19    Q.   You're saying that he picked a number
20  without regard to doing some form of a bottoms-up
21  estimate.
22    A.   That's my understanding.
23    Q.   Okay. Show me where he said that.
24    A.   Well, just because he doesn't say that he

Page 144

1  did a bottoms-up estimate. Again, I'm assuming that.
2  Whether that's true or not, it is.
3    Q.   No, I understand, you're assuming it, and at
4  least in this instance, you're telling me the basis
5  for your assumption by directing me to Mr. Blatt's
6  testimony, right?
7    A.   Yes.
8    Q.   Now, what day -- what day are you looking at
9  of Blatt's testimony?
10    A.   In my binder, I have it May 27th.
11    Q.   Okay. And what pages and what lines?
12    A.   The discussion starts at -- let's see here,
13  120, 121.
14    Q.   120 and 121, okay. You're looking at what
15  tab in your -- what's been marked as Exhibit 1?
16    A.   First tab.
17    Q.   Okay. And what pages -- I'm sorry, you gave
18  me the pages, 120 and 121?
19    A.   Yes.
20    Q.   Okay, and you're saying that those are --
21  well, which lines in particular on 120 and 121?
22    A.   Well, it all goes -- keeps going up through
23  125, but basically he's talking about first he
24  recommended to Mr. Tuckman -- the question said 19 to

Page 145

1  19,5, and he says I think I recommended 20, and then
2  the discussion is in the elements, so he had -- he had
3  at least in his mind doubled the cost of the elements
4  to get to that number.
5    Q.   To get to what number?
6    A.   To get to his -- well, theoretically to get
7  to his 19 to 20 thousand dollar target price.
8    Q.   Okay, and how did he establish the rest of
9  the price?
10    A.   I don't know.
11    Q.   What pages of Blatt's testimony did you read
12  other than the ones that are attached as tab 1 to
13  Exhibit 1?
14    A.   I think there might -- there's some
15  additional testimony in tab 8 of my binder that goes
16  from page -- there's about, I don't know -- I don't
17  know how many pages are here, but there's maybe ten
18  pages, so times four, maybe 40 pages.
19    Q.   Are you aware that in Mr. Blatt's
20  deposition, he offered an explanation about how he
21  came up with his price for the power heads?
22    MR. PRESS: Objection.
23    A.   I don't recall specifically how he came up
24  with his price.

37 (Pages 142 to 145)

Page 146

1    Q.   Are you -- you know what a molded can is?
2    A.   What I do remember -- no, I don't know what
3  a molded can is, but I remember him making a point
4  that he made some kind of a comment that there were
5  some issues he thought with a molded can and one other
6  part and that would drive the price --
7    Q.   Correct.
8    A.   That would drive his price up in his mind.
9    Q.   Did he have an estimate for the molded can
10 that went into the price?
11   A.   I don't recall ever seeing any estimate
12 where he built up to that 19,500 price.
13   Q.   Did he testify what his estimate was?
14   A.   If he did, I don't remember.
15   Q.   Okay.  He didn't have to sit down and make a
16 fancy document that says estimate in order to come up
17 with an estimate, right?
18   A.   No, he didn't have to make a fancy document,
19 and if there were no cost and pricing data later, you
20 know, he could have a target price and that's fine.
21   Q.   When you say a target price, sir, do you
22 mean to imply that there's something wrong with that?
23   A.   That's what I just said, if -- if you're in
24 a non-cost-justified mode or atmosphere, you can pick

Page 147

1  a price and put it in and that's it.
2    Q.   Was Mr. Blatt at least as you understood the
3  testimony utilizing his judgment in connection with
4  coming up with his price for a power head?
5    A.   I think initially that would be his
6  judgment, yes.
7    Q.   Okay.  Now, he had been in the business for
8  how long?
9    A.   A long time.  I don't know the exact number
10 of years.
11   Q.   Was he familiar with the technology to build
12 a power head?
13       MR. PRESS:  Objection.
14   A.   I don't know.  I would assume he was but I
15 don't know.
16   Q.   Okay.  Do you take any issue with him
17 utilizing his judgment to come up with an estimate?
18   A.   Not initially, no.
19   Q.   Okay.  And I take it that you don't have any
20 views about what you think the price should have or
21 shouldn't have been, right?
22   A.   Not a specific number, no.
23   Q.   Okay.  Now, going back to that same sentence
24 in paragraph 1 where you make reference to the

Page 148

1  undisclosed contingency cost, that was -- that
2  undisclosed contingency cost was the doubling of the
3  cost for an element --
4    A.   Right.
5    Q.   -- in his estimate, right?
6    A.   Right.
7    Q.   Now, in and of itself -- strike that.  Do
8  you know if there was any cost history available at
9  the company at the time, General Microwave, about what
10 the labor costs were to build an element?
11   A.   The labor or the labor and materials?
12   Q.   Labor.
13   A.   Labor.  I know that Mr. Blatt testified that
14 there wasn't -- that the data was not good.
15   Q.   Okay.
16   A.   I don't know if -- I don't know
17 independently whether --
18   Q.   Okay.
19   A.   -- they did or they didn't.
20   Q.   All right.  There was nothing that
21 prohibited Mr. Blatt from doubling his estimate.
22   A.   At that time --
23   Q.   Right.
24   A.   -- that he did it, no.

Page 149

1    Q.   Okay.
2    A.   And by that time, I mean for the original
3  quote of the 21.
4    Q.   Okay.  Reading on in paragraph 1, it says,
5  "Specifically, Herley arrived at this target price
6  range by doubling the cost of the element component
7  power head from 4,500 to 9,000," and that -- Mr. Blatt
8  testified to that, right?
9    A.   Yes.
10   Q.   Okay.  Reading on, it says, quote, "I have
11 been informed that Herley did not disclose this
12 contingency during negotiation of the power head
13 contracts or during pre-award audit," period.  "As
14 stated above, the cost of the element was a
15 significant part of the cost to the power head,"
16 period.  "Doubling the cost estimate of the element
17 had a material impact on the total cost of the power
18 head," period.  "As such, subsequent negotiated power
19 head contract prices agreed to by the government
20 incorporated this material defect," period.  Let me
21 stop there.  So you're testifying that in your view,
22 Mr. Blatt or someone from Herley was required to tell
23 the government during the negotiation that the
24 estimate for the element had been doubled from 4,500

93adf20f-b971-4cf2-9ac5-35203b1a8d56

Page 150

1  to 9,000.
2      A.   Yes.
3      Q.   And when was that disclosure required?
4      A.   Prior to the agreement on price for the 42
5  units, which would have been in I guess July of 2001.
6      Q.   And who was required to disclose it?
7      A.   Herley.
8      Q.   Okay.  Did you as part of forming an opinion
9  here make an assessment about when the disclosure was
10 required?
11     A.   Not day by day except to say that a
12 disclosure is required, and as consistent with my
13 report and Nash's report, as a date of agreement on
14 price.
15     Q.   And you think the date of the agreement was
16 when?
17     A.   I think the award was July of 2001 on the 42
18 units, and then February 20th of 2002 for the 139
19 units.
20     Q.   Okay.  Now, turn if you would to Exhibit
21 Number 15, Professor Nash's report.
22     A.   Got it.
23     Q.   I think if we just -- you've read this
24 before, right?

