UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE HERLEY INDUSTRIES INC. SECURITIES LITIGATION | CIVIL ACTION<br>No. 06-2596 (JRS)<br>CLASS ACTION |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO
STRIKE PORTIONS OF REPORT OF DEFENDANTS' EXPERT, PATRICK CONROY**

Stanley P. Kops (SPK 6328)
LAW OFFICE OF STANLEY P. KOPS
102 Bala Avenue
Bala Cynwyd, PA  19004
Telephone:  (610) 949-9999
Facsimile:   (610) 949-9773

*Plaintiffs' Liaison Counsel*

Ira M. Press *(admitted pro hac vice)*
Sarah G. Lopez
KIRBY McINERNEY LLP
825 Third Avenue, 16th Floor
New York, NY  10022
Telephone:  (212) 371-6600
Facsimile:   (212) 751-2540

LABATON SUCHAROW LLP
140 Broadway
New York, New York  10005
Telephone:  (212) 907-0700
Facsimile:    (212) 818-0477

*Attorneys for Plaintiffs and the Class*

**TABLE OF CONTENTS**

I.   Background ................................................................. 2

II.  Argument .................................................................. 4

       A.   Standard for Admission or Exclusion of Expert Testimony ........... 4

       B.   Conroy's Measure Of Damages Is Unreliable And Unsupported ....... 5

       C.   Conroy's Measure of Damages Is Prejudicial And Likely To Confuse The
            Trier Of Fact ................................................... 10

       D.   Even if Conroy's Alternative Methodology Were Valid, His Application of
            it Was Improper ................................................. 12

III. Conclusion ................................................................ 13

## TABLE OF AUTHORITIES

*Cases*

*Affiliated Ute Citizens v. United States*,
  406 U.S. 128 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Bourjaily vs. United States*,
  483 U.S. 171 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Calhoun v. Yamaha Motor Corp., U.S.A.*,
  350 F.3d 316 (3d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 10

*Dura Pharmaceutical, Inc. v. Broudo*,
  125 S. Ct. 1627 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*In re Cigna Corp. Sec. Litig.*,
  459 F. Supp. 2d 338 (E.D. Pa. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 11

*In re Exec. Telecard, Ltd. Sec. Litig.*,
  979 F. Supp. 1021 (S.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*In re Gaming Lottery Sec. Litig.*,
  96-5567, 2000 WL 193125 (S.D.N.Y. Feb 16, 2000) . . . . . . . . . . . . . . . . . . . . . . 8

*In re Imperial Credit Indus., Inc. Sec. Litig.*,
  252 F. Supp. 2d 1005 (C.D. Cal. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*In re Northern Telecom Sec. Litig.*,
  116 F. Supp. 2d 446 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*In re Oracle Sec. Litig.*,
  829 F. Supp. 1176 (1993 N.D. Cal.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*In re Royal Dutch/Shell Transport Sec. Litig.*,
  404 F. Supp. 2d 605 (D.N.J. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Lauria v. Nat'l R.R. Passenger Corp.*,
    145 F.3d 593 (3d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Myzel v. Fields*,
    386 F. 2d 718 (8th Cir. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Peil v. Speiser*,
    806 F. 2d 1154 (3d Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Randall v. Loftsgaarden*,
    478 U.S. 647 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Trout v. Milton S. Hershey Med. Ctr.*,
    576 F. Supp. 2d 673 (M.D. Pa. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Zhou*,
    06-286, 2008 WL 4067103 (D.N.J. Aug. 25, 2008) . . . . . . . . . . . . . . . . . . . . . . 4, 10

***Statutes***

15 U.S.C. § 78u-4(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

15 U.S.C. §78bb(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Fed. R. Evid. 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 10

Fed. R. Evid. 701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 10

Fed. R. Evid. 704 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 10

Private Securities Litigation Reform Act of 1995 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 6

Securities Exchange Act of 1934 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 5-9, 11

