Exhibit B

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
IN RE: HERLEY INDUSTRIES, INC. SECURITIES
LITIGATION


                        No. 06-2596 (JRS)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -



                    October 29th, 2009

                    10:05 a.m.


        Deposition of DR. PATRICK CONROY, held

at the offices of Kirby McInerney, LLP, 825

Third Avenue, New York, New York, pursuant to

Subpoena, before Jeremy Frank, a Notary Public

of the State of New York.




Job No: 2574




HUDSON REPORTING & VIDEO          1-800-310-1769

1                      Conroy

2              THE WITNESS:  In another 15 minutes

3        or so can we take a short break?

4              MR. PRESS:  Do you want to break

5        now, we can break now.

6              THE WITNESS:  No, its okay.

7        Q.      All right.

8              How many shares, Herley shares do

9    you believe were purchased by class members

10   during the class period?

11        A.      I don't know, I'm sure its in the

12   backup and exhibits, I don't know a number.

13        Q.      Can you point me to someplace

14   where you have the number, the number of

15   shares purchased?

16              MR. LECHTMAN:  Do you mind reading

17        back the last question.

18              (Record read.)

19        A.      I think we would have to look at

20   the backup to this, I don't know the number

21   off the top of my head.

22        Q.      It is not in your report?

23        A.      I don't believe its that number,

24   let's me see if its in --

25              MR. LECHTMAN:  Ira, just so I'm

1                            Conroy
2          clear, you're asking for a number of all
3          shares purchased in Herley stock during
4          the class period?
5              MR. PRESS:  The number of shares
6          purchased during the class period, yes.
7              A.    I don't think I have a number of
8      shares listed in the report.
9              Q.    But you did come up with a number
10     in order to estimate classwide damages?
11             A.    Correct.
12             Q.    Do you have any understanding or
13     belief of the number of shares of Herley that
14     were purchased between, subsequent to the
15     announcement of suspension which I believe was
16     June 13th, 2006, but prior to the announcement
17     that the suspension had been lifted on October
18     13th, 2006?
19             A.    I'm sorry, do I know the number of
20     shares purchased during that time period?
21             Q.    Do you have any opinion, not do
22     you know, do you have any opinion of the
23     number of shares purchased during that period?
24             MR. LECHTMAN:  Objection, you can
25         answer.

1               Conroy

2       A.      I don't know.

3       Q.      Did you ever look into that?

4       A.      I don't know, I don't recall.

5       Q.      On Exhibit 9 of your report you do

6   have a figure for the number of shares

7   outstanding on June 5th, 2006, 14,649,916.

8       A.      Yes.

9       Q.      Does that number give you any

10  sense of any better basis to recall the number

11  of shares you believe were purchased during

12  the class period?

13      A.      No.

14      Q.      Now, you continue, hold on, go

15  back to page two of your report, second

16  paragraph.

17      A.      Hold on one second.

18      Q.      Sure.

19      A.      Go ahead.

20      Q.      Second paragraph, the one that

21  begins with the words, "Much of the decline,"

22  and the last sentence says, "This implies that

23  had the full extent of the allegations and

24  consequential impact of the allegations on

25  Herley been known at the beginning of the

1                        Conroy

2      study, but I don't recall those specific

3      dates.

4            Q.    But its not, these dates are not

5      include in the event studies that you attached

6      to your report?

7            A.    Do you mean these dates are not

8      included?

9            Q.    You did not include a study of the

10     stock price impact or did you on the dates

11     that the extent of the fines became known

12     publicly, the extent the compliance costs

13     became known publicly?

14            MR. LECHTMAN:   Objection, you can

15            answer.

16            A.    I don't know if those dates are

17     included in the event study analysis that we

18     did or not.

19            Q.    All right.

20                  So what sort of scientific study

21     then did you do to determine the impact that

22     Herley stock price would have seen had the

23     indictment and suspension along with the

24     actual resolution of those matters been

25     disclosed at the beginning of the class period

1                          Conroy

2    specific dates.

3           Q.    In general, was Herley's stock

4    price reacting statistically significantly to

5    disclosure of material information?

6                 MR. LECHTMAN:   Objection.

7           A.    I'm not sure what you're asking.

8                 I think you seem to be asking did

9    it trade in an efficient market; is that what

10   you're asking?

11          Q.    That's a way of asking it.

12          A.    I think yes, Herley's stock price

13   traded in an efficient market where one would

14   expect that news that's material would have an

15   impact on the stock price.

16          Q.    Do you know whether NERA experts

17   generally performed event studies when you're

18   trying to determine the impact of information

19   on a public company stock price?

