# EXHIBIT A

Expert Report

1. My name is Ralph C. Nash, Jr. I reside at 2510 Virginia Ave. NW, Washington, DC 20037. I am currently Professor Emeritus of Law of The George Washington University, Washington, DC. I initially learned about Government procurement as a contract negotiator with the Department of the Navy from 1953 to 1959. I subsequently worked for American Machine & Foundry Co. as Assistant Director of Contracts and Assistant Counsel in 1959 and 1960. During this seven year period I negotiated contracts with a number of defense contractors. In 1960, I founded the Government Contracts Program of the University's Law School and was Director of the Program for eleven years. I have authored or coauthored numerous books and articles regarding Government procurement, including textbooks and a monthly periodical, *The Nash & Cibinic Report*. I have also taught hundreds of courses on Government procurement issues – both in the Law School and in a continuing education mode. The principal attendees in the continuing education courses have been Government contracting officers and corporate officials working on the business aspects of Government contracts. In the last three decades, I have been a consultant on government contracting matters for various Government agencies, including the Department of Defense, the Federal Aviation Administration and the Postal Service. This consultation has focused primarily on procurement policy issues concerning improvements to the process of Government procurement. I also consult with private corporations and law firms on Government contracting matters. I have served as an expert witness on behalf of the Department of Justice and private corporations in both state and federal courts testifying on the practices, policies and procedures in the Government procurement process in order to assist the court in understanding the underlying premises of lawsuits in this area. A copy of my *curriculum vitae* is attached hereto at Attachment A. The cases in which I have given testimony as an expert witness in the last four years are set forth in Attachment B. I am being compensated for this engagement at the rate of $600 per hour plus reimbursement for my travel costs.

2. I have been asked to provide an expert opinion in the case Herley Industries Securities Litigation, Civil Action No. 06-2597 (JRS), E.D. Pa. regarding the contentions of Patrick A McGeehin, an expert witness for the plaintiff. Solely for the purposes of rendering my opinions, I have utilized the facts stated in the McGeehin report without opining on their validity.

3. Mr. McGeehin's ten opinions are contained in Part IV of his report where he contends that several actions of Herley constituted violations of the requirement in the Federal Acquisition Regulation that sole-source contractors submit "cost or pricing data" that is "current," "accurate," and "complete." My comments will address each of these opinions in sequence:

> Opinion 1 asserts that Herley did not disclose a "contingency." While Table 15-2 following FAR 15.408 requests that an offeror submitting a price disclose contingencies, it makes it clear that contingencies are not cost or pricing data. See the following instruction:
>
> > C. As part of the specific information required, you must submit, with your

1

proposal, cost or pricing data (that is, data that are *verifiable and factual* and otherwise as defined at FAR 2.101). You must clearly identify on your cover sheet that cost or pricing data are included as part of the proposal. *In addition*, you must submit with your proposal any information reasonably required to *explain your estimating process*, including --
> (1) The judgmental factors applied and the mathematical or other methods used in the estimate, including those used in projecting from known data; and
> (2) The nature and amount of any contingencies included in the proposed price. (Italics added)

It can be seen from this instruction that offerors are requested to provide two types of data -- (I) cost or pricing data which is factual in nature and (II) judgmental data including contingencies which explain the offeror's estimating process. Cost or pricing data is defined in FAR 2.101 as follows:

> Cost or pricing data (10 U.S.C. 2306a(h)(1) and 41 U.S.C. 254b) means all facts that, as of the date of price agreement or, if applicable, an earlier date agreed upon between the parties that is as close as practicable to the date of agreement on price, prudent buyers and sellers would reasonably expect to affect price negotiations significantly. Cost or pricing data are data requiring certification in accordance with 15.406-2. *Cost or pricing data are factual, not judgmental; and are verifiable.* While they do not indicate the accuracy of the prospective contractor's judgment about estimated future costs or projections, they do include the data forming the basis for that judgment. Cost or pricing data are more than historical accounting data; they are all the facts that can be reasonably expected to contribute to the soundness of estimates of future costs and to the validity of determinations of costs already incurred. They also include such factors as --
> (1) Vendor quotations;
> (2) Nonrecurring costs;
> (3) Information on changes in production methods and in production or purchasing volume;
> (4) Data supporting projections of business prospects and objectives and related operations costs;
> (5) Unit-cost trends such as those associated with labor efficiency;
> (6) Make-or-buy decisions;
> (7) Estimated resources to attain business goals; and
> (8) Information on management decisions that could have a significant bearing on costs. (Italics added)

