**EXHIBIT B**

In the Matter of

Herley Industries Security Litigation

Eastern District of Pennsylvania

Civil Action No. 06-2596 (JRS)

Report of:
Patrick A. McGeehin
FTI Consulting, Inc.

July 1, 2009

FTI

In the Matter of
Herley Industries Security Litigation
Eastern District of Pennsylvania
Civil Action No. 06-2596 (JRS)

## TABLE OF CONTENTS

DESCRIPTION

I. Expert's Background and Qualifications

II. Scope of Work Performed

III. Federal Acquisition Regulations (FAR) Requirements

IV. Actions Taken by Herley Industries, Inc.

V. Expert Opinions and Discussions

VI. Other Cases in which Expert Testimony Has Been Provided

VII. List of Publications

ATTACHMENTS

I. Resume of Patrick A. McGeehin, CPA

II. List of Publications by Patrick A. McGeehin, CPA

III. Data and Other Information Considered in Forming Opinions

In the Matter of
Herley Industries Security Litigation
Eastern District of Pennsylvania
Civil Action No. 06-2596 (JRS)

I.   EXPERT'S BACKGROUND AND QUALIFICATIONS

I am a certified public accountant and a Senior Managing Director at FTI Consulting, Inc. I have in excess of 30 years of experience in the practice of public accounting and consulting, and have concentrated a very large portion of my practice in the area of Federal Government contracts, including assistance with the financial aspects of disputes arising out of government contracts. Enclosed, as Attachment I, is a current copy of my personal resume, which provides more detailed information with respect to my background and qualifications.

I have provided expert testimony, either in deposition or live hearing situations, on approximately one hundred different occasions, including those which were related to government contract disputes involving cost accounting and pricing issues under the Federal Acquisition Regulations (FAR) and the Cost Accounting Standards (CAS). I have also been involved with disputes relating to cost allocation and pricing violations where false claim allegations have been raised. I have testified before various Federal and State Boards of Contract Appeals, including the ASBCA, in Arbitration and Mediation situations, in Federal District Courts, State courts, International Arbitration, and before the U.S. Court of Federal Claims. A complete listing of my publications is included in Attachment II to this report.

FTI

In the Matter of
Herley Industries Security Litigation
Eastern District of Pennsylvania
Civil Action No. 06-2596 (JRS)

## II.  SCOPE OF WORK PERFORMED

I have been asked to opine on certain actions and conduct taken by Herley Industries, Inc. in connection with the negotiation, award and audit of two Navy contracts for the production of Power Heads, and to evaluate those actions to determine if the actions constituted violations of the Federal Acquisition Regulations (FAR). Power Heads are components of the radar system used on the Navy's E2-C "Hawkeye" aircraft. They act as fuses between the radar power source and the radar to protect the radar from power surges.

As a basis for coming to the conclusions described below, I have relied on my knowledge of provisions contained in the FAR and the Truth in Negotiations Act (TINA), my experience with required procedures for conducting contract negotiations with the Government, and on information contained in the documents listed on Attachment III to this report. FTI is being compensated for my time at the rate of $400 per hour. Other employees of FTI who are assisting me are being billed by FTI at rates ranging from $375 to $300 per hour.

## III.  FEDERAL ACQUISITION REGULATIONS (FAR) REQUIREMENTS

The process for awarding Federal Government contracts is outlined in the Federal Acquisition Regulations. Part 6 of the FAR entitled "Competition Requirements" requires Federal Government Contracting Officers to promote a policy of "full and open competition" for the acquisition of goods and services purchased by the Federal Government. As required by the FAR, Government procurement officials must, to the maximum extent possible, implement

F T I

In the Matter of
Herley Industries Security Litigation
Eastern District of Pennsylvania
Civil Action No. 06-2596 (JRS)

competitive procedures which will allow the normal marketplace forces of supply and demand to ensure the Government gets a fair and reasonable price for the goods and services it needs. The FAR anticipates that for some items which the Government needs, no competitive market exists and therefore "full and open competition" does not exist. In some cases, goods and services have to be obtained on a "sole source" basis where only one contractor is able or willing to contract with the government. In those cases, the Government cannot rely on the competitive market place to provide a fair and reasonable price. For example, the Government cannot "shop around" for a nuclear power plant or an aircraft carrier. In cases in which competitive pressures cannot provide assurance that a fair and reasonable price will be obtained, the Government requires that an alternative acquisition process be followed. This process is outlined in FAR Part 15 entitled "Contracting by Negotiation".

