**EXHIBIT C**

Page 1

U.S. DISTRICT COURT FOR THE

EASTERN DISTRICT OF PENNSYLVANIA



IN THE MATTER OF:         :   Civil Action

  HERLEY INDUSTRIES       :   No. 06-2596 (JRS)

  SECURITY LITIGATION     :

— — —

Tuesday, October 6, 2009

— — —



Deposition of PATRICK A. McGEEHIN, taken pursuant to notice, was held at the law offices of Blank Rome LLP, Watergate, 600 New Hampshire Avenue, Northwest, Washington, D.C., commencing at 10:00 a.m., on the above date, before Karen Young, Notary Public.

MAGNA LEGAL SERVICES
Seven Penn Center, 8th Floor
1635 Market Street
Philadelphia, Pennsylvania 19103
(866) 624-6221

Page 30

1  A. Yes.
2  Q. Who's that?
3  A. Mike Behn is a lawyer in Chicago I think.
4  Q. Uh-huh. Have you had dealings with
5  Mr. Behn?
6  A. Yeah, I worked on a case for Mike a while
7  back.
8  Q. Okay, all right. And then do you see in the
9  upper right-hand corner, it says file and then it's
10 circled and there's a hyphen, Ed.
11 A. Yes.
12 Q. You wrote that?
13 A. Yes.
14 Q. What does that mean?
15 A. Ed, for the file.
16 Q. Whose file?
17 A. For his file, you know, just to hold onto.
18 Q. Oh, I see. You were preparing this and
19 giving it to --
20 A. Ed.
21 Q. Okay, and why were you doing that?
22 A. I'm not sure I gave a whole lot of thought.
23 Just to introduce him to the case and to tell him to
24 hold onto this. It had certain information on it

Page 31

1  about e-mail addresses for Mr. Press --
2  Q. Uh-huh.
3  A. -- and Mr. McNeela.
4  Q. Okay. Do you see three quarters of the way
5  down references made to reports due July 1? Do you
6  see that?
7  A. Yes.
8  Q. Counsel told you that?
9  A. Yes.
10 Q. And then under that, it says, if I'm reading
11 it correctly, it says procedure slash potential?
12 A. Protocol.
13 Q. Protocol, FAR and TINA.
14 A. Yeah.
15 Q. Why did you write that?
16 A. Well, as I testified earlier, this -- my
17 recollection, and this would tend to support it, is
18 that those were the discussions in the initial
19 conversation.
20 Q. Okay, and then reading on the top of the
21 page but toward the right side, do you see where it
22 says, "Violate regs"?
23 A. Yes.
24 Q. Why did you write that?

Page 32

1  A. I don't know why I wrote it, but apparently
2  somebody must have said that it had to do with
3  violating the regs.
4  Q. Okay. Was there a discussion about that
5  subject matter with counsel?
6  A. I would assume so.
7  Q. Do you remember it?
8  A. Nothing further than what I've already
9  testified based on my recollection.
10 Q. Okay, and then you see it says one half of
11 value? You see that?
12 A. I do.
13 Q. Did you write that?
14 A. Yes, I wrote everything on this sheet.
15 Q. Okay. Why did you write it?
16 A. I don't know why I wrote it, but apparently
17 somebody must have mentioned something about half of
18 value.
19 Q. Do you have any memory of that discussion?
20 A. No.
21 Q. Half of value of what?
22 A. I don't remember.
23 Q. Don't remember?
24 A. Yeah.

Page 33

1  Q. Okay, all right. There came a point in
2  time, I take it, when you were being -- when you
3  realized that you were being asked to perhaps consider
4  giving opinions about whether or not there were
5  violations of the FAR. Is that a fair statement?
6  A. Yeah, yes, or that -- yeah, in my
7  experience, were there -- would these matters
8  constitute violations, yes.
9  Q. Okay. When did that thought crystallize in
10 your brain?
11 A. I don't know that it didn't crystallize
12 right from the beginning. From the beginning, the
13 intent was for me to give testimony based upon my
14 experience and practices, whether what I was about to
15 look into would in fact constitute pricing violations
16 in the government contract industry.
17 Q. Okay, so at a certain point, you realized
18 that you were being asked to at least as a consultant
19 and perhaps then as a testifying expert, to offer
20 opinions about whether or not there had been potential
21 or actual violations of the federal acquisition
22 regulations or FAR. It's all caps, F-A-R.
23 A. Yeah, but again, within -- within the
24 government contract industry, in my experience, again,

Page 34

1  not as a lawyer or not as a, you know, giving a legal
2  opinion, but just in my experience, would I view these
3  as violations of the FAR within the government
4  contract industry.
5      Q.   Okay. Have you been an expert previously on
6  the subject matter of the FAR and whether or not
7  certain activities ran afoul of the FAR?
8      A.   I'd say yes.
9      Q.   Okay. Can you tell me which cases?
10     A.   It would be easier if I looked at my --
11     Q.   Sure.
12     A.   -- resume.
13     Q.   Yeah, absolutely. We can do that. Let me
14 mark as the next exhibit, which will be McGeehin
15 Exhibit Number 5, a copy of your report, which also
16 contains in the back your C.V. Did I accurately
17 describe Exhibit Number 5?
18     A.   I think you did.
19     Q.   Okay, and I believe as attachment 1, if I
20 recall correctly, your C.V. -- your resume --
21     A.   Yes.
22     Q.   -- is appended.
23     A.   Yes.
24     Q.   And somewhere in that resume is a list of

Page 35

1  cases.
2      A.   Yes.
3      Q.   Listing of expert testimony, okay.
4      A.   Yes.
5      Q.   Could you just tell me, sir, in which of
6  these matters -- well, first of all, what does this
7  list represent?
8      A.   Right. This list represents to the best of
9  my knowledge of cases that I've -- that have gone
10 either to deposition stage or live hearing and expert
11 testimony stage.
12     Q.   Okay, so these are cases in which you agreed
13 to be an expert, and along the way, you prepared a
14 report and where at least you gave a deposition and
15 you may have even offered testimony in a courtroom or
16 in an administrative proceeding, fair?
17     A.   I think that's right with one asterisk if
18 you will.
19     Q.   Okay.
20     A.   I think there's a couple references here to
21 some binding DRB, dispute resolution boards.
22     Q.   Okay.
23     A.   And they may not have had reports involved.
24     Q.   Okay, so which ones did you offer opinions

