**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE HERLEY INDUSTRIES, INC.<br>SECURITIES LITIGATION | CIVIL ACTION<br>NO. 06-2596 (JRS) |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFFS' MOTION TO STRIKE PORTIONS OF
<u>REPORT OF DEFENDANTS' EXPERT, PATRICK CONROY</u>**

**BLANK ROME LLP**
James T. Smith
Evan H. Lechtman
Nakul Krishnakumar
One Logan Square
Philadelphia, PA 19103
Tel: (215) 569-5500
Fax: (215) 832-5500

*Attorneys for Defendants*

102406.00619/21831076v.2

**TABLE OF CONTENTS**

Factual Background ........................................................................................................................2

        A.      The Instant Case. ....................................................................................................2

        B.      Dr. Conroy's Report. ..............................................................................................3

Legal Argument ..............................................................................................................................5

I.       There Is No Basis To Exclude Dr. Conroy's Alternative Damage Model As Unreliable Or Unsupportable. .........................................................................................................................5

        A.      Out-Of-Pocket Damages Are Not The Only Permissible Measure Of Damages In A Securities Fraud Case. ...................................6

        B.      In Any Case, Dr. Conroy's Alternative Damage Methodology Is Consistent With The Out-Of-Pocket Method. ......................................................................................................................6

II.     The Probative Value Of Dr. Conroy's Alternative Damage Analysis Is Not Substantially Outweighed By Any Prejudice Or Confusion It Will Cause. ....................11

III.    Plaintiffs' Argument Regarding The Alleged Improper Application Of Dr. Conroy's Alternative Damage Model Does Not Impact The Admissibility Of That Opinion. ......14

Conclusion ...................................................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Aetna Inc. V. Express Scripts, Inc.*,
   2009 U.S.Dist. LEXIS 84975 (E.D.Pa. Sept. 16, 2009) ............................................................8

*Berckeley Inv. Group, Ltd. v. Colkitt*,
   455 F.3d 195 (3d Cir. 2006).....................................................................................................6

*Daubert v. Merrell Dow Pharma., Inc.*,
   509 U.S. 579 (1993)................................................................................................................16

*In re Japanese Elec. Prods. Antitrust Litig.*,
   723 F.2d 238 (3d Cir. 1983).....................................................................................................6

*Main St. Mortg., Inc. v. Main St. Bancorp, Inc.*,
   158 F.Supp.2d 510 (E.D.Pa. 2001) ...................................................................................15, 16

*Paoli Railroad Yard PCB Litigation v. Southeastern Pennsylvania Transportation
   Authority*, 35 F.3d 717 (3d Cir. 1994) .....................................................................................8

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Company, Inc.*,
   998 F.2d 1224 (3d Cir. 1993)............................................................................................12, 13

*Polycast Technology Corp. v. Uniroyal Plastics Acquisition Corp.*,
   792 F.Supp. 244 (S.D.N.Y. 1992)............................................................................................7

*Robertson v. White*,
   81 F.3d 752 (8th Cir. 1996) .....................................................................................................7

*Spain v. Gallegos*,
   26 F.3d 439 (3d Cir. 1994).....................................................................................................14

*Stecyk v. Bell Helicopter Textron, Inc.*,
   295 F.3d 408 (3d Cir. Pa. 2002)..............................................................................................16

*Trout v. The Milton S. Hershey Medical Center*,
   576 F.Supp.2d 673 (M.D.Pa. 2008) .......................................................................................15

*United States v. Downing*,
   753 F.2d 1224 (3d Cir. 1985)...................................................................................................6

*United States v. Mitchell*,
   365 F.3d 215 (3d Cir. 2004)...................................................................................................13

*United States v. Terzado-Madruga*,
   897 F.2d 1099 (11th Cir. 1990) ...................................................................................13

*United States v. Zhou*,
   2008 U.S. Dist. LEXIS 65168 (D.N.J. Aug. 25, 2008)..............................................15

*Veloso v. Western Bedding Supply Co., Inc.*,
   281 F.Supp.2d 743 (D.N.J. 2003) ...............................................................................13