Page 151

1      A.   Yeah.
2      Q.   Okay.  Turn to the third page.
3      A.   Yeah.
4      Q.   Do you see where he says, quote, "FAR
5  15.407-1 requires price reduction for submitting
6  defective cost of pricing data," paren, "not current,
7  accurate or complete," closed paren, "but there is no
8  similar requirement if the offeror fails to submit,"
9  quote, "judgmental factors," closed quote, "or
10 contingencies," closed quote, period.  Do you see
11 that?
12     A.   Yeah.
13     Q.   Do you agree with it?
14     A.   Not necessarily.
15     Q.   Okay.  So you disagree about what 15.407
16 requires.
17     A.   Right.
18     Q.   Tell me what is the basis for your
19 disagreement.
20     A.   Yeah, and I think it's -- as I've started to
21 draft in the response and my comments to Mr. Nash, I
22 think there can be times when what he's saying is
23 true, that there's no -- there's no requirement to
24 submit judgmental factors or contingencies, I mean as

Page 152

1  part of a price reduction for defective pricing under
2  cost and pricing data.  I think we both agree, FAR
3  part 15 requires you to submit both of those
4  judgmental factors and contingencies.  So I can really
5  stop there and say we have a FAR violation.
6          Now, going further from there and saying
7  okay, is it cost and pricing data, which is kind of
8  layer 2, I think Mr. Nash in a vacuum can offer some
9  opinions about this, and that's fine.  I think you
10 have to take into context here the totality of what
11 Herley was doing, and if you -- if you recall, the way
12 that they were putting their cost data together and
13 submitting it to the government was not based upon
14 really an estimate in the first instance of a build-up
15 as you use it, a bottoms-up cost build-up, which if
16 you look at the back and forth between the parties,
17 you would assume that it was.  Here's our estimate for
18 labor hours that we came up with, here's our total
19 labor dollars, here's our material, and in that
20 context, by not disclosing something as fundamental as
21 the existence of the contingency, there's no question
22 if -- you can't later second-guess the doubling versus
23 the halving versus the tripling or whatever the -- you
24 can't say in that particular instance that the fact

Page 153

1  that a particular contingency did or didn't happen,
2  that's different.  You know, you can't say well now I
3  want my money back for that.  That's different from
4  did you give the government the information that
5  formed the basis for the way that you put your bid
6  together, and I would say -- I would just say right
7  there Herley failed to do that, and that was relevant
8  information in accordance with the definition of cost
9  or pricing data under the FAR.
10     Q.   I'm going to move to strike the
11 nonresponsive part of your testimony and I'm going to
12 ask you again.  We're focused on the first sentence of
13 Professor Nash's report.  "FAR 15.407-1 requires price
14 reduction for submitting defective pricing or pricing
15 data," paren, "not current, accurate or complete, but
16 there is no similar requirement if the offeror fails
17 to submit judgmental factors."  That's in quotes, or,
18 quote, "contingencies," closed quote.  Did I read that
19 correctly?
20     A.   You read it correctly.
21     Q.   Okay.  And you disagree with what the
22 professor says here, right?
23     A.   Yes.
24     Q.   Okay.  In a nutshell, tell me why you

93adf20f-b971-4cf2-9ac5-35203b1a8d56

Page 154

1  disagree with his explanation of the requirements of
2  15.407-1.
3      A.   Did I -- isn't that what you just asked to
4  strike?  I just did that.  I went through and
5  explained to you, because I think that these -- this
6  contingent -- the fact that there was a contingency
7  and the fact that judgmental factors had been baked
8  into the calculations, that is a fact that would meet
9  the definition of cost and pricing data as opposed to
10 just some contingency that feels doesn't need to be
11 disclosed for some reason.
12     Q.   So you think there are gradations of
13 judgmental factors?
14         MR. PRESS:  Let him finish his answer.
15     A.   Let me finish my answer.  We're talking
16 about an issue of disclosure, right, which Professor
17 Nash says yes, you do have to disclose contingency,
18 but there's no -- if you don't, no harm, no foul,
19 there's no impact from that.
20     Q.   I'm not sure we agree on what Professor Nash
21 --
22     A.   Okay.
23     Q.   -- says and doesn't say, but he's going to
24 be here I think next week to say what's on his mind.

Page 155

1      A.   Well, I'm just reading his report.  That's
2  all.
3      Q.   I don't agree that you're reading by his
4  report.  Let me read from his report where it says
5  quote, "Thus, the failure to identify a contingency
6  does not constitute a violation of the FAR requirement
7  to submit current, accurate and complete cost or
8  pricing data," period, closed quote.  Do you see that?
9      A.   Yes.
10     Q.   Do you agree with that?
11     A.   I think I just went -- went through that.  I
12 just went through that.  He -- Nash says that you have
13 to -- back on the page before there, says that you
14 have to disclose any contingencies in your proposed
15 price.  Where we differ -- okay.
16     Q.   Again, rather than argue about summaries, I
17 don't want to argue with you.
18     A.   Okay.
19     Q.   I just want to be able to hand this
20 transcript to Professor Nash and say here's why
21 McGeehin disagrees with you --
22     A.   Okay.
23     Q.   -- in a nutshell, okay?  You guys can duke
24 this out before a jury and they'll decide if they're

Page 156

1  going to believe you or him, okay?  But Nash is not
2  conceding in opinion 1 that there was a violation of
3  the FAR.
4          MR. PRESS:  Objection.
5  BY MR. SMITH:
6      Q.   But whether he is or isn't, your lawyers, or
7  not your lawyers, but the lawyers for the plaintiffs
8  can ask him and he's going to say whatever he's going
9  to say, but I'm focused on a particular sentence in
10 the last paragraph, his conclusory sentence which
11 says, "Thus, the failure to identify a contingency
12 does not constitute a violation of the FAR requirement
13 to submit current, accurate and complete cost or
14 pricing data," and I just want to ask you, yes or no
15 do you agree with that?
16     A.   I disagree with that.
17     Q.   You disagree, okay.
18     A.   Yeah.
19     Q.   So you think he's wrong?
20     A.   Yes.
21     Q.   Okay.  And you think he's wrong because?
22     A.   Because in this case, the fact that there is
23 a contingency was not disclosed.  Not the amount of
24 the contingency.  So -- and I hate -- I apologize for

Page 157

1  giving you a long answer.  Sometimes they're not in a
2  nutshell, but in this particular case, because of the
3  way that the proposal developed, that contingency and
4  the failure to disclose that contingency was critical
5  and would be considered cost or pricing data in my
6  view.
7      Q.   Okay, so this focuses on a unique set of
8  factual circumstances in your mind?
9      A.   Yes.
10     Q.   And what are those unique facts that you're
11 assuming to be true?
12     A.   Several.  One, the fact that the target
13 price, using my definition as we discussed on the
14 record, of in that 19 to 20 thousand became pretty
15 much the price that ran through all of the submissions
16 and negotiations for the 42 units.  Second, the fact
17 that a tutorial by another person at Herley in another
18 division that wasn't even meant to be the estimate for
19 this -- for this contract, where $19,900 became a bid,
20 and then not coincidentally, it would appear based
21 upon just watching the evolution, that number was
22 backed into, all of which presuppose at the outset in
23 the target price that we had this doubling of the
24 estimate for the element.

Page 158

1    Q.    Okay.  Let's break that down a little bit.
2  The price that actually went to the government, was
3  that supported by Mr. Blatt's estimate?
4    A.    Which price?  Which one?
5    Q.    One that he testified to at his deposition,
6  how he came up with the price.
7    A.    I would say no.
8    Q.    Why?
9    A.    Because the original number that went to the
10 government was an exact number of, you know, $19,897.
11 I think I have the right number.  Yeah, 19,897, which
12 was not based upon what Blatt had -- had talked about
13 except that it's in the ball park.  And secondly, it
14 was based upon a, quote, tutorial by Mr. Rounsaville,
15 who had sent it over to Herley Farmingdale as an
16 example of how you might kind of put a price together,
17 and that then became the price that went to the
18 government.
19   Q.    What was the difference between Blatt's
20 estimated price and the Rounsaville number that you're
21 talking about?
22   A.    If it was 20, it was in -- within dollars.
23 If it was 19,5, it was within $500, so close.
24   Q.    Whose number was higher?

Page 159

1    A.    Well, the deposition transcript of Blatt
2  seemed to say he was saying he thought 20, and then
3  the number that went in on a tutorial was 19, I want
4  to say 897 from Mr. Rounsaville.  I'm not sure I'm
5  saying that right.  Rounsaville.  But what I'm saying
6  is outside of just trying to come to $20,000, my
7  understanding is there was no connection between the
8  methodology used to estimate the 19,897 and whatever
9  methodology that Blatt may or may not have used to
10 come up with his ball park of 20,000.
11   Q.    Well, what was Blatt's methodology to get to
12 20,000 other than the 9,000 for the element?
13   A.    That's all I know, and the two points you
14 brought out that you said that he thought he had two
15 problems in talking to --
16   Q.    You're talking about the molded can and the
17 connector?
18   A.    Yeah.
19   Q.    Was there anything -- did he do estimates
20 for the molded can and the connector?
21   A.    You know, I don't remember.
22   Q.    So you didn't factor those into your
23 analysis.
24   A.    No, I didn't -- I didn't factor it into my