*Other Authorities*

141 Con. Rec. H13691-08, H13702-03 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

David Tabak, *Risk Disclosures and Damages Measurement in Securities Fraud Cases*,
     21 Sec. Reform Act Litig. Rep. 6 (Apr. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Plaintiffs hereby move (i) to strike those portions of the expert report submitted by Patrick Conroy ("Conroy") dated August 14, 2009 (the "Conroy Report") that proffer an alternative method for calculating alleged damages by improperly looking only at the fines, penalties and expenses incurred by Herley Industries, Inc. ("Herley" or the "Company") as a consequence of the acts that also gave raise to defendants' violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") 15 U.S.C. §§78j(b) and 78t(a), and (ii) to exclude Conroy's testimony at trial on this topic.  *See* Conroy Report, annexed as Ex. A to accompanying declaration of Ira M. Press ("Press Decl.").

As discussed below, Conroy's alternative damage calculation utilizes an improper methodology for calculating class-wide damages in a §10(b) case.  It improperly focuses on the harm to the Company as a result of the admitted and alleged criminal misconduct that defendants concealed during the class period, and not the impact on Herley's stock price of the misrepresentations and subsequent disclosure of the concealed information.  In so doing, Conroy confuses the damages to Herley from the alleged criminal misconduct with the injury suffered by class period Herley investors as a result of defendants' class period misrepresentations and omissions concerning the criminal misconduct.  Conroy's analysis fails to calculate the "out-of-pocket" damages suffered by the Class, fails to utilize an event study, and seeks to ignore the injury to the Class resulting from the artificially inflated price of the Company's stock during the Class Period. Conroy's alternative methodology is unreliable, prejudicial, contrary to the Private Securities Litigation Reform Act of 1995 ("PSLRA") and the efficient market principle, and it is likely to confuse the trier of fact. Therefore, it should be excluded.

## I.   Background

This is a securities fraud class action brought under §§10(b) and 20(a) of the Exchange Act against Herley and several of its current and former officers and directors.  Herley is a manufacturer

of microwave products and technologies to defense contractors, and the U.S. Government. During the Class Period (October 1, 2001 to June 14, 2006) defendants, *inter alia*, withheld information relevant to government contracts and submitted fraudulent and inflated cost data to government auditors, in violation of applicable government contracting regulations. This undisclosed misconduct rendered several of Herley's SEC filings materially misleading, causing Herley's stock price to trade at artificially inflated levels. In June 2006, upon disclosure of the misconduct and its effects (a government indictment and suspension of Herley), Herley's stock price declined materially, causing injury to investors.

Plaintiffs submitted the Expert Report Regarding Damages of Scott D. Hakala dated June 30, 2009 ("Hakala Report") in connection with this matter. The Hakala Report calculates damages by using an event study focused on the Class Period events that disclosed the truth to the market, the accepted methodology in §10(b) cases to determine inflation per share as a result of defendants' fraud. The Hakala Report concluded that the aggregate classwide damages are $80.7 million.

On August 14, 2009, defendants submitted the Conroy Report which seeks to respond to the Hakala Report. The Conroy Report has two components. First, it calculates damages using an event study methodology, and calculates damages of $63.2 million (Press Decl. Ex. A at pp. 2, 4-13, 20).[1] The Conroy Report also proffers an alternative measure of damages by purporting to calculate the impact of the admitted and alleged criminal misconduct on Herley itself, rather than the impact of concealed or misrepresented information on Herley's stock price. Id. at pp. 14-18.

---

[1] While plaintiffs are not moving to strike the portion of the Conroy Report that calculates damages on the basis of an event study, plaintiffs do not agree with all of the conclusions asserted in that portion of the Conroy Report.