20                MR. LECHTMAN:   Objection.

21          A.    Generally event studies are

22   performed if its relevant, yes.

23          Q.    Is an event study a necessary

24   component of a damage calculation in a 10(b)

25   class action?

1                        Conroy
2        A.    I would say yes.
3        Q.    Now, is an event study a necessary
4   component of a damage calculation for a claim
5   under the 1933 act?
6        A.    I don't know.
7        Q.    How about for a shareholder
8   derivative claim?
9        A.    I don't know if its a necessary
10  component for a shareholder derivative claim.
11       Q.    Have you ever tried to analyze
12  damages in a shareholder derivative action?
13            MR. LECHTMAN:   Objection.
14       A.    Sorry, say that one more time.
15       Q.    Have you ever done damage analysis
16  of a shareholder derivative action?
17            MR. LECHTMAN:   Objection.
18       A.    I certainly have worked on
19  shareholder derivative actions before.  Have
20  we done a damage analysis of shareholder
21  derivative analysis, I would guess so, yes.
22       Q.    And have you personally done one?
23       A.    Have I worked personally on
24  derivative actions ever?
25       Q.    First, have you ever done an

1                    Conroy
2    based on a percentage of the share price on
3    each day during the class period.
4         Q.    As opposed to the actual dollar or
5    penny reaction?
6         A.    As opposed to a constant dollar
7    price reaction or a dollar price reaction
8    which is constant between disclosures.
9         Q.    Anything else that you can think
10   of that the dura changed in terms of
11   acceptable calculation of damages in
12   securities fraud cases?
13              MR. LECHTMAN:  Objection.
14        A.    That's a very general question.
15              I think in general, dura was
16   certainly instrumental in making sure an event
17   study was done, in making sure that the fraud
18   however inflation is calculated off of that
19   fraud be related specifically indirectly to
20   the fraud.
21        Q.    Predura was it possible to
22   calculate damages in a securities fraud case
23   without an event study?
24              MR. LECHTMAN:  Objection.
25        A.    I don't know the answer to that.

1                        Conroy

2      paragraph 34?

3           A.      And 37.

4           Q.      And 37, and I'm wondering whether

5      you calculated the cost of written compliance,

6      written contracting policies and procedures or

7      an ethics and compliance officer, but whether

8      you calculated those at all?

9           A.      No need to wonder, I didn't.

10          Q.      You also referred to --

11          A.      Am I done with this?

12          Q.      You are done with this for the

13     moment.

14                  -- legal cost relating to the

15     criminal indictment, its legal costs of about

16     $11.36 million.  And did you include the legal

17     costs related to the shareholder derivative

18     action?

19          A.      This was the, we asked counsel to

20     quantify legal costs for us related to this

21     action, and as we, that's where we got this

22     figure from.  And then we again there was,

23     counsel also represented there was an

24     insurance payment so that's where we got that

25     figure from.  So the legal cost figure we have

1                              Conroy
2    is everything we understand to be associated
3    with this action.  I don't know off the top of
4    my head whether it includes legal fees for a
5    derivative action or not.
6              Q.    I am just wondering the term you
7    used, legal costs related to the criminal
8    indictment --
9              A.    Right.
10             Q.    -- obviously I think its clear
11   from the terminology you use that would
12   include legal costs related to defending and
13   ultimately settling the criminal charges; is
14   that correct?
15             A.    It would include all legal costs
16   related to the criminal indictment.  If that
17   number was different than what it would be
18   here, we would use that different number.
19             Q.    Does it also include legal costs
20   related to defending this action?
21             A.    I don't know.
22             Q.    And --
23             A.    This was as of, I assume as of the
24   day of this report, but I don't believe, I
25   don't know.

1                        Conroy

2        Q.      Okay.

3                But this action is not the

4    criminal indictment, that why I'm asking.

5        A.      I understand.

6        Q.      There is a criminal indictment,

7    there is this action, there is also a

8    shareholder derivative action.  I think I

9    asked before if you know if that figure

10   included the cost of defending the shareholder

11   derivative action.

12       A.      I don't know.

13       Q.      Have you ever enquired as to what

14   those legal costs are?

15       A.      I don't believe so.

16               I don't know how much more you

17   have, if you have a lot more can we take a

18   two-minute break?

19       Q.      We can.

20       A.      If you don't have much more I'm

21   happy to keep going.

22       Q.      I don't know how much more we

23   have, we are working on it so --

24       A.      Can we take --

25       Q.      It is wisest to take a break.