2

FAR 15.407-1 requires price reduction for submitting defective cost or pricing data (not current, accurate, or complete), but there is no similar requirement if the offeror fails to submit "judgmental factors" or "contingencies." The purpose of the request for data to explain the estimating process is to assist the Government personnel in understanding the offeror's system but has no penalty attached to it. Thus, *the failure to identify a contingency does not constitute a violation of the FAR requirement to submit current, accurate, and complete cost or pricing data.*

Opinion 2 asserts that Herley did not rely on "historical data" in arriving at its estimate. This opinion reflects a fundamental misunderstanding of the FAR requirement. The cost or pricing data provisions constitute a *disclosure* requirement not a *use* requirement. The purpose of the requirement is to ensure that the Government personnel have the same factual information as the offeror when they are negotiating prices. This allows the Government personnel to evaluate the validity of the offeror's estimate and to come up with their own estimate for purposes of negotiating the ultimate price. *There is no requirement that the contractor use the cost or pricing data to arrive at its proposed price.*

Opinion 3 asserts that Herley did not disclose "historic sales data." Contract prices have not been considered to fall within the definition of cost or pricing data because they are known to the Government personnel. Note that they are not included in the list of types of cost or pricing data in the FAR 2.101 definition set forth above. Thus, *the failure to disclose sales data does not constitute a violation of the FAR requirement to submit current, accurate, and complete cost or pricing data.*

Opinion 4 asserts that Herley did not disclose that its estimates of labor hours were based on a "worst case basis" and that they contained a contingency. As in the case of my comment on Opinion 1, this is a contention that Herley did not disclose its estimating logic – a failure for which the FAR provides no penalty. To put it another way – *there is no requirement in the FAR that estimates be "accurate."*

Opinion 5 asserts that Herley had actual cost data on producing Power Heads at the time the contract was signed that it neither used nor disclosed. As discussed with regard to Opinion 2, there is no requirement in the FAR that an offeror use such actual data. However, if there was such actual data, it was cost or pricing data which was required to be disclosed.

Opinion 6 asserts that Herley failed to disclose one "yield rate" that was significantly higher than prior yield rates that had been disclosed. There is some evidence that Herley personnel believed that this yield rate was aberrational and somewhat suspect. This raises the question of whether it was data that "prudent buyers and sellers would reasonably

3

expect to affect price negotiations significantly" (see the above definition of cost or pricing data). Since there has been disagreement over the years as to the scope of this "prudent buyers and sellers" limitation on the interpretation of cost of pricing data, the decision not to disclose this data would appear to fall within the scope of this limitation.

Opinion 7 asserts that Herley failed to disclose actual labor hours to manufacture an element of the Power Head. Only if there was such data that was accumulated *before the contract was signed*, would it constitute cost or pricing data which was required to be disclosed.

Opinion 8 asserts that Herley included material costs in its estimate for work at Herley Lancaster that were higher than material costs that had been incurred at Herley Farmingdale. However, this opinion contains no allegation that there was a failure to disclose any factual information – it merely questions an estimating practice. It seems apparent that two different facilities with totally different capabilities would arrive at different estimates of the costs of performing the work – with the result that they could make very different decisions on how much work to buy versus how much work to make in house.

Opinion 9 asserts that Herley stated that it would not use material purchased for repairs to perform the contract but later used that material. If the company had made a decision not to use the material purchased for repairs to perform the contract and had not reversed this decision before the contract was awarded, there is no violation of the requirement to disclose cost or pricing data. Only if the decision to use material purchased for repairs was made *prior to contract award*, was it required to be disclosed.

Opinion 10 asserts that Herley stated that it had authorized the expenditure of $100,000 to improve its manufacturing process but that it had not done so. *Only if this is factually correct*, would it constitute a failure to disclose "accurate" cost or pricing data.

    4. In summary, Mr. McGeehin's opinions 1 through 5 and 8 that Herley violated the FAR requirement for the submission of current, accurate, and complete cost or pricing data are based on an incorrect interpretation of the FAR. His opinions 7, 9, and 10 are based on a correct interpretation of the FAR if the facts that he assumes are correct. His opinion 6 questions Herley's interpretation of the FAR cost or pricing data requirements in a situation where reasonable people have differed in their interpretation. The most fundamental flaw in his interpretation of the FAR is his assumption that contractors are required to *use* current, accurate, and complete cost or pricing data rather than merely to *disclose* such data.

4

5. In preparing this report, I have reviewed the following documents:

a. The McGeehin expert report.

b. Indictment: USA v. Herley Industries and Lee Blatt

c. Consolidated class action complaint: Herley Securities Litigation

d. Deposition transcript (with exhibits) of:
    Lee Blatt
    Myron Levy
    Patricia Salina
    Joseph Gallagher
    George Rounsaville
    Howard Eckstein

6. I will supplement this opinion as necessary.

*[signature]*

Ralph C. Nash, Jr.
August 14, 2009