When participating in a "negotiated" rather than a "competitive" acquisition, contractors are normally required to submit to the Government "cost or pricing data". "Cost or pricing data" is defined at FAR 2.101 as follows:

> "Cost or pricing data means all facts, that, as of the date of price agreement…..prudent buyers and sellers would reasonably expect to affect price negotiations significantly. Cost or pricing data are more than historical accounting data; they are all the facts that can be reasonably expected to contribute to the soundness of estimates of future costs and to the validity of determinations of costs already incurred".

In the Matter of
Herley Industries Security Litigation
Eastern District of Pennsylvania
Civil Action No. 06-2596 (JRS)

Submission of cost or pricing data requires disclosure of estimated amounts for each cost element and of proposed profit or fee and of "all the facts" bearing on the accuracy of those estimated amounts. It also includes "information on management decisions that could have a bearing on costs" (FAR 2.101). The requirement to provide "cost or pricing data" requires contractors to disclose items such as vendor price quotes, production methodologies and yields, inventory valuations and overhead cost allocation methodologies. "Cost or pricing data" is intended to place the Government and the contractor on an equal footing when negotiating contract price in those cases where the goods or services being procured are not actively traded in the marketplace and the Government has no other basis to ascertain that it is able to obtain a reasonable price.

When "cost or pricing data" are required, contractors often must also submit a "Certificate of Current Cost or Pricing Data" (FAR 15.406-2) certifying that the data provided are "current, accurate and complete" as of the date on which price agreement is reached. If it is later determined that the "cost or pricing data" submitted was not "current, accurate and complete", the government may assert that data upon which price was negotiated was "defective" and that the contractor engaged in "defective pricing". If "defective pricing" occurs, the negotiated contract price may be adjusted downward and the contractor may be subject to fines and penalties. If considered sufficiently egregious, a contractor's failure to disclose required data or to disclose false or misleading data may be considered reckless disregard and result in the Government bringing allegations of false claims. The actual certification language contained in the certificate is shown below.

In the Matter of
Herley Industries Security Litigation
Eastern District of Pennsylvania
Civil Action No. 06-2596 (JRS)

"This is to certify that, to the best of my knowledge and belief, the cost or pricing data (as Defined in Section 15.401 of the Federal Acquisition Regulation (FAR) and required under FAR Subsection 15.403-4) submitted, either actually or by specific identification in writing, to the contracting officer or to the contracting officer's representative in support of [THIS PROPOSAL] are accurate, complete, and current as of [THE DATE OF AGREEMENT UPON PRICE]. This certification includes the cost or pricing data supporting any advance agreements and forward pricing rate agreements between the offeror and the Government that are part of the proposal."

Signature: _____ [1]

As can be seen from the regulations outlined above, the requirement for submission of "cost or pricing" data places stringent requirements upon contractors. When required, contractors must provide the Government all relevant facts which would have a bearing on price negotiations and must make sure that the disclosure of these facts are current, accurate and complete. Examples of facts which would normally have a bearing on price negotiations

---

[1] In addition to the certification contractors are required by FAR Part 15 to provide estimated costs on an SF 1411. The SF 1411 contains a statement that requires contractors to represent that amounts listed on the SF 1411 "reflect our estimated costs as of this date".

5

In the Matter of
Herley Industries Security Litigation
Eastern District of Pennsylvania
Civil Action No. 06-2596 (JRS)

and which, if not disclosed during price negotiations would, if material, result in a violation of FAR Part 15 regulations, include:

- the existence of amounts included in bid prices which are intended to address contingencies for undisclosed events;
- the use of non cost based estimating techniques (such as first defining a desired price and then estimating, or 'backing into', the cost components of that price (e.g. labor, material, overhead) as a fixed percentages of that price;
- the existence of historical price data indicating that prior actual costs and prices varied significantly from prices currently being bid;
- use of "worst case" assumptions to estimate labor hour requirements where the number of hours used to estimate labor costs anticipates that every possible manufacturing problem that can possible go wrong will go wrong;
- the existence of actual labor hour and cost history for prior performance relating to the product being manufactured.