Page 36

1  that concerned the FAR and whether or not conduct ran
2  afoul of the FAR?
3      A.   Yeah, if it's okay with you, it's easier to
4  go backwards from the last page just because that's
5  the most recent, so back on page 11 of my resume --
6      Q.   Okay.
7      A.   The first one is that Midwest Transport,
8  U.S. District Court --
9      Q.   Okay.
10     A.   -- in the Northern District of Texas. That
11 involves a -- that's an ongoing matter. I can't go
12 into a lot of details, but that does involve an
13 allegation with respect to a violation of the FAR by
14 the -- by the government.
15     Q.   Okay, so you've given an opinion to one of
16 the parties in that dispute that there's been or
17 hasn't been a violation of the FAR?
18     A.   Yeah, I mean, some -- maybe not stated just
19 that way, but I've given an opinion with respect to
20 whether -- whether or not someone -- you used the
21 phrase run afoul of the FAR. Whether I viewed that as
22 something from an industry perspective, whether it was
23 or was not, quote, you know, running afoul of the FAR.
24     Q.   Uh-huh, and --

Page 37

1      A.   I'm sorry.
2      Q.   Have you been deposed in that case or is
3  this a criminal case?
4      A.   I don't think it has any criminal aspects.
5  It's a civil.
6      Q.   Okay.
7      A.   But I have been deposed. Just two things
8  might be helpful. My client is in italicized -- in
9  italics --
10     Q.   Okay.
11     A.   -- on these sheets, and secondly, if you see
12 a reference to a 2, that's a deposition versus a 1
13 would be a live hearing, and that's under the forum
14 column on the right side.
15     Q.   That's helpful. Thanks. So the court has
16 not accepted your opinion that you're a qualified
17 expert at least in that matter.
18     A.   I haven't testified --
19     Q.   Got it.
20     A.   -- in live. Just deposition on that one.
21     Q.   Okay. Anything else on that page?
22     A.   Yeah, hold on now. I've got to go one at a
23 time here. Yeah, I wouldn't think any of the others,
24 even though they involve government contract issues,

Page 38

1  they're not running afoul of the FAR, as you said.
2     Q.   And if we go to page 10 of Exhibit Number 5,
3  that's page 10 of your resume attached as attachment
4  1.
5     A.   Halfway up the page, there's a case there
6  involving Lockheed Martin. Maybe right --
7     Q.   Yeah.
8     A.   Maybe 40 percent.
9     Q.   I see.
10    A.   And that's a case where the government
11 alleged that Lockheed Martin violated an aspect of FAR
12 part 31, cost principles, and I was representing
13 Lockheed Martin on that case.
14    Q.   Okay, and 1 means you testified in court?
15    A.   Yes, and in fact, I think I produced a copy
16 of that -- that was one -- one of the ones that was
17 not under a protective order.
18    Q.   Okay.
19    A.   And with redaction, I could produce for you.
20    Q.   All right, and do you remember what opinions
21 you gave in the case other than there was no violation
22 of part 31?
23    A.   Yeah, yeah, that in my experience, that the
24 -- there were several things that I did in that case,

Page 39

1  but under -- as an accountant, it was a very
2  complicated accounting case, but the opinion was that
3  the manner in which Lockheed accounted for those costs
4  was appropriate, and that was relevant to the
5  treatment under the FAR, in a very general sense. We
6  also did some calculations for them.
7     Q.   So you were not attempting to quantify
8  damages in the case.
9     A.   No, I think they had been pretty much
10 stipulated.
11    Q.   Okay.
12    A.   Yeah.
13    Q.   And did the scope of your engagement in the
14 Lockheed Martin matter focus exclusively on whether or
15 not the FAR had been violated, or the provisions of
16 the FAR, or not, as the case may be?
17    A.   Yeah, the cost principles. The government's
18 position that under the cost principles you would
19 reach this result. Lockheed's was under the cost
20 principles, no, you would reach this result, and so
21 that was -- that was the gist of what I was testifying
22 about in that case.
23    Q.   So this was an interpretation of a provision
24 of the FAR and what its impact would be on accounting

Page 40

1  procedures.
2     A.   In a sense. Again, there's a fine line in
3  terms of, you know, not -- not interpreting the FAR as
4  giving a legal opinion with respect to a particular
5  provision, but in my experience, how that particular
6  issue in the government contract community under, you
7  know, customary practices would be had.
8     Q.   Okay. Any other cases on page 10?
9     A.   The item right above it, I did not testify
10 in court on that case, but I gave a deposition,
11 Science Application International Corporation, SAIC.
12 I testified in a deposition for SAIC.
13    Q.   Okay, and what opinions did you give?
14 Again, focusing on the FAR.
15    A.   Yeah, yeah, focus on the FAR, that was an
16 organizational conflict of interest case where the
17 government was alleging damages relating to the
18 organizational conflict of interest, and my testimony
19 was that the damages that they were calculating were
20 improper.
21    Q.   Why?
22    A.   Because there was no cause-effect in my mind
23 between the -- what they were alleging and what the
24 damages were calculated.