*Woods v. Abrams*,
   2008 U.S. Dist. LEXIS 93224 (W.D.Pa. Nov. 17, 2008) .........................................16

**STATUTES AND RULES**

Fed. R. Evid. 403 ...............................................................................................2-3; 12-13

Fed. R. Evid. 702 ..........................................................................................................6, 8, 12

**OTHER AUTHORITIES**

David Tabak, *Risk Disclosures and Damages Measurement in Securities Fraud Cases,* 21
   Sec. Reform Act Litig. Rep. 6 (Apr. 2006).................................................................2

102406.00619/21831076v.2

Defendants Herley Industries, Inc. ("Herley"), Lee Blatt ("Blatt"), Myron Levy ("Levy"), Anello C. Garefino ("Garefino"), Thomas V. Gilboy ("Gilboy"), and John M. Kelley ("Kelley") (collectively "Defendants"), by and through their undersigned counsel, respectfully submit this Memorandum of Law in Opposition to Plaintiffs' Motion To Strike Portions of Report of Defendants' Expert, Patrick Conroy. For the reasons set forth below, Plaintiffs' motion should be denied.

## PRELIMINARY STATEMENT

Plaintiffs seek to strike one of the opinions offered by Defendants' damages expert, Dr. Patrick Conroy ("Dr. Conroy"), by attempting to dissect that opinion from the remainder of Dr. Conroy's report, thereby treating Dr. Conroy's opinions as if they are wholly unrelated. Examining Dr. Conroy's alternative damage opinion in isolation, Plaintiffs contend that it should be deemed inadmissible because: (1) it is unreliable as it improperly takes into account the impact of Herley's indictment and subsequent suspension on Herley, and its relationship to Herley's stock price; (2) it is prejudicial and likely to confuse the jury under Rule 403 of the Federal Rules of Evidence; and (3) it was erroneously applied. Each of these contentions are flawed and must be rejected. Plaintiffs' motion is premised on a mistaken understanding of Dr. Conroy's report and a mischaracterization of the applicable law.

Plaintiffs base their reliability argument on the notion that there is only one permissible measure and methodology to be employed in calculating damages in a securities fraud case, and that Dr. Conroy deviated from this lone measure when he looked at the effect of the criminal indictment and subsequent suspension of Herley in June 2006, in order to determine the amount of inflation contained in Herley's stock price during the Class Period. The law does not support Plaintiffs overly-narrow view. Moreover, Dr. Conroy's alternative damage opinion conforms with the measure of damages which Plaintiffs concede is permissible, in that it seeks to quantify

the potential inflation contained in Herley's stock price during the Class Period. The fact that Plaintiffs' damages expert did not consider the actual impact of the indictment or suspension in performing his analysis is not a sufficient basis to strike Dr. Conroy's opinion. Nor is the fact that the damage figure offered by Dr. Conroy as a result of this analysis is smaller than that offered by the Plaintiffs' expert.

Plaintiffs Rule 403 argument is equally meritless. Plaintiffs do not allege, much less prove that the prejudice associated with Dr. Conroy's alternative analysis will <u>substantially</u> outweigh the probative value of that opinion. Nor can they. Dr. Conroy's analysis would be important to the jury because it goes directly to the reliability and accuracy of the analysis offered by Plaintiffs' damage expert. In addition, Dr. Conroy's testimony will assist the jury in understanding the fact that the market may have overreacted to the news of the indictment and suspension, and had that news been known at the beginning of the Class Period, any purported damages would have been far less than that alleged by Plaintiffs' expert.

Finally, Plaintiffs' challenge regarding the application of Dr. Conroy's analysis must be left for the jury, as it go to the weight of the testimony, not its admissibility. This is evidenced by the fact that Plaintiffs fail to cite a single case in support of this baseless argument.

## FACTUAL BACKGROUND

A.  **The Instant Case.**

Plaintiffs contend that between October 1, 2001 and June 14, 2006, Defendants issued false and misleading statements to the market which caused the price of Herley's stock to trade at an artificially inflated price. Plaintiffs' case is predicated on the Defendants' purported failure to disclose an alleged illegal scheme by Herley and Blatt to defraud the U.S. government in connection with three contracts for the purchase of certain products used in military aircraft. Plaintiffs assert claims against Blatt and Herley pursuant to section 10(b) of the Securities

2

Exchange Act of 1934, as well as claims against the remaining defendants under section 20(a) of that Act.