Page 160

1  analysis.  I don't have any sheet of paper from Blatt
2  coming up to that 20 thousand.  All I know for sure is
3  the doubling of the element.
4    Q.    You don't have a sheet -- you don't have a
5  sheet of paper about the doubling of the element
6  either, right?  You have his testimony.
7    A.    Testimony, right.
8    Q.    Right, and to the extent he testified about
9  how he came up with the 20,000, no one's brought it to
10 your attention and you haven't read it, other than the
11 doubling.
12   A.    No, I do remember, as I testified half hour
13 ago, that there was issues with respect to those two
14 issues, and -- but I don't remember him doing a
15 calculation --
16   Q.    Okay.
17   A.    -- showing those dollars.
18   Q.    Okay.  Show me where in the Blatt testimony
19 in your book you have testimony about the two issues,
20 the doubling and the -- not the doubling.  The molded
21 can and connector.  Which tab should I go to?
22   A.    I don't know that we do, but let me check.
23 We have some of Blatt's testimony at tab 8, and if I
24 could look at the original -- the one point, the

Page 161

1  original that's been marked for the deposition has
2  some highlighting in it --
3    Q.    Oh, sure.
4    A.    -- that didn't copy in the two copies here.
5    Q.    Here you go.
6    A.    Yeah, thanks.
7    Q.    Sure.
8    A.    Yeah, this is some of the discussion in here
9  about the historical pricing.
10   Q.    I'm on molded cans and connectors.
11   A.    Yeah, I'm just getting there.  I don't have
12 total recall on all this.  Here's what I had
13 remembered reading that you had asked me about
14 earlier, page 229.
15   Q.    Okay.
16   A.    And on page 229, he's estimating how he came
17 up with the material costs associated with the $9,500
18 bid, and he says, "I think it was in the range of
19 three or four thousand.  I know all the small bits and
20 pieces.  I think I estimated 2,000.  The major
21 problems were the connector and the molded can."
22 That's what you were talking about.
23   Q.    Uh-huh.
24   A.    And then on 230, "How did you" -- "How did

41 (Pages 158 to 161)

93adf20f-b971-4cf2-9ac5-35203b1a8d56

Page 162

1  you get these prices in that range?" "By my
2  experience." And then it goes on and on. I don't
3  know if you want -- you just asked me specifically to
4  identify where the discussion of the connected and
5  molded cans were in Blatt's testimony, May 27th, 2009,
6  page 229 and 230.
7      Q.  So that was in connection with his
8  explanation about how he established the material part
9  of the estimate that he did?
10     A.  Yeah, I mean, that's -- that's what I --
11  that's what I remembered reading about this can thing
12  that you talked about.
13     Q.  Okay, okay, and he was offering testimony to
14  support what number in his estimate?
15     A.  Well, it's a little unclear, but this had to
16  do with the $9,500 intercompany bill.
17     Q.  Ninety-three or 95?
18     A.  Well, it turned out to be 9,000 I think that
19  was -- the question said 9,300.
20     Q.  Wasn't it 9,300? Which tab are you looking
21  at, by the way?
22     A.  Okay, this is tab number 8, page 229.
23     Q.  Page 229, okay. On line 16 at 229, the
24  question's asked, quote, "If as you said before, the

Page 163

1  material costs were generally one-third of the overall
2  bid, and if the estimated bid you had for the
3  subassembly was 9,300, do you recall the material cost
4  for the subassembly being in the range of 3,000?"
5  Answer: "I think it was in the range of three to four
6  thousand. I know all the small bits and pieces I
7  think I estimated at 2,000. The major problems were
8  the connector and the molded" -- it says "cam." It
9  should be "can."
10     A.  Yeah.
11     Q.  Question: "How do you estimate the price in
12  the $2,000 range?" Answer: "By my experience."
13  Question: "Did you go and look at any catalogs for
14  pricing, you know, a part that was necessary to make a
15  subassembly?" Answer: "If I may, if you have this
16  room to paint," and then you can read as well as I
17  can, right?
18     A.  I'm not sure, but I can read it.
19     Q.  You can't read?
20     A.  No, I said as well as you.
21     Q.  Oh, that's all right. What's wrong with
22  this estimate?
23     A.  I didn't know that we were on to wrong with
24  the estimate. You just had asked me where it was.

Page 164

1      Q.  Well, that's what I asked.
2      A.  Okay, so we're off of that.
3      Q.  Yeah, you see here he's giving you an
4  explanation about how he came up with the estimate to
5  support his number, which you like to call target
6  price, right? What's wrong with it?
7      A.  Well, this -- this now is on to the estimate
8  of the subassembly.
9      Q.  Okay.
10     A.  We're talking about now the bid from Farming
11  -- from Lancaster to Farmingdale as to how they came
12  up with this $9,000 number for the subassembly.
13     Q.  You don't take issue with that in your
14  opinion?
15     A.  Not in the opinion that we were just talking
16  about. Back in -- back in opinion number 8, which
17  we'll get to, I do take exception to the fact that the
18  cost information at the time would seem to suggest
19  that the estimate for the materials was nowhere in
20  that range. All he's talking about here is if you use
21  his rule of thumb of a third, a third, a third, and
22  you take a third of 9,000, isn't that about 3,000, and
23  he says yes. I'm not sure how -- how penetrating and
24  detailed that kind of an estimate is, but it is what

Page 165

1  it is.
2      Q.  Okay. Are you expressing an opinion in this
3  case about the $9,300 that was part of the bid for the
4  subassembly to be built in Lancaster?
5          MR. PRESS:  Objection.
6      A.  Opinion 8, we have a discussion about that.
7  I'm not giving an opinion that I know what the number
8  was or -- I mean, should have been.
9      Q.  Right.
10     A.  I'm just saying that that estimate, based on
11  other contemporaneous information, didn't seem to be
12  supported, and that other information wasn't shared.
13     Q.  Okay. Well, let's wait until we get to 8
14  then and we'll --
15     A.  Okay.
16     Q.  Let's move on to opinion number 2.
17     A.  All right.
18     Q.  Back to your report, and hopefully the air
19  conditioning guy will come here and relieve us of this
20  80 degree temperature we find ourselves in.
21     A.  Part of the strategy, right.
22     Q.  Opinion number 3, quote, "In forming his bid
23  on the first power head contract with the Navy,"
24  comma, "Herley did not rely upon historical data

93adf20f-b971-4cf2-9ac5-35203b1a8d56

Page 166

1  regarding the per-unit power head price charged in
2  prior bids or the labor hours or material costs
3  associated with the manufacture of power heads." Let
4  me stop right there. How do you know that's true?
5  What facts do you have, or are you just assuming that
6  again?
7      A.  No, because -- because we know that the
8  exact amount that went in was based upon
9  Mr. Rounsaville's calculation, which he describes in
10  his testimony as a tutorial, just as an example of how
11  you might do something a third, a third, a third.
12      Q.  What historical data about labor hours and
13  material costs was available at the company at the
14  time of this bid?
15      A.  Well, it depends.  At the time of the bid --
16      Q.  Or at the time of the agreement.
17      A.  Well, up through the time of the agreement
18  -- well, short answer is I don't know exactly with
19  respect to the first power head contract for 42 units
20  what information, actual data existed from Herley.
21      Q.  Okay.  Now, reading on, it says, next
22  sentence, quote, "Instead, Herley started with the
23  target price of the range of 19 thousand to 20
24  thousand and backed into the amounts for labor,

Page 167

1  material and overhead costs."  Do you see that?
2      A.  Yes.
3      Q.  Mr. Blatt never testified that his $20,000
4  figure that he came up with was a result of starting
5  with a target number and backing into it, did he?
6      A.  I don't know whether he did or not, but
7  Mr. Rounsaville did.
8      Q.  Okay, but didn't Blatt tell you how he came
9  up with his number?
10      MR. PRESS:  Objection.
11      A.  We already went through this.  I don't think
12  so.  I don't know how he came up with his specific
13  number of 20,000 except to know that he doubled the
14  price -- his estimate -- first of all, it wasn't even
15  -- let's be clear on that.  It wasn't doubling his
16  cost of the element from 4,500 to 9,000.  It was his
17  doubling of an estimate of the element from 4,500 to
18  9,000, and then the two issues that you raised about
19  the connector and the cans, which I don't know
20  specifically what calculations he might have done to
21  factor those in.
22      Q.  But Mr. Blatt never testified that he was
23  involved in any way, shape or form in terms of backing
24  into a number, did he?