The Conroy Report's alternative calculation does not utilize an event study, but instead focuses on the purported lost revenue and costs and expenses incurred by *the Company* as a result of the wrongful conduct that was concealed during the class period. All of the information used by Conroy in his alternative damages calculation was first revealed *after* the close of the Class Period and results from agreements that Herley reached with Government agencies after the close of the class period.[2]

Included in Conroy's calculation are: (i) the lost or shifted revenue as a result of the indictment and suspension; (ii) the cost of former CEO defendant Lee Blatt's severance package (triggered by the post class-period agreement with the government to lift the suspension); (iii) the legal costs associated with a Department of Justice ("DOJ") investigation into Herley's misconduct and the corresponding criminal indictment; and (iv) an increase in audit fees triggered by the resignation of Herley's auditor. Conroy Report (Ex. A) at ¶¶ 32-38. Conroy, after calculating some of these costs, adjusts and discounts them (*see id.* at pp 14-18),[3] divides these adjusted costs by the number of Herley shares outstanding (*id* at fn. 26, 28, 31) and then concludes that the "entire impact of the alleged fraud is approximately $1.41 per share or $0.97 per share if Herley is able to recover its insurance for legal costs." Conroy Report at ¶ 38. In other words, according to Conroy's calculations, Herley's reported financial results would have been $1.41 to $0.97 lower had the wrongful conduct not occurred.

---

[2]See, e.g., Conroy Report at ¶ 11 (discussing agreement reached on October 13, 2006 to lift suspension of Herley), ¶ 12 (discussing May 5, 2008 agreement to settle criminal charges).

[3]While the total of all of the costs that Conroy considers is more than $30 million, his damage calculation depends on "discounting" these payments down to below $14 million.

Dr. Conroy's alternative methodology does not purport to calculate the impact of the misrepresentations and omissions on Herley's stock price.

## II. Argument

### A. Standard for Admission or Exclusion of Expert Testimony

To establish the admissibility of their proposed expert's report and testimony, defendants must meet three threshold requirements: (1) the witness must be qualified to testify as an expert; (2) the testimony must be reliable, that is, the expert's opinion must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation; and (3) the testimony must be relevant for the purposes of the case and must assist the trier of fact. *See* Fed. R. Evid. 702; *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 320 (3d Cir. 2003); *Lauria v. Nat'l R.R. Passenger Corp.*, 145 F.3d 593, 597 (3d Cir. 1998) (*superseded by statute on other grounds*); *United States v. Velasquez*, 64 F.3d 844, 849 (3d Cir. 1995). *See also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 n.10 (1993) (citing *Bourjaily vs. United States*, 483 U.S. 171, 175-76 (1987)). Under *Daubert*, the court is required to perform a "gatekeeper" role with respect to the admission of expert testimony. *Daubert*, 509 U.S. at 597; *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). The advisory committee notes to Rule 704, moreover, clearly point out that under Rule 701 and 702 expert opinions "must be helpful to the trier of fact" or they are not permitted. Fed. R. Evid. 704, Notes of Advisory Committee.

In addition to the rules regarding experts, all evidence -- including Conroy's proposed testimony and report -- is subject to Rule 403. *United States v. Zhou*, 06-286, 2008 WL 4067103, at *4 (D.N.J. Aug. 25, 2008) ("In addition to the Court's gate-keeping function applicable to expert testimony, all evidence is subject to Federal Rule of Evidence 403"). Rule 403 provides for the

exclusion of evidence on the grounds of "unfair prejudice," "confusion of the issues" and "misleading the jury." Fed. R. Evid. 403.

The alternative measure of damages portion of the Conroy Report and any testimony in connection therewith must be excluded because it is unreliable, is not helpful to the trier of fact, and is likely to unfairly prejudice the fact finder and to confuse the issues.