Further, as mentioned above, contractors must provide assurance to the Government that the data provided can be relied on as a basis for negotiating a reasonable price by providing a signed Certificate of Current Cost or Pricing Data. While these requirements may appear to be onerous, it should be remembered that they are only required to protect the public interest, when the procurement must be made in a non competitive or sole source environment. If the Government could not require the submission of reliable cost or pricing in those situations, the

6

In the Matter of
Herley Industries Security Litigation
Eastern District of Pennsylvania
Civil Action No. 06-2596 (JRS)

contractor would be in a position to dictate prices, and the Government would be unable ascertain if the price it was required to pay had any reasonable cost basis.

IV.   ACTIONS TAKEN BY HERLEY INDUSTRIES, INC.

As outlined above, prior to the award of a non competitive contract, contractors must provide to the Government "cost or pricing data" that is "current, accurate and complete" so that the Government has the ability to negotiate a fair and reasonable price. Cost or pricing data is defined by the FAR as "all facts that prudent buyers and sellers would reasonably expect to affect price negotiations significantly". Contractors that provide data which is found to be "defective", in that it is not "current accurate and complete", are in violation of FAR Part 15 and are subject to corrective actions. My review of the documents provided by counsel related to this case indicates that the "cost or pricing data" provided by Herley and on which the Government relied upon to negotiate the prices for two Navy contracts for the production of Power Heads was "defective" in that it was not "current, accurate and complete". Specific examples of such "defective pricing" are listed below:

1.  In response to the Navy's December 2000 solicitation for Power Heads, Herley established a target price in the range of $19,000 to $20,000 based on, among other things, an undisclosed contingency cost. Specifically, Herley arrived at its target price range by doubling the cost of the element component of the Power Head from $4,500 to $9,000. I have been informed that Herley did not disclose this contingency during negotiation of the Power Head contracts or during pre

7

In the Matter of
Herley Industries Security Litigation
Eastern District of Pennsylvania
Civil Action No. 06-2596 (JRS)

award audit. As stated above, the cost of the element was a significant part of the cost of the Power Head. Doubling the cost estimate of the element had a material impact on the total cost of the Power Head. As such, subsequent negotiated Power Head contract prices agreed to by the Government incorporated this material defect.

2. In formulating its bid on the first Power Head contract with the Navy, Herley did not rely on historical data regarding the per-unit Power Head price charged in prior bids or the labor hours or material costs associated with the manufacture of Power Heads. Instead, Herley started with the target price range of $19,000-$20,000, and backed into the amounts for labor, material and overhead costs. Those costs which were not based on historical data assumed that the target price of approximately $20,000 would consist of one third material cost, one third labor costs and one third overhead and profit. After the numbers for material labor and indirect costs were determined, Herley arrived at a per unit price of $19,897. Herley bid exactly $19,897 per unit in response to the Navy's December 2000 solicitation. I have been informed that Herley did not disclose the above described pricing technique at the time Herley was required to submit cost or pricing data( i.e. at the time the procurement was increased to 42 units).

3. Historical sales data indicated that Herley had sold Power Heads to various customers from 1989 to 2001. The sales prices of those Power Heads ranged

In the Matter of
Herley Industries Security Litigation
Eastern District of Pennsylvania
Civil Action No. 06-2596 (JRS)

from $3,795 per unit for seven units sold to Fleet & Industrial in 1996 to $7,500 for one unit sold to Seocal in 1998. The cost estimates for Power Heads Herley provided to the Navy in 2001, including an 11% profit, were $20,241 per unit for 42 units and $18,775 per unit for 139 units. I have been informed that, during price negotiations with the Navy, Herley did not disclose historic sales data.

4. During a pre award audit of a Power Head cost estimate, the Government requested support for the number of labor hours estimated for the manufacture of the Power Head element. Herley responded by providing a detailed "labor estimate" outlining 134 separate steps required to produce a Power Head element with estimated labor hours for each step. The time Herley assigned to each step of the process was based on a worst case scenario in which everything that could go wrong would go wrong and included 30% to 40% markups for "contingencies". I have been informed that Herley did not disclose that its labor costs were based on a worst case basis and that they included up to a 40% markup for contingencies.