Page 41

1     Q.   How did the FAR get implicated?
2     A.   Well, the organizational conflict of
3  interest provisions are under the federal acquisition
4  regulations where companies have to follow those
5  rules, where they can't -- they can't wear two hats,
6  if you will --
7     Q.   Uh-huh.
8     A.   -- with respect to two different agencies.
9     Q.   Well, did your opinion focus on that
10 provision of the FAR or whether or not there was a
11 causal relation?
12    A.   More the latter.
13    Q.   Okay.
14    A.   My opinion in that case focused more on
15 damages.
16    Q.   Okay. Any other cases on page 10?
17    A.   I don't think so.
18    Q.   Page 9?
19    A.   The fourth item from the top, Daewoo
20 Engineering and Construction.
21    Q.   Uh-huh.
22    A.   I gave rebuttal testimony in that case, and
23 the gist of that testimony was the context in which
24 certain pricing violations had been alleged against

Page 42

1  Daewoo, so I was testifying that in order to assess a
2  violation of the FAR or a false claim, you have to
3  look at the context of the damage calculation to
4  really understand whether or not there was a
5  violation.
6      Q.   What was the principle in Daewoo that you
7  were rebutting?
8      A.   The principle was -- there were about six or
9  seven pricing actions that the government alleged were
10 false.
11     Q.   That constituted false claims?
12     A.   Yes, yes, on a counterclaim, so it was
13 originally a claim by Daewoo. Government then alleged
14 a false claim.
15     Q.   Okay.
16     A.   And so I was trying to put some context into
17 the violations that the government was alleging on the
18 pricing end of things. They had another -- they had
19 other false claims dealing with bait and switch and
20 other items, but on the pricing issues, I was trying
21 to identify and explain in the industry the context
22 for some of those alleged violations.
23     Q.   What opinions did you offer about the FAR in
24 the Daewoo case?

Page 43

1      A.   Well, they were -- the opinions -- as an
2  example, there was a reference to FAR part 31 in terms
3  of the pricing under the FAR of construction
4  equipment, and it gets kind of detailed, but the usage
5  of Corps of Engineer equipment raised some -- and how
6  those are used or should be used, so that -- that was
7  one aspect of the FAR. There was allegations about
8  unallowable costs for things like entertainment
9  included in overhead pools of the contractor, which --
10 which the government alleged were violations of the
11 FAR. Those types of things.
12     Q.   And you offered an opinion that those
13 unallowable costs were not violations of the FAR?
14     A.   No, I offered -- well, on the first one,
15 yes, okay.
16     Q.   That's on the construction equipment?
17     A.   On the equipment, yeah. On the
18 entertainment, those were the ones that I was
19 explaining the context of a construction -- not that
20 in and of themselves an entertainment cost is not a
21 violation of FAR. It was, but that when you look at a
22 $2,000 item on a hundred million dollar construction
23 project, trying to put that into context --
24     Q.   Okay.

Page 44

1      A.   -- is what I was discussing there.
2      Q.   All right. Have we covered what you did in
3  the Daewoo case as a rebuttal expert?
4      A.   I think so.
5      Q.   Okay. Any other cases on page 9?
6      A.   I don't think so.
7      Q.   Page 8?
8      A.   There's a case -- there's a case, the second
9  item from the top, United States Department of State,
10 which is our client, versus Perini Corporation.
11     Q.   Uh-huh.
12     A.   In that case I offered testimony and
13 calculations that the costs included by Perini in its
14 overhead pools were unallowable in accordance with the
15 provisions of the FAR, and there was a subsequent
16 false claims case that was settled in that matter, but
17 I didn't offer any testimony with respect to that
18 case.
19     Q.   But you did testify in USA versus Perini
20 about the subject matter you just described?
21     A.   Yeah.
22     Q.   And you were qualified as an expert by the
23 court?
24     A.   Oh, yes.

Page 45

1      Q.   On the issue of -- well, strike that. On
2  what matter were you qualified, or matters?
3      A.   You know, every proffer is a little bit
4  different, as you may know, and I don't remember the
5  exact wording of the proffer in that case.
6      Q.   Anything else on 8?
7      A.   Yeah, the next item under that is a Northrop
8  Grumman false claims case, where I represented the
9  U.S. Attorney's office and plaintiffs' lawyers in the
10 case that was tried out of Chicago, and I don't
11 exactly remember -- I know -- I know I offered
12 testimony with respect to damages calculations. The
13 FAR violation in that case had to do with having an
14 acceptable or appropriate material handling system
15 under progress payments under the FAR, but I don't
16 remember if -- if they solicited an opinion with
17 respect to that issue from me.
18     Q.   So you don't remember if your opinions
19 implicated the FAR, at least in the Northrop Grumman
20 matter?
21     A.   Yeah, I think that's right.
22     Q.   Okay. Anything else on page 8?
23     A.   A little further down, the Newport News
24 Shipbuilding is another false claim action where I

Page 46

1  represented the government, and that case had to do
2  with -- and that would be kind of the same answer as
3  the other one. The violations had to do with IR and
4  D, independent research and development and bid and
5  proposal costs and damages, and again, as I sit here,
6  I don't remember whether my testimony was just limited
7  to the damages or also to my opinions with respect to
8  those FAR part 31 issues.
9      Q.  Okay. Anything else -- any other cases on
10 page 8 which concern the FAR?
11     A.  Well, yeah. And just to be clear, there's a
12 couple -- there's a legend on the far right hand that
13 talks about E -- it's E, it says federal related. The
14 ones that I was trying to hit here were ones where
15 there was violations of the FAR rather than just
16 generically related to the FAR. As an example,
17 there's a couple of cases I haven't touched on that
18 have to do with lost profits cases where somebody
19 leaves a company, a government contractor, and they
20 get sued because they took business and they have a
21 claim for lost profits, or I'm defending them. So
22 they sometimes have FAR references to them in terms of
23 how you calculate damages, but it wasn't a pure run of
24 -- run afoul of the FAR --

Page 47

1      Q.  Right.
2      A.  -- as we've been discussing.
3      Q.  That's what I want -- appreciate that.
4      A.  Yeah, okay, and then -- so that's it on page
5  8.
6      Q.  Okay. Page 7?
7      A.  On page 7, I represented Honeywell, about
8  the middle of the page, on a false claims violation --
9  or allegation by the government that just went through
10 deposition, and as I recall, my testimony had to do
11 with the appropriateness of allocating costs under the
12 FAR, how you allocate certain costs under the FAR.
13     Q.  Do you have any further recollection of what
14 opinions you gave in the Honeywell case?
15     A.  That's all I remember right now. The case
16 settled, so I don't remember.
17     Q.  Okay, and that -- you gave those opinions in
18 a deposition.
19     A.  Yes, and I think that's all on page 7.
20     Q.  Okay. Anything on 6?
21     A.  On page 6, the Safeco case about halfway
22 down involved the -- as I remember, the government
23 alleging that Safeco -- Safeco's calculation of
24 equipment costs again was not in accordance with the