      **B.**      **Dr. Conroy's Report.**

Dr. Conroy was asked to evaluate the damage calculations and other conclusions contained in a report offered by Plaintiffs' damage expert Dr. Scott Hakala. (Report of Dr. Patrick Conroy ("Report") attached as Exhibit "A", at ¶2). Dr. Hakala calculated aggregate damages for the Class Period of $80.7 million, based on alleged artificial inflation of $5.78 per share of Herley stock. Assuming liability, Dr. Conroy thus sought to determine the amount of artificial inflation contained Herley's stock price during the Class Period. In order to do this, Dr. Conroy began by conducting an event study in an effort to determine the effect of certain disclosures on Herley's stock price. An event study is a statistical technique designed to determine if a stock price changes substantively following the disclosure of potentially material information. (*Id.*). In order to control for market influences, Dr. Conroy built a model that measured the relationship between Herley's stock price and the market. This enabled Dr. Conroy to determine if certain disclosures caused the price of Herley's stock to move in a manner that was inconsistent with the market. This permitted Dr. Conroy to test whether the unexplained movement in Herley's stock price was statistically significant. (Report, ¶19). Based on this methodology, Dr. Conroy concluded that Dr. Hakala's damage analysis was incomplete and inaccurate, as it did not fully consider (or in one instance did not consider at all) certain positive news relating to the indictment and the suspension which caused the price of Herley's stock to increase. (Report, p.2). When corrected, Dr. Conroy concluded that damages based solely on the movement in Herley's stock price were approximately $2.73, per share. (*Id.*). Dr. Conroy then took that per share damage figure and multiplied it times the number of

3

shares allegedly damaged, and concluded that aggregate damages were approximately $63.2 million.[1]

Building on that analysis, Dr. Conroy recognized that a calculation of damages that was confined exclusively to the drop in Herley's stock price following the news of Herley's indictment and subsequent suspension was not necessarily the most accurate measure, given the facts and circumstances of this case. (Report, pp.13-18). Specifically, Dr. Conroy noted that both the Complaint and Dr. Hakala imply that the actions underlying the indictment and suspension actually caused Herley's stock price to double during the early part of the class period. (Report, ¶24). Dr. Conroy concluded that this was an unlikely scenario given the size of the contracts at issue (approximately $3.6 million) when compared to Herley's market capitalization of approximately $154 million. (*Id.*). This is further unlikely in a case such as this, where the vast majority of the allegations in the indictment were dropped, the suspension was short in duration, and did not involve Herley losing any known business. In short, Dr. Conroy determined that a full and complete disclosure of the alleged fraud at the beginning of the Class Period would have resulted in a stock price decline that was much lower than the declines suffered by Herley's shares in June 2006. (Report, ¶27).

In an effort to more precisely determine the potential damages in this case, Dr. Conroy found it important to evaluate damages per share of Herley's stock, without focusing exclusively on the market's potential overreaction to the news of the indictment and suspension. (Report, pp.13-18). Dr. Conroy thus examined the actual and consequential effects of the alleged fraud. (*Id.*). Employing a conservative valuation approach, Dr. Conroy quantified the total economic

---

[1] In order to calculate the number of shares allegedly damaged, Dr. Conroy utilized NERA's Multi-Sector, Multi-Trader Model. (Report, p.19). This model examines daily trading volume, shares outstanding, short interests, insider holdings and transactions, and quarterly institutional trading to estimate the purchase dates and holding periods of stock transactions by identified and unidentified investors over a given period. Plaintiffs have not challenged the use of this model.

effect of the indictment and suspension on Herley. (*Id.*). Dr. Conroy then converted that number into per share terms. This alternative approach provided for a damage estimate that was more closely aligned to the reality of the situation. Under this approach, Dr. Conroy determined that damages were approximately $1.41 per share. (*Id.*, ¶18). Said another way, had the reality of the indictment and suspension been known to the market at the outset of the class period, Herley's stock price would have traded at $1.41 less than it did throughout the Class Period. Dr. Conroy then applied the NERA multi-trader model to the $1.41 per share of damages and concluded that damages to the class -- assuming liability -- were approximately $13.9 million. (*Id.*)(See *supra*, fn.1).