Page 168

1      A.  I don't think -- I don't know that Mr. Blatt
2  did.  I wasn't saying that he did.
3      Q.  Okay.  And you're saying you're relying upon
4  Rounsaville's comment for this backed into concept?
5      A.  Yes.
6      Q.  Reading on in your report, same paragraph,
7  it says, "Those costs which were not based on
8  historical data assumed that the target price of
9  approximately 20,000 would consist of one-third
10  material costs, one-third labor costs and one-third
11  overhead and profit."  You got that from Rounsaville's
12  testimony?
13      A.  I think -- well, you can get that from
14  Rounsaville's actual estimate, and I think it's also
15  in Blatt's testimony that he said generally it's a
16  third, a third, a third.
17      Q.  Okay, now, let's take a look at what Nash
18  says.
19      A.  Yes.
20      Q.  In Nash's report, he says -- you see where
21  it says opinion 2?
22      A.  Yes.
23      Q.  "Asserts that Herley not rely on historical
24  data," in quotes, "in arriving at its estimate.  This

Page 169

1  opinion reflects a fundamental misunderstanding of the
2  FAR requirement," period.  "The cost or pricing data
3  provisions constitute a disclosure requirement, not a
4  use requirement."  Okay.  Do you agree with that?
5      A.  Yes.
6      Q.  Okay.  Reading on, it says, "The purpose of
7  the requirement is to ensure that the government
8  personnel have the same factual information as the
9  offeror when they are negotiating prices," period.  Do
10  you agree with that?
11      A.  Generally, yes.
12      Q.  Okay.  Reading on, it says, quote, "This
13  allows the government personnel to evaluate the
14  validity of the offeror's estimate and to come up with
15  their own estimate for purposes of negotiating the
16  ultimate price," period.  Do you see that?
17      A.  Yeah.
18      Q.  Reading on, it says, quote, "There is no
19  requirement that the contractor use the cost or
20  pricing data to arrive at its proposed price."  Do you
21  see that?
22      A.  Yes.
23      Q.  Do you agree with that?
24      A.  Yeah, I'm okay with that general opinion.  I

43 (Pages 166 to 169)

93adf20f-b971-4cf2-9ac5-35203b1a8d56

Page 170

1  think he just missed what I was saying. We make a
2  comment in the beginning that they did not rely on
3  historical data, but that's just framing out the
4  issue. Our conclusion -- my conclusion is at the end
5  that they didn't disclose their whole pricing
6  technique at the time they submitted and agreed to the
7  price.
8      Q.   Okay. Opinion number 3, your report,
9  Exhibit 5, states, quote, "Historical sales data
10 indicates that Herley sold power heads to various
11 customers from 1989 through 2001. The sales price for
12 those power heads ranged from $3,795 per unit for
13 seven units sold to Fleet International in 1997 to
14 7,500 for one unit sold to SEACAL in 1998. The cost
15 estimates for power heads readily provided to the Navy
16 in 2001, including an 11 percent profit, were 20,241
17 per unit for 42 units, and 18,775 per unit for 139
18 units. I have been informed that during price
19 negotiations with the Navy, Herley did not disclose
20 the historic sales data." Did I read that correctly?
21     A.   Yes, sir.
22     Q.   Okay. So you're taking issue with, assuming
23 it's to be true, that Herley didn't disclose
24 historical sales price information.

Page 171

1      A.   Yes.
2      Q.   Okay. Now, do you know if the Navy already
3  had that sales price information?
4      A.   I don't know. I don't know if they had all
5  of it. They may have.
6      Q.   Did they have any of it?
7      A.   I don't know.
8      Q.   Okay. Now, what was sold to SEACAL in 1998?
9  Do you know?
10     A.   All I have is -- all I have is in my binder,
11 a listing of the sales.
12     Q.   Right. Do you know what it was that was
13 sold to SEACAL?
14     A.   The power head.
15     Q.   Was it the same thing that the Navy was
16 buying from Herley in 2001?
17     A.   I think it was.
18     Q.   Why do you say that?
19     A.   Because of the model number.
20     Q.   And Fleet Industrial, the sale in 1996, what
21 was sold to Fleet?
22     A.   Same.
23     Q.   How much money did General Microwave make on
24 the units that were sold to Fleet Industrial?

Page 172

1      A.   Don't know.
2      Q.   Did they lose money?
3      A.   Don't know.
4      Q.   Same question with respect to SEACAL.
5      A.   Yeah, same answer.
6      Q.   Now let's go to Professor Nash. He says in
7  his report, Exhibit 15, he states in pertinent part,
8  quote, "Opinion 3 asserts that Herley did not disclose
9  historic sales data." That's in quotes, "historic
10 sales data," period. "Contract prices have not been
11 considered to fall within the definition of cost or
12 pricing data because they are known to government
13 personnel," period. Let me stop right there. Is that
14 true?
15     A.   If -- I would say maybe if you know that the
16 government has them, that may be true.
17     Q.   Okay. What about his statement contract
18 prices have not been considered to fall within
19 definition of cost or pricing data? Do you agree with
20 that?
21     A.   No. I think that only goes with the rest of
22 the sentence. He's saying because they're known to
23 the government. I would think if you -- even if you
24 take that sentence at its face, the flip side is if

Page 173

1  they are not known to the government, then I guess
2  they would be considered cost and pricing data.
3      Q.   Well, but wouldn't you then have to cross
4  out the word "because" and add the word "if"?
5          MR. PRESS:   Objection.
6      A.   Maybe I shouldn't have jumped up, as you
7  said. He can answer that old question, whether he
8  would say if or because.
9      Q.   Oh, he did. He put "because" in his report.
10     A.   No, I'm saying whether you could substitute
11 "if" or "because." I'll let him answer that question,
12 whether you could substitute "if" or "because."
13     Q.   Okay, Mr. McGeehin, he's already answered
14 the question. He put in his report what he thinks the
15 state of the universe is, and I'm just trying to
16 understand if you disagree, why you disagree.
17     A.   Yeah.
18     Q.   And you're saying that Professor Nash is
19 wrong?
20     A.   I think in this case, given the great
21 variation in the prices we're talking about here,
22 given the -- given the fact that these do not appear
23 to all be government sales, they might be to
24 subcontractors under a government sale and the

44  (Pages 170 to 173)

Page 174

1  government may not have access to sales to GE, to
2  Martin Marietta, to Fleet Industrial. The ones
3  obviously that they sold directly to the Navy, that's
4  one thing, but those that were not sold to the Navy
5  but to a prime contractor, I'm not sure they would
6  have access to that information, and I would think the
7  government would definitely view them as relevant and
8  would help put them on equal footing with the
9  contractor in terms of negotiating a price.
10     Q.   Did anyone from the government ever tell you
11  that they believed that historic sales data, sales
12  prices from prior sales, constitute cost and pricing
13  data?
14        MR. PRESS: Objection.
15     A.   No one ever told me. I mean -- you mean did
16  anybody ever tell me -- I didn't speak to anybody from
17  the government on this case.
18     Q.   Did you ever see any authority for the
19  proposition that you advanced that contract prices are
20  considered within the scope of cost and pricing data,
21  historic contract prices?
22     A.   I would think there would be a couple of
23  areas of authority.
24     Q.   Okay. You're looking at Exhibit 16?

Page 175

1     A.   Yes. I think there's a reference -- let's
2  take a look at that.
3     Q.   Are you in section 2.101, the definitional
4  section?
5     A.   Yeah.
6     Q.   Are you under cost and pricing data?
7     A.   Yeah.
8     Q.   Because you see what the professor says,
9  right, in his report?
10     A.   Yeah.
11     Q.   It says -- he says, quote, "Note that they
12  are not included in the list of types of cost or
13  pricing data in the FAR 2.101 definition set forth
14  above."
15     A.   Right.
16     Q.   Do you see that? Do you agree with that?
17     A.   I don't see it listed outside -- yeah,
18  exactly, except for information on changes in
19  production methods or purchasing volume, but I will
20  admit that they don't list out sales on other items.
21     Q.   Okay, but you wanted to look some other
22  place?
23     A.   I was just looking for the general
24  definition within cost and pricing data, prudent

Page 176

1  buyers and sellers would reasonably expect to affect
2  price negotiations, so there's one source. The second
3  is in this particular case, there was a question
4  coming back from DCAA back to Herley on just the bill
5  of materials on the assemblies -- on the $645 on the
6  bill of materials, and they said hey, you sold these
7  before for 645, what gives, and there was a discussion
8  back and forth. It was a little confusing, but at
9  least it stands for the proposition that a prior
10  sale -- and that was just the subassembly material
11  aspect, but stands for the proposition that the
12  government would be interested in prior sales and the
13  level of price.
14     Q.   So you're saying that because the government
15  asked about the material quote in a prior power head
16  sale, that that meant that Herley's nondisclosure of
17  historic sales data constituted a FAR violation?
18     A.   No, I've reached my own opinion why it would
19  constitute a FAR violation. You asked me what -- was
20  there any -- what do I know that would help support
21  that proposition, and that's what I was just giving
22  you. If you're wondering whether the government would
23  be interested in that kind of information and
24  negotiation, to put them on a level playing field, I