### B. Conroy's Measure Of Damages Is Unreliable And Unsupported

It is well-settled that the appropriate measure of damages in a §10(b) securities case is to determine "out-of-pocket" damages suffered by the plaintiffs. *In re Cigna Corp. Sec. Litig.*, 459 F. Supp. 2d 338, 349 (E.D. Pa. 2006) (examining the law concerning methodology for determining economic loss and damages and noting that "courts have generally applied an out-of-pocket measure of damages"). In other words, damages should be measured by "the difference between the fair value of what the plaintiff received and the fair value of what the plaintiff would have received had there been no fraudulent conduct." *Id. See also Randall v. Loftsgaarden*, 478 U.S. 647, 662 (1986) (Courts have "generally applied this 'out-of-pocket' measure of damages in §10(b) cases"); *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 155 (1972) ("the correct measure of damages under §28 of the [Securities Exchange] Act, 15 U.S.C. §78bb(a), is the difference between the fair value of all that the [plaintiff] received and the fair value of what he would have received had there been no fraudulent conduct") (citing *Myzel v. Fields*, 386 F. 2d 718, 748 (8th Cir. 1967)).

The measure of damages in open-market 10(b) actions, like the theory behind those actions, stems from the "fraud on the market theory" which:

> Is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and it's business

5

*Peil v. Speiser*, 806 F. 2d 1154, 1160 (3d Cir. 1986); *accord, Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).[4]  *See also In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1425 (3d Cir. 1997) (noting that an efficient market immediately incorporates information into the price of a security).  Injury in 10(b) actions is predicated on the impact of the misrepresentation or omission (and its subsequent disclosure) on a company's stock price.  As a result, damages are calculated by measuring the impact of the misrepresented information on the stock price.  Thus, "[t]he out-of-pocket rule permitted a purchaser to recover the difference between the purchase price and the true value of the securities absent the alleged fraud as measured by the correction in the market price following curative disclosure." *In re Royal Dutch/Shell Transport Sec. Litig.*, 404 F. Supp. 2d 605, 610 (D.N.J. 2005) (citations omitted).

Congress recognized this reality when enacting the PSLRA.  The PSLRA sets forth a limitation on damages, requiring that they "not exceed the difference between the purchase price or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." 15 U.S.C. § 78u-4(e).  This provision is predicated on the understanding that 10(b) damages are calculated by measuring the impact of corrective disclosures on a stock's market price. 141 Con. Rec. H13691-08, H13702-03 (1995) ("Typically in an action involving a fraudulent misstatement or omission, the investor's damages are presumed to be the difference between the

---

[4] It is undisputed that, at all times relevant hereto, Herley's stock traded in an efficient market. *See* Conroy Deposition Transcript (Press Decl. Ex. B) at p. 84 ln. 12-15 ("Herley's stock price traded in an efficient market where one would expect that news that's material would have an impact on the stock price.").

price the investor paid for the security and the price of the security on the day the corrective information gets disseminated in the market.").

This concept is even recognized by defendants' expert. Dr. Conroy is a Vice President of a firm called NERA (see Ex. A. at ¶ 5). In fact, the Conroy Report arguably suggests that NERA (as opposed to Dr. Conroy personally) was engaged to provide the damage opinion. *See* Conroy Report at ¶ 2 ("NERA has been asked by counsel for Herley ... to evaluate the Expert Report Regarding Damages of Scott D. Hakala."). David Tabak, NERA's Senior Vice President wrote an article in which he stated, "[i]n securities fraud cases, damages analyses typically begin by estimating the 'artificial inflation' in the stock [which]…at any point in time is the amount by which the actual stock price exceeds the true value, or the level that the price would be if defendants corrected any previous misrepresentations or unlawful omissions of information." David Tabak, *Risk Disclosures and Damages Measurement in Securities Fraud Cases*, 21 Sec. Reform Act Litig. Rep. 6, 8 (Apr. 2006) (Press Decl. Ex. C).

The Conroy Report itself acknowledges that this is the proper measure of damages, when it states "[t]he calculation of Section 10(b) damages (assuming liability) begins with a measurement of alleged stock price inflation at purchase and sale for each transaction by each shareholder." Conroy Report ¶ 39.