5. At the time Herley prepared its cost estimate for the 139 unit Power Head contract in October 2001, it had accumulated six months of actual cost data with respect to the labor hours for the manufacture of elements. I have been informed that Herley did not use this historic data as a basis for its cost estimate,

In the Matter of
Herley Industries Security Litigation
Eastern District of Pennsylvania
Civil Action No. 06-2596 (JRS)

and did not disclose to the Government the fact that it had six months of actual element manufacturing cost data.

6. In connection with a pre award audit, Herley failed to provide complete data regarding element yield rates to the government. Although Herley stated that the increase in the per unit element price was due to recent degradation of the manufacturing process, resulting it decreased yields, Herley knowing failed to present data indicating a substantially higher yield rate than they had reported to the government.

7. In connection with a pre award audit, Herley misrepresented its actual labor hours for the manufacture of elements. Specifically, in a February 21, 2002 letter to the Navy, Herley represented that its current experience for the amount of technician time required to manufacture an element was 31.8 hours. Herley's actual data indicated that it only took 20.2 hours of technician time to manufacture an element. I have been informed that this information was not shared with the Government.

8. In negotiating the price of the Power Heads, Herley directed that the manufacture of the subassemblies/housing be moved from Herley Farmingdale, where the part had been historically manufactured, to Herley Lancaster, which had not previously manufactured the subassembly. Herley Lancaster quoted a

In the Matter of
Herley Industries Security Litigation
Eastern District of Pennsylvania
Civil Action No. 06-2596 (JRS)

price of $9,300 per subassembly in connection with the contract for 42 power heads. That price consisted of material costs estimated to be between $2,000 and $3,000, even though Herley's historical data indicated a material cost of $645 per subassembly. Immediately after both Power Head contracts were awarded, Herley directed that the manufacture of the subassemblies occur at Herley Farmingdale and not be moved to Lancaster. Herley data indicates that the actual material costs associated with the manufacture of the subassemblies in Farmingdale was $360.

9. In response to auditor inquiries as to why the historical subassembly material costs of $645 were not applicable to the current contracts, Herley stated, among other things, that the historical price related to materials purchased for repairs that would not be used for the manufacture of the subassemblies under the Navy contracts. Such materials, however, were in fact utilized in manufacturing the subassemblies.

10. In support of a price quote for Power Heads, Herley represented to the Navy that it had been authorized to spend $100,000 on new manufacturing tooling and processes needed to improve the manufacture of Power Head elements. I have been informed that, at the time Herley made this representation, Herley was aware that no authorization to acquire new equipment had been made, and that no new equipment was needed to produce Power Head elements.

In the Matter of
Herley Industries Security Litigation
Eastern District of Pennsylvania
Civil Action No. 06-2596 (JRS)

## V. EXPERT OPINIONS AND DISCUSSIONS

In my opinion, the actions which Herley took, as listed in Part IV of this report, resulted in violation of the provisions of FAR Part 15 and the Truth in Negotiations Act. The actions listed in Part IV resulted in Herley withholding from Government negotiators, "facts that prudent buyers and sellers would reasonably expect to affect price negotiations significantly". The failure of Herley to disclose this information resulted in the Government being deprived of information needed to negotiate fair and reasonable prices. As such, the negotiated prices for both of the Power Head contracts discussed in this report were based on "defective pricing", in that the data made available by Herley on which Government negotiators relied was "inaccurate and incomplete".

I understand that Herley has been in the US Government contracting business for over forty years and during that time has negotiated numerous cost proposals. The FAR Part 15 and TINA requirements applicable to negotiated procurements, which are discussed in this report, are basic, commonly known and essential requirements with which Government Contractors must comply. As an experienced Government Contractor, Herley Industries must have, or should have, been aware of its obligation to comply with these laws and regulations and that its conduct as described above did not comply with these laws and regulations.

In the Matter of
Herley Industries Security Litigation
Eastern District of Pennsylvania
Civil Action No. 06-2596 (JRS)

VI. **OTHER CASES IN WHICH EXPERT TESTIMONY HAS BEEN PROVIDED**

See current resume attached (Attachment I).

VII. **LIST OF PUBLICATIONS**

See listing of published articles attached for Mr. McGeehin (Attachment II).

_____          7-01-2009
Patrick A. McGeehin                      Date

13

FTI