Page 48

1  FAR part 31, and my testimony was that it was.
2      Q.  Which provisions of the FAR were implicated
3  in that engagement?
4      A.  It's a FAR part 31 that deals with --
5  there's a provision, I don't remember the exact number
6  right now, but it deals with how you price
7  construction equipment under a federal government
8  contract.
9      Q.  All right, and you offered those opinions in
10 connection with an administrative proceeding?
11     A.  Yes, sir.
12     Q.  Okay. Anything else on 6?
13     A.  The mediation -- there's a mediation
14 reference there with the Big Dig up in Boston. Those
15 involved allegations by DCAA that the designer had
16 included costs in its overhead pools and allocated
17 costs that were r  .compliant with the FAR. I
18 represented the Big Dig and consulted with the Defense
19 Contract Audit Agency in terms of preparing and
20 presenting and resolving those issues during
21 mediation, but I didn't testify per se.
22     Q.  Did you offer opinions relating to the FAR?
23     A.  Yes.
24     Q.  Which opinions?

Page 49

1      A.  The opinions that I offered there were in
2  terms of the method to allocate overhead under FAR
3  provisions, because the FAR had been referenced in the
4  contracts for the designers at the Big Dig, so DCAA's
5  position -- I don't remember all the details, but was
6  that in accordance with the FAR, that the allocation
7  was not proper under the FAR and some of the guidance
8  under the cost accounting standards. Parson's
9  position was of course the opposite, and I presented
10 at that mediation.
11     Q.  Okay. Anything else on 6?
12     A.  Essex Electro, that was a deposition, as I
13 recall, that had to do with the government's
14 allegation that Essex' method of allocating overhead
15 and claiming overhead under something called an
16 unabsorbed overhead claim was improper, and I -- my
17 opinion -- I offered opinion and calculations about
18 how that should be done, but that didn't go to trial.
19 That was a deposition.
20     Q.  Uh-huh, and you offered opinions about
21 whether or not certain accounting did or didn't run
22 afoul of the FAR?
23     A.  Yeah, and again, I should -- I should
24 tighten that up a little bit. On that one, it's as

Page 50

1  much case law under the Armed Services Board of
2  Contract Appeal as the FAR per se because the FAR
3  doesn't have -- FAR has a more generic description,
4  but there's been case law over time that helped define
5  that a little bit better.
6      Q.   Okay. Anything else on that page?
7      A.   The bankruptcy case at the bottom of the
8  page, Wells Fargo Bank, my deposition testimony had to
9  do with under government contract regulations, what
10 costs can appropriately be put into a termination for
11 convenience claim or not. The issue there was whether
12 the termination for convenience claim of Kitty Hawk
13 was appropriate as part of the evaluation of the
14 bankruptcy court and the trustees in that case.
15     Q.   What opinions did you offer?
16     A.   I don't remember the exact details, but
17 generally that the -- certain amounts that were
18 included in the claim were either appropriate or not
19 appropriate under -- under, you know, government
20 procurement regulations.
21     Q.   Under the FAR?
22     A.   Yeah, that -- that case I think actually was
23 U.S. Postal Service, which has its own set of
24 regulations. I won't say they mirror the FAR, but

Page 51

1  they're similar to the FAR in terms of --
2      Q.   Okay.
3      A.   -- those types of issues.
4      Q.   Page 5?
5      A.   The second to the last item on the page,
6  U.S. versus Jacobs Engineering, that was a case that
7  generally had to do with an allegation by the
8  government that Jacobs had violated the provision of
9  FAR 31.205, I want to say 46, it's either 46 or 42,
10 with respect to -- it's called the rental cost
11 principle --
12     Q.   Uh-huh.
13     A.   -- where they were renting from an
14 intercompany division and -- I mean, didn't do it
15 right under the FAR, and I offered deposition
16 testimony in terms of that issue and also calculated
17 damages.
18     Q.   Did you offer an opinion about whether or
19 not there was or wasn't compliance with the FAR?
20     A.   That's kind of like one of those -- one of
21 the other ones. I'm not sure exactly of that. I seem
22 to remember that coming up in the deposition, but I
23 just -- I just don't remember. It's back a while.
24     Q.   Okay. Anything else on that page?

Page 52

1      A.   I don't think so.
2      Q.   Okay. Page 4?
3      A.   Second one from the top of the page, that
4  Diverco case was similar to the Essex Engineers case
5  that I talked earlier.
6      Q.   I'm sorry, Diverco. Oh, second one from the
7  top.
8      A.   From the top, yeah. Similar to that Essex
9  Engineering case I talked about earlier that had to do
10 with not purely the FAR, but the FAR as refined by
11 case law on the calculation of unabsorbed overhead
12 under a government contract.
13     Q.   Can you tell me what opinion you offered in
14 Diverco?
15     A.   As I remember, and that's about 15 years
16 ago, but as I remember that, it had to do with how you
17 make the -- how you -- how you make the calculation of
18 what you're trying to measure as unabsorbed overhead
19 and impact as a result of a delay.
20     Q.   And how was the FAR implicated? What
21 provision or what opinion did you offer relating to
22 the FAR?
23     A.   As I said, it's more like that Essex
24 Engineer case. It was more an opinion that --

Page 53

1  something called the Eichleay formula and Byrd
2  fluctuation formulas have evolved in the Armed
3  Services Board of Contract Appeals, and they fall out
4  of FAR part 31 allocation principles and requirements,
5  so it's tangentially related to that.
6      Q.   So Diverco was more about a methodology that
7  was utilized for a damage model?
8      A.   I think that's fair, yeah.
9      Q.   Anything else on page 4?
10     A.   The Ryan-Walsh matter, which is the third
11 from the bottom, had to do with -- it had to do with
12 many things. One of the issues had to do with the
13 large -- a large part of the dispute had to do with
14 the calculation and appropriateness under CAS -- the
15 cost accounting standard 416 for the appropriateness
16 of -- of the inclusion of about five and a half
17 million dollars of workmen's comp costs that the
18 government alleged was inappropriate under FAR part 31
19 and CAS standard 416, and I gave testimony that I did
20 not think that it was inappropriate under those
21 standards.
22     Q.   Okay. Anything else on that page?
23     A.   The General Dynamics Corporation at the
24 bottom of the page, that -- I testified at deposition