## LEGAL ARGUMENT

I.  **THERE IS NO BASIS TO EXCLUDE DR. CONROY'S ALTERNATIVE DAMAGE MODEL AS UNRELIABLE OR UNSUPPORTABLE.**

Courts have "broad discretion" with respect to admitting expert testimony. *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 218 (3d Cir. 2006). Any "doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility." *See In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 238, 279 (3d Cir. 1983), *rev'd on other grounds sum nom*, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *see also United States v. Downing*, 753 F.2d 1224, 1241 (3d Cir. 1985) (Third Circuit has taken the position that Rule 702 creates a "presumption of helpfulness"). Plaintiffs' principal argument in support of their motion strike the alternative damage model offered by Dr. Conroy has virtually nothing to do with the reliability of that opinion, as they contend, and everything to do with the fact that Plaintiffs are dissatisfied with the results of that analysis. This is not a sufficient basis to strike Dr. Conroy's alternative damage model.

5

### A. Out-of-pocket Damages Are Not The Only Permissible Measure of Damages In A Securities Fraud Case.

Cloaked as an argument regarding reliability, Plaintiffs' initial argument is that in a securities fraud case there is only one acceptable measure of damages, and only one acceptable methodology that can be employed to determine those damages. This is not the case.

Plaintiffs contend that the correct measure of damages in a securities fraud case is a Plaintiff's out-of-pocket damages -- the difference between the fair value of what the purchaser received and the fair value of what he would have received had there been no fraudulent conduct. (Plaintiffs' Memorandum of Law In Support of Motion to Strike ("Memo"), at p.5). Plaintiffs overreach in arguing that this measure of damages is the <u>only</u> permissible way to account for losses in a securities fraud case. Plaintiffs rely on a number of authorities in support this novel proposition, however, none of those cases actually adopt the position articulated by Plaintiffs. (*Id*., pp. 5-7). While these authorities recognize that an out-of-pocket measure of damages is <u>generally</u> employed in securities fraud cases, none of them mandate or even suggest that an alternative damages theory is per se improper, or warrants exclusion. (*Id.*). Moreover, Plaintiffs fail to acknowledge those cases that have recognized that in certain circumstances, out-of-pocket damages are not the only damages available under the federal securities laws. See *Polycast Technology Corp. v. Uniroyal Plastics Acquisition Corp.*, 792 F.Supp. 244, 255 (S.D.N.Y. 1992); *Robertson v. White*, 81 F.3d 752, 758 (8th Cir. 1996).

### B. In Any Case, Dr. Conroy's Alternative Damage Methodology Is Consistent With the Out-of-Pocket Method.

Setting aside the Plaintiffs' overstatement of the law with regard to the proper measure of damages in a securities fraud case, it is clear that Dr. Conroy's alternative damage calculation comports with the out-of-pocket theory, in that it seeks to determine the difference between what a purchaser of Herley's stock during the Class Period received when they acquired the stock,

6

versus what they would have received had there been no alleged fraud. The fact that Dr. Conroy's alternative methodology addresses the potential that the market actually overreacted to Herley's June 6, 2006 indictment and June 13, 2006 suspension, thus causing the price of Herley's securities to move in a manner that was inconsistent with the factual reality of the situation, does not make it unreliable.

"The Third Circuit has extensively discussed the standard for reliability in *Paoli Railroad Yard PCB Litigation v. Southeastern Pennsylvania Transportation Authority*, 35 F.3d 717 (3d. Cir. 1994)." *Aetna Inc. V. Express Scripts, Inc.*, 2009 U.S.Dist. LEXIS 84975, *21 (E.D.Pa. Sept. 16, 2009). "There, the Court emphasized that:

> As we explained in *Paoli I*, "the reliability requirement must not be used as a tool by which the court excludes all questionably reliable evidence." *Paoli I*, 916 F.2d at 857. The "ultimate touchstone is helpfulness to the trier of fact, and with regard to reliability, helpfulness turns on whether the expert's 'technique or principle [is] sufficiently reliable so that it will aid the jury in reaching accurate results.'" *DeLuca*, 911 F.2d at 956 (quoting 3 J. Weinstein & M. Berger, *Weinstein's Evidence* 702[03], at 702-35 (1988)). A judge frequently should find an expert's methodology helpful even when the judge thinks that the expert's technique has flaws sufficient to render the conclusions inaccurate.