Page 177

1  think the answer is yes.
2     Q.   Did the government ask during the
3  negotiations what the historic sales data showed?
4     A.   I don't know.
5     Q.   Well, doesn't that kind of contradict what
6  you just said?
7     A.   No.
8     Q.   No?
9     A.   No.
10     Q.   Even though the government didn't ask, but
11  you think they'd be interested, but did they forget to
12  ask?
13        MR. PRESS: Objection.
14     A.   I don't know, but what I do know is that no
15  contractor in a false claim, defective pricing FAR
16  violation can rely upon the fact that the government
17  didn't do something to avoid an otherwise problem for
18  them under the federal acquisition regulation.
19     Q.   So as I appreciate, you're saying that there
20  was a mandatory obligation to disclose as cost and
21  pricing data what the prior sales history showed by
22  way of price, right?
23     A.   Yeah, know I don't about mandatory
24  obligation. I would say in my judgment under industry

45 (Pages 174 to 177)

93adf20f-b971-4cf2-9ac5-35203b1a8d56

Page 178

1   practice, in this set of facts and circumstances, they
2   should have disclosed.
3       Q.   Can you cite us to any authority to support
4   that?
5       A.   I just did. The general definition of what
6   cost and pricing data is, the general definition that
7   we just talked about is data that prudent buyers and
8   sellers would reasonably expect to affect price
9   negotiations.
10      Q.   Right, and you think that's the authority.
11      A.   Yeah, I think -- yeah, I think -- I think if
12  I were asked by this client, you know, should we tell
13  them about these and we're not sure they know about
14  them, I'd say yes.
15      Q.   So the -- the eight examples of what does
16  constitute cost and pricing data in the definitional
17  section, you don't -- it's not persuasive to you that
18  prior sales prices is not contained in here.
19      A.   No, I mean, look -- look at the language.
20  The sentence before that, cost or pricing data are
21  more than historical accounting. They're all facts
22  that can reasonably expect to contribute to the
23  soundness of estimates of future costs and the
24  validity of determination of costs incurred. They

Page 179

1   also include, so it's -- this is not, with all respect
2   to Ralph Nash, this isn't meant to be an exhaustive
3   list of what the costs --
4       Q.   Sure.
5       A.   And as he has written in his books.
6       Q.   Can you cite to me a case from anywhere,
7   whether it be from an administrative board, a court,
8   anywhere, where anybody -- any body has held that
9   prior sales prices constitute cost and pricing data?
10      A.   I'll let that up to you lawyers. I'm not
11  familiar with a case.
12      Q.   Okay.
13      A.   I'm not saying there isn't one. I'm just --
14  that's not something I do, is to summarize cases like
15  that.
16      Q.   Okay. Do you keep abreast of the decisions
17  relating to the scope of cost and pricing data and
18  other FAR issues?
19      A.   Generally, yes. Any time we could break
20  would be great for a bathroom break here.
21          MR. SMITH: We can take a break now.
22          (Recessed at 2:48 p.m.)
23          (Reconvened at 2:54 p.m.)
24  BY MR. SMITH:

Page 180

1       Q.   You ready to proceed, sir?
2       A.   Yes.
3       Q.   Okay. I'm on opinion number 4 in your
4   report, and that deals with the cost work-up, the
5   estimate for the labor associated with the element; is
6   that right?
7       A.   Yes.
8       Q.   Why don't you take a moment and review it to
9   yourself.
10      A.   Okay.
11      Q.   Now, let me just ask you, you don't know and
12  don't have an opinion about whether or not that
13  estimate was a good estimate, not a good estimate?
14  You weren't asked to focus on that, right?
15      A.   Which estimate?
16      Q.   The estimate referenced in paragraph 4 of
17  your report.
18      A.   Yeah, true, yes.
19      Q.   Okay, so let me then focus you on what
20  Professor Nash says about your opinion. You see where
21  it says on page 3 of Exhibit 15, quote, "Opinion 4
22  asserts that Herley did not disclose in its estimates
23  of labor hours" -- I'm sorry, let me start again.
24  "Opinion 4 asserts that Herley did not disclose that

Page 181

1   its estimates of labor hours were based on a," quote,
2   "worst-case basis," closed quote, "and that they
3   contain a contingency," period. "As in the case of my
4   comment on opinion 1," comma, "there is a contention
5   that Herley did not disclose its estimating logic,"
6   hyphen, "a failure for which the FAR provides no
7   remedy," period.
8       A.   No penalty.
9       Q.   Penalty, I'm sorry, no penalty, period. "To
10  put it another way," hyphen, "there is no requirement
11  in the FAR that estimates be," quote, "accurate,"
12  closed quote. Do you see that?
13      A.   I do.
14      Q.   Okay. Let's just focus on that last
15  sentence, quote, "To put it another way," hyphen,
16  "there is no requirement in the FAR that estimates be
17  accurate." Do you see that?
18      A.   I do.
19      Q.   Do you agree with that?
20      A.   I would say generally, yes.
21      Q.   You're saying that Herley in this instance
22  was required to disclose its estimating logic?
23      A.   Yes.
24      Q.   Okay, and what is the basis for that

93adf20f-b971-4cf2-9ac5-35203b1a8d56

Page 182

1  opinion?
2      A.   Well, they had a request from the government
3  to give them, you know, backup to their estimates,
4  which they did.  They went through and --
5      Q.   Yes.
6      A.   -- I'll use the phrase backed into the total
7  of 41 hours per item, and when they did that, the
8  deposition testimony says to get there, they just said
9  assume a complete failure at every -- at every step
10 and the worst that could happen, go wrong, that's how
11 you should put this together.
12     Q.   And who testified to that?
13     A.   That was --
14     Q.   If you know.
15     A.   I do know.  Gallagher.
16     Q.   Okay.
17     A.   So that -- so if -- if that were the case, I
18 mean, if you and I were negotiating, I think you'd
19 want to know that by the way, my 41 hours is a
20 worst-case scenario.  I'm not -- it's not really my
21 best estimate, but it's if everything goes wrong,
22 that's what I think.
23     Q.   Was there a basis to create an estimate
24 based upon a worst-case scenario?

Page 183

1      MR. PRESS:  Objection.
2      A.   I don't necessarily think so in this case.
3      Q.   And the example that you just used about
4  well, if you and I were negotiating, you would want to
5  know, there's lots of things I'd want to know, right?
6  I may want to know, for example, what your bottom line
7  is, right?
8      A.   Uh-huh.
9      Q.   Do you have to tell me?
10     A.   Well, eventually if you want to cut a deal,
11 huh?
12     Q.   Well, but for all we know, during the
13 negotiations, you might have been willing to go a
14 little bit lower.  Are you required to disclose that?
15 Because I'd want to know that.
16     A.   No, but a bottom-line estimate, what you
17 will take as a price on a job is very different from
18 your estimating logic as to how you got to a cost
19 estimate with respect to the item.
20     Q.   So what you're saying is that even though
21 this was judgmental, the fact that it was a worst-case
22 scenario made it a mandatory disclosure?
23     A.   I think in these circumstances, they should
24 have disclosed the basis for how they got to those

Page 184

1  estimates.
2      Q.   Because it was a worst-case scenario?
3      A.   Well, you should disclose the basis of your
4  estimates, and it was totally relevant to coming up
5  with the price to be negotiated.
6      Q.   Does that mean that any time that you have
7  an estimate and exercise judgment, you have to
8  disclose your methodology?
9      A.   I hesitate to say any time.  I'm looking at
10 this particular fact circumstance.  I think in this
11 fact circumstance, given how they came up with that
12 approach, given the fact that they magically arrived
13 at a 41 technician hours per item and that that number
14 happens to match exactly where they were before, I
15 would think how they got to that number was
16 information they should have disclosed to the
17 government.
18     Q.   Okay, and you think that because?  Do you
19 understand my question?
20     A.   No, I thought you were still thinking.
21     Q.   No, no, no.  I was hoping for you to
22 complete the sentence, but let me do it a little bit
23 differently.
24     A.   Okay.