The alternative measure of damages posited in the Conroy Report is entirely inconsistent with the accepted and well-established out-of-pocket rule. It utilizes a model which does not even take into account the inflated purchase price of the shares or the impact of corrective disclosures on the price of those shares. Moreover, the Conroy Report does not address damages incurred by the plaintiff class -- but instead proposes to measure the damage suffered by the Company. The alternative method used by Dr. Conroy simply purports to add up the losses, costs and expenses

7

Herley incurred as a result of the fraud *after* it was disclosed and *after* the market reacted to the disclosure, calculates the impact of the numbers on Herley's financial results, and multiplies that number by some estimate of damaged shares.[5]

Conroy's alternative measure of damages is likewise unreliable for its failure to use an event study. The event study method "is an accepted method for evaluation of materiality of damages to a class of stockholders in a defendant corporation." *In re Gaming Lottery Sec. Litig.*, 96-5567, 2000 WL 193125, at *1 (S.D.N.Y. Feb 16, 2000). Courts have held that in calculating aggregate damages in a §10(b) securities case that the use of an event study or similar analysis is necessary "to isolate the influences of information specific to [the Company] which defendants allegedly have distorted" and that as a result of a failure to employ such a study, "the results reached by [the expert] cannot be evaluated by standard measures of statistical significance." *In re Oracle Sec. Litig.*, 829 F. Supp. 1176, 1181 (1993 N.D. Cal.); *see also In re Exec. Telecard, Ltd. Sec. Litig.*, 979 F. Supp. 1021, 1025-26 (S.D.N.Y. 1997) (finding expert's methodology not reliable because he failed to conduct an event study or regression analysis); *In re Northern Telecom Sec. Litig.*, 116 F. Supp. 2d 446, 460 (S.D.N.Y. 2000) (finding the expert's testimony "fatally deficient in the he did not perform an event study or similar analysis to remove the effects on the stock price of market and industry information"); *In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d 1005, 1015 (C.D. Cal. 2003) (excluding expert testimony for failure to conduct an event study). Conroy's alternative method does not focus on the inflated price of Herley stock and does measure the harm to the Class, let alone in way that allows for an evaluation by "standard measures of statistical significance."

---

[5]Incredibly, though he purports to estimate class-wide damages, Conroy admitted during his deposition that he did not estimate the number of Herley shares that were purchased during the Class Period. Conroy Dep. (Press Decl. Ex. B) at 57-59.

Conroy himself admits that an event study is a necessary component of a §10(b) damage calculation.

> Q. Is an event study a necessary component of a damage calculation in a 10(b) class action?
>
> A. I would say yes.

Ex. B at 84 ln. 23-85 ln 2.  Conroy also testified at his deposition that the Supreme Court opinion in *Dura* was "instrumental in making sure that an event study was done." Ex. B at 187 ln. 15-17.[6] When asked if his alternative method included an event study focused on the stock price impact on the dates on which the extent of the fines and compliance costs became known publicly, Conroy answered that he did not know (Ex. B at 74 ln 9-18), despite his own concession that an event study is necessary.

While Conroy's alternative damages may approximate damages for a shareholder derivative case (which seeks to recoup damages suffered by a corporation), it is improper, unreliable and not supported by the law in this §10(b) securities action and will not adequately compensate class members for their loss resulting from the alleged fraud.  Accordingly, the Court should strike this portion of the Conroy Report.

---

[6]Conroy's partners at NERA are in accord.  Tabak observes that the most common way to determine the effect on a security of undisclosed or misrepresented information,

> is to begin by using an event study to examine the change in the price of the relevant security when the information was eventually disclosed to the market.... [T]his is the analysis used in most shareholder class actions and is consistent with the Supreme Court's recent ruling in *Dura Pharmaceutical, Inc. v. Broudo*, 125 S. Ct. 1627.

Press Decl. Ex. C. at 21 Sec. Reform Act Litg. Rep. at 8.