Page 54

1  but not in live hearing, and one of the issues in that
2  case was -- maybe all the issues in that case had to
3  do with the allowability and appropriateness of costs
4  under government contract procurement regulations,
5  specifically FAR part 31, saying whether or not in my
6  interpretation in the industry, would these be
7  appropriate costs to include in an overhead pool or
8  were they -- I mean appropriate costs to include in
9  direct charges to the contract or not.
10    Q.   Were you offering an opinion in that case
11  about the applicability of a particular FAR provision
12  or the construction of a particular FAR provision?
13  I'm not understanding what you're saying.
14    A.   Okay, we'll try it again. This was a
15  termination for -- well, it was a termination for
16  default.
17    Q.   Okay.
18    A.   General Dynamics and McDonnell Douglas was
19  putting in a claim under termination for convenience.
20    Q.   Okay.
21    A.   Under termination for convenience, you
22  submit all the costs that you incur under a contract.
23  Some of those costs the government alleged were not,
24  quote, allowable under the Federal Procurement

Page 55

1  Regulations, the FAR.
2    Q.   Right.
3    A.   And my testimony had to do with that -- that
4  in my opinion -- it was two general issues. My
5  opinion that they were, and then secondly, there were
6  some sampling methods that were used by the
7  government's expert that I felt were inappropriate.
8    Q.   Okay. Anything else on page 4?
9    A.   I don't think so.
10    Q.   Page 3?
11    A.   Page 3 at the top of the page, the Northrop
12  Corporation case, as I remember, had to do with an
13  issue of inappropriate bidding process by Northrop
14  that resulted in them understating their estimated
15  costs that they were going to complete the contract.
16    Q.   What opinions did you give about the FAR in
17  that case?
18    A.   I don't remember. I think most of what I
19  did on that case had to do with just damages.
20    Q.   Okay.
21    A.   I think -- I just don't remember.
22    Q.   Any opinions about whether or not the FAR
23  had been run afoul of in any of the other cases that
24  appear on page 3?

Page 56

1    A.   Let me just -- let me just look. I see that
2  there's a JAK Construction case. They're part of the
3  Army. I know it had to do with issues by the Army
4  about costs that they felt were not appropriate, but I
5  don't -- I don't remember any of the details in that.
6    Q.   Okay. Should we move to page 2?
7    A.   Sure.
8    Q.   Any cases mentioned on page 2 where you
9  offered opinions about whether or not provisions of
10  the FAR had been run afoul?
11    A.   Yeah, the second item from the top.
12    Q.   Yes.
13    A.   That Litton Systems case, that involved
14  allegations of CAS, cost accounting standard, and FAR
15  part 31 allocation issues, and that was the subject of
16  my testimony.
17    Q.   What opinions did you offer?
18    A.   Again, it's a while ago, but generally it
19  had to do with that -- I believe that the allocation
20  approaches that Litton had used in terms of its
21  computer cost allocations under the FAR and the CAS
22  were inappropriate.
23    Q.   So you testified for the U.S.?
24    A.   Yes.

Page 57

1    Q.   Anything else on page 2?
2    A.   At the bottom of the page there, the second
3  from the bottom was a criminal case.
4    Q.   This is Tempest Products?
5    A.   Yes, and that case -- that case had to do
6  with anti-kickback, and I didn't -- as I recall, I did
7  give a specific opinion about the FAR, but just about
8  the inappropriate conclusion that DCAA had reached in
9  terms of how much money the company had made on that
10  project that they were alleging a kickback.
11    Q.   Was this in connection with a sentencing
12  proceeding?
13    A.   No, it was actually part of the main -- the
14  main hearing.
15    Q.   Okay. Anything else on 2?
16    A.   The last one on the page was a -- as I
17  recall that case, had to do with calculation of costs
18  under a -- the case I think was originally terminated
19  for default, and I don't remember all the details, but
20  it had FAR termination for convenience and termination
21  for default issues. I remember -- the only thing I
22  remember about the case was doing some calculations.
23  I don't remember the exact thrust of the testimony. I
24  think that was a jury trial, but I'm not sure.

Page 58

1  Q. Okay, and you don't remember if you offered
2  opinions about the FAR?
3  A. I don't.
4  Q. Okay. Page 1?
5  A. The third item down, Engineering, Inc., that
6  was a NASA Board of Contract Appeals case, and in that
7  case I offered testimony about, again, the rental cost
8  principle under FAR part 31 and violation of FAR.
9  There was an allegation that what they had done
10 violated the FAR. It gets kind of complicated, but --
11 and I offered opinion that I believed that it did not.
12 Q. Okay. Anything else on page 1?
13 A. Down the page a bit, TDC Management, that
14 was another termination for convenience case, and in
15 that case, the government alleged that the costs that
16 had been included by TDC Management were improper, and
17 we -- our firm and me -- and I reviewed that -- the
18 costs, and agreed with certain costs that we felt were
19 unallowable and then disagreed with certain others
20 that we thought were allowable under the FAR.
21 Q. Did you testify in that case?
22 A. Yes.
23 Q. Okay. Anything else on page 1?
24 A. I don't think so.