> Thus, as we explained above, we think that the primary limitation on the judge's admissibility determinations is that the judge should not exclude evidence simply because he or she thinks that there is a flaw in the expert's investigative process which renders the expert's conclusions incorrect. The judge should only exclude the evidence if the flaw is large enough that the expert lacks "good grounds" for his or her conclusions." *Id.*

Plaintiffs have not, and cannot show that that Dr. Conroy's opinion is sufficiently unreliable such that it warrants exclusion simply because he considered, in part, the impact of the indictment and suspension on Herley when calculating damages in this case.

Plaintiffs first contend that Dr. Conroy's alternative damage analysis is inconsistent with the out-of-pocket approach because it does not take into account the inflated purchase price of

7

Herley's stock or the impact of corrective disclosures on those shares. (Memo, p.7). This is simply not true. Plaintiffs' attempts to separate Dr. Conroy's damages analysis into its constituent parts and then to evaluate only one of those parts in a vacuum, must be rejected. Dr. Conroy's alternative damage analysis must be considered in conjunction with his other work regarding damages in this case -- work that has not been challenged by the Plaintiffs .

In conclusory fashion, Plaintiffs suggest that Dr. Conroy's opinion proposes a measure of damages suffered by the Company and not its shareholders. This is not the case. In making this argument, Plaintiffs discount the fact that the company is owned by its shareholders and thus there is a direct relationship between the impact to a company and it stockholders. Dr. Conroy testified that the impact of the indictment and suspension on Herley's business cannot be separated from the impact on Herley's stock price:

> They are not independent of each other. Again, and I think as the report tries to lay out which is Herley's stock price reactions to various pieces of news, the news that that was available at that time are one thing, but also the underlying economic cost to the company of the allegedly inflated cost and the components that went into that that are also relevant to a discussion of what happened to the stock price reaction. (Dep. Trans. P. Conroy, attached as Exhibit "B", 43:20-44:5).

Moreover, Plaintiffs ignore the fact that Dr. Conroy's alternative damage model measures damages as the inflation on a per share level. Said another way, Dr. Conroy determines that, had Herley been able to disclose the actual facts regarding the indictment and the suspension at the outset of the Class Period in October 2001, the actual impact of this news on the price of Herley's stock would have been $1.41 per share, not the $5.78 suggested by the Plaintiffs' damages expert. (Report, Exhibit 9).

In performing his analysis, Dr. Conroy began by evaluating the methodology employed by Plaintiffs' damage expert, Dr. Hakala. In so doing, Dr. Conroy conducted an event study to

8

determine the market adjusted impact of potential alleged disclosures of Herley's alleged fraud on Herley's stock price. (Report, ¶15). Dr. Conroy utilized this event study in order to determine the potential effect certain disclosures had on Herley's stock price. He then evaluated this information to determine the potential amount of inflation those disclosures had on Herley's stock price, calculated as a value per share. Upon performing this analysis, Dr. Conroy determined that "had the full extent of the allegations and consequential impact of the allegations on Herley been known at the beginning of the Alleged Class Period, the June 2006 price declines are not representative of what would have happened to Herley's stock price." (Report, ¶3)(Conroy Dep. Trans., 59:20-60:22). This was based, in part, on Dr. Conroy's conclusion that it would be inconsistent for a company with a market capitalization of $154 million to experience a fifty percent drop in its stock price as a result of allegations of impropriety regarding government contracts valued at approximating $3 million. (*Id*., 181:5-182:20). Thus, Dr. Conroy was investigating the inflation per share that is the basis for an out-of-pocket damages analysis.