Page 185

1      Q.   Just so there's no mystery to this, I fully
2  expect that a person who's recognized as one of the
3  foremost experts in the world on government
4  contracting is going to say you're wrong.
5      A.   You're going to make me blush.  Oh, you're
6  talking about someone else.
7      Q.   Yeah, I'm talking about Professor Nash,
8  right?  And you and he disagree, and I'm trying to
9  understand why he says it wasn't required to be
10 disclosed and you say it was.
11     A.   Okay, well --
12     Q.   So I'm trying to understand what it is that
13 makes you think it was required other than if you're
14 saying look, that's my judgment and it's based upon my
15 years of experience and my understanding of the FAR,
16 that's it, Smith, and move on.
17     A.   Right, I think there's three issues, and
18 bear with me.  First is -- and you may disagree with
19 this, but I think --
20     Q.   I'll tell you if I do.
21     A.   If you read his report, he -- Mr. Nash says
22 under part 15, you are required to disclose a
23 contingency.  Assume that for a moment.  So I don't
24 think there's any question that we agree -- you're

93adf20f-b971-4cf2-9ac5-35203b1a8d56

Page 186

1    trying to find areas of disagreement. We agree that
2    you have to disclose a contingency. We disagree that
3    he says however, if you don't, it may be a FAR
4    violation but there's no impact to the proposal price
5    because it's not cost and pricing data. So that's
6    where we disagree. His opinion here, number 4, he
7    said there's no requirement in the FAR that the
8    estimates be accurate. That's not even the issue, so
9    I don't even -- we certainly don't agree on that
10    sentence, but that's not the issue. The issue is
11    clearly and cleanly whether they should have disclosed
12    it, and I think we're in agreement. He just says
13    there's no impact if you don't.
14    Q.   Is there an impact if you don't?
15    A.   I think in this case there is. I think if
16    they would have disclosed the fact that they had
17    whacked up these estimates for the labor hours to back
18    into the 41 hours that they had originally, to back
19    into the $20,000 price that they were coming up with,
20    and that all of that was just after the fact a
21    summarization of numbers, I think if they would have
22    just disclosed that to the government, that would have
23    made a difference in the negotiation of the price.
24    Q.   Now, this backing into that -- well, you

Page 187

1    know what? I'll just save that for trial. Okay,
2    let's move on to opinion 5. Why don't you read
3    opinion 5 in your report to yourself.
4    A.   Got it.
5    Q.   Can you show me where this six months of
6    actual cost data is?
7    A.   Yes, in the binder, tab 5-1.
8    Q.   Tab 5?
9    A.   Tab 5, pages 5-1.
10    Q.   What data is captured in here?
11    A.   In there, the technician time and the --
12    some of the engineering time to produce the first --
13    well, part of the first 42, but then Herley uses 32
14    elements is summarized there.
15    Q.   Okay, so let's just figure this out. This
16    -- where did this document come from?
17    A.   It was provided to us -- it's a
18    Herley-produced document.
19    Q.   Okay.
20    A.   At the top of the page, there's a Bates
21    stamp, so I just assume it was produced from Herley's
22    files.
23    Q.   Okay. How was it produced?
24    A.   I don't know.

Page 188

1    Q.   What information was intended to be captured
2    in the document?
3    A.   Based upon subsequent correspondence from
4    Herley back to the government, it was represented to
5    be the actual hour experience for elements that had
6    been built up through in this case the data stops on
7    12/14/01, but it became part of a file and submission
8    in February of 2002 from Herley to the government.
9    Q.   Now, what -- you're referring to another
10    tab?
11    A.   Yes, in tab -- in tab 7, there's more
12    information with respect to this issue.
13    Q.   Okay. Show me which document in tab 7
14    connects with the information in tab 5.
15    A.   Okay, if you look at the first page --
16    Q.   Yes.
17    A.   This is question 1, what is their actual
18    hour experience from the current number of element
19    bills, do you see that? That's the first question,
20    number 1.
21    Q.   Yes.
22    A.   And they answer it with here's certain
23    information, and this is in February of '02.
24    Q.   Okay, and that's the letter dated February

Page 189

1    21st, 2002 from Rounsaville.
2    A.   Right.
3    Q.   Okay.
4    A.   And then if you go back a few pages, you'll
5    see an e-mail not to the government, but from Rosalie
6    Schachter. It's 7-3 in the upper right-hand -- before
7    -- no, you're way too as far. Back, back, right
8    there. An e-mail from Rosalie Schachter to Lee Blatt.
9    Q.   Uh-huh.
10    A.   That there were some questions he apparently
11    asked in an e-mail, but she says the actual labor
12    hours for the current number of elements is 820. Then
13    if you go back two pages, you'll see a summary of the
14    820, those hours. Do you see that?
15    Q.   Uh-huh.
16    A.   Okay, and then if you go to the next page, I
17    have another copy of the same document we were looking
18    at back in tab 5 --
19    Q.   Right.
20    A.   -- that comes to that same 820. It's
21    actually 821.
22    Q.   Okay. And how many elements were built
23    during this period of time?
24    A.   If you go back two pages to a document we

93adf20f-b971-4cf2-9ac5-35203b1a8d56

Page 190

1  didn't look at, right there, right under the thing
2  that says shipped, 42 repairs, but it says assume we
3  had ten that weren't tested now, so I'm going to
4  divide this by 32, then it does some calculations to
5  come up with what the estimates of hours per element
6  were.
7      Q.   Okay, I understand this is an estimate that
8  you're making reference to, but the data here --
9      A.   Yeah.
10     Q.   -- that's a part of tab 5 --
11     A.   Yes.
12     Q.   These are entries by John Kenny, Christopher
13  Crane.  I'm assuming you don't recognize any of these
14  names, right?
15     A.   These are just workers, yeah.
16     Q.   Are they technicians, engineers or both?
17     A.   They're both.  Based upon the analysis at
18  the end, they're both technicians and engineers.
19     Q.   Okay, and how many -- does this document
20  tell us how many elements were built during this
21  period of time?
22     A.   I don't think this document does.  The
23  document that they use then to summarize it does.
24     Q.   And that's the document that's in tab 7, the

Page 191

1  estimate?
2      A.   Yes.
3      Q.   Okay, and what was the basis for the
4  estimate that there were 32 elements built?
5      A.   I don't know.
6      Q.   Who did it?
7      A.   Tuckman.
8      Q.   Tuckman did it?
9      A.   That's my understanding.
10     Q.   Who said that Tuckman did it?
11     A.   I don't know.  I have written on the top of
12  the page "Tuckman."
13     Q.   Is this his handwriting?
14     A.   Don't know, but what I do know is that if --
15  if you look at the information, they divided it by 32.
16  They said 42 were done, however, let's assume ten
17  weren't yet a hundred percent tested, therefore, let's
18  divide by 32.  See what I'm saying?
19     Q.   I understand.
20     A.   Yeah.
21     Q.   Do you know who created this document?
22     A.   Someone at Herley, but I have written down
23  Tuckman, so it seems like I asked that question once
24  before and somebody either told me Tuckman or this was

Page 192

1  prepared at his direction.
2      Q.   Any testimony that you referred to?
3      A.   It could be.  I just don't remember.
4      Q.   Okay, and do you know if this estimate was
5  based upon a series of assumptions that turned out to
6  be inaccurate?
7      A.   Say that again.  I'm sorry.
8      Q.   Do you know if this estimate was based upon
9  a series of assumptions that later turned out to be
10  inaccurate?
11     A.   I don't think so.  I mean, I think it -- the
12  information -- if you look in the end of 7, you'll see
13  an e-mail in March of '02, which is even later, and
14  there they said we completed 32 elements and they
15  refer again to this same number.  So as of March of
16  '02, they hadn't identified any problems with their
17  data.  See, and they show that tech elements of 20.2,
18  but then that's somehow translated -- forwarded to the
19  government as 31.8.
20     Q.   Was Mr. Gallagher questioned about this
21  document?
22     A.   Yeah, I don't know.  I have -- this is where
23  I guess I have the reference to Tuckman where he's
24  transmitting the data.