### C.     Conroy's Measure of Damages Is Prejudicial And Likely To Confuse The Trier Of Fact

The Federal Rules of Evidence require that expert testimony be relevant for the purposes of the case and must assist the trier of fact.  Fed. R. Evid. 702; Fed. R. Evid. 704, advisory committee notes.  Conroy's Report does not help the trier of fact and will serve only to confuse the issues relevant to this case.

In addition to the rules governing expert testimony, all evidence including expert evidence is subject to Federal Rule of Evidence 403.  *See Daubert*, 509 U.S. at 595 (stating that analysis on expert evidence should include a consideration of other evidence rules, such as Rule 403).  Rule 403 provides for the exclusion of evidence when its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury…"  Fed. R. Evid. 403.  Courts routinely exclude expert evidence on the basis of Rule 403 for its likeliness to prejudice or confuse the fact-finder.  *See, e.g.*, *Zhou*, 06-286, 2008 WL 4067103, at *4-5 (excluding expert report on the basis of Rule 403 because the probative value would be substantially outweighed by the danger of unfair prejudice, confusion of the issues and misleading the jury); *Trout v. Milton S. Hershey Med. Ctr.*, 576 F. Supp. 2d 673, 679 (M.D. Pa. 2008) (expert testimony excluded under Rule 403 because it would likely confuse and mislead the jury).

The Conroy Report sets forth a measure of damages that adds up the lost or shifted revenue due to the fraud and the costs to the Company.  Conroy Report at ¶¶ 32-38.  These are costs incurred by the Company—and not a measure of the inflation of its stock price.  Conroy then purports to calculate the per share impact of these costs and expenses if they would have been disclosed during the Class Period to conclude that the "entire impact of the alleged fraud is approximately $1.41 per share, or $0.97 per share if Herley is able to recover its insurance for legal costs."  Conroy Report

at ¶ 38. The introduction of 10(b) damage measure that ignores stock price impact is prejudicial and likely to confuse the issues and the trier of fact. What is at issue in this §10(b) case is the class members' losses as a result of the inflated price of Herley's stock due to the alleged misrepresentations and omissions, and the subsequent decrease in the stock price once the truth was disclosed. Any costs and expenses incurred by the Company as an after-effect of the alleged misconduct that was concealed are irrelevant to the calculation of the "'true value' of the security *at the time of the purchase*."[7] *Cigna*, 459 F. Supp. 2d at 349-50 (emphasis added). Introduction of these irrelevant losses, costs and expenses will not assist the trier of fact in determining the correct measure of damages and will only serve to distract the fact finder from the actual damages suffered by the Class.

Through the Conroy Report, defendants are attempting to suggest to the jury a lower damages number than that provided by the Hakala Report by using (an improperly-discounted calculation of) costs incurred by the Company as a result of post-Class Period investigations and fines as a proxy for damages incurred by the Class. Conroy's model has the wrong focus. He is not attempting to calculate the market impact of the fraud or inflation per share. Rather, he arrives at adjusted financial results to which market participants did not react during the Class Period. As noted above, when shares trade in an efficient market, as Herley's shares did by Conroy's own admission (Ex. B at 84 ln. 12-15), the share price is presumed to react to and incorporate all publicly known information. Conroy's theory is premised on the notion that in June 2006, Herley's stock price overreacted to fears of potential fines, penalties and business disruptions that by and large proved

---

[7]Conroy's analysis also begs the question of how costs imposed pursuant to agreements reached on October 13, 2006 (four months after the end of the class period) and May 5, 2008 (nearly two years after the class period ended), could possibly operate to reduce the damages of all class members – even those who sold their shares prior to those agreements.

11

to be unfounded. Conroy Report ¶3. Were this true, Herley's share price should have reversed the entire June 2006 decline when the alleged "true" impact of the misconduct became known. That it did not do so underscores the flawed nature of Conroy's calculation. As Herley traded in an efficient market, the market price reactions to material news—good and bad—should be the best indication of the market's valuation of the impact of this news.