Page 59

1  Q. Okay. Have you ever offered an opinion in
2  any matter about whether data constitutes or doesn't
3  constitute cost and pricing data within the meaning of
4  the FAR?
5  A. I don't think I've ever asked to give that
6  specific opinion.
7  Q. Okay.
8  A. Whenever you're -- take a quick break?
9      MR. SMITH: Oh, sure.
10         (Recessed at 11:09 a.m.)
11         (Reconvened at 11:15 a.m.)
12 BY MR. SMITH:
13 Q. Mr. McGeehin, we're going to hand to you
14 what we're going to mark as the next exhibit, Exhibit
15 Number 6. Exhibit Number 6 represents a thread of
16 e-mails starting with one from a Rita Gaskin to you
17 dated June 6th, and continuing right up from -- or to
18 July 5th from a Matt Krafft, K-R-A-F-F-T, to you and
19 Mr. McNeela. Are you familiar with these e-mails,
20 sir?
21 A. Yeah, they look like they were produced from
22 our offices.
23 Q. Okay, and I take it you gathered up
24 everything you had in response to the subpoena that

Page 60

1  was served?
2  A. Yes.
3  Q. You didn't withhold anything?
4  A. No.
5  Q. Okay. In the -- or on the second page of
6  the e-mail thread, reference is made there to the
7  engagement letter and retainer check, and that's --
8  you see that, the e-mail dated June 11th?
9  A. Yes.
10 Q. Okay. Does that refresh your recollection
11 about when precisely you were engaged?
12 A. Yeah, I think that -- it refreshes my
13 recollection as to when the engagement letter was
14 signed and we received a check.
15 Q. Okay, and I don't remember, did you start
16 working on the matter before you got the retainer
17 check in?
18 A. Yeah, I think as I indicated earlier, that
19 Ed Giddings has some time on June 8th.
20 Q. Okay.
21 A. Again, I may have had some time but didn't
22 charge it prior to opening up the matter officially
23 with the signed LOE.
24 Q. Okay, okay. Keep next to you if you would

Page 61

1  Exhibit Number 2, all right? We know the engagement
2  letter gets signed sometime on or about June 11th,
3  right? You with me?
4  A. At least by June 11th, yes.
5  Q. Okay. Now -- now, can you tell me, sir,
6  between the time that engagement letter was signed and
7  the time your report was prepared and signed by you,
8  can you tell me which documents you reviewed in this
9  case?
10 A. We would have reviewed --
11 Q. I'm not on the we.
12 A. Yeah, okay.
13 Q. I'm on the you.
14 A. Got you, got you. I would have reviewed the
15 -- let me take a look at my report to refresh my
16 recollection.
17 Q. Your report is dated -- or it's marked
18 Exhibit 5. It's right there if you want to look at
19 it.
20 A. Yeah, I have it here also. Yes, it's the
21 same copy. Attachment 3 indicates the documents that
22 had been considered in forming opinions, and on those,
23 I had read excerpts of some of those and all of
24 others.

Page 70

1  -- that the identification of who was deposed and who
2  was interviewed and what the relevant issues and
3  documents were came from counsel.
4    Q.  Okay.  And I think you said you've never
5  been an expert for Kirby McInerney before, for any
6  lawyer?
7    A.  I don't believe so.
8    Q.  Okay, and have you heard about a firm,
9  Labaton, L-A-B-A-T-O-N?
10   A.  Not ringing a bell.
11   Q.  Okay.  I want to talk to you about your
12 decisions regarding staffing.  Did you make the
13 decision to involve Matthew Krafft and Edwin Giddings?
14   A.  Yes, sir.
15   Q.  Why?
16   A.  Both Matt and Ed have a very extensive
17 background in government contracts and have worked
18 with me, so those would be the general reasons.
19   Q.  Okay.  Tell me about Mr. Krafft's background
20 in government contracting.
21   A.  Mr. Krafft has been with me for about 20 --
22 I guess about 20 some years, and during that time,
23 both in terms of advising clients with respect to
24 government contract matters, cost accounting

Page 71

1  standards, cost and pricing issues, FAR unallowable
2  cost issues, he's worked with me on many occasions and
3  by himself with clients on many occasions, both in a
4  litigation and nonlitigation environment on issues in
5  the government contract accounting, costing, pricing
6  arena.
7    Q.  Do you know if he has any experience, prior
8  experience before this engagement about what
9  constitutes or doesn't constitute cost and pricing
10 data within the meaning of the FAR?
11   A.  Yes.
12   Q.  Okay, and what experience is that?
13   A.  Well, I just touched on.  He and I routinely
14 work with clients and advise them in terms of what
15 types of issues would be problematic in terms of being
16 supplied or not supplied.  We've worked on cases where
17 those -- or where those issues are relevant in terms
18 of somebody alleging a violation of cost and pricing
19 data.  Sometimes that would rise to the level of
20 testimony, as we went through here this morning, but
21 sometimes it would not, where we would just consult
22 with a client or advise them with respect to that.
23   Q.  So you're saying that he has experience
24 advising clients about what does or what doesn't

Page 72

1  constitute cost and pricing data within the meaning of
2  the FAR.
3    A.  Sure.
4    Q.  And you do too.
5    A.  Sure.
6    Q.  I think you said that you've never offered
7  opinions about that as an expert.
8    A.  I think I said I've never given a specific
9  opinion on that matter.  Not to say of course that I
10 don't deal with that, you know --
11   Q.  Okay, but you advise clients on that --
12   A.  -- routinely on those issues.
13   Q.  Routinely.
14   A.  Yes.
15   Q.  So you have some matters going now?
16   A.  Yes.
17   Q.  What matters?
18   A.  The matter involves -- I'm not going to give
19 you the names of them, but the --
20   Q.  We'll call it company X.
21   A.  Yeah, company X, one that involves a project
22 that they're bidding down south in terms of what --
23 when they're putting their labor rates together, what
24 they need to do and what's an acceptable and not

Page 73

1  acceptable amount to include for certain insurance
2  costs as part of their cost and pricing data.  Company
3  B in terms how they allocate their overhead for
4  purposes of bid and proposal and whether if they tell
5  -- what they need to disclose to the government, and
6  if they disclose something to the government, what are
7  the ramifications with respect to potential defective
8  pricing issues that might come up on that issue.
9  Those are two I can think of right now that are
10 ongoing.
11   Q.  Okay.  Let's focus on Mr. Giddings.  What
12 background does he have in government contracting?
13   A.  Ed -- Ed Giddings has been with me during
14 some of the same types of issues that we just
15 described for Mr. Krafft and myself.  I think he's
16 been with me, I want to say seven years plus or minus.
17 Prior to that he worked with Honeywell.  He was a
18 compliance officer for a while with Honeywell.  He
19 also worked with Sprint in their government contract
20 area, and in addition, he's got consulting experience
21 prior to Rubino & McGeehin and FTI with I want to say
22 Coopers & Lybrand and one of the other big -- well,
23 back then big eight, but big four now.
24   Q.  Okay, all right.  Let me hand to you what