Recognizing this inconsistency, Dr. Conroy attempted to apportion the market reaction to the news of the indictment and suspension in order to account for the reality of the situation by focusing on the actual impact of those events on Herley. Dr. Conroy then used that figure to value the impact of the suspension and indictment on a per share level. (*Id*., 74:20-76:2). Despite Plaintiffs' contentions to the contrary, Dr. Conroy's analysis does not ignore the impact of the alleged misrepresentation or omission, or the impact of their purported disclosure on Herley's stock price. Indeed, the whole point of Dr. Conroy's alternative analysis is to more accurately value the actual impact of the disclosures relating to the indictment and suspension on Herley's stock. At his deposition, Dr. Conroy testified:

9

> I think there are many instances where there can be a stock price reaction due to multiple pieces of information. As I understand it, the job is to determine how one apportions that to the relevant parts that are related to the fraud. I think it is an attempt to do that, it is an attempt to look at the exact financial impact of the alleged fraud and then use that as a basis for inflation." (*Id*., 77:3-12).

This is entirely proper, and in fact necessary in a case such a this, where the market's reaction to the disclosures at issue does not appear to comport with the reality of the situation, thus requiring additional analysis to properly determine damages.

In support of their motion Plaintiffs point to an article authored by Dr. Conroy's colleague, Dr. David Tabak which states: "[i]n securities fraud cases, damages analyses <u>typically begin</u> by estimating the 'artificial inflation' in the stock …" (Memo, p.7, Exhibit C.)(citing David Tabak, *Risk Disclosures and Damages Measurement on Securities Fraud Case*, 21 Sec. Reform Act Litig. Rep. 6, 8 (Apr. 2006)(emphasis added). Plaintiffs attempt to use this article to imply that Dr. Tabak is suggesting that the alternative approach utilized by Dr. Conroy is improper because it relies, in part, on the effect of the indictment and suspension on Herley. Dr. Conroy's approach is entirely consistent with Dr. Tabak's instruction, as the whole point of his analysis is to determine the alleged artificial inflation in Herley's stock. Indeed, in the very same article upon which Plaintiffs rely, Dr. Tabak generally discusses the ways to determine the effect of the undisclosed or misrepresented information. He notes that: "There are two ways to determine the effect of the undisclosed or misrepresented information. One way would be to actually estimate the effect at the time of the omission or misrepresentation at the time that an investor made a purchase through a 'bottom-up' analysis that tries to value that information." (*Id*., p.8). This is exactly what Dr. Conroy attempts to do in his alternative analysis. Plaintiffs failed to point out that Dr. Tabak actually reviewed Dr. Conroy's report before it was submitted,

10

and suggested no changes. (Conroy Dep. Trans., 231:14-232:23). Clearly he was in agreement in with the methodology employed by Dr. Conroy.

Finally, Plaintiffs contend that Dr. Conroy's measure of damages is unreliable because it fails to use an event study, a step that Plaintiffs argue is required in order to establish damages is a securities fraud case. (Memo, p.8). It is clear, however, that Dr. Conroy actually utilized a detailed event study whereby, through statistical regression, he examined the effect of certain disclosures on Herley's stock price. (Report, pp. 6-12). Plaintiffs ignore this fact by treating Dr. Conroy's approach to damages in isolation, as if they were two, unrelated parts: (1) Dr. Conroy's event study analysis (including his corrections to the work of Plaintiffs' damages expert); and (2) Dr. Conroy's analysis at issue in the instant motion concerning the actual impact of the alleged fraudulent conduct. Plaintiffs disregard the fact that Dr. Conroy's alternative approach builds off his event study analysis by recognizing that the market's reaction to the disclosure of the indictment and suspension was overdone. (Conroy Dep. Trans., 43:19-44:5).

Dr. Conroy's alternative damage analysis is well-reasoned, properly supported, and will be of assistance to the trier of fact. There is nothing unreliable about that analysis which warrants its exclusion.