Page 193

1      Q.   And you know Mr. Tuckman didn't offer any
2  testimony in the case, right?
3          MR. PRESS:  Objection.
4      A.   I think he pled the fifth or something like
5  that.
6      Q.   Okay.  Let's move on to opinion number 6.
7      A.   Yeah.
8      Q.   Why don't you take a moment and review your
9  opinion to refresh your recollection.
10     A.   Got it.
11     Q.   What particular data are you making
12  reference to in opinion number 6 here?  Is this the
13  run 4?
14     A.   Yes.
15     Q.   Okay.  Now, the difference between your
16  opinion and Professor Nash's opinion, you've read what
17  he has to say, right?
18     A.   Yeah.
19     Q.   Okay, and among other things, he makes
20  reference to evidence that personnel believed the
21  yield rate was aberrational and somewhat suspect.  Do
22  you see that?
23     A.   I do see that.
24     Q.   Did you come across any such evidence in

93adf20f-b971-4cf2-9ac5-35203b1a8d56

Page 194

1 your review of the file?
2     A.   I didn't see any evidence of that.  There
3 may have been some statements that some of the Herley
4 witnesses said that.
5     Q.   Isn't that evidence?
6     A.   I don't think it's evidence when you -- when
7 you then admit into a plea where you agree that that
8 -- that you withheld results of run 4 with the intent
9 to deceive the auditors and that Herley should have
10 disclosed this data in response to the auditors'
11 inquiries, I don't -- I don't frankly feel a need to
12 go much further than that and analyze whether or not
13 someone at Herley might have concluded that it could
14 have been aberrational and therefore, maybe it kind of
15 should be disclosed to the government.  I never went
16 down that path.  I didn't quite understand Mr. Nash's
17 even going into those waters.
18     Q.   Well, let's just consider this.  One
19 possible avenue that was available to Herley -- the
20 Herley people that were involved in the decision not
21 to disclose run 4 was to turn it over to the
22 government and argue that it's meaningless because
23 it's aberrational, right?
24     MR. PRESS:  Objection.

Page 195

1     A.   Could they have done that, yes.
2     Q.   Right.
3     A.   They didn't do that.
4     Q.   That's true, and that theoretically could
5 have avoided problems.
6     MR. PRESS:  Objection.
7 BY MR. SMITH:
8     Q.   Right?
9     A.   Theoretically.
10     Q.   Okay.  Let's go to opinion number 7.  Take a
11 moment and review to yourself your opinion.
12     A.   Got it.
13     Q.   Is there any particular tab in Exhibit
14 Number 1 that you believe supports these assertions?
15     A.   Yes.
16     Q.   Which tab?
17     A.   We already touched on it a little bit.  Tab
18 7.
19     Q.   Seven.
20     A.   Yeah.
21     Q.   Okay.  And you're making reference to the
22 second power fit head contract or the first?
23     A.   Here initially -- yeah, that's where the
24 representation was made for the second.  By February

Page 196

1 of '02 and the data through 12/14/01, that first
2 contract was already signed.  Now, I will -- I will
3 say just so the record's clear, that's what I meant --
4 that's what I discussed here.  In reality, I don't
5 know whether there was other data available in July of
6 '01 at the time of signing that first power head
7 contract.  Here I have a document showing from May
8 through December 14th of '01, so clearly -- and that
9 document became part of a response by Herley that I
10 think was not factual.  But whether there was other
11 cost and labor information, I'm not quite sure why
12 there wouldn't be cost information prior to May '01 on
13 other element and power head labor runs, but I haven't
14 seen any, but I don't know why there wouldn't have
15 been, but here specifically we have a document where
16 clearly they show the government some information
17 right around or the day after I guess the agreement on
18 price, and I don't think it accurately represented
19 what was -- what was in the record.
20     Q.   When did this information become available?
21     A.   Well, theoretically, since it's May of '01,
22 it would be available any time someone queried the
23 database.  This particular one shows information
24 through 12/14 of '01.

Page 197

1     Q.   When was the contract signed?
2     A.   2/21 or 2/20/02.
3     Q.   Okay.  Let's go on to opinion number 8.
4 Now, in opinion number 8, I'm not sure what it is
5 precisely you're being critical of, so maybe you can
6 tell us.
7     A.   Yeah, I think as Mr. Nash points out, that
8 I'm not pointing to a particular piece of factual
9 information that wasn't -- I am in fact looking at
10 this estimating practice, and if you just try to
11 connect the dots, you can't help but reach the
12 conclusion that something doesn't seem to be right
13 when you're baking into a subassembly estimate 2 to 3
14 thousand dollars worth of materials even though you
15 were showing that it should be more like 645
16 historically, and the actual, when it happened later,
17 you checked it out, it was 360.  So I guess I'm -- I
18 guess I'm just generally making an observation that
19 those three connected dots, especially coupled with
20 the allegation by Blatt or his statement that right up
21 until he signed the contract, he was going to ship
22 this stuff out to Lancaster and then had a change of
23 heart immediately thereafter and decided to, no, keep
24 it in house where it was.

93adf20f-b971-4cf2-9ac5-35203b1a8d56

Page 198

1    Q.   Who had the change of heart?
2    A.   Blatt.
3    Q.   Who said that?
4    A.   I think he did.  Yeah, he -- they were going
5   -- they were going to farm it out, and that's why they
6   had this subassembly estimate for $9,300, or $9,000,
7   I'm sorry, and then it ended up, they never did it at
8   Lancaster and they all did it in house at Farmingdale.
9    Q.   When did Mr. Blatt find out that the
10  subassembly was not built in Lancaster?
11   A.   No, he decided not to build it in Lancaster.
12   Q.   What witness said that?
13   A.   Huh?
14   Q.   What witness said that?
15   A.   I think Blatt did.
16   Q.   Why don't you show me where Mr. Blatt said
17  that in his deposition.
18   A.   Okay, the testimony I have shows that he
19  directed that it would be moved to Herley Farmingdale
20  to Herley Lancaster.  That's in his -- in Blatt's
21  testimony.
22   Q.   Well, that's in keeping with the way it was
23  proposed, right?
24   A.   Right, that's how it was proposed, and then

Page 199

1   the assumption is, and I don't have a reference to
2   that, but my understanding was that, and I'm assuming
3   that right after award, Herley directed the
4   manufacture occur at Farmingdale, not be moved to
5   Lancaster, and that's where they have it.
6    Q.   Okay, so you're assuming that to be the
7   fact.
8    A.   I'm assuming, yes.
9    Q.   And you can't point to any Blatt testimony
10  to that effect, right?
11   A.   Not on that issue.
12   Q.   And again, just getting back to opinion
13  number 8, I'm still -- are you offering opinions in
14  opinion number 8 that there was wrongdoing here or are
15  you just making observations?
16   A.   I think on that one it's more of an
17  observation.
18   Q.   Okay.
19   A.   Just that the dots don't connect and --
20   Q.   All right, well then let's move on to where
21  you're offering opinions.  Let's go on to number 9.
22   A.   Yes.
23   Q.   Okay, have you looked at 9?
24   A.   Yes.

Page 200

1    Q.   Okay.  What is the basis for your opinion
2   that the materials that had allegedly been purchased
3   for repairs were in fact utilized for manufacturing
4   the subassemblies?
5    A.   A couple things.  Witness statement of --
6   let me just find it here.  Let's see.  Such materials
7   are in fact -- that would be Gallagher's deposition.
8    Q.   Okay.  Let me ask you this.
9    A.   Yes.
10   Q.   If you look at Professor Nash's opinion, he
11  says, quote, in pertinent part, "If the company had
12  made a decision not to use the material purchased for
13  repairs to perform the contract and had not reversed
14  this decision before the contract was awarded, there
15  is no violation of the requirement to disclose cost or
16  pricing data."  Do you see that?
17   A.   I do.
18   Q.   Do you agree with that?
19   A.   I think generally yes.
20   Q.   So would you agree with me that this is an
21  issue that's really going to turn on the facts?
22   A.   Yes.
23   Q.   And when the decision was made not to go
24  forward in Lancaster but to go forward in Farmingdale

Page 201

1   with the subassemblies, right?
2    A.   No, this is the repairs issue, yeah.  This
3   is --
4    Q.   Fair point.  By extension then --
5    A.   Yeah, if you're going to make the decision
6   that they actually were going to use all those repair
7   kits --
8    Q.   Okay.
9    A.   And --
10   Q.   And so you and he really don't disagree.
11  It's just a question of timing, when were decisions
12  made.
13   A.   Yeah, in a general opinion or comment, I
14  don't disagree with what he's saying.  It just all
15  hinges on the facts.
16   Q.   Okay, all right.  Your opinion number 10
17  focuses on the hundred thousand dollar expenditure,
18  and that's another timing issue, as I appreciate it,
19  right?
20   A.   Yes.
21   Q.   Let's look at what the professor says.  He
22  says, quote -- I'm reading the pertinent part.  "Only
23  if this is factually correct would it constitute a
24  failure to disclose," quote, "accurate," closed quote,