The proper focus for damages in a §10(b) securities case is the artificially inflated stock price. Conroy acknowledges as much in his report stating "[t]he calculation of Section 10(b) damages (assuming liability) begins with a measurement of alleged stock price inflation at purchase and sale for each transaction by each shareholder." Conroy Report ¶ 39. While the costs that Herley incurred are related to the underlying fraud (as they resulted from the conduct whose concealment constitutes the fraud), they do not constitute the loss suffered by the class – the drop in stock price once the fraud was disclosed – or the difference between the inflated price of the stock and the true value of stock when the portion attributed to the fraud is removed. The introduction of these later-disclosed costs and expenses incurred by the Company is prejudicial and likely to confuse a trier of fact.

> **D.  Even if Conroy's Alternative Methodology Were Valid, His Application of it Was Improper**

Even assuming, *arguendo*, the validity of Conroy's alternative methodology, Conroy's calculation is deeply flawed. Conroy calculates that the financial impact of the fraud on Herley was $13.9 million (Conroy Report at ¶3) even though the various costs and penalties that he considers add up to more than $30 million.[8] Conroy reaches this lower number through arbitrary and dubious present value discounts. Conroy Report at ¶29 n.24 & 25. Similarly, Conroy reduces the lost income

---

[8] These costs include: a $3.5 million fine (Ex. A at ¶ 29), a $6 million settlement (*id*); $3 million in lost contracts; $8.914 million in severance payments to defendant Blatt (*id* at ¶ 35), legal costs of $11.36 million, (*id* at ¶ 36), $420,000 in increased audit fees (*id* at ¶ 37).

that Herley suffered on the Powerhead contracts by assuming a 10% gross margin although Herley's contemporaneous SEC filings referred generally to 30-35% gross margins on the Powerhead contracts (Ex. A at ¶28 & n.22).

Further, in calculating the costs to Herley, Conroy did not consider the costs of all of the conditions that were imposed on the Company in connection with the October 2006 agreement to lift Herley's suspension. Ex. B at 206 ln. 4-9. ("Q. …I'm wondering whether you calculated the cost of written compliance, written contracting policies and procedures or an ethics and compliance officer, but whether you calculated those at all?  A.  No need to wonder, I didn't."). Moreover, Conroy is not even sure whether he included all of the legal costs that Herley incurred in connection with the various suits and proceedings that arose from the misconduct. *Id*. at 206-08. So, even assuming *arguendo* that Conroy's alternative methodology is legitimate, his application of it is not, and the corresponding portion of the Conroy Report and any trial testimony on the subject should be excluded.

### III.    Conclusion

For the forgoing reasons, the portion of the Conroy Report which measures damages

without regard to the impact of misrepresentations, omissions and corrective disclosures on Herley's stock price should be stricken from the report and excluded from testimony at trial.

Dated: November 6, 2009

Respectfully submitted,

KIRBY McINERNEY LLP

By:  /s/
Ira M. Press (pro hac vice)
Andrew M. McNeela
Sarah G. Lopez (pro hac vice)
825 Third Avenue, 16th Floor
New York, NY 10022
Telephone: (212) 371-6600
Facsimile: (212) 751-2540

*Plaintiffs' Lead Counsel and Counsel for Lead Plaintiff/Class Representative Galleon Management, L.P.*

Stanley P. Kops (SPK 6328)
LAW OFFICE OF STANLEY P. KOPS
102 Bala Avenue
Bala Cynwyd, PA 19004
(610) 949-9999

*Plaintiffs' Liaison Counsel*

LABATON SUCHAROW LLP
Christopher Keller (*pro hac vice*)
Jonathan Gardner (*pro hac vice*)
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
*Plaintiffs' Counsel*
*Counsel for Class Representative Norfolk County Retirement System*

F:\Files\C1\C1\FILES\herley\Motion to Strike IN WORD PERFECT.wpd

14