Page 98

1  we've been informed based upon a review of deposition
2  transcripts or grand jury testimony, or it may be that
3  the source of your information is counsel, right?
4      A.  That's right, and again, that's why it's an
5  assumption.
6      Q.  Sure.
7      A.  Either it was or was not.
8      Q.  Okay. So would it be fair to state at least
9  with respect to section 4 of the draft, that the
10 bullet point -- the information contained in the
11 bullet points, these are all facts that you're
12 assuming to be true?
13     A.  I think -- I think generally -- I can't --
14 if you look at part 4 of the report, that's not what
15 ended up in the report, so I would say the report that
16 I issued on July 1 of 2009 would state what is opinion
17 versus what is fact and where I'm relying upon a fact
18 that counsel needs to prove at trial. I have looked
19 at certain documents that may in fact be corroborating
20 or relevant to that conclusion or the testimony that
21 counsel is going to elicit from other witnesses and we
22 can discuss each of those, but in terms of part 4 of a
23 draft, before I'm even involved with it, I wouldn't
24 make a generic kind of statement but I haven't studied

Page 99

1  it for that particular purpose.
2      Q.  Well, I'm not sure I understand your
3  question -- or your answer, so I'm going to ask the
4  question slightly differently I think.
5      A.  Okay.
6      Q.  You had two of your staffers working on a
7  draft of a report, and the form that it was in July --
8  as of June 24th is marked as Exhibit 9, right?
9      A.  Yes.
10     Q.  It was seven days before you had to release
11 and serve an expert report in this case.
12     A.  Yes.
13     Q.  Right? Somebody, and you think it was
14 Mr. Giddings, was putting down factual information in
15 part 4 of that draft report in the form of those
16 bullets that appear on pages 5 through 8, right?
17     A.  Yeah, factual information or assumptions
18 that would have to be proven.
19     Q.  Okay, and obviously they weren't sitting
20 there wasting their time, right?
21         MR. PRESS: Objection.
22 BY MR. SMITH:
23     Q.  There was a reason why at least at that
24 moment in time they thought it was important to put

Page 100

1  those facts in the report; is that right?
2          MR. PRESS: Objection.
3      A.  I would assume that's right. They're trying
4  to get -- they're trying to get the outline and the
5  skeleton --
6      Q.  Okay.
7      A.  -- and the guts of the report together so we
8  can file it, as you said, a week later.
9      Q.  And I'm just trying to see if we can do this
10 in summary form and maybe we can move a little faster.
11 To the extent that this factual information at least
12 at that moment in time was contained in the report,
13 these are facts that you were assuming would be proven
14 at trial in order for your opinions to come in, right?
15         MR. PRESS: Objection.
16     A.  As a general notion, we were assuming that
17 certain facts have to be proven at trial.
18     Q.  Are these the facts? That's what I'm trying
19 to understand, at least as of June 24th.
20         MR. PRESS: Objection.
21     A.  Some of them are facts and assumptions and
22 others are documents that we looked at. As an
23 example, if a number -- if we say that there was a 30
24 percent and 40 percent markup, we went and looked at a

Page 101

1  deposition transcript on that one as an example and
2  that's what your witness -- that's what Herley's
3  witness had said. So it's a mixture of things that
4  we're assuming, but we did ask the questions in terms
5  of okay, what do we know with respect to these issues
6  that we can rely on or look at to help try to kind of
7  fill out the story.
8      Q.  Well, were you concerned at the time about
9  whether or not there was evidentiary support for each
10 of these assumed facts, or was that something you just
11 left up to the lawyers?
12     A.  I think as in any case, we would ask about
13 that and where we were concerned and asked the
14 question and certain things we were told we would --
15 you know, that either is going to be proven at trial
16 or it's not, but assuming that the underlying fact is
17 what it's laid out to be, what is my opinion with
18 respect to in the industry, whether that's an
19 appropriate pricing action or it's not.
20     Q.  Okay, and which facts were you told to
21 assume and which facts did you want to drill down to
22 see if there was evidentiary support?
23     A.  I think it's a -- you know, we can go
24 through each of the items in my report and I can tell

Page 174

1  government may not have access to sales to GE, to
2  Martin Marietta, to Fleet Industrial. The ones
3  obviously that they sold directly to the Navy, that's
4  one thing, but those that were not sold to the Navy
5  but to a prime contractor, I'm not sure they would
6  have access to that information, and I would think the
7  government would definitely view them as relevant and
8  would help put them on equal footing with the
9  contractor in terms of negotiating a price.
10     Q.  Did anyone from the government ever tell you
11  that they believed that historic sales data, sales
12  prices from prior sales, constitute cost and pricing
13  data?
14     MR. PRESS: Objection.
15     A.  No one ever told me. I mean -- you mean did
16  anybody ever tell me -- I didn't speak to anybody from
17  the government on this case.
18     Q.  Did you ever see any authority for the
19  proposition that you advanced that contract prices are
20  considered within the scope of cost and pricing data,
21  historic contract prices?
22     A.  I would think there would be a couple of
23  areas of authority.
24     Q.  Okay. You're looking at Exhibit 16?