II. **THE PROBATIVE VALUE OF DR. CONROY'S ALTERNATIVE DAMAGE ANALYSIS IS NOT SUBSTANTIALLY OUTWEIGHED BY ANY PREJUDICE OR CONFUSION IT WILL CAUSE.**

Plaintiffs also contend that Dr. Conroy's alternative damage analysis should be stricken under Rule 403. Plaintiffs fail to recognize that, if expert testimony survives the rigors of Rules 702 and 703, then Rule 403 becomes an unlikely basis for exclusion, especially in the pretrial setting. *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Company, Inc.*, 998 F.2d 1224, 1237 (3d Cir. 1993). For testimony to be excluded under Rule 403, its probative value must be "substantially outweighed" by the listed dangers contained in that Rule. *Id.*

11

"The Third Circuit has warned that evidence should be <u>excluded</u> under Rule 403 only <u>sparingly</u> because the evidence excluded is concededly probative." *Veloso v. Western Bedding Supply Co., Inc.*, 281 F.Supp.2d 743, 747 (D.N.J. 2003)(citing *Spain v. Gallegos*, 26 F.3d 439, 453 (3d Cir. 1994)(emphasis added); see also *United States v. Terzado-Madruga*, 897 F.2d 1099, 1117 (11th Cir. 1990). "Therefore, the balance under the Rule should be struck <u>in favor of admissibility</u>." *Id.* (emphasis added).

Plaintiffs' argument in support of striking Dr. Conroy's alternative damage analysis pursuant to Rule 403 is nothing more than a rehashing of their argument addressed above. Plaintiffs continue to contend that Dr. Conroy's alternative damage method has the wrong focus because Dr. Conroy considers, in part, the impact of the indictment and the suspension on Herley, not its share price. For the reasons discussed above, they are wrong.

Setting aside the duplicative nature of this argument, as a threshold matter, Plaintiffs have not, and cannot demonstrate that the probative value of Dr. Conroy's alternative damage analysis is <u>substantially</u> outweighed by any alleged prejudice or confusion, as they must under Rule 403. Any argument -- such as that proffered by the Plaintiff -- that the testimony at issue is merely more prejudicial than probative must be rejected. *Petruzzi's IGA Supermarkets*, 998 F.2d at 1237. Plaintiffs' brief is devoid of any analysis of how they would be prejudiced, or how the jury will be confused by the introduction of this testimony, much less that the alleged prejudice or confusion would substantially outweigh the testimony's probative value.

Dr. Conroy's alternative damage analysis will assist the jury in not only understanding the potential damages in this case, but also aid them in evaluating the damage opinion offered by Plaintiffs' damages expert. See *United States v. Mitchell*, 365 F.3d 215, 247 (3d Cir. 2004)("opposing expert's testimony will ordinarily be helpful to the jury *precisely because it is*

12

*opposing* – it will help the jury to evaluate the reliability of the opinion offered by the proponent expert."). Under Rule 403, evidence may be excluded when its admission would lead to litigation of collateral issues, thereby creating a side issue which might distract the jury from the main issues. See *Spain*, 26 F.3d at 453 (citing *Blancha v. Raymark Indus.*, 972 F.2d 507, 514 (3d Cir. 1992). This is not the case here. Dr. Conroy's analysis does not focus on collateral issues, but rather, focuses on the critical issue of the alleged damages suffered by purchasers of Herley stock. Given the facts and circumstances of this case, it would be prejudicial not to allow the jury to understand the impact of the indictment and suspension on Herley, and its relationship to the price of Herley's stock. It would also be prejudicial not to allow the jury to understand the fact that Herley's stock price potentially overreacted to the news of the indictment and suspension.

According to Plaintiffs, however, a jury need not look at anything more than a stock's price reaction to certain news events in order to determine damages in a securities fraud case, even if this reaction is overdone. This argument is incomplete and illogical. For example, take a situation where a company announces that it had been indicted on thirty-five criminal counts, thus causing the price of its stock to immediately drop by fifty percent. Assume that those charges were dropped two-years later in their entirety, however, the price of that company's stock did not return to pre-indictment levels. According to the Plaintiffs, the company would be responsible for damages attributable to that fifty percent drop in the stock price, despite the fact that the reality of the situation dictated otherwise. Under Plaintiffs' overly-narrow view of what may be considered in evaluating damages in a securities fraud case, the jury would be confused and Plaintiffs would be prejudiced if they examined anything but that fact that the company's stock price dropped on the news of the indictment and did not recover, in order to assess

13

potential damages. Plaintiffs' theory is clearly illogical. The jury should be afforded the opportunity to learn how the actual facts of the case relate to potential damages.