93adf20f-b971-4cf2-9ac5-35203b1a8d56

Page 202

1    "cost or pricing data." Do you agree with that?
2        A.    Yes.
3        Q.    And what would have to be factually correct
4    is that Herley stated that it had authorized the
5    expenditure of a hundred thousand dollars to improve
6    its manufacturing process but it had not done so,
7    right?
8        A.    Yeah, and I would go on, because they
9    reference in the manufacturing process, you know, and
10   tooling, so that, you know -- but yeah, it would hinge
11   -- this one again would hinge on the facts.
12       Q.    Okay, okay. Let me just -- okay. Tell me
13   about your educational background.
14       A.    I have a Bachelor of Science degree summa
15   cum laude from the University of Scranton in Scranton,
16   Pennsylvania, and an MBA in -- well, MBA is a general
17   degree, but with an emphasis on procurement and
18   contracting from G.W.
19           MR. SMITH:    Let's go off the record for a
20   second.
21               -  -  -
22           (Discussion off the record)
23               -  -  -
24   BY MR. SMITH:

Page 203

1        Q.    You then got an MBA, sir?
2        A.    Yes.
3        Q.    Where did you get it from?
4        A.    George Washington.
5        Q.    And in what year?
6        A.    1980.
7        Q.    And you're a certified public accountant?
8        A.    Yes.
9        Q.    And when did you get the certification?
10       A.    1977.
11       Q.    And I'm sure everybody asks you, did you
12   pass the first time?
13       A.    Three parts, and I got the last one the next
14   time.
15       Q.    I'm sorry, you got the last one --
16       A.    The next time.
17       Q.    Okay, okay, and you started your
18   professional career at Coopers & Lybrand?
19       A.    Yes.
20       Q.    And you were involved in government contract
21   services group, if I recall?
22       A.    Yes.
23       Q.    Okay. What did you do?
24       A.    I was obviously just out of school, so I was

Page 204

1    an entry-level person. I moved to Washington after
2    spending a year in Philly on the audit staff, and I
3    had the opportunity to go to Washington and I went
4    down there and joined their government contracts
5    services group and got my MBA while I was doing that.
6        Q.    And then you left Coopers & Lybrand to go to
7    Rubrino & McGeehin?
8        A.    Rubino, yes.
9        Q.    Rubino.
10       A.    Yes.
11       Q.    And what year did you do that?
12       A.    1980.
13       Q.    And you've been with that entity through the
14   acquisition by FTI Consulting?
15       A.    Correct.
16       Q.    So we're talking 27 years.
17       A.    Right.
18       Q.    Okay, and what does Rubino & McGeehin do?
19       A.    Really what Rubino & McGeehin did, it was
20   two really distinct things. One was we had an audit,
21   regular audit and accounting CPA firm, which you would
22   consider a more traditional CPA firm, and that was
23   called Rubino & McGeehin, Chartered, and then we had
24   Rubino & McGeehin Consulting Group, where I spent

Page 205

1    certainly in the last 15 years or so in that -- in
2    there, and what we did there was pure consulting on
3    government contract or claims or litigation type
4    issues.
5        Q.    Okay. Your publications --
6        A.    Yes.
7        Q.    Have you -- have you published any articles
8    or -- well, let's start with articles, relating to
9    government contracting?
10       A.    Yes.
11       Q.    Okay, and are your publications all listed
12   on your C.V.?
13       A.    Yes.
14       Q.    Do any of them have anything to do with cost
15   and pricing data?
16       A.    Yes, we -- I think I produced copies of a
17   couple of those. Some -- there was some course
18   materials, if you look at page 12 of my resume, which
19   is attachment 2.
20       Q.    Uh-huh.
21       A.    The -- there's some course materials that I
22   authored and presented. One was on cost reimbursement
23   contracting for Fed pubs, accounting for U.S. defense
24   contracts for -- in London for Hawksmere, recovering

93adf20f-b971-4cf2-9ac5-35203b1a8d56

Page 206

1  costs of money. Those three that -- DCAA search for
2  unallowable interest costs, government contract
3  audits, ESOPs for government contractors.
4      Q.  Okay, so all your publications are listed on
5  page 12.
6      A.  Yes.
7      Q.  Have you ever been involved in a situation
8  where the court has refused to recognize you as an
9  expert on any particular opinion you wanted to offer?
10      A.  The only -- the only one I've had is I had a
11  Daubert challenge on a piece -- I was accepted as an
12  expert and allowed to testify, but on one piece of
13  testimony, a judge in New York ruled that one aspect
14  was more an engineering issue than an accounting
15  issue.
16      Q.  This was Judge Preska?
17      A.  Yes.
18      Q.  And this was the matter of the Morse Diesel
19  Inc. versus Trinity Industries?
20      A.  Yes, sir.
21      Q.  And in that case, do you recall that the
22  judge ruled in pertinent part, quote, "I view
23  McGeehin's testimony as being an insufficient basis
24  for Trinity's claim for unpaid progress payments since

Page 207

1  he provides no factual support for his conclusory
2  statement that the difference between the contract
3  price and the money Morse," slash, "Diesel paid
4  Trinity could only be explained by unpaid progress
5  payments"?
6      A.  Yes, which that case was appealed and it's
7  long torture history, but yes, I remember that.
8      Q.  Was the judge reversed on that issue?
9      A.  The case was retried. I testified in a
10  second case, but they reversed it on other issues.
11      Q.  Have there been any other times when someone
12  challenged your qualifications as an expert?
13      A.  Not that I remember.
14      Q.  Has any court or tribunal ever limited your
15  testimony in any way?
16      A.  Just that one, and again, that was -- that
17  was more a limitation than a preclusion. I testified
18  before Judge Preska in that subsequent trial.
19      Q.  Have you ever testified as an expert in a
20  securities fraud case?
21      A.  Once.
22      Q.  Which case was that?
23      A.  Hercules Industries. It was a derivative
24  class action suit against Hercules Industries.

Page 208

1      Q.  Were you a damages expert?
2      A.  No.
3      Q.  What did you testify about?
4      A.  The application of statement of position
5  81.1 and how to account for long-term government
6  contracts.
7      Q.  And over the course of your career, how many
8  times have you been engaged as an expert?
9      A.  In excess of a hundred.
10      Q.  Okay, and do you tend more to be for the
11  defense or the plaintiffs?
12      A.  Pretty evenly split.
13          MR. SMITH:  Okay, I have no further
14  questions. Thank you for coming.
15          MR. McNEELA:  Can we go off the record for
16  two or three minutes?
17              - - -
18          (Discussion off the record)
19              - - -
20          MR. PRESS:  Plaintiffs have no questions.
21          MR. SMITH:  Thank you very much.
22          (Whereupon, the deposition was concluded at
23  approximately 3:35 p.m.)
24

Page 209

1          CERTIFICATE
2  I hereby certify that the proceedings and evidence
3  noted are contained fully and accurately in the notes
4  taken by me in the deposition of the above matter, and
5  that this is a correct transcript of the same.
6
7
8          _____
9          KAREN YOUNG
10
11
12  (The foregoing certification of this transcript does
13  not apply to any reproduction of the same by any
14  means, unless under the direct control and/or
15  supervision of the certifying reporter.)
16
17
18
19
20
21
22
23
24

93adf20f-b971-4cf2-9ac5-35203b1a8d56

Page 210

1        CERTIFICATE OF DEPONENT
2
3        I, PATRICK A. McGEEHIN, have read the entire
4   transcript of my testimony taken on Tuesday, October
5   6, 2009, contained within pages 5 through 208, and it
6   is true, correct and complete to the best of my
7   knowledge, recollection and belief, except for the
8   list of corrections, if any, attached on a separate
9   sheet herewith.
10
11   _____      _____
12   PATRICK A. McGEEHIN          DATE
13
14   SUBSCRIBED AND SWORN to before me this _____ day
15   of _____, 2009, in the jurisdiction
16   aforesaid.
17
18   _____      _____
19   My commission expires        Notary Public
20
21
22
23
24

Page 211

1        ERRATA SHEET
2   CASE CAPTION:  IN RE HERLEY INDUSTRIES
3   DEPONENT:  PATRICK A. McGEEHIN
4   PAGE    LINE    CORRECTION
5   ____    ____    _____
6   ____    ____    _____
7   ____    ____    _____
8   ____    ____    _____
9   ____    ____    _____
10   ____    ____    _____
11   ____    ____    _____
12   ____    ____    _____
13   ____    ____    _____
14   ____    ____    _____
15   ____    ____    _____
16   ____    ____    _____
17   ____    ____    _____
18   ____    ____    _____
19   ____    ____    _____
20   ____    ____    _____
21   ____    ____    _____
22   ____    ____    _____
23   ____    ____    _____
24   ____    ____    _____

93adf20f-b971-4cf2-9ac5-35203b1a8d56