Page 175

1     A.  Yes. I think there's a reference -- let's
2  take a look at that.
3     Q.  Are you in section 2.101, the definitional
4  section?
5     A.  Yeah.
6     Q.  Are you under cost and pricing data?
7     A.  Yeah.
8     Q.  Because you see what the professor says,
9  right, in his report?
10     A.  Yeah.
11     Q.  It says -- he says, quote, "Note that they
12  are not included in the list of types of cost or
13  pricing data in the FAR 2.101 definition set forth
14  above."
15     A.  Right.
16     Q.  Do you see that? Do you agree with that?
17     A.  I don't see it listed outside -- yeah,
18  exactly, except for information on changes in
19  production methods or purchasing volume, but I will
20  admit that they don't list out sales on other items.
21     Q.  Okay, but you wanted to look some other
22  place?
23     A.  I was just looking for the general
24  definition within cost and pricing data, prudent

Page 176

1  buyers and sellers would reasonably expect to affect
2  price negotiations, so there's one source. The second
3  is in this particular case, there was a question
4  coming back from DCAA back to Herley on just the bill
5  of materials on the assemblies -- on the $645 on the
6  bill of materials, and they said hey, you sold these
7  before for 645, what gives, and there was a discussion
8  back and forth. It was a little confusing, but at
9  least it stands for the proposition that a prior
10  sale -- and that was just the subassembly material
11  aspect, but stands for the proposition that the
12  government would be interested in prior sales and the
13  level of price.
14     Q.  So you're saying that because the government
15  asked about the material quote in a prior power head
16  sale, that that meant that Herley's nondisclosure of
17  historic sales data constituted a FAR violation?
18     A.  No, I've reached my own opinion why it would
19  constitute a FAR violation. You asked me what -- was
20  there any -- what do I know that would help support
21  that proposition, and that's what I was just giving
22  you. If you're wondering whether the government would
23  be interested in that kind of information and
24  negotiation, to put them on a level playing field, I

Page 177

1  think the answer is yes.
2     Q.  Did the government ask during the
3  negotiations what the historic sales data showed?
4     A.  I don't know.
5     Q.  Well, doesn't that kind of contradict what
6  you just said?
7     A.  No.
8     Q.  No?
9     A.  No.
10     Q.  Even though the government didn't ask, but
11  you think they'd be interested, but did they forget to
12  ask?
13     MR. PRESS: Objection.
14     A.  I don't know, but what I do know is that no
15  contractor in a false claim, defective pricing FAR
16  violation can rely upon the fact that the government
17  didn't do something to avoid an otherwise problem for
18  them under the federal acquisition regulation.
19     Q.  So as I appreciate, you're saying that there
20  was a mandatory obligation to disclose as cost and
21  pricing data what the prior sales history showed by
22  way of price, right?
23     A.  Yeah, know I don't about mandatory
24  obligation. I would say in my judgment under industry

Page 178

1   practice, in this set of facts and circumstances, they
2   should have disclosed.
3       Q.   Can you cite us to any authority to support
4   that?
5       A.   I just did. The general definition of what
6   cost and pricing data is, the general definition that
7   we just talked about is data that prudent buyers and
8   sellers would reasonably expect to affect price
9   negotiations.
10      Q.   Right, and you think that's the authority.
11      A.   Yeah, I think -- yeah, I think -- I think if
12  I were asked by this client, you know, should we tell
13  them about these and we're not sure they know about
14  them, I'd say yes.
15      Q.   So the -- the eight examples of what does
16  constitute cost and pricing data in the definitional
17  section, you don't -- it's not persuasive to you that
18  prior sales prices is not contained in here.
19      A.   No, I mean, look -- look at the language.
20  The sentence before that, cost or pricing data are
21  more than historical accounting. They're all facts
22  that can reasonably expect to contribute to the
23  soundness of estimates of future costs and the
24  validity of determination of costs incurred. They

Page 179

1   also include, so it's -- this is not, with all respect
2   to Ralph Nash, this isn't meant to be an exhaustive
3   list of what the costs --
4       Q.   Sure.
5       A.   And as he has written in his books.
6       Q.   Can you cite to me a case from anywhere,
7   whether it be from an administrative board, a court,
8   anywhere, where anybody -- any body has held that
9   prior sales prices constitute cost and pricing data?
10      A.   I'll let that up to you lawyers. I'm not
11  familiar with a case.
12      Q.   Okay.
13      A.   I'm not saying there isn't one. I'm just --
14  that's not something I do, is to summarize cases like
15  that.
16      Q.   Okay. Do you keep abreast of the decisions
17  relating to the scope of cost and pricing data and
18  other FAR issues?
19      A.   Generally, yes. Any time we could break
20  would be great for a bathroom break here.
21          MR. SMITH: We can take a break now.
22          (Recessed at 2:48 p.m.)
23          (Reconvened at 2:54 p.m.)
24  BY MR. SMITH:

Page 180

1       Q.   You ready to proceed, sir?
2       A.   Yes.
3       Q.   Okay. I'm on opinion number 4 in your
4   report, and that deals with the cost work-up, the
5   estimate for the labor associated with the element; is
6   that right?
7       A.   Yes.
8       Q.   Why don't you take a moment and review it to
9   yourself.
10      A.   Okay.
11      Q.   Now, let me just ask you, you don't know and
12  don't have an opinion about whether or not that
13  estimate was a good estimate, not a good estimate?
14  You weren't asked to focus on that, right?
15      A.   Which estimate?
16      Q.   The estimate referenced in paragraph 4 of
17  your report.
18      A.   Yeah, true, yes.
19      Q.   Okay, so let me then focus you on what
20  Professor Nash says about your opinion. You see where
21  it says on page 3 of Exhibit 15, quote, "Opinion 4
22  asserts that Herley did not disclose in its estimates
23  of labor hours" -- I'm sorry, let me start again.
24  "Opinion 4 asserts that Herley did not disclose that

Page 181

1   its estimates of labor hours were based on a," quote,
2   "worst-case basis," closed quote, "and that they
3   contain a contingency," period. "As in the case of my
4   comment on opinion 1," comma, "there is a contention
5   that Herley did not disclose its estimating logic,"
6   hyphen, "a failure for which the FAR provides no
7   remedy," period.
8       A.   No penalty.
9       Q.   Penalty, I'm sorry, no penalty, period. "To
10  put it another way," hyphen, "there is no requirement
11  in the FAR that estimates be," quote, "accurate,"
12  closed quote. Do you see that?
13      A.   I do.
14      Q.   Okay. Let's just focus on that last
15  sentence, quote, "To put it another way," hyphen,
16  "there is no requirement in the FAR that estimates be
17  accurate." Do you see that?
18      A.   I do.
19      Q.   Do you agree with that?
20      A.   I would say generally, yes.
21      Q.   You're saying that Herley in this instance
22  was required to disclose its estimating logic?
23      A.   Yes.
24      Q.   Okay, and what is the basis for that