Here, Herley pled guilty to only two of the thirty-five counts leveled against it, while all of the remaining charges were dropped in their entirety. The economic impact of the suspension of Herley was minimal at best. Dr. Conroy attempts to account for this by determining the actual effect of the indictment and suspension on Herley shares. The fact that Plaintiffs' expert does not consider this reality, or the fact that this reality indicates that Plaintiffs' expert damage figure is overstated is not a sufficient basis to strike Dr. Conroy's opinion.[2]

### III. PLAINTIFFS' ARGUMENT REGARDING THE ALLEGED IMPROPER APPLICATION OF DR. CONROY'S ALTERNATIVE DAMAGE MODEL DOES NOT IMPACT THE ADMISSIBILITY OF THAT OPINION.

In a last-ditch effort to exclude Dr. Conroy's alternative damage model, Plaintiffs attempt to transform their Motion to Strike into an argument on the merits of Dr. Conroy's conclusions. Plaintiffs argue that in calculating the financial impact of the indictment and the suspension on Herley, Dr. Conroy used "arbitrary and dubious present value discounts" and improper gross margins. (Memo, at. 12-13)[3]. Plaintiffs fail to cite a single case to support their argument that such an analysis warrants exclusion. This is not surprising, given that this argument goes to the weight, and not the admissibility of Dr. Conroy's opinion, and is thus an improper basis to strike that opinion. See *Main St. Mortg., Inc. v. Main St. Bancorp, Inc.*, 158 F.Supp.2d 510, 516 (E.D.Pa. 2001)(holding errors in expert report go to weight, not admissibility and thus not basis

---

[2] The two cases relied upon by Plaintiffs in support of the Rule 403 arguments are also easily distinguishable. In *United States v. Zhou*, 2008 U.S. Dist. LEXIS 65168, *19 (D.N.J. Aug. 25, 2008) the Court refused to admit expert testimony because it was "replete with conclusory, and inflammatory, accusations against" government investigators, and put at issue in the case the credibility of governmental investigations. Likewise, in *Trout v. The Milton S. Hershey Medical Center*, 576 F.Supp.2d 673, 679 (M.D.Pa. 2008), the Court refused to admit testimony of a medical expert under Rule 403 because it was not based on medically sound information. Clearly, these facts are not present in this case, thus making the cases cited by Plaintiffs in support of their Rule 403 argument inapplicable.

[3] The 10% gross margin figure referenced by Plaintiffs is actually the result of a typographical error in Dr. Conroy's report. The 10% figure actually represents marginal cost. Accordingly, Dr. Conroy used a gross margin of 90%, a far more conservative estimate that the 30-35% suggested by the Plaintiffs. (Report, p.14).

14

for exclusion). It is clear that if Plaintiffs have qualms with the substance of Conroy's alternative damage analysis, they may raise them at the appropriate time -- trial. *Id.*; see also *Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579, 596 (1993); *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. Pa. 2002) ("Rule 705, together with Rule 703, places the burden of exploring the facts and assumptions underlying the testimony of an expert witness on opposing counsel during cross-examination."); *Woods v. Abrams*, 2008 U.S. Dist. LEXIS 93224, *5 (W.D.Pa. Nov. 17, 2008)(noting Defendants will have the opportunity for vigorous cross-examination at trial, and the opportunity to present contrary evidence via their own expert witness).

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion To Strike Portions of Report of Defendants' Expert, Patrick Conroy should be denied.

**BLANK ROME LLP**

*s/ James T. Smith*
JAMES T. SMITH
EVAN H. LECHTMAN
NAKUL KRISHNAKUMAR
One Logan Square
Philadelphia, PA  19103
Tel:  (215) 569-5500
Fax:  (215) 832-5500

*Attorneys for Defendants*

Dated: November 23, 2009

15

102406.00619/21831076v.2