UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE HERLEY INDUSTRIES INC. SECURITIES LITIGATION | CIVIL ACTION<br><br>No. 06-2596 (JRS)<br><br><u>CLASS ACTION</u><br><br>AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

**TABLE OF CONTENTS**

I.  **Summary of the Action**             1

II.  **Jurisdiction and Venue**           9

III.  **The Parties**              10

IV.  **Background:  The Procurement and  Contracting Process** 14
    **For Sole-Source Federal Contractors**
    **Under the Federal Acquisition Regulations**

V.  **Defendants' Undisclosed, Fraudulent Federal Contracting Practices** 18

VI.   A.  **Defendants' False and Misleading Filings with the SEC:** 28
       **Herley's Operations**

VI.   B.  **Defendants' False and Misleading Filings with the SEC:** 34
       **Herley's Financial Statements**

VI.   C.  **Defendants' Other False and Misleading Statements** 52

VII.  **Materiality**              78

VIII.  **Loss Causation**            81

IX.  **Defendants' Misrepresentations Proximately Caused Plaintiffs'** 91
    **Damages Through Fraud on the Market**

X.  **Scienter Allegations**           92

XI.  **Class Action Allegations**         103

    **COUNT I:  For Violation of Section 10(b) of the Exchange Act** 105
    **and Rule 10b-5 Promulgated Thereunder Against All Defendants**

**COUNT II:  For Violation of Section 20(a) of the Exchange Act Against    108
the Individual Defendants**

**PRAYER FOR RELIEF                                                          109**

**JURY DEMAND                                                                110**

# I.
## SUMMARY OF THE ACTION

Plaintiffs, on behalf of themselves and all others similarly situated, upon personal knowledge as to plaintiffs and their acts, and as to all other matters upon information and belief based upon, *inter alia*, the investigations of Lead Plaintiff's counsel, states as follows:

1. This is a securities fraud class action brought on behalf of all persons who purchased the common stock of Herley Industries, Inc. ("Herley" or the "Company") between October 1, 2001 and June 14, 2006, inclusive (the "Class Period"). The action asserts claims against Herley and certain of its officers and directors for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder by the SEC.

2. Herley engineers, manufactures and provides microwave products and technologies to defense and aerospace entities for use in command and control systems, flight instrumentation, radars, weapons sensors and electronic warfare systems. Herley's primary customers include prime defense contractors (e.g., Northrop Grumman, Lockheed Martin, Raytheon and Boeing), the U.S. Government (including the Department of Defense, NASA and other U.S. Government agencies) and international customers (including the Egyptian, German, Japanese and South Korean militaries and suppliers to international militaries). Herley's products and systems are currently deployed on numerous military platforms, including planes (such as the F-16 Falcon), missiles and missile systems (such as the Trident II D-5 and the AMRAAM air-to-air missile), and unmanned aerial vehicles. Additionally, through its commercial technologies division, Herley provides certain products for use in commercial technologies (most notably, for use in magnetic resonance imaging

1

[MRI] devices).

3.      Herley's explicit business strategy, repeatedly stated by Company executives and in Herley's filings with the Securities and Exchange Commission ("SEC"), was to target long-term, high-growth, high-priority defense programs in which Herley would function as the **sole** provider of microwave equipment.  Such sole-provider status did not arise *de jure* (e.g., as a result of contract terms) but rather emerged *de facto*:  i.e., as many of the contracts called for specialized products that would meet rigorous specifications and testing, the company that initially won the contract would often become the only company capable of providing the product called for by the contract.   Thus, initial competitive contract wins would lead to non-competitive repeat contracts for further products. Herley's executives frequently referred to their high "batting average" in identifying, targeting and winning such contracts, and attributed Herley's revenue growth, profit growth and high margins to management's "batting average".   Herley's SEC filings stated that one of Herley's "competitive strengths" was that Herley "generate[d] a significant proportion of [its] revenue" through its "high proportion of long-term sole-provider production programs".

4.      Herley's largest customer has always been the U.S. government and its agencies, such as the Navy, Air Force, etc. (the "Government").  Government contracts directly provided 22% of Herley's net sales in fiscal 2006, 25% of Herley's net sales in fiscal 2005, 17% of Herley's net sales in fiscal 2004, 25% of Herley's net sales in fiscal 2003, 17% of Herley's net sales in fiscal 2002, 19% of Herley's net sales in fiscal 2001, and 26% of Herley's net sales in fiscal 2000.  Sub-contracting work performed by Herley for prime defense contractors, who themselves were working on Government contracts, resulted in yet further Government work.  For example, whereas 26% of Herley's net sales in fiscal 2000 resulted *directly* from Government contracts, 77% of Herley's net

2

sales in fiscal 2000 resulted from work Herley performed directly and indirectly – i.e., as a subcontractor, or sub-subcontractor – for the Government.

5.      Given Herley's dependence on Government work, the loss of the Government as a customer would be devastating for Herley.  The company itself so warned in its SEC filings: for example, in an April 25, 2002 Prospectus filed with the SEC in connection with Herley's secondary offering and sale of 3 million shares of Herley stock:

> WE RELY ON A SMALL NUMBER OF SIGNIFICANT CUSTOMERS.
>
> Our sales have historically come mainly from contracts with agencies of, and prime contractors to, the U.S. government. Net sales directly to the U.S. government accounted for 19% of fiscal year 2001 net sales. Additionally, approximately 30% of our net sales were attributable to our next five largest customers for fiscal year 2001... If we were to lose any of these or any other major customers, or if orders by any major customer were otherwise to be delayed or reduced, including reductions due to market or competitive conditions in commercial markets or further decreases in government defense spending, then our business, financial condition and results of operations would be harmed.

6.      The U.S. government contracting process is governed by procurement regulations known as the Federal Acquisition Regulations ("FAR").   For sole-source procurement, in which there is no competitive bidding but rather a direct solicitation from the Government to the sole supplier of the needed product, FAR sets forth special procedures (detailed at in section IV, below) to ensure that the prices charged to the Government are fair and reasonable.   Essentially, in sole-source circumstances, FAR requires that the contractor provide the Government with detailed disclosures concerning the product's production costs (so as to allow the Government to negotiate a reasonable price that provides the contractor with reasonable profit), and empowers the

Government to audit the contractor so as to verify whether the contractor's bid-price (in a non-competitive situation) is reasonable or justified by the contractor's underlying costs.

7.    Given the Government's singular prominence as Herley's largest customer and Herley's main source of sales, revenues and earnings, and given the Government's rules for doing business (i.e., FAR), regulatory compliance was highly material for Herley.  Failure to comply with FAR could trouble and/or undermine Herley's relationship with the Government, could expose Herley to various penalties and liabilities, and could endanger the future revenue flows from Herley's largest source of revenues.  Again, Defendants so warned in Herley's SEC filings: for example, Herley's April 25, 2002 Prospectus stated:

> GOVERNMENT REGULATION
>
> Because of our participation in the defense industry, we are subject to audits by various government agencies for our compliance with government regulations... We believe that we operate our business in material compliance with applicable laws and regulations. However, any failure to comply with existing or future laws or regulations could have a material adverse impact on our business, financial condition and results of operations.

8.    The gravamen of this complaint is simple.  Unbeknownst to plaintiffs and the Class, Defendants went to elaborate lengths in contracting with the Government – as detailed herein and in the federal indictment filed in criminal proceedings against Herley and Blatt under the caption *USA v. Blatt et al.*, 06-cr-00268-LS-ALL (E.D. Pa. 2006) – to submit fraudulent, false and inflated cost data to the Government.   By such false and inflated cost submissions, Defendants secured Government contracts at price levels far above what Herley would have received had Herley submitted true and accurate cost information.

9.    As detailed below, Defendants' undisclosed, fraudulent acts had the direct effect of

4

fraudulently inflating Herley's reported revenues, earnings, and margins, and consequently of inflating the price of Herley's shares. As Herley recognized and reported illegitimate and fraudulently-derived revenues, earnings and margins in materially false and misleading financial statements, press releases, SEC filings, and conference calls, Herley's shares increased from a trading range of $8-$12 per share to spend the most of the Class Period at inflated prices of $16-$24 per share. Simultaneously, Defendants' undisclosed, fraudulent acts exposed Herley to material liabilities – including fines and penalties; disgorgement of illegitimate profits; increased legal, regulatory and compliance costs; and potential and actual loss of further contracts with its largest customer, the Government – of which plaintiffs and the Class were unaware.

10.     At all times during the Class Period, and as detailed below (section VI), Defendants maintained in Herley's SEC filings and in other public statements that:

(a)     the Government was Herley's largest and best customer;

(b)     Herley had "strong" and "mutually beneficial relationships with various agencies of the U.S. government";

(c)     one of Herley's key competitive strengths was its "long-standing relationships with the U.S. government";

(d)     because of its participation in the defense industry, Herley was "subject to audits by various government agencies for our compliance with government regulations" and that Herley "operate[d] our business in material compliance with applicable laws and regulations"; and

(e)     although "failure to comply with existing or future laws or regulations could have a material adverse impact on [Herley's] business, financial condition and results of operations" Herley was "not aware of any events which are reasonably likely to result in any cancellation of its

5

government contracts".

11.     As alleged in detail below, these statements were either false and misleading in and of themselves and/or were rendered false and misleading by omission of the fact that Defendants were engaged in a fraudulent scheme in which: (i) they submitted false and inflated cost information to the Government during the procurement process for certain Government contracts; (ii) they thereby secured from the Government, on the basis of such inflated cost disclosures, prices for certain products (for which Herley was the sole supplier) far above the prices Herley would have received had Herley's cost disclosures been truthful; (iii) they recorded and reported, as a result of such fraudulently-derived, inflated prices, illegitimate and unsustainable revenues, earnings and margins from such transactions; and (iv) they exposed Herley to exactly the sort of "material adverse impact" that Defendants had stated could result were Herley to fail "to comply with existing or future laws or regulations".

12.     As alleged in detail below (see section VII), Defendants' false and misleading statements and/or omissions were *materially* false and misleading and/or were *material* omissions.

13.     On June 6, 2006, the United States Attorney's Office for the Eastern District of Pennsylvania announced that Blatt (and Herley) had been indicted for submitting

> grossly inflated prices for products sold to the military for which Herley Industries was the only supplier, and falsely represented or had other Herley employees falsely represent that the prices charged were based on true and accurate information about Herley Industries' costs and expenses, when they were not.

14.     In the week following disclosure of the indictment, as further information came to light – including (i) analysts lowering of their ratings of Herley; (ii) Blatt resignation, stating, "the time is particularly appropriate for me to step down as Chairman... it is long past time for me to leave

6

Herley..."), (iii) Herley's replacement of its Chief Financial Officer; (iv) quantification of liability revealing that Blatt was facing as many as 185 years in prison and Herley was facing tens of millions of dollars in fines, costs and liabilities; and (v) the Government – i.e., Herley's single largest customer – announcing that it had barred three Herley facilities (responsible for approximately 55% of Herley's revenues) from receiving any new Government contracts – Herley's shares lost nearly 50% of their value, falling from a closing price of $17.50 per share on June 5, 2006, immediately prior to disclosure of the indictment, to close at $9.21 per share on June 14, 2006.

15.    Further fallout emerged later, including: (i) Herley's reporting of quarterly financial results in which earnings had diminished under a sudden increase in legal fees resulting from the Government investigation and indictment; (ii) Herley's announcing that it would have to delay its quarterly SEC filing so as to allow its auditors to review Herley's financial results, controls and procedures in light of the indictment; (iii) Herley's shares being threatened with delisting from the NASDAQ as a result of Herley's failure to timely file required SEC filings; (iv) Herley's auditor resigning after disputes with Herley's management about the nature and extent of an internal investigation into the matters that were the subject of the Government's indictment; (v) imposition upon Herley of a costly and draconian regulatory structure, designed to ensure Herley's regulatory compliance, as a condition of Herley's being allowed to perform further Government work; and (vi) concomitant costs of approximately $10 million incurred when Herley, at the Government's demand, severed all ties with Defendant Blatt.

16.    On October 13, 2006, Herley announced that it had negotiated an agreement with the Government to lift the Government's ban on awarding new contracts to Herley. As detailed in ¶ 135 below, the agreement imposes numerous and costly ethical, operational and disclosure-related

7

demands on Herley. A primary condition of the agreement was that Herley completely sever all ties to Blatt, which severing the Company announced on the same day. The cost to Herley of doing so, pursuant to an agreement it negotiated with Blatt, was more than $10 million, which cost swung the multi-million profit Herley would have reported for the fourth quarter of fiscal 2006 into a multi-million dollar loss. This is in addition to the impact upon Herley of being forced to terminate its founder, leader, and the driving force behind the Company.

17.    Criminal proceedings against Herley and Blatt continue.

18.    Herley has not yet restated its financial statements to remove from them the influence of fraudulently-derived revenues and the resulting fraudulently-inflated earnings. However, Herley's (now-former) auditor BDO Seidman LLP has withdrawn its previously-issued opinion certifying Herley's financial statements.

19.    In July 2006, BDO Seidman resigned from its position as Herley's auditor after concluding that Herley's management was unwilling to conduct a truly independent, adequate investigation capable of determining "the impact of the alleged illegal acts on the financial statements of the Company" or of "identify[ing] the potential involvement of other Company personnel involved" in those acts. In a letter sent to Herley's management (attached as an exhibit to Herley's August 16, 2006 Form 8-K filed with the SEC), BDO Seidman stated that it was "no longer able to rely on the representations of management provided to date":

> On several occasions prior to our resignation, including in writing on June 26, 2006, we provided a clear indication of the nature of the independent investigation that would be required, and the conditions of our access to the results of such investigation, in order for us to remain the independent registered public accountant for the Company. Repeated attempts by the Company to reduce the scope of such investigation concluded with a meeting on July 24, 2006

8

between representatives of BDO Seidman, LLP and the firm that had been hired to perform an independent investigation. Following that meeting, we concluded that no such independent investigation acceptable to us was going to be performed due to apparent limitations on the scope of the investigation in response to attorney-client privilege concerns.

As a result of the lack of responsiveness to our request regarding the scope of the independent investigation, we believe we are no longer able to rely on the representations of management provided to date. Accordingly we have withdrawn our opinion on the Company's financial statements for the year ended June 30, 2005. In addition, pursuant to the procedures required by Section 10A(b)(2) of the Securities Exchange Act of 1934, we concluded that the scope of the independent investigation of the alleged illegal acts as contemplated by the Company would not be sufficient to allow BDO to determine either the impact of the alleged illegal acts on the financial statements of the Company or identify the potential involvement of other Company personnel involved in the accounting and financial reporting function due to the attorney-client privilege limitations that were being imposed. Accordingly, in the circumstances, we were and are unable to conclude that the Company was taking timely and appropriate remedial actions with respect to the alleged illegal acts.

## II.
## JURISDICTION AND VENUE

20.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the

Securities Exchange Act of 1934 (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 (17 C.F.R.

§240.10b-5) promulgated thereunder by the SEC.

21.    Venue is proper in this District pursuant to §27 of the Exchange Act. Many of the acts

and transactions giving rise to the violations of law complained of herein, including the preparation

and dissemination to the investing public of false and misleading information, occurred in this

District. Herley has its principal place of business at 101 North Pointe Boulevard, Lancaster,

Pennsylvania 17601, where the day-to-day operations of the Company are directed and managed.

22.     In connection with the acts, conduct and other wrongs complained of, the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails, and the facilities of the national securities markets.

## III.
## THE PARTIES

23.     (a)  Court appointed Lead Plaintiff and Class Representative Galleon Management L.P. ("Galleon Management, acting as investment manager, made numerous trades in Herley Industries Inc. ("Herley") securities on behalf of the Galleon Captains Fund, L.P.; the Galleon Captains Offshore Fund, Ltd.; Galleon Explorers Partners, L.P.; Galleon Explorers Offshore, Ltd.; and Galleon Admirals Offshore Fund, Ltd. (collectively the "Galleon Funds") during the Class Period, as detailed in the certification previously filed with this Court.

(b)  Based on the powers granted to Galleon Management by the relevant investment management agreements and limited partnership agreements, Galleon Management is the attorney-in-fact for the Galleon Funds with unrestricted decision making authority to act in connection with the Galleon Funds' investments.

(c)  The trades in Herley stock that give rise to recoverable claims for securities fraud were made by Galleon Management on behalf of the Galleon Captains Fund, L.P. and Galleon Captains Offshore Fund, Ltd. (collectively the "Captains Funds").

(d) In addition to the powers under the agreements as described in ¶23(b), above, the Managing Member of the General Partner of the Galleon Captains Fund, L.P., who is also a Director of Galleon Captains Offshore Fund Ltd. expressly authorized Galleon Management's participation in this lawsuit on behalf of the Captains Funds.

10

(e) The Captains Funds formally assigned their claims in this action to Galleon Management on February 27, 2009.

24.    (a)    Court appointed class representative, Norfolk County Retirement System ("Norfolk"), purchased Herley common stock during the Class Period, as detailed in the certification previously filed with this Court, and was damaged thereby.

(b)    Norfolk, Galleon Management and Galleon Managements's assignors are collectively known herein as "Plaintiffs."

25.    Defendant Herley is headquartered in this District and incorporated in Delaware. Herley engineers and provides microwave products and technologies to defense and aerospace entities for use in command and control systems, flight instrumentation, radars, weapons sensors and electronic warfare systems. Herley's primary customers include large defense prime contractors (including Northrop Grumman, Lockheed Martin, Raytheon and Boeing), the U.S. Government (including the Department of Defense, NASA and other U.S. Government agencies) and international customers (including the Egyptian, German, Japanese and South Korean militaries and suppliers to international militaries). Herley's products and systems are currently deployed on numerous military platforms, including planes (such as the F-16 Falcon), missiles and missile systems (such as the Trident II D-5 and the AMRAAM air-to-air missile), and unmanned aerial vehicles. Additionally, through its commercial technologies division, Herley provides certain products for use in commercial technologies (most notably, for use in magnetic resonance imaging devices). Herley's stock is traded in an efficient market on NASDAQ under the ticker symbol "HRLY".

26.    Defendant Lee N. Blatt ("Blatt") is the co-founder of Herley and served as Herley's

11

Chief Executive Officer ("CEO") and as Chairman of Herley's Board of Directors ("Chairman") for thirty-five years preceding June 2001. In June 2001, Blatt resigned from his CEO position but continued to serve as Chairman, and as a member of Herley's Executive Committee, throughout the Class Period until his resignation was announced on June 9, 2006. On June 6, 2006, Blatt was indicted on 35 counts of price-gouging the U.S. government through submission of false and fraudulently-inflated costs (which led the government to agree to prices on certain contracts much higher than would have been possible or justified absent such fraudulent submissions). On October 12, 2006, as a pre-condition to Herley's being allowed to contract new business with the U.S. government, Herley severed all remaining ties with Blatt. During the Class Period, Blatt received approximately $900,000 from the sale of 48,000 shares of Herley stock.

27.     Defendant Myron Levy ("Levy") served throughout the Class Period as Herley's CEO and as a member of Herley's Executive Committee. Levy replaced Blatt as Herley's CEO on June 21, 2001, prior to which time Levy had served as Herley's President (a position he retained until August 13, 2003). On August 13, 2003, Levy relinquished the title of President to John M. Kelley (see below) and was appointed to serve as Vice-Chairman of Herley's Board of Directors, a position he retained until June 9, 2006, at which time he became Chairman after Blatt's resignation. During the Class Period, Levy received more than $2 million from the sale of 125,000 shares of Herley stock.

28.     Defendant John M. Kelley ("Kelley") served as a senior executive of Herley (under numerous titles) and as a member of Herley's Executive Committee throughout the Class Period. Prior to the Class Period, Kelley served as Vice President and Director of Corporate Communications during 2000, and subsequently was promoted to Senior Vice President in

12

September 2000 and then to Executive Vice-President, and President of Herley's Commercial Technologies division, in July 2001.  Since August 13, 2003, Kelley has served as Herley's President.  During the Class Period, Kelley received more than $232,000 from the sale of 12,000 shares of Herley stock.

29.    Defendant Anello C. Garefino ("Garefino") served throughout the Class Period as Herley's Vice President, Finance, and additionally, during much of the Class Period, as Herley's Chief Financial Officer ("CFO") – a position he was forced to relinquish twice during the Class Period when the Company appointed other individuals to replace him.  On September 27, 2004, Garefino was replaced as CFO by Thomas V. Gilboy (but continued to serve as VP, Finance).  After Gilboy's sudden resignation on September 12, 2005, Garefino became "acting" CFO, and continued in such position until June 12, 2005 when, in the wake of the Company's indictment, Herley appointed Kevin J. Purcell as its CFO.  During the Class Period, Garefino received more than $1.56 million from the sale of 88,939 shares of Herley stock.

30.    Defendant Thomas V. Gilboy ("Gilboy") served, between September 27, 2004 and September 12, 2005, as Herley's Chief Financial Officer.

31.    By reason of their positions, the officers and/or directors identified (collectively the "Individual Defendants") had access to material inside information about Herley and were able to control directly or indirectly the acts of Herley and the contents of the representations disseminated during the Class Period by or in the name of Herley.

**IV.**
**BACKGROUND:**
**THE PROCUREMENT AND CONTRACTING PROCESS**
**FOR SOLE-SOURCE FEDERAL CONTRACTORS**
**UNDER THE FEDERAL ACQUISITION REGULATIONS**

32.     Throughout the Class Period, the U.S. government was Herley's largest single customer, accounting for between 17% and 26% of Herley's yearly net sales as set forth in the table below:

| Fiscal Year | Sales to U.S. Government as % of Total Sales |
|:-----------:|:--------------------------------------------:|
| 2006 | 22% |
| 2005 | 25% |
| 2004 | 17% |
| 2003 | 25% |
| 2002 | 17% |
| 2001 | 19% |
| 2000 | 26% |

33.     A high proportion of Herley's net sales flowed from non-competitive contracts in which Herley was the "sole source" of a specialized component or system required by the U.S. military or certain of its prime contractors (e.g., Raytheon, Lockheed, Boeing, etc.).

34.     U.S. Government purchasing is conducted by and through Federal Acquisition Regulations ("FAR"). Among the goals of FAR is that the Government make its purchases at fair and reasonable prices.

35.     Under FAR, competitive bidding on open Government contracts is often sufficient in and of itself to ensure the fair and reasonable prices FAR requires. In non-competitive, sole-

14

source contracting and procurement, however, the Government is unable to rely on competitive bidding as a mechanism to generate fair and reasonable prices.  In such sole-source situations, because the Government is unable to conduct a price-check by reference to other prices submitted by other contractors, the Government evaluates the price quoted by the sole-source contractor by requiring the contractor to disclose the costs purportedly underlying the price-quote.

36.    Chapter 15 of FAR, in relevant part, authorizes and requires the Government to: (a) require that sole source contractors submit certain cost information for the product in question so as to enable the Government to ascertain whether the price the contractor wished to charge the Government was a reasonable one and whether the contractor's profits at such price were reasonable; and (b) require that sole source contractors submit to Government audits of their records to allow the Government better to "evaluate the accuracy, completeness, and currency of the cost or pricing data".  *See*, *inter alia*, FAR §§ 15.305, 15.402, 15.403-3, 15.403-4, 15.404, 15.406-2, 15.408 and Table 15-2, and 52.215-2 (reproduced in Appendix A hereto and **bolded** in relevant part).

37.    The typical contracting process on sole-source government contracts exceeding *de minimis* amounts is as follows:

(a)    First, an employee of the Government with procurement responsibilities (the "contracting officer") issues a Request for Proposal ("RFP") to solicit a bid or price quotation from the supplier of the needed product (the "contractor").  As per §15 of FAR, the RFP requires the contractor to submit certain cost information, to certify that information as accurate, and to agree to submit to possible audit of its records to allow the Government to further evaluate the contractor's bid;

(b)    The contractor submits its bid, disclosing cost information as per FAR §15

15

and Table 15-2. Such cost information is required to be based on the contractor's prior experience (the contractor's "historical data"), diverging from such historical data, if necessary, as a consequence of any changed circumstances or changed estimates. The contractor's bid is submitted together with a Contract Pricing Proposal Information Cover Sheet on FAR Standard Form 1411 (the "Contract Cover Sheet"), signed by the contractor, which states in relevant part that:

> This proposal is submitted in response to the RFP... and **reflects our best estimates and/or actual costs as of this date and conforms with the instructions in FAR [] Table 15-2. By submitting this proposal, the offeror, if selected for negotiation, grants the contracting officer or an authorized representative the right to examine, at any time before award, those books, records, documents and other types of factual information, regarding the form or whether such supporting information is specifically referenced or included in the proposal as the basis for pricing, that will permit an adequate evaluation of the proposed price**.

(c)     The government RFP/contract, as per FAR § 15 and 52.215-2, as well as the Contract Cover Sheet, all provide that the government, through the Defense Contract Audit Agency ("DCAA") and the Defense Contract Management Command ("DCMC"), could conduct a "pre-award audit" of the contractor. In a pre-award audit, government auditors review the contractor's bid proposal against, *inter alia*, the contractor's historical data, and otherwise examine the reasonableness of the contractor's cost quotes and estimates (*see* FAR §15.404-2(c) and, generally, §15.404), and report their audit findings to the contracting officer. The goal of such auditing is to verify that, in the absence of price competition and/or open bidding, the price paid by the government is fair and reasonable. FAR §§ 15.404-1(a)(3), 15.404-1(c), 15.404-1(d).

(d)     Subsequently, the contracting parties conduct further negotiations. In such negotiations, one of the responsibilities of the contracting officer is to determine whether the profit

16

suggested by the contractor's proposal (i.e., the difference between the price quoted by the contractor and the cost information disclosed by the contractor) is reasonable. See FAR §15.404-4(c), 15.405 and generally § 15.404-4).

(e)    Ultimately, the contracting parties reach agreement on the terms and prices of the contract. The contractor is then required to certify that the cost information it had submitted was accurate, complete and current. See FAR § 15.406-2. The contractor does so by executing a Certificate of Current Cost and Pricing Data, as per FAR 15.406-2, which states:

### Certificate of Current Cost or Pricing Data

**This is to certify that, to the best of my knowledge and belief, the cost or pricing data** (as defined in section 2.101 of the Federal Acquisition Regulation (FAR) and required under FAR subsection 15.403-4) submitted, either actually or by specific identification in writing, to the Contracting Officer or to the Contracting Officer's representative in support of [this contract/RFP] **are accurate, complete, and current** as of [the date upon which a final price was agreed to]. This certification includes the cost or pricing data supporting any advance agreements and forward pricing rate agreements between the offeror and the Government that are part of the proposal.

38.    The majority of Herley's sole-source contracts with the government were "Firm, Fixed-Price" contracts. Such contracts obligate the government to pay a firm, fixed price for the products it procures: no allowance exists to allow subsequent price adjustments should certain contingencies occur (e.g., unexpected higher costs). Other contract types include fixed-price contracts that contain various price-adjustment or incentive clauses, or various "cost-plus" contracts that allow, in various ways, the price to be set by the contractors' eventual costs "plus" certain other amounts representing profits, incentives, etc.

39.     Defense Department Procurement and Acquisition Policy (see Contract Pricing Reference Guide at §5.3.1) advises contracting officers that Firm, Fixed-Price contracts should be used in situations where "the contractor is able to accurately estimate the cost of the work called for in the contract".

40.     FAR §16.202-2 states that Firm, Fixed-Price contracts should be used when the contracting officer can, at the outset, establish fair and reasonable prices because, *inter alia*, "available cost or pricing information permits realistic estimates of the probable costs of performance":

> A firm-fixed-price contract is suitable... when the contracting officer can establish fair and reasonable prices at the outset, such as when—
>
> (a) There is adequate price competition;
>
> (b) There are reasonable price comparisons with prior purchases of the same or similar supplies or services made on a competitive basis or supported by valid cost or pricing data;
>
> (c) Available cost or pricing information permits realistic estimates of the probable costs of performance; or
>
> (d) Performance uncertainties can be identified and reasonable estimates of their cost impact can be made, and the contractor is willing to accept a firm fixed price representing assumption of the risks involved.

## V.
## DEFENDANTS' UNDISCLOSED, FRAUDULENT FEDERAL CONTRACTING PRACTICES

41.     Unbeknownst to plaintiffs and the Class, and as disclosed on June 6, 2006 in an indictment brought by the U.S. Attorney's Office for the Eastern District of Pennsylvania captioned as *USA v. Blatt et al.*, 06-cr-00268-LS-ALL (E.D. Pa.) (the "Government Indictment"), Defendants

Blatt and Herley and certain other officers and employees of Herley had devised and implemented a detailed scheme in which they submitted false and inflated cost information to the Government so as to secure Government approval of Herley contracts at inflated prices (which prices would not have been approved had accurate cost information been disclosed) and so as to thereby to report for Herley inflated revenues and profits (which would not have been possible had accurate cost information been disclosed).

42.    As detailed in the Government Indictment, incorporated herein by reference, Defendants' operated their cost-falsification scheme in the following manner:

(a)    In each instance, Blatt caused Herley, in its response to the Government's RFP, to provide an inflated price quotation for the product/system in question and to 'justify' that inflated price quotation through elaborate, fictional submissions concerning its costs.

(b)    In each instance, Blatt caused Herley to represent to the Government that, as a result of a purported obsolescence in its previously-used manufacturing process (i.e., Herley's "historical data" available to the Government), a new manufacturing process would be required (i.e., resulting in a divergence from Herley's historical data).  For example, Herley represented to the Government that a necessary component of the product was no longer commercially available, and would need to be produced in-house (and expensively) by Herley.

(c)    In each instance, Blatt caused Herley to provide fraudulent, inflated costs resulting from the purported obsolescence of the old process and the requirement that a new process be used.  For example, the division of Herley contracting with the Government would, under Blatt's direction and with the participation of other Herley executives, obtain from another division of Herley a fraudulent and inflated statement of the cost of the component to be purportedly

19

manufactured in-house by that Herley division.

(d)    In each instance, after the Government agreed to contracts at prices vastly inflated by Herley's false and inflated cost representations (purportedly justified by Herley's claim that a new manufacturing process was necessary), Herley did not employ the new manufacturing process (which was in fact unnecessary) and instead used the same parts and process it had always used.

(e)    In each case, Blatt directed the creation of a paper trail to make it appear as if an unexpected event had allowed Herley to revert to the cheaper, older process.

43.    For example, as detailed in the Government Indictment, in a contract with the U.S. Air Force in which Herley was the sole-source provider of specialized voltage-controlled oscillators ("VCO") for use in F-16 fighter jet radar systems[1]:

(a)    Defendants Blatt and Herley, in response to an urgent Air Force RFP for provision of such VCOs, submitted an extremely-high price quote that diverged from Herley's historical data and did not reflect Herley's true costs or estimates;

(b)    initially, to justify the quoted price, Defendant Blatt caused other Herley executives to make false, fictitious and fraudulent representations to the Government concerning (inflated) labor requirements and costs that would be caused by an accelerated delivery schedule;

(c)    the Government then notified Herley that it would conduct a pre-award audit of Herley's price quote on the current contract, and that it would also review Herley's actual costs from a previous VCO contract;

---

[1]    VCOs are small components of larger radar systems. Essentially, a VCO consists of a signal generator and an oscillator that amplifies the signal – which signal is used by on-board F-16 radar systems to track other objects in the sky and on land.

(d)    in response, Defendant Blatt, in order to preserve his arbitrarily-inflated price quote for the VCOs, devised and implemented the following scheme:

(i)    Defendant Blatt decreed that the Herley division manufacturing the VCOs ("Herley-Lancaster") could not use a crucial component of those VCOs – a high-performance NEC transistor that was no longer being manufactured – from Herley's inventory;

(ii)    Since Herley-Lancaster could not find any other readily-available supply of the NEC transistors (other than in its own inventory), Defendant Blatt informed Herley-Lancaster that a newly-acquired Herley division – Herley-Nashua – would design, develop, manufacture and supply a substitute for the NEC transistor;

(iii)    Defendant Blatt then instructed an executive (whom Blatt knew to be unfamiliar with the product and Herley division at issue) from yet another Herley division, Herley-Woburn, to generate a document that would appear to be a (costly) bid from Herley-Nashua to manufacture the substitute part;

(iv)    Defendant Blatt caused the above-mentioned executive to fax to Herley-Lancaster the faked Herley-Nashua bid;

(v)    As intended by Defendant Blatt, Herley-Lancaster falsely informed the contracting officer that it had no NEC transistors available for the VCO contract;

(vi)    As intended by Defendant Blatt, Herley-Lancaster falsely informed the DCAA auditor (in the Goverment's pre-award audit) that Herley's price quote for the VCOs was supported/necessitated by the additional costs described in the faked Herley-Nashua bid to create a substitute part for the NEC transistor;

(vii)    Additionally, in order to further support the high price quote for the

21

current VCO contract, Herley-Lancaster falsely and fraudulently inflated its purported costs for a previous VCO contract (now being audited in the pre-award audit) by representing that it had incurred costs from work done by Syracuse University, when in fact Syracuse University had not done any such work;

(e)     as a result of the foregoing false and inflated cost submissions to the contracting officer and the DCAA auditor, the Government entered into a contract with Herley at vastly-inflated prices, without basis in Herley's actual or estimated costs, that allowed Herley profits of approximately 250%;

(f)     Herley submitted a Contract Cover Sheet, as required by FAR, falsely certifying that its cost disclosures, including the additional costs resulting from the purported necessity to manufacture a substitute component in-house for the purportedly-unavailable NEC transistor, reflected Defendants' actual and best-estimated costs;

(g)     After securing the VCO contract at a price inflated by the purported necessity to manufacture substitutes for the NEC transistor, Defendant Blatt and another Herley executive then instructed Herley-Lancaster that it could proceed with the assembly and manufacture of the VCOs by using the NEC transistors that Herley-Lancaster had always possessed in inventory.

44.     In another example, as detailed in the Government Indictment, in a contract with the U.S. Air Force in which Herley was the sole-source provider of specialized power-heads for use in the Navy's E-2C "Hawkeye" planes' radar systems (the "Power Heads")[2]:

---

[2]     The Power Head functioned as a fuse between the power source for the radar and the radar itself, protecting the radar from harmful power surges. The E-2C Hawkeye plane was stationed on the Navy's airplane carriers and was primarily used for monitoring functions. Each E-2C Hawkeye carried extra Power Heads on board; whenever one failed, it would be replaced immediately (by either a brand-new or refurbished one).

(a)     Initially, in order to inflate Navy demand for *new* Power Heads (as opposed to refurbished/repaired ones) for which Herley as the sole source, Defendant Blatt at various times directed Herley-Farmingdale to slow down its repair of old Power Heads, to stop working on such repairs, to cancel open repair orders, to limit repairs only to recently-manufactured items, to stall repairs pending payments, and to slow repair operations by returning to inventory materials already selected and segregated for use in repairs;

(b)     the Navy issued an RFP for the Power Heads;

(c)     Defendant Blatt, knowing that Herley was the sole source for Power Heads, instructed Herley-Farmingdale to advise the Navy that Herley would no longer manufacture Power Heads;

(d)     in response to Navy's concern at being left without any source of Power Heads – which concern Defendant Blatt had expected – Defendant Blatt then agreed to have Herley-Farmingdale 'resume' manufacture and repair of Power Heads at prices inflated in the manner described below;

(e)     Defendant Blatt – who directed Power Head negotiations, supplied rationales for Power Head pricing, and knew of and expected the possibility of a pre-award audit – directed that Herley-Farmingdale provide arbitrarily-inflated price quotations for new Power Heads, which price quote was *not* based on Herley's true costs and expenses; and took elaborate action to make it appear as if the arbitrarily-inflated prices were justified on the basis of Herley's costs and expenses, repeatedly making and causing other employees of Herley-Farmingdale to make false statements to the Navy concerning Power Head costs, including:

(i)     Defendant Blatt represented that his best estimate of the cost to

23

produce the Power Heads' core – the film or element (suspended in a housing or subassembly) – was approximately $4,500, when in fact Defendant Blatt knew that Herley-Farmingdale's costs for such films/elements were so low – less than $10 – that such costs were simply incorporated into the division's overhead;

        (ii)    In order to provide further purported support for the high and highly-inflated price quotations, Defendant Blatt caused Herley-Farmingdale to fraudulently represent to the Navy that it had been authorized to spend substantial sums on new equipment to be used in manufacturing the Power Heads, when Blatt knew that no such authorization existed because no new equipment was needed;

        (iii)    In order to provide further purported support for the high and highly-inflated price quotations, Defendant Blatt falsely advised the Navy, and directed other Herley employees to do the same, that Herley was going to move Power Head production, in part, away from its historic location in Herley-Farmingdale and transfer it to Herley-Lancaster;

        (iv)    In furtherance of that scheme, Defendant Blatt directed the head of Herley-Lancaster to issue to Herley-Farmingdale a quotation to manufacture Power-Head sub-assemblies at vastly-inflated prices;

        (v)    In order to make it appear as if Herley's price quotations were based on actual costs and expenses, Defendant Blatt provided Herley-Farmingdale with a set of false, fraudulent and fictitious rationales to use to 'justify' Herley's price-quotations

        (f)    Defendant Blatt signed a Certificate of Current Cost and Pricing Data fraudulently representing that the cost and pricing data submitted by Herley was accurate;

        (g)    During the course of the Government's pre-award of audit of Herley's Power

24

Head bid, which audit Blatt had expected, and in order to support the inflated prices Herley had submitted, Defendant Blatt, caused Herley and Herley employees to make numerous statements to DCAA and DCMC auditors that Blatt knew to be false, and directed the creation of phony documents supporting such prices to provide to the Government auditors:

(i)    Defendant Blatt directed other Herley employees to misstate the costs and labor hours needed to manufacture the Power Heads,

(ii)    Defendant Blatt caused Herley-Farmingdale to represent to DCAA auditors that Power Head sub-assemblies would be manufactured by Herley-Lancaster and then sold to Herley-Farmingdale at certain (vastly inflated) prices;

(iii)    Defendant Blatt directed Herley-Farmingdale's submission of false, fictitious and fraudulent cost data to support Herley's inflated prices, including a cost sheet, a materials cost summary sheet, an entirely fictitious cost breakdown for manufacturing Power Head films, a labor cost breakdown, a quotation from Herley-Lancaster regarding manufacture of the Power Head sub-assembly, and further submissions regarding yield;

(iv)    In response to Government auditors' requests to examine Herley-Farmingdale's costs, expenses and yields on the first batch of Power Heads provided under the contract, Defendant Blatt removed the current Herley negotiator (an employee of Herley-Farmingdale, who knew about the matters at issue) and replaced him with an employee of Herley-Chicago who, as Defendant Blatt knew, had no direct knowledge about Power Head costs, expenses and yields;

(v)    In response to a DCMC request for Herley-Farmgindale's actual labor costs and expenses concerning current manufacture of Power Head elements, Defendant Blatt caused

the new Herley negotiator (see immediately above) to make false, fraudulent and misleading representations on the basis of which Herley and the Government negotiated a final price;

(h)    After the Power Head contract was finalized and enlarged to three times its initial size, Defendant Blatt caused Herley to execute another Certificate of Current Cost and Pricing Data fraudulently representing that the cost and pricing data submitted by Herley was accurate, when Blatt and Herley knew it was false, fictitious and fraudulent;

(i)    Immediately after securing the Power Head contract at inflated prices in the manner described above, Defendant Blatt ordered Herley-Farmingdale to begin manufacture of Power Heads and ordered Herley-Farmingdale to perform all the work and to cancel its order to purchase Power-Head sub-assemblies from Herley-Lancaster, which order was merely a ruse devised by Defendant Blatt and others to support Herley's inflated prices;

(j)    In order to conceal this fraud, Defendant Blatt directed that, if asked about the switch, Herley-Farmingdale explain that it had unexpectedly found Power Head sub-assemblies and materials and therefore did not need to order them from Herley-Lancaster;

(k)    In order to further conceal this fraud, Defendant Blatt also directed Herley-Farmingdale to keep its book in a manner that materials costs and sub-assemblies costs not be allocated to the Power Head contract.

45.    As detailed in the Government Indictment, the prices Defendants secured from the government through engaging in the above-mentioned, undisclosed and fraudulent business practices generated tremendous profit margins for Herley of between 250% and 300%. A 300% profit margin means that profits are three times costs: e.g., if Herley sold $1 million of products at a 300% profit margin, Herley's costs would have been $250,000 and Herley's profits $750,000. Such profits

26

would have been considered unreasonable by the Government and would not have been possible absent Defendants' above-described fraud.

46.     By engaging in the above-mentioned, undisclosed and fraudulent business practices, Defendants Blatt and Herley defrauded the Government into paying prices higher than it would have paid had Defendants accurately disclosed Herley's true costs, and into allowing Herley to reap profits greater than would have possible had Defendants accurately disclosed Herley's true costs.

47.     As alleged in greater detail below (see section VI), the prices secured by Defendants' engaging in the above-mentioned and undisclosed fraudulent business practices resulted in: (i) Defendants' receiving and reporting of fraudulent, false and inflated revenues that would not have been received or reported absent Defendants' fraud; (ii) Defendants' receiving and reporting of fraudulent, false and inflated net income and earnings (i.e., profits) that would not have been received or reported absent Defendants' fraud; and (iii) Defendants' reporting of fraudulent, false and inflated margins that would not have been possible absent Defendants' fraud.

48.     By engaging in the above-mentioned, undisclosed and fraudulent business practices, Defendants exposed Herley to undisclosed liabilities including: disgorgement of millions of dollars of excess profits; possible fines and penalties amounting to several multiples of such excess profits; increased regulatory, legal and accounting costs; potential restatement of previously-issued financial statements; and potential and actual loss of further contracting with Herley's single largest customer, the U.S. government.

49.     That Defendants were engaging in conduct that exposed Herley to such liabilities was fact unknown to plaintiffs and the Class.

50.     When Defendants' conduct and the consequent liabilities were disclosed between

27

June 6, 2006 (when the Government Indictment was announced) and June 13, 2006 (when the Government barred certain Herley facilities from consideration for any further Government work), Herley' shares lost approximately 47% of their value, falling from $17.50 per share on June 5, 2006 to close at $9.21 per share on June 14, 2006.

### VI.A
### DEFENDANTS' FALSE AND MISLEADING FILINGS WITH THE SEC: HERLEY'S OPERATIONS

51.    During the Class Period, Defendants caused Herley to file the following Forms 10-K with the SEC:

(a)    on October 23, 2001, a Form 10-K for the fiscal year ended July 29, 2001 (the "2001 Form 10-K"), signed *inter alia* by Defendants Blatt, Levy and Garefino;

(b)    on October 25, 2002, a Form 10-K for the fiscal year ended July 28, 2002 (the "2002 Form 10-K"), signed *inter alia* by Defendants Blatt, Levy and Garefino;

(c)    on October 31, 2003, a Form 10-K for the fiscal year ended August 3, 2003 (the "2003 Form 10-K"), signed *inter alia* by Defendants Blatt, Levy and Garefino;

(d)    on October 15, 2004, a Form 10-K for the fiscal year ended August 1, 2004 (the "2004 Form 10-K"), signed *inter alia* by Defendants Blatt, Levy and Gilboy;

(e)    on October 31, 2005, a Form 10-K for the fiscal year ended July 31, 2005 (the "2005 Form 10-K"), signed *inter alia* by Defendants Blatt, Levy and Garefino.

52.    As detailed below, in each of the above-mentioned Forms 10-K that Defendants caused Herley to file with the SEC during the Class Period (collectively, the "Forms 10-K") Defendants made certain disclosures concerning Herley's strategy, Herley's competition and Herley's competitive strengths, Herley's relationship with Government agencies, Herley's

compliance with governmental regulations and the material risks of non-compliance, and Herley's involvement in legal proceedings.

53.    For the reasons detailed below, such disclosures created a duty to disclose Defendants' above-mentioned, undisclosed and fraudulent business practices (see section V, above).

54.    The omission from the Forms 10-K of any mention of Herley's actual, fraudulent and non-compliant business practices in its sole-source contracting with the U.S. Government was a material omission that rendered the Forms 10-K false, incomplete and misleading.

55.    The 2002 Form 10-K, in disclosures concerning Herley's strategy, competition, competitive strengths and customers, emphasized the centrality to Herley's operations and finances of non-competitive, sole-source contracts with the U.S. Government, and made certain positive representations about Herley's relationship with the Government:

> **STRATEGY**
>
> – **STRENGTHEN AND EXPAND CUSTOMER RELATIONSHIPS. We have developed mutually beneficial relationships with various agencies of the U.S. government and defense and commercial companies. We expect to continue to build and strengthen these relationships with industry leaders by anticipating and recognizing their needs and providing them with on-time and cost-effective solutions**.
>
> **COMPETITIVE STRENGTHS**
>
> – **HIGH PROPORTION OF LONG-TERM SOLE-PROVIDER PRODUCTION PROGRAMS. We generate a significant proportion of our revenue from continuing, long-term programs**, both in the production and upgrade phases, and continue to target high growth, high priority defense programs. **Typically, on such long-term defense programs we are the sole provider of microwave equipment.**
>
> – DIVERSE PRODUCT AND CUSTOMER BASE. **We have a**

29

**diverse product and customer base, with only the U.S. government, at approximately 17%, representing more than 10% of our fiscal 2002 revenues. We are a first-tier supplier to all of the prime defense contractors, as well as a direct supplier to all of the service branches of the U.S. military**, including products found on over 120 individual platforms. Foreign customers accounted for approximately 32% of our revenues in fiscal 2002.

        – **LONG-STANDING INDUSTRY RELATIONSHIPS. We have established long-standing relationships with the U.S. government and other key organizations in the aerospace and defense industry** after 35 years in the defense electronic industry. Over this period, we have become recognized for our ability to develop new technologies and meet stringent program requirements.

                                *****

CUSTOMERS
**During the fiscal year ended July 28, 2002, approximately 17% of our net sales were attributable to contracts with offices and agencies of the U.S. government.** No other customers accounted for shipments in excess of 10% of net sales.

                                *****

COMPETITION
The microwave component and subsystems industry is highly competitive and we compete against many companies, both foreign and domestic. Many of these companies are larger, have greater financial resources and are better known. As a supplier, we also experience significant competition from the in-house capabilities of our customers.

Competition is generally based upon technology, design, past performance and price. Our ability to compete depends, in part, on our ability to offer better design and performance than our competitors and our readiness in facilities, equipment and personnel to complete the programs. **Many of the programs in which we participate are long standing programs in which we are the sole provider of product.**

56.    The 2001 Form 10-K, 2003 Form 10-K, 2004 Form 10-K and 2005 Form 10-K

                                30

contained statements identical to the above-mentioned statements in the 2002 Form 10-K.

57.    The omission from the Forms 10-K of Defendants' fraudulent, non-compliant, sole-source contracting with the U.S. Government was a material omission from the Forms 10-K, and rendered them materially false and misleading, especially given 10-K statements:

(a)    emphasizing the centrality of the Government as Herley's largest single customer responsible for between 17% and 26% of Herley's net sales;

(b)    characterizing Herley's "mutually beneficial relationships with various agencies of the U.S. government" adding Herley's purported "expect[ation] to continue to build and strengthen these relationships";

(c)    characterizing such "long-standing relationships with the U.S. government" as one of Herley's *competitive strengths*;

(d)    stating that Herley generated "a significant proportion of our revenue from continuing, long-term programs", that "[t]ypically, on such long-term defense programs we are the sole provider of microwave equipment" and that "[m]any of the programs in which we participate are long-standing programs in which we are the sole provider of product";

(e)    characterizing such sole-provider production programs as one of Herley's *competitive strengths*.

58.    The 2001 Form 10-K, 2002 Form 10-K, 2003 Form 10-K, 2004 Form 10-K and 2005 Form 10-K each contained a section titled "Legal Proceedings" in which Defendants disclosed the existence and status of material legal proceedings involving Herley. Although each of the Forms 10-K disclosed litigation between Herley and the former-owners of a company that Herley had acquired, none of the Forms 10-K disclosed in their Legal Proceedings disclosures the existence of the

31

government's investigation (let alone the fraudulent contracting conduct that gave rise to the investigation in the first place). This omission was a material omission that rendered the Forms 10-K materially false, incomplete and misleading, especially for the reasons described in ¶ 57 immediately above.

59.    The 2001 Form 10-K, 2002 Form 10-K, 2003 Form 10-K, 2004 Form 10-K and 2005 Form 10-K each contained substantively identical disclosures concerning the existence and importance of governmental regulations in defense contracting, Herley's regulatory compliance, and the theoretical consequences of theoretical non-compliance with such regulations:

> **GOVERNMENT REGULATION**
> **Because of our participation in the defense industry, we are subject to audits by various government agencies for our compliance with government regulations.** We are also subject to a variety of local, state and federal government regulations relating to, among other things, the storage, discharge, handling, omission, generation, manufacture and disposal of toxic or other hazardous substances used to manufacture our products. **We believe that we operate our business in material compliance with applicable laws and regulations. However, any failure to comply with existing or future laws or regulations could have a material adverse impact on our business, financial condition and results of operations.**
>
> \*\*\*\*\*
>
> The Company believes that presently anticipated future cash requirements will be provided by internally generated funds, its existing unsecured credit facility, and the approximately $64,812,000 net proceeds from the sale of 3,000,000 shares of common stock to the public on April 30, 2002 (See Note M of the financial statements). A significant portion of the Company's revenue for fiscal 2003 will be generated from its existing backlog of sales orders. The backlog of orders at July 28, 2002 was approximately $82,678,000. All orders included in backlog are covered by signed contracts or purchase orders. **Nevertheless, contracts involving government programs may be terminated at the discretion of the government. In the**

**event of the cancellation of a significant amount of government contracts included in the Company's backlog, the Company will be required to rely more heavily on cash reserves and its existing credit facility to fund its operations. The Company is not aware of any events which are reasonably likely to result in any cancellation of its government contracts.**

60.    The above-quoted representations were materially false and misleading.  To state that "failure to comply with existing or future laws or regulations could have a material adverse impact on our business, financial condition and results of operations" is to repeat tautological boilerplate rather than to inform investors of actual compliance failures. To warn that government contracts could be terminated is to describe an eternal and unchanging truth rather than to inform investors of the existence of real grounds for such cancellation.  And to state that "[w]e believe that we operate our business in material compliance with applicable laws and regulations" and that "[t]he Company is not aware of any events which are reasonably likely to result in any cancellation of its government contracts" is to affirmatively misrepresent material facts that Defendants knew were otherwise.

61.    The omission from the Forms 10-K of Defendants' fraudulent, non-compliant, sole-source contracting with the U.S. Government was a material omission from the Forms 10-K, and rendered them materially false and misleading, especially given 10-K statements:

(a)    disclosing the regulatory framework under which defense contracting operated;

(b)    advising that "failure to comply with existing or future laws or regulations could have a material adverse impact on our business, financial condition and results of operations" but asserting Defendants' belief that "we operate our business in material compliance with applicable laws and regulations";

33

(c)    advising that "contracts involving government programs may be terminated at the discretion of the government" but asserting that Defendants were "not aware of any events which are reasonably likely to result in any cancellation of its government contracts".

### VI.B
### DEFENDANTS' FALSE AND MISLEADING FILINGS WITH THE SEC: HERLEY'S FINANCIAL STATEMENTS

62.    As alleged above and detailed in the Government Indictment, the prices secured by Defendants' above-mentioned, undisclosed and fraudulent business practices were prices that were vastly inflated by Defendants' false, fictitious and fraudulent cost submissions to the U.S. Government, which convinced the Government to agree to contract prices based on the seeming (but fabricated) truth of such cost submissions. Had Defendants acted truthfully, complied with FAR, and disclosed to the Government their accurate and actual product costs, price negotiations would have occurred at levels far below the ones inflated by Defendants' fraudulent cost submissions, and final contracts would have been executed at price levels far below the ones inflated by Defendants' fraudulent cost submissions. Although FAR provides that contractors may enjoy reasonable profits, the 250%-300% profit margin secretly created for Herley by Defendants' fraudulent practices is far above the Government's definition of "reasonable profits". Absent Defendants' false, fictitious and fraudulent cost submissions, the Government would never have agreed to pay Herley the prices it did.

63.    Consequently, Defendants' above-mentioned, undisclosed and fraudulent business practices resulted in Defendants' receiving, and reporting in Herley's financial statements, fraudulent, false and inflated revenues that would not have been received or reported absent Defendants' fraud. Such fraudulent, false and inflated revenues also had the effect of inflating the

net income and earnings (i.e., profits), as reported in Herley's financial statements, which such net income and earnings would not have been received or reported absent Defendants' fraud.

64.    Additionally, and as a mathematical consequence, Defendants' above-mentioned, undisclosed and fraudulent business practices resulted in Defendants' reporting of fraudulent, false and inflated margins (i.e., the difference between revenues and costs/expenses, expressed as a percentage of revenues) that would not have been possible absent Defendants' fraud.  Margins are a metric of great interest to investors and the market because they are often interpreted as indicators of a given company's comparative efficiency and operational skill.  For example, if one company has costs that are 50% of revenues, while another company in the same industry has costs that are only 40% of revenues, that suggests to investors that the latter company is a more skillful and better-managed organization.  Herley's materially-inflated  margins – margins among the very highest in the defense industry –  were highly misleading.  They were not the result of management's operational skill, but rather the result of the extra-high, illegitimate, fraudulently-derived revenues secured through Defendants' secret and elaborate price-gouging of the Government.

65.    In short,  Defendants' above-mentioned, undisclosed and fraudulent business practices caused Herley to report – in quarterly press releases, quarterly conference calls with analysts and investors, quarterly and annual financial statements, and quarterly and annual SEC filings – inflated revenues, net income and earnings, and margins.

66.    To the extent they are detailed in the Government Indictment, Defendants' above-mentioned, undisclosed and fraudulent business practices caused Herley to recognize and report sales from such practices at least during Fiscal 2001, Fiscal 2002, and Fiscal 2003.  However, the full extent of Defendants' fraudulent business practices remains unclear. As alleged above, Herley's

(now-former) auditor resigned after finding that Herley's management was unwilling to conduct a truly independent, adequate investigation capable of determining, *inter alia*, "the impact of the alleged illegal acts on the financial statements of the Company". Defendants may have continued their fraudulent business practices and caused Herley to recognize and report sales from such practices for periods later than those identified in the specific examples detailed in the Government Indictment.

67.    Although the full extent and effects of Defendants' fraud remains unclear, it is clear that all of the Forms 10-K contained financial statements reporting materially inflated, false and misleading revenues, net income and earnings, and margins. The 2001 Form 10-K, 2002 Form 10-K and 2003 Form 10-K contained financial statements that reported inflated revenues, net income, earnings and margins for each of those fiscal years. Because each Form 10-K contains financial statements for the issuer's previous three years, the 2004 Form 10-K and 2005 Form 10-K, at the very least, contained financial statements for previous years that reported materially inflated, false and misleading revenues, net income and earnings, and margins.

68.    The same undisclosed misconduct that rendered the financial statements in Herley's Forms 10-K materially false and misleading also rendered certain of Herley's Forms 10-Q filed by Defendants during the Class Period false and misleading, including at the very least:

(a)    Herley's March 8, 2002 Form 10-Q, signed by Defendants Levy and Garefino, for second quarter of fiscal 2002;

(b)    Herley's December 17, 2002, March 18, 2003, and June 11, 2003 Forms 10-Q, signed by Defendants Levy and Garefino, for the first, second and third quarters of fiscal 2003;

(c)    Herley's December 17, 2003, March 17, 2004, and June 16, 2004 Forms 10-Q,

36

signed by Defendants Levy and Garefino, for the first, second and third quarters of fiscal 2004.

69.     Each of the Forms 10-K that Defendants caused Herley to file with the SEC during the Class Period, in addition to containing materially false and misleading financial statements as alleged above, also contained a statement from Herley's auditor concerning the annual audit of Herley's financial statements and the auditor's opinion concerning Herley's financial statements (the "Auditor Certifications").  Each of the Auditor Certifications stated that the financial statements "are the responsibility of the [Herley's] management", and certified Herley's financial statements as materially accurate, complete and GAAP-compliant when, as a result of Defendants' above-mentioned, undisclosed and fraudulent conduct, they were none of these things.  Each of the Auditor Certifications was therefore, as a result of Defendants' above-mentioned, undisclosed and fraudulent conduct, materially false and misleading.

(a)     The Auditor Certification contained in Herley's 2001 Form 10-K, provided by Arthur Andersen LLP, stated:

REPORT OF INDEPENDENT PUBLIC ACCOUNTANTS

To the Board of Directors of Herley Industries, Inc.

We have audited the accompanying consolidated balance sheets of Herley Industries, Inc and Subsidiaries as of July 29, 2001 and July 30, 2000, and the related  consolidated  statements of income, shareholders' equity and  flows for the 52 weeks ended July 29, 2001,  July 30, 2000 and August 1, 1999. These financial statements are  the  responsibility  of  the  Company's management.   Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance  with  auditing  standards generally accepted in the United  States. Those  standards  require that we plan and perform the audit to obtain reasonable assurance about   whether   the   financial   statements   are   free  of  material

misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Herley Industries, Inc. and Subsidiaries as of July 29, 2001 and July 30, 2000, and the consolidated results of their operations and their cash flows for the 52 weeks ended July 29, 2001, July 30, 2000 and August 1, 1999 in conformity with accounting principles generally accepted in the United States.

/S/ ARTHUR ANDERSEN LLP
Lancaster, PA
October 3, 2001

(b)      The Auditor Certification contained in Herley's 2002 Form 10-K, provided

by Deloitte & Touche LLP, stated:

INDEPENDENT AUDITORS' REPORT

To the Board of Directors ofHerley Industries, Inc.

We have audited the accompanying consolidated balance sheet of Herley Industries, Inc. and Subsidiaries ("the Company") as of July 28, 2002, and the related consolidated statement of income, shareholders' equity, and cash flows for the year then ended. Our audit also included the financial statement schedule listed in the Index at Item 14 as it relates to the year ended July 28, 2002. These consolidated financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements and financial statement schedule based on our audit. The financial statements of the Company for the years ended July 29, 2001 and July 30, 2000 were audited by other auditors who have ceased operations. Those auditors expressed an unqualified opinion on those financial statements in their report dated October 3, 2001, updated as of March 1, 2002.

We conducted our audit in accordance with auditing standards

38

generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of the Company as of July 28, 2002, and the results of their operations and their cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, such financial statement schedule as it relates to the year ended July 28, 2002, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

As discussed in Note A to the consolidated financial statements, in 2002 the Company changed its method of accounting for goodwill by adopting Statement of Financial Accounting Standards No. 142, "Goodwill and Other Intangible Assets."

/s/ DELOITTE & TOUCHE LLP
October 15, 2002
Baltimore, Maryland

(c)     The Auditor Certification contained in Herley's 2003 and 2004 Forms 10-K,

also provided by Deloitte & Touche LLP, were substantively identical to the Auditor Certification

in the 2002 Form 10-K.

(d)     The Auditor Certification contained in Herley's 2005 Form 10-K, provided

by BDO Seidman LLP, stated:

REPORT   OF   INDEPENDENT   REGISTERED   PUBLIC
ACCOUNTING FIRM

To the Board of Directors

39

Herley Industries, Inc.
Lancaster, Pennsylvania

We have audited the accompanying consolidated balance sheet of Herley Industries, Inc. and subsidiaries (the "Company") as of July 31, 2005, and the related consolidated statements of income, shareholders' equity, and cash flows for the year ended July 31, 2005. We have also audited the financial statement schedule listed in the index at Item 15 as it relates to the year ended July 31, 2005. These financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit. The financial statements of the Company for the years ended August 1, 2004 and August 3, 2003 were audited by other auditors who have expressed an unqualified opinion on those financial statements in their report dated October 14, 2004.

We conducted our audit in accordance with standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Herley Industries, Inc. as of July 31, 2005, and the results of its operations and its cash flows for the year ended July 31, 2005, in conformity with accounting principles generally accepted in the United States of America.  Also, in our opinion, the schedule presents fairly in all material respects the information set forth therein.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of Herley Industries, Inc. internal control over financial reporting as of July 31, 2005, based on criteria established in Internal Control -- Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO criteria) and our report dated October 7, 2005 expressed an

40

unqualified opinion thereon.

/s/ BDO SEIDMAN, LLP
Philadelphia, Pennsylvania
October 7, 2005

70.    Furthermore, each of Herley's Forms 10-K and Forms 10-Q filed after 2001 contained certifications signed by Herley's Chief Executive Officer and Chief Financial Officer, as per the Sarbanes-Oxley Act of 2002, attesting to the material accuracy, truth and completeness of the Forms 10-K (the "SOX Certifications"). Each of the SOX Certifications was therefore, as a result of Defendants' above-mentioned, undisclosed and fraudulent conduct, materially false and misleading.

(a)    The 2002 Form 10-K contained the following SOX Certifications signed by Defendants Levy and Garefino:

Certification of Chief Executive Officer
pursuant to Section 302(a) of the SARBANES–OXLEY ACT OF 2002

I, Myron Levy, Chief Executive Officer of Herley Industries, Inc. (the "Registrant"), certify that:

(a) I have reviewed this annual report on Form 10–K of Herley Industries, Inc. for the fiscal year ended July 28, 2002;

(b) Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report; and

(c) Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this annual report.

Dated: October 21, 2002

41

By: /s/ Myron Levy
Chief Executive Officer

*****

Certification of Chief Financial Officer
pursuant to Section 302(a) of the SARBANES-OXLEY ACT OF 2002

I, Anello C. Garefino, Chief Financial Officer of Herley Industries,
Inc. (the "Registrant"), certify that:

(a) I have reviewed this annual report on Form 10-K of Herley
Industries, Inc. for the fiscal year ended July 28, 2002;

(b) Based on my knowledge, this annual report does not contain any
untrue statement of a material fact or omit to state a material fact
necessary to make the statements made, in light of the circumstances
under which such statements were made, not misleading with respect
to the period covered by this annual report; and

(c) Based on my knowledge, the financial statements, and other
financial information included in this annual report, fairly present in
all material respects the financial condition, results of operations and
cash flows of the Registrant as of, and for, the periods presented in
this annual report.

Dated: October 21, 2002
By: /s/ Anello C. Garefino
Chief Financial Officer

*****

Certification of Chief Executive Officer
pursuant to 18 U.S.C. SECTION 1350, as adopted pursuant to
Section 906 of the SARBANES-OXLEY ACT OF 2002

I, Myron Levy, certify, pursuant to 18 U.S.C. Section 1350, as
adopted pursuant to Section 906 of the SARBANES-OXLEY ACT
OF 2002, that the Annual Report of Herley Industries, Inc. on Form
10-K for the fiscal year ended July 28, 2002 fully complies with the
requirements of Section 13(a) or 15(d) of the Securities Exchange Act
of 1934 and that information contained in such Annual Report on
Form 10-K fairly presents in all material respects the financial

42

condition and results of operations of Herley Industries, Inc.

Dated: October 21, 2002
By: /s/ Myron Levy
Chief Executive Officer

*****

Certification of Chief Financial Officer
pursuant to 18 U.S.C. SECTION 1350, as adopted pursuant to
Section 906 of the SARBANES-OXLEY ACT OF 2002

I, Anello C. Garefino, certify, pursuant to 18 U.S.C. Section 1350, as
adopted pursuant to Section 906 of the SARBANES-OXLEY ACT
OF 2002, that the Annual Report of Herley Industries, Inc. on Form
10-K for the fiscal year ended July 28, 2002 fully complies with the
requirements of Section 13(a) or 15(d) of the Securities Exchange Act
of 1934 and that information contained in such Annual Report on
Form 10-K fairly presents in all material respects the financial
condition and results of operations of Herley Industries, Inc.

Dated: October 21, 2002
By: /s/ Anello C. Garefino
Chief Financial Officer

(b)    The 2003 Form 10-K contained the following SOX Certifications signed by

Defendants Levy and Garefino, which, in addition to certifying the company's financial statements

and the company's overall filing, also certified the company's internal, financial and disclosure

controls and procedures:

CERTIFICATION PURSUANT
TO RULE 13a-14(a)

I, Myron Levy, certify that:

1. I have reviewed this Annual Report on Form 10-K of Herley
Industries, Inc.;

43

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) for the registrant and have:

a. designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

c. disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. all significant deficiencies and material weaknesses in the design

44

or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: October 31, 2003
By: /s/ Myron Levy
Title: Vice Chairman of the Board and
Chief Executive Officer

*****

CERTIFICATION PURSUANT
TO RULE 13a-14(a)

I, Anello C. Garefino, certify that:

1. I have reviewed this Annual Report on Form 10-K of Herley Industries, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

a. designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the

45

registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

c. disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: October 31, 2003
By: /s/ Anello C. Garefino
Title: Vice President Finance and
Chief Financial Officer
                                                    *****


CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350

In connection with the Annual Report of Herley Industries, Inc. (the

"Company") on Form 10‒K for the fiscal year ended August 3, 2003, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Myron Levy, Vice Chairman of the Board and Chief Executive Officer of the Company, hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes‒Oxley Act of 2002, that, to my knowledge:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: October 31, 2003
By: /s/ Myron Levy
Title: Vice Chairman of the Board and
Chief Executive Officer

*****

CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350

In connection with the Annual Report of Herley Industries, Inc. (the "Company") on Form 10‒K for the fiscal year ended August 3, 2003, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Anello C. Garefino, Vice President Finance and Chief Financial Officer of the Company, hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes‒Oxley Act of 2002, that, to my knowledge:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: October 31, 2003
By: /s/ Anello C. Garefino
Title: Vice President Finance and
Chief Executive Officer

47

(c)    The 2004 and 2005 Forms 10-K contained the SOX Certifications substantively identical to the SOX Certification contained in the 2003 Form 10-K. The 2004 SOX Certifications were signed by Defendants Levy and Gilboy; the 2005 SOX Certifications by Defendants Levy and Garefino.

(d)    The Forms 10-Q filed between December 17, 2002 and March 10, 2006 contained SOX certifications substantively identical to the SOX Certification contained in the 2003 Form 10-K. All of these Form 10-Q SOX Certifications were signed by Defendant Levy as Herley CEO; all but three (the December 9, 2004, March 11, 2005 and June 10, 2005 Forms 10-Q) by Defendant Garefino as Herley's CFO (the three exceptions were signed by Defendant Gilboy, who replaced Garefino as Herley's CFO for one year).

71.    At all times, Defendants represented falsely that Herley's financial statements, including the above-mentioned financial statements, were prepared in accordance with Generally Accepted Accounting Principles ("GAAP"). Ultimately, after disclosure of the Government Indictment and Defendants' undisclosed and illegal price-gouging, and after Defendants' failure to authorize and implement a truly independent and adequate investigation capable of determining "the impact of the alleged illegal acts on the financial statements of the Company" or of "identify[ing] the potential involvement of other Company personnel involved" in those acts, Herley's then-auditor BDO Seidman LLP concluded that it was "no longer able to rely on the representations of management provided to date", resigned, and withdrew its previously-issued certification of Herley's financial results as materially accurate, complete and GAAP-compliant.

72.    Herley's above-mentioned financial results and financial statements did not comply with GAAP.

73.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

74.    Due to Defendants' above-mentioned, undisclosed and fraudulent business practices, and their distortive effects upon Herley's financial statements and reported financial results, Defendants presented Herley's financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)    The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b)    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c)    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(d)    The principle that financial reporting should provide information about how

49

management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)    The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(f)    The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

(g)    The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

(h)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

75.    Further, the undisclosed adverse information concealed by Defendants during the

50

Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

76.     GAAP provides that financial statements should be restated in limited circumstances: when there is a change in the reporting entity; when there is a change in accounting principles used; or to correct an error in previously-issued financial statements.   As alleged above, Herley's previously-issued financial statements were materially false and misleading when issued, due to: (i) the omission of Defendants' true business practices; (ii) the misleading, illegitimate and inflated revenues, earnings, profits and margins that such practices effected; and (iii) the omission of the sizeable liabilities to which Herley was exposed as a result of such practices.   Herley's auditor at the time of the disclosure of the Government Indictment subsequently resigned after concluding that Defendants were refusing to authorize and implement a truly independent and adequate investigation capable of determining "the impact of the alleged illegal acts on the financial statements of the Company", and withdrew its certification of Herley's previously-issued financial statements. Herley's previously-issued financial statements exist now in limbo, lacking auditor approval, and distorted to as-yet unknown extent by Defendants' illegitimate and illegal business practices.   A restatement of such financial results is necessary, but has been precluded by Defendants' refusal to delve into the past in order to determine exactly who did what and to what effect.

## VI.C
## DEFENDANTS' OTHER FALSE AND MISLEADING STATEMENTS

77.     Throughout the Class Period, Defendants, in addition to issuing the materially false and misleading SEC filings discussed above, issued to the public other materially false and misleading statements.  As detailed below, such statements included:

(a)     Quarterly press releases announcing Herley's quarterly and annual financial results (the "Financial Press Releases") (see ¶ 78);

(b)     Quarterly conference calls with analysts and investors in which Defendants further discussed Herley's operations, results, and prospects;

(c)     Frequent press releases announcing new, renewed, extended or augmented contracts with the Government (the "Government Defense Contract Press Releases") (see ¶ 80);

(d)     Yearly speeches by Defendant Blatt, given at Herley's annual meeting of shareholders and simultaneously disseminated to the public in press releases, discussing Herley's operations, results, strategies and prospects (the "Chairman's Addresses") (see ¶¶ 84-90); and

(e)     Various other statements concerning Herley's operations, results and prospects contained in press releases and conference calls (see ¶ 92).

78.     In addition to the quarterly and annual financial statements contained in Herley's SEC filings, which were materially false and misleading for the reasons stated above (see ¶¶ 72-74), Defendants also reported Herley's purported financial results in quarterly press releases (the "Financial Press Releases") and in quarterly conference calls with analysts and investors, listed in the table below:

**The Financial Press Releases and the Conference Calls**

52

| Date | Event | Contents |
|---|---|---|
| October 1, 2001 | press release | Q4 2001 and 2001 results |
| December 26, 2001 | press release | Q1 2002 results |
| March 6, 2002 | press release | Q2 2002 results |
| May 29, 2002 | press release | Q3 2002 results |
| September 25, 2001 | press release | Q4 2002 and 2002 results |
| December 12, 2002 | press release | Q1 2003 results |
| March 12, 2003 | press release | Q2 2003 results |
| March 13, 2003 | conference call | Q2 2003 |
| June 5, 2003 | press release | Q3 2003 results |
| October 7, 2003 | press release | Q4 2003 and 2003 results |
| October 7, 2003 | conference call | Q4 2003 and 2003 |
| December 11, 2003 | press release | Q1 2004 results |
| March 15, 2004 | press release | Q2 2004 results |
| March 16, 2004 | conference call | Q2 2004 |
| June 14, 2004 | press release | Q3 2004 results |
| June 15, 2004 | conference call | Q3 2004 |
| October 15, 2004 | press release | Q4 2004 and 2004 results |
| October 18, 2004 | conference call | Q4 2004 |
| December 9, 2004 | press release | Q1 2005 results |
| December 10, 2004 | conference call | Q1 2005 |
| March 8, 2005 | press release | Q2 2005 results |
| March 9, 2005 | conference call | Q2 2005 |
| June 9, 2005 | press release | Q3 2005 results |

| | | |
|---|---|---|
| June 10, 2006 | conference call | Q3 2005 |
| October 24, 2005 | press release | Q4 2005 and 2005 results |
| November 1, 2005 | conference call | Q4 2005 and 2005 |
| December 13, 2005 | press release | Q1 2006 results |
| December 14, 2005 | conference call | Q1 2006 |
| March 8, 2006 | press release | Q2 2006 results |
| March 9, 2006 | conference call | Q2 2006 |

79.     The Financial Press Releases and the above-mentioned conference-calls, in which Defendants reported Herley's purported financial results, were materially false and misleading for the same reasons as stated above in section VI(B).

80.     Throughout the Class Period, Defendants caused Herley to issue numerous press releases announcing that Herley had won new defense contracts, or had had old defense contracts extended and/or augmented at the option of the Government, to provide the Government directly or indirectly (through contracting with certain prime defense contractors – e.g., Northrop Grumman, Lockheed Martin, Raytheon and Boeing – themselves working on Government contracts) with Herley's products.   Such press releases (collectively, the "Government Defense Contract Press Releases") are listed in the table below:

**Government Defense Contract Press Releases**[3]

| Date | Title of Press Release |
|---|---|

---

[3]     Excluded from this list are press releases announcing: (i) non-defense contracts won and/or extended by Herley (e.g., medical imaging systems) and (ii) defense contracts with foreign governments (e.g., Switzerland, South Korea, Australia, India) or non-governmental entities (e.g., NATO, EADS).

| December 4, 2001 | Herley Receives $1.0 Million Contract Award To Supply High Power Microwave Hardware For E-2C Aircraft |
|---|---|
| January 7, 2002 | Herley Receives Contract Awards Totaling $3.4 Million – Herley Will Supply Microwave Products for the E2-C Surveillance Aircraft, the F-18 Fighter Aircraft and the HARM and RAM Missiles |
| January 15, 2002 | Herley Receives Contract Awards Totaling $4.29 Million; Microwave Hardware for F-16 Aircraft And AMRAAM Missiles |
| February 22, 2002 | Herley Receives Contract Award's Totaling $7.5 Million; Herley Will Supply Microwave Products for the National Missile Defense And E-2C Programs |
| April 3, 2002 | Herley Receives $3.5 Million Contract Award for the U.S. Navy's F-18 E/F Super Hornet; This Award Represents the 2nd Year Release of a Five-Year $16.5 Million Contract |
| June 10, 2002 | Herley Receives a $15.3 Million Contract From The U.S. Navy; Herley Will Supply Complex Integrated Microwave Assemblies for Electronic Warfare Simulation |
| June 18, 2002 | Herley Received Contract Awards Totaling $3.1 Million; U.S. Military Actions Beginning to Generate Order Activity |
| July 18, 2002 | Herley Receives Contract Award for $2.2 Million; 4th Quarter Backlog Continues to Grow (Textron Sensor-Fuzed Weapon) |

55

| July 24, 2002 | Herley Receives $2.6 Million Contract Award From Northrop; F-16 Business Activity Remains Strong; Year-to-Date Bookings Exceed Forecasts |
| --- | --- |
| August 5, 2002 | Herley Receives $6.4 Million Contract Award; Herley Will Supply Defense Electronics for F-16 Upgrades |
| August 16, 2002 | Herley Backlog Increases to a Record $90 Million; August Bookings in Excess of $10 Million |
| September 30, 2002 | Herley Awarded $1.6 Million Contract To Supply And Integrate Flight Avionics Hardware For The Skeeter Target; Herley Will Be A Key Participant In Next Generation Aerial Target Program For The U.S. Air Force |
| October 14, 2002 | Herley Receives Additional $1.1 Million in Contract Awards for Rivet Joint; Increasing Opportunities in Intelligence, Surveillance and Reconnaissance Upgrades |
| January 13, 2003 | Herley Receives Contract Awards Totaling $3.9 Million; Options Are Expected to Range Between $20 and $65 Million; Herley Will Supply Defense Electronics to the AMRAAM Program |
| March 21, 2003 | Herley Receives $1.5 Million Contract Award (vertical launch missile) |
| March 24, 2003 | Herley Reaffirms Expectations for a Strong 2nd Half and Full Year; Fiscal 2003 Revenue and Earnings Guidance Directed to the High End of Range; Herley's Business Strategy to Focus on Multi-Year Funded Programs Proving Successful |

| April 14, 2003 | Herley Receives $1.1 Million Contract Award from Raytheon Electronic Systems (National Missile Defense Program) |
|---|---|
| April 15, 2003 | Herley Receives $3.05 Million in Contract Awards to Supply Transponders for the Space Launch Program |
| June 5, 2003 | Herley Receives $2.3 Million Contract Award; Herley Will Provide Microwave Hardware for Textron's Sensor Fuzed Weapon |
| June 11, 2003 | Herley Receives Contract Awards Totaling $3.5 Million; Herley Will Be Supplying Microwave Hardware for the F-18 Aircraft |
| June 24, 2003 | Herley Receives $1.5 Million Contract Award from Lockheed Martin Space Systems (Low Cost Missile Test Kit) |
| July 8, 2003 | Herley Receives Contract for Next Generation Missile Tracking Hardware; Contract Award Including Options Totals $1.9 Million; The First Application Will Be the Advanced Medium Range Air to Air Missile ("AMRAAM") Program |
| July 9, 2003 | Herley Receives $1 Million Contract Award (power amplifiers for military airborne communications) |
| August 27, 2003 | Herley Receives Contracts Totaling $1.7 Million; Herley Solidifies Position as Key Supplier to U.S. Missile Defense Programs |
| August 29, 2003 | Herley Receives $9.4 Million Contract Award From the U.S. Navy; Herley Will Supply Radar Tracking Transponders for Systems Training and Target Operations |

| | |
|---|---|
| September 11, 2003 | Herley Receives $2.25 Million Contract Award; Business Activity in Defense Markets Remains Strong (power amplifiers for upgraded communications systems) |
| October 23, 2003 | Herley Receives $3.6 Million Corporate Purchasing Agreement From Lockheed Martin (Navy's AEGIS Combat System AN/SPY-1 radar components) |
| December 1, 2003 | Herley Receives $3.6 Million Contract Award for ICAP III Program; Herley Will Supply Microwave Hardware to Northrop Grumman (new jamming system Navy EA-6B Prowler aircraft and EA-18G Growlder aircraft) |
| December 19, 2003 | Herley Receives Contract Awards Totaling $6.2 Million (missile encoders for the AMRAAM, switch filters for ASPIS II, I/Q modulators for Northrop Grumman, time delay units for Ballistic Missile Defense, hybrids for the Small Diameter Bomb, microwave components for the Rolling Airframe Missile, microwave components for U-2 "Butterfly") |
| January 12, 2004 | Herley Receives $2.5 Million Contract Award; Herley Will Supply Microwave Hardware for the F-18 E/F Super Hornet' Aircraft; 2nd Quarter Bookings on Target to Reach Record Level |
| February 9, 2004 | Herley Announces Contract Awards Totaling $6.5 Million; The Awards Include ICAP III, F-16, and AMRAAM Follow-On Production Programs to Be Delivered Within One Year |
| April 20, 2004 | Herley Receives $2.1 Million Contract Award from the U.S. Navy (radar tracking transponders for Navy test ranges) |

| | |
|---|---|
| April 20, 2004 | Herley Receives a $2.9 Million Contract Award; Herley Will Supply Microwave Hardware for the SLQ-32 Electronic Warfare Systems |
| April 22, 2004 | Herley Receives a $1.5 Million Contract Award From the U.S. Army; Herley Will Develop a New Ground Station System For White Sands Missile Range |
| June 16, 2004 | Herley Receives a $2.3 Million Follow-On Contract Award and a $2.3 Million Option (Sensor Fuzed Weapon) |
| June 17, 2004 | Herley Announces $19.7 Million ID/IQ Contract Award From the U.S. Air Force; Herley Will Supply Low Noise Assemblies for the F-16 Fire Control Radar |
| December 1, 2004 | Herley Announces Contract Awards Totaling $7.2 Million (F-16 microwave assemblies; microwave hardware for missile test applications; avionics system hardware for AFSAT) |
| March 11, 2005 | Herley Announces $6.5 Million in Contract Awards; -- $4.2 Million to Supply Flight Termination Receivers for the AMRAAM Missile Program, the 12th Year of Production for This Program |
| March 23, 2005 | Herley Receives Follow-On Contract Award In Excess of $1.7 Million From U.S. Navy; Herley to Supply APN-245 Beacon Sets for the F/A-18 E/F Aircraft |
| March 28, 2005 | Herley Receives Follow-On Contract Award in Excess of $3.3 Million From U.S. Navy; Herley to Supply AN/ARA-63 Tactical Instrument Landing Systems for F/A-18F and E-2C Aircraft |

| | |
|---|---|
| May 2, 2005 | Herley Announces $3.0 Million in Contract Awards (integrated microwave assemblies for radar warning receivers; radio beacons for F/A-18 E/F Super Hornet aircraft) |
| May 12, 2005 | Herley Announces $8.5 Million Contract Modification Increasing Existing Contract to $17.1 Million; -- Innovative Concepts, Inc. Awarded Contract to Develop Next Generation of Improved Data Modem (IDM) Technology(R) to U.S. Army Aviation |
| May 31, 2005 | Herley Receives Approximately $3.6 Million in Contract Awards; Strong Bookings Expected For The Remainder Of Fiscal 2005 (Air Force air-to-air missile; Navy Coyote supersonic sea-skimming target missile) |
| June 22, 2005 | Herley Receives $1.2 Million Contract Award for U.S. Ballistic Missile Defense (BMD); Herley's Farmingdale Division to Supply Microwave Assemblies for the Phased Array Radar |
| June 23, 2005 | Herley Receives $1.8 Million Contract Award to Supply Amplifiers for U.S. Army Improvised Explosive Device Countermeasures; Herley Expects Farmingdale's Amplifier Business to Be a Catalyst for a Strong Fiscal Year 2006 |
| June 29, 2005 | Herley Receives Multi-Year Navy Contract Award to Repair Aircraft Landing Systems; $1.3 Million in First Year Delivery Orders With the Total Award Expected to Exceed $6 Million |
| July 22, 2005 | Herley Receives Contract Award from Office of Naval Research; Herley Subsidiary, Innovative Concepts, Inc., will provide Communication Systems to Unmanned Vehicles |

| | |
|---|---|
| July 29, 2005 | Herley Receives Contract Awards Totaling $4.5 Million;Herley Subsidiary, Micro Systems, Will Supply Products to New and Legacy Customers (DSQ-50A Sensor and Telemetry Downlink Airborne for Navy; hardware for Airforce unmanned airborne vehicle) |
| August 1, 2006 | Herley Receives Contract Awards Totaling $4.3 Million (microwave hardware for a major U.S. weapons program; unidentified contract with international defense company) |
| August 8, 2005 | Herley Receives $11.8 Million in High Power Amplifier Contract Awards; Herley Farmingdale Positioned to Generate Increased Power Amplifier Revenues in Fiscal 2006 |
| November 2, 2005 | Herley Announces Contract Awards Totaling $5.1 Million (synthesizers and multi-function microwave assemblies to two international defense contractors) |
| December 8, 2005 | Herley Receives $7.6 Million in Contract Awards; New England Division Continues Its Success in EW Markets EWST Contract Awards Include Simulator Upgrades and an Order for an RSS 8000 SYSTEM |
| January 3, 2006 | Herley Receives $2.4 Million Contract Award to Supply Microwave Hardware to the AMRAAM Program; Approval of U.S. Defense Budget Should Spark Herley's 2006 Bookings in the 2nd Quarter |
| January 5, 2006 | Herley Receives $9.1 Million Contract Award for a Major U.S. Missile Program; Herley Will Provide Telemetry Instrumentation for Flight Analysis Requirements |

61

| | |
|---|---|
| January 19, 2006 | Herley Announces Contract Awards Totaling $5.6 Million (Integrated Microwave Assemblies (IMA) for the EA-18G; command and control instrumentation for U.S. Air Force Subscale Aerial Target (AFSAT) program) |
| February 1, 2006 | Herley Receives a $2.2 Million Follow-On Contract Award to Supply Carrier Landing Systems to the U.S. Navy; Preliminary Bookings Numbers for Herley's Second Quarter Exceed $50 Million; Preliminary Q2 Revenues Are Approximately $45 Million |
| March 6, 2006 | Herley Announces Contract Award With U.S. Army; Army Exercises Options for IDM 304(TM) |
| March 13, 2006 | Herley Receives Approximately $3.1 Million in Contract Awards; Contract From Wright Patterson AFB for ECM/Target Simulator; Provide Telemetry Instrumentation to Prime Defense Contractor |
| April 3, 2006 | Herley Receives $2.8 Million Contract Award; Contract Award Represents the 1st Release of a 5 Year Agreement (Sensor Fuzed Weapon) |
| April 6, 2006 | Herley to Receive $3.4 Million Contract Award; Will Represent the First Half of a Software Contract From the U.S. Army |

| April 25, 2006 | Herley Receives Multi-Year Contract Totalling Approximately $18 Million; Herley to Supply Tactical Instrument Landing System for U.S. Navy; First Year Revenues Expected to Exceed 3.5 Million; First Year Delivery Order Expected to Exceed $3 Million; Legacy Program Has 30 Year History With Herley |
|---|---|
| May 9, 2006 | Herley Receives $2 Million Contract Award to Supply Avionics to Major Domestic Contractor; Expect Future Sales Growth From International Markets |

81. The Government Defense Contract Press Releases were materially false and misleading because of their failure to disclose, *inter alia*:

(a) Defendants' above-mentioned fraudulent business practices in sole-source Government contracting;

(b) the inflated, illegitimate and unsustainable revenues resulting from Defendants' fraudulent business practices; and

(c) the liabilities to which Defendants' fraudulent business practices were exposing Herley, including:

(i)    potential and actual loss of further Government business as a result of Defendants' above-mentioned fraudulent business practices

(ii)    disgorgement of millions of dollars of ostensible "revenues" that were recorded only through Defendants' undisclosed fraud; and

(iii)    the necessity to use such revenues to pay fines and penalties consequent upon Defendants' fraud, and to pay for increased legal, regulatory and compliance costs

63

(see, e.g., ¶¶ 106-107, 135).

82.    Near the beginning of each calendar year, at the Company's annual meeting of shareholders, Defendant Blatt gave a speech (the "Chairman's Address").   The text of each Chairman's Address was simultaneously disseminated to the market and broader public in press releases issued by Herley.  The Chairman's Addresses, as detailed below, were materially false and misleading for reasons detailed below.

83.    Each Chairman's Address was materially false and misleading as a result of its failure to disclose *inter alia*:

(a) Defendants' above-mentioned fraudulent business practices in sole-source Government contracting;

(b) the inflated, illegitimate and unsustainable revenues resulting from Defendants' fraudulent business practices; and

(c) the liabilities to which  Defendants' fraudulent business practices were exposing Herley, including:

(i)    potential and actual loss of further Government business as a result of Defendants' above-mentioned fraudulent business practices

(ii)    disgorgement of millions of dollars of ostensible "revenues" that were recorded only through Defendants' undisclosed fraud; and

(iii)    the necessity to use such revenues to pay fines and penalties consequent upon Defendants' fraud, and to pay for increased legal, regulatory and compliance costs (see, e.g., ¶¶ 106-107, 135).

64

84. On January 10, 2002, Defendants caused Herley to issue a press release of the 2002

Chairman's Address, which stated in relevant part:

> **Lee Blatt, Chairman of Herley Industries, Inc. Address to Stockholders**
>
> January 10, 2002 Business Wire
>
> Herley Industries, Inc., Chairman of the Board, Mr. Lee Blatt addressed stockholders at the company's Annual Stockholders Meeting held at the Le Meridien hotel in Boston.
>
> *****
>
> **"Well, it is one year later, and it is amazing how much better we seem to have become at managing our Company**. We recently released the results of our first quarter of this fiscal year to the plaudits of our major shareholders and analysts.
>
> **"Analysts have forecasted that Herley will have revenues ranging between $92 and $94 million for fiscal year 2002. That represents internal growth of 15% or more. We're comfortable with that and are hoping to do a little better. Analysts have also forecasted earnings of $.82 to $.84 per share, representing an earnings growth rate of more than 20%. Again, we're comfortable, and again we will try to do better.** Double-digit growth excluding acquisitions is a lofty goal for any defense industry company, but we expect to accomplish that goal this year and next year.
>
> *****
>
> **"Last June, Myron Levy, John Kelley and I went to the Paris Air Show to receive this award from Aviation Week, one of the premier publications in the defense industry. Herley was honored for being the best managed small aerospace company. It is extremely gratifying to be so honored by one's peers; so much so that we're going to try to win again.**
>
> **"Among the many criteria evaluated for Aviation Week's "Best Managed" awards are those that are important to us, as well as those to which we attach secondary importance.** Key to us is net income, followed by revenue growth. Less important to us, but not to

65

many analysts, is return on investment and return on assets.

**"We believe that what distinguishes Herley from other small defense/aerospace companies is our batting average.**

"For those of you here who follow the Red Sox, please accept my sympathies. If you follow baseball locally you know that Nomar Garciapara has a batting average. So does Herley.

**"Earlier in this address, I mentioned that we are working on business for 2004. Our success in this process, and in making the right choices now, at this time, will result in our batting average in 2004. Herley's deep, experienced management team begins by targeting a selection of defense programs in which we want to participate.** Not all government programs thrive, and those that do grow, don't grow equally. At management meetings we perform what we could call 'microwave triage'.

-- Based on our experience;

-- **based on our customer relationships**;

-- based on our particular microwave expertise;

-- based on published government documents;

-- based on Aviation Week and Defense News inputs; and

-- based on marketing forecasts;

we make decisions on which defense programs we want to pursue;

-- where we should allocate our R & D resources; and

-- which programs have the possibility of becoming Dynasty programs like the F16, which will afford 50 years of production to Herley.

**"We often have competition at the start of a new radar, new missile systems or new communication program.** Our customer may not be able to fully fund the necessary engineering development. An expensive and time-consuming engineering proposal may be required. We do not have the engineering resources to handle all of the business opportunities we receive. We cannot treat all

66

opportunities equally. We have to focus on the programs we want to win. We may invest our engineering dollars to win a program that our customer cannot fully fund. Once we have won a program, we have to produce. We have to meet our engineering commitments and do it in a timely manner. **If we succeed, we often will face no further competition during the entire life of the program. We are assured of our share of the production work at fair, negotiated prices. But, we have to pick the right programs, and it is not a single decision that we make.** At this time, we probably have over 50 programs in various stages of development that will make up a good part of our fiscal 2004 and beyond revenues. We've turned down 50 other business opportunities because we just don't have the microwave engineers or manufacturing capability to do it all. **Our ability to pick the right program and then perform makes up our batting average...**

Thank you,
Lee Blatt, Chairman

(Emphasis Added)

85.    The January 10, 2002 Chairman's Address – specifically (i) the representations concerning Herley's purported revenues, profits and growth; (ii) the representations attributing Herley's purported revenues, profits and growth to Herley's management quality; (iii) the representations concerning the 'batting average' of Herley's management, including the skills required for such batting average and the revenues resulting from such batting average; and (iv) the representations distinguishing Herley from the contemporary wave of accounting fraud (e.g., " We do not believe in pro forma earnings.  We have real earnings and real cash flow") – was materially false and misleading, given (a) the fact that Herley's purported revenues, profits and growth were in part the result of Defendants' undisclosed and fraudulent business practices (rather than solely the result of and the measure of management quality and batting average) and (b) the fact that Herley's management was itself engaged in elaborate fraudulent schemes while at the same time publicly

67

claiming to distinguish itself from other companies whose frauds were then being discovered.

86.    On January 14, 2003, Defendants caused Herley to issue a press release of the 2003

Chairman's Address, which stated in relevant part:

**Chairman's Address at Herley Annual Meeting January 14, 2003**

PR Newswire January 14, 2003 Tuesday

Herley Industries, Inc. (Nasdaq: HRLY), Chairman of the Board, Mr. Lee Blatt addressed stockholders at the company's Annual Stockholders' Meeting held at the Grand Hyatt Hotel in New York.

*****

**"At last year's shareholders meeting, this address focused on Herley's 'batting average' of selecting long term, profitable defense programs on which to participate. That ability to select the right programs comes from long experience in the defense industry.**..

*****

**"A business is only good if it is profitable. Business is most often profitable when demand is present and competition is absent. That's where the defense industry is today.**

"The government approved consolidation of the largest companies in the defense business; and has reduced the top tier of U. S. defense companies from more than 50 to just four: Lockheed, Boeing, Northrop Grumman and Raytheon. Mid level, and small companies such as Herley, have been part of the same consolidation process, and Herley itself is now an amalgam of eight companies. We are told that the government approved the consolidation of the number of companies in the defense business due to the expected downsizing of the defense budget after the peak spending of the Reagan era. The number of companies has been drastically reduced, but, in reality, the U. S. defense budget today, at $355 billion, is not materially different in spending dollars than it was during the Reagan era. **All of the companies left in the defense business have each evolved into either the only supplier, or one of the very few suppliers of some**

68

necessary defense technology.

"Herley, which is focused almost completely on the defense business, has evolved through acquisitions and divestitures into one of the largest microwave technology companies in the world. In most of our business areas, we are the sole supplier of the products in which we specialize. For the balance of our business, we may have one or two competitors -- an easily manageable situation if your focus is on profit, as is ours. Where did our competition go? We, or one of the other few remaining defense suppliers, have acquired many of them. Other microwave companies have exited the defense business for the commercial telecommunication industry. It is fair to say, that for the past several years, business conditions for Herley have been as good, or better, than they have ever been in our history.

"So, for Herley, the defense business is stable and profitable. Can it grow? For the past five years, we've grown at a compounded annual growth rate of over 23%. During the same period, our operating income, EBIT has averaged 18% of revenue. Those are excellent results for any business.

"Where will that kind of profitable growth come from in the future? In addition to organic growth, the main driver, we have adopted three strategic initiatives: acquisitions, increasing our international business, and increasing our technical resources to handle more outsourcing by our customers.

"Last year at our annual meeting this address was limited to a detailed accounting of our ability to grow organically at a 15% or better rate, which is approximately double the projected growth rate of the defense business.  Selection of long-term production programs, our teaming arrangements with the top-tier companies, and our ability to attract good engineering talent has made that possible. Our organic growth during this past year was 21.4%, maintaining our record...

*****

"Let's talk about the future. Herley is now in its 38th year of existence, a long time for any company. We've had almost eight years of consecutive profitable quarters. We are experiencing strong

organic revenue growth. **Our profit margins are among the highest, if not the highest, in the defense industry.** We have approximately $80 million in cash in the bank. We have no real debt. Our backlog is at record levels, up over $100 million. By any measure, we are a financially solid, well-established, profitable business. We happen to specialize in microwave technology. We happen to practice our microwave technologies primarily in the defense business, but you have made an investment in us as a business, and that is the way you should judge us.

\*\*\*\*\*

**"Well, if everything looks so rosy, what could possibly go wrong? What could go wrong is a large, bad acquisition. We could pay far too much; select a technology unknown to us; or buy a promising but unproven business. These are not likely scenarios, given our proven track record. Seasoned, experienced, technically proficient executives run every Herley facility. We have made some mistakes in the past, but we are not given to leaps of faith, and our mistakes have been small and isolated. Our acquisition track record is available to allow for your individual review and conclusions.** We must caution any investor to remember that the past may be an indicator of the future, not a guarantee. The last three years in the stock market proved that there are no guarantees.

87.    The January 14, 2003 Chairman's Address – specifically (i) the description of

Herley's profitability as a function of management's batting average and of non-competitive sole-

source procurement; (ii) the attribution of Herley's organic growth to the quality of Herley's

management and engineers; (iii) the depiction of Herley as a "cautiously-managed business" wary

of downside risk; and (iv) the proffered list of "what could possibly go wrong" – was materially false

and misleading, given (a) the undisclosed role of Defendants' undisclosed and fraudulent business

practices in Herley's non-competitive sole-source Government contracting, and in generating part

of Herley's purported growth, and (b) the tremendous undisclosed risks and downside to which

Defendants' undisclosed and fraudulent business practices had exposed Herley and Herley's

investors.

70

88.     On January 15, 2004, Defendants caused Herley to issue a press release of the 2004

Chairman's Address, which stated in relevant part:

> Herley Chairman Addresses Shareholders at Annual Meeting of Shareholders January 15, 2004
>
> PR Newswire January 15, 2004 Thursday
>
> Herley Industries, Inc. Chairman of the Board Lee N. Blatt addressed stockholders at the company's Annual Stockholders' Meeting today at the Waldorf Astoria in New York.
>
> *****
>
> **"This year's address will focus on the value of the shares of Herley stock we all hold, and our plans to enhance shareholder value. We believe that good management of Herley, and the utilization of our assets effectively in a stable, growing industry, will result in greater shareholder value.**
>
> **"Reviewing briefly, Herley had a great year. Revenues, profits, EPS and backlog reached record levels. Our business is sound; our margins are the highest, or among the highest of any company in the defense industry. We achieved our goal to reach $100 million in annual revenues. We accomplished everything that we had set as a goal for this past year** except for one thing -- we did not complete any major acquisitions. That one failing, we believe, is keeping our stock price from reflecting an excellent performance. **While our earnings margins are the envy of our peer companies**, analysts and shareholders have expressed disappointment about our top line growth - our revenue line.
>
> *****
>
> "Herley's senior management team is comprised of our Chairman, our CEO, Myron Levy; John Kelley, our President, and Bill Wilson, our Chief Operating Officer. Working with the key people at our five major facilities, we have formulated a business plan that we believe is best for Herley to achieve its objective of enhancing shareholder value and increasing our top-line growth.
>
> *****

71

3. So, business is good, and looks like it will continue to be good, with minimum competition. All of these factors will help to increase Herley's organic growth rate. To expand our participation in new business opportunities and find additional teaming relationships, we will need to increase our investments in marketing and engineering. This is a considered, risk-reward judgment that we have reached. Our top line growth has been modest; **our earnings margins are probably double any other defense company's, and yet the market's response is measured. We believe that higher top line growth will result in a favorable reaction from Wall Street.** We have a deep, talented, experienced management team, and we have excellent financial resources, with over $80 million in cash. So, we've adopted this aggressive growth plan, but be assured, we will continue to watch earnings carefully.

\*\*\*\*\*

"Those are our plans. We expect to make Herley a bigger, better company - more valuable to employees and shareholders...

(Emphasis added)

89.    The January 15, 2004 Chairman's Address – specifically (i) the repeated references to the superiority of Herley's margins; (ii) the claims that the market was undervaluing Herley's stock given, *inter alia*, Herley's superior margins; (iii) the depiction of Herley's business as stable and predictable; and (iv) the congratulatory references to Herley's previous revenues, revenue growth and revenue goals – was materially false and misleading, given (a) the undisclosed role of Defendants' undisclosed and fraudulent business practices in generating the high margins and revenue and revenue growth reported by Herley, and (b) the tremendous undisclosed risks and downside to which Defendants' undisclosed and fraudulent business practices had exposed Herley and Herley's investors, which, when disclosed, would decimate market valuation of Herley's stock.

90.    On February 23, 2006, Defendants caused Herley to issue a press release of the 2006 Chairman's Address, which stated in relevant part:

72

**Herley Chairman Addresses Shareholders at Annual Meeting of Shareholders February 23, 2006**

Herley Industries, Inc. Chairman of the Board, Lee N. Blatt, addressed stockholders at the company's Annual Stockholders' Meeting today at The Waldorf-Astoria Hotel in New York. His comments follow:

*****

"Herley is now important to Lockheed; we are important to Northrop Grumman; we are important to Boeing; we are important to Raytheon. What we do is critical technology for all branches of the Defense Department. **Some critical part, made only by Herley, is in almost every major defense system fielded by the United States. We have always needed our customers, and still do. What is gratifying to this Board, to our managers, and every single one of our employees, is that they need us as much.**

"**Attaining this relationship is critical to our future**...

*****

"To review, **what have we done right? We have transformed Herley into a necessary and desired partner of our customer base. Our backlog is at an all time high; business prospects are excellent; we are on the right long-term defense programs.** However, engineering staffing to handle the business we already have and are expecting to get this year is a bigger problem than finding new opportunities. Acquisition of engineering talent is the largest single problem we face...

*****

"**Three years ago we set a goal of reaching an operating rate of $250 million annually by the end of 2007. That means, roughly, having regular revenues of $20 million per month in about 1-1/2 years. It is still our goal, but it will be tough to get there without another acquisition or two. What we do expect though, is that we will have very strong organic growth that would at least get us pretty close.**

"As we near that $250 million annual goal, Herley must look beyond

73

2007. Herley will need new technologies and will need to seek new opportunities in our ever changing defense business...

*****

"The test of our success will be higher profits, improved cash flow, and greater inter-company transactions. These are our key indicators. We are just as focused on the bottom line as we are on the top line. **We've acquired what we need to, in order to go forward. We've invested, and will continue to invest as needed to ensure our future. The ball is in our court. Now we have to perform. We accept that challenge**."

(Emphasis added)

91.      The February 23, 2006 Chairman's Address – specifically (i) the representations concerning how Herley had positioned itself well with its Defense customers; (ii) the representations that Herley has positioned itself well for future organic growth; and (iii) the comments on Wall Street's valuation of Herley shares – was materially false and misleading, given (a) the fact that Defendants' undisclosed and fraudulent business practices were exposing Herley to potential and actual loss of Defense contracting business and thus to material diminishment of Herley's future growth, and (b) the tremendous undisclosed risks and downside to which Defendants' undisclosed and fraudulent business practices had exposed Herley and Herley's investors, which, when disclosed, would decimate market valuation of Herley's stock.

92.      Finally, during the Class Period, Defendants made various other materially false and/or misleading public representations, including:

(a)      In a Herley press release issued on April 13, 2005 announcing Herley's $20 million acquisition of Innovative Concepts, Inc., and discussing Herley's relationship with the Government, Defendant Blatt stated:

74

"The acquisition of ICI is an excellent fit for Herley and will provide immediate benefits for both business operations. **Herley has strong relationships with the U.S. Navy and Air Force while ICI has strong ties with the U.S. Army.**

(b)     In a Herley press release issued on June 9, 2005 announcing results for the third quarter of fiscal 2005, and noting Herley's "excellent business relationships with all branches of the U.S. military", Defendant Kelley stated:

Innovative Concepts continues to benefit from market acceptance of its IDM Technology (R), as today's military thinking parallels ICI's product offering of mobile, interoperable, tactical data communications in hostile environments. **Herley plans to leverage its excellent business relationships with all branches of the U.S. military which should generate new program and platform opportunities for ICI products.**

(c)     In a Herley press release issued on July 29, 2005 announcing new defense contract wins, and commenting on Herley's Government contracting, Defendant Kelley stated:

John M. Kelley, Herley President, stated, "These contracts are very good examples of the type of business that defines Herley and the way we operate. Herley seeks programs where we begin a manufacturing cycle that we believe will become a Defense Department staple. We analyze opportunities in our market segments and select those that we want to pursue. While there is engineering development up-front, once on the program, Herley reaps the benefits of our early involvement with multi-year manufacturing contracts."

Kelley continued, "The exercise of Lot 11 for the U.S. Air Force is our bread and butter business. This is the eleventh annual contract award received by MSI, and we expect the USAF will exercise options for an additional four years."

(d)     In a Herley press release issued on April 25, 2006 announcing $18 million in new defense contract wins, and commenting on Herley's relationship with the Government, Herley and Defendant Kelley stated:

75

Herley Receives Multi-Year Contract Totalling Approximately $18 Million; Herley to Supply Tactical Instrument Landing System for U.S. Navy; First Year Revenues Expected to Exceed 3.5 Million; First Year Delivery Order Expected to Exceed $3 Million; Legacy Program Has 30 Year History With Herley

Herley Industries, Inc. announced today that it has been awarded a follow-on five year contract with the U.S. Navy to supply the Tactical Instrument Landing System ("TILS"). The TILS is used on all carrier aircraft including the F/A-18E/F, E/A-18G, E-2C and E-2D. The TILS is able to provide flight guidance information to the pilot under all weather conditions day or night... This contract is a follow-on to a previously awarded five year Navy contract with Herley providing support to all Navy carrier aircraft programs. The previous five year contract was awarded in 2001 and is nearing completion.

**John Kelley, Herley President, commented, "Herley has a long and valued history with the U.S. Navy on this very important legacy program**. With our acquisition of Stewart-Warner in 1995, Herley added this key product technology to our already growing list of business with the Navy."

(e)    In a Herley press release issued on May 10, 2006 announcing the creation of a new corporate position within Herley – Director of Administration and Governance, the appointment of an individual to that position, and commenting on Herley's Government contracting, Herley and Defendant Kelley stated:

Charles Pourciau, Jr. Joins Herley as Director of Administration and Governance

Herley Industries, Inc. announced that Charles Pourciau, Jr., has joined Herley as Director of Administration and Governance, a newly created, corporate position. Mr. Pourciau will oversee contract administration and direct corporate governance, reporting to the President.

John Kelley, Herley's President, said, "Herley has grown to be a large, complex company, that must deal with new compliance and administration issues on a daily basis. **It is vitally important that Herley manage both the contract and compliance areas from a**

76

**corporate level**, and are very pleased to have Charles join us in this position. **His twenty-four years of experience in the electronics industry with government contracting, export compliance, and governance, as well as his legal background will be invaluable to the Company. Charles will be the Company's point of contact for all Herley facilities, responsible for ensuring the compliance with contract regulations and governmental legislation as it applies with defense contractors."**

93.    The statements and representations made by Defendants in the press releases quoted in ¶ 92 above – statements concerning Herley's Government contracting; Herley's relationship with the Government; and Herley's revenues, profits, margins, backlog, the growth of each of the foregoing, and the sources of each of the foregoing – were materially false and or misleading because they created a duty to disclose and yet failed to disclose:

(a) Defendants' above-mentioned fraudulent business practices in sole-source Government contracting;

(b) the inflated, illegitimate and unsustainable revenues resulting from Defendants' fraudulent business practices; and

(c) the liabilities to which Defendants' fraudulent business practices were exposing Herley, including:

(i)      potential and actual loss of further Government business as a result of Defendants' above-mentioned fraudulent business practices

(ii)     disgorgement of millions of dollars of ostensible "revenues" that were recorded only through Defendants' undisclosed fraud; and

77

(iii)    the necessity to use such revenues to pay fines and penalties consequent upon Defendants' fraud, and to pay for increased legal, regulatory and compliance costs (see, e.g., ¶¶ 106-107, 135).

# VII
## MATERIALITY

94.    In purchasing Herley stock during the Class Period, plaintiffs and other Class members assumed – in the absence of any disclosure to the contrary – that Herley's reported revenues, profits and margins were the straightforward result of normal, legitimate and proper business operations.  Unbeknownst to plaintiffs and other Class members, Defendants' undisclosed and fraudulent business practices, intended and employed by Defendants to effectively 'price-gouge' the Government, allowed Herley to report revenues, profits and margins higher than would have been possible had Defendants not employed such undisclosed and fraudulent business practices.

95.    Defendants' Class Period statements and omissions concerning Herley's regulatory compliance were highly material to investors.  In purchasing Herley stock during the Class Period, plaintiffs and other investors relied upon Defendants' materially false and misleading statements concerning Herley's regulatory compliance, relationship with the government, and the integrity and honesty of the business practices supposedly employed by Defendants in connection with Herley's government contracting.

96.    The quality, legitimacy and integrity of a company's management and business practices are central factors in investors' assessments of a company's "investment quality".  Investors are rightly concerned not only that a lack of integrity in business practices may cost a company

78

business, since potential customers and/or clients may avoid doing business with the company, but also that improper practices may expose the company to fines, penalties or other liabilities, and public opprobrium. Such factors form part of the publicly available information that is reflected in the price at which investors are willing to buy or sell a stock, and thus directly and forseeably impact the price of a company's stock traded on an efficient market.

97.    Facts concerning whether a government contractor – and especially a government contractor such as Herley for whom the government was its single largest customer – is engaging in practices that violate government contracting regulations unquestionably would be material to a reasonable investor in deciding to invest in the stock of such a firm. Such facts would form part of the publicly available information about that firm's stock that would determine its price in an open, active and efficient market such as the NASDAQ.

98.    Here, Defendants engaged in improper business practices, made false statements regarding those practices, and omitted to disclose important, highly material information regarding those practices, all of which had the reasonably forseeable and direct effect of artificially inflated the prices of Herley common stock during the Class Period. As a consequence, there was a disparity between the transaction prices that plaintiffs and the Class paid for their Herley shares during the Class Period and the true value or "investment quality" of those securities that plaintiffs and the Class acquired. Herley's shares would have traded at prices significantly lower during the Class Period had Defendants timely and fully disclosed the truth about their government contracting practices detailed in the Government Indictment announced to the public on June 6, 2006.

99.    Had plaintiffs and the Class known the truth concerning Herley's actual business practices during the Class Period, including Defendants' elaborate and long-standing violations of

federal contracting regulations (FAR), they would not have acquired Herley stock at all and/or at the inflated prices at which they did.

100.    As alleged below, once the truth concerning – and the consequences of – Herley's actual business practices and regulatory compliance began to emerge, investor confidence in Herley was shattered and a steep slide in the price of Herley's common stock ensued.  Between June 6, 2006 and June 13, 2006 – as the Government Indictment was announced, tens of millions in potential liability quantified, Blatt resigned, and three Herley divisions responsible for more than 50% of Herley's revenues were barred from any further government work – Herley's shares lost nearly 50% of their value, falling from $17.50 per share on June 5, 2006 to $9.21 per share on June 14, 2006. This clearly demonstrates the impact that Defendants' improper business practices and materially false and misleading public statements had on the market's assessment of the value of Herley's stock.

101.    This sharp and immediate market reaction is an extremely practical and clear indicator of materiality.

102.    Additionally, materiality is further supported by the fact that the Government was, throughout the Class Period, Herley's single largest customer, responsible for between 17% and 26% of Herley's annual revenues for its fiscal years 2001-2006.  Anything that threatened Herley's business relationship with such a customer was certainly material, a conclusion which Defendants themselves espoused in their Forms 10-K, each of which informed investors that: (i) because of its participation in the defense industry, Herley was "subject to audits by various government agencies for our compliance with government regulations"; (ii) that Herley "operate[d] our business in material compliance with applicable laws and regulations"; (iii) that "failure to comply with existing

80

or future laws or regulations could have a material adverse impact on [Herley's] business, financial condition and results of operations"; but (iv) that Herley was "not aware of any events which are reasonably likely to result in any cancellation of its government contracts".

## VIII
## LOSS CAUSATION

103.    Defendants' above-mentioned, undisclosed and fraudulent business practices allowed Herley to report misleading, false and inflated financial revenues, income, profits, margins and growth.  Defendants omitted to disclose the illegitimate practices underlying Herley's reported and purported financial results, and instead attributed such revenues, earnings, profits, margins and growth to Herley's managerial, strategic and operational quality.  Believing Herley to be a well-managed, well-run, fast-growing company, the market consequently so valued Herley's shares, which increased from their 2001 trading range of $8-$10 per share to more than double in price by early 2002 (when they closed as high as $24.62 per share on April 16, 2002) and to plateau thereafter during 2003, 2004, 2005 and the first half of 2006 at a trading range of between $16 and $22 per share.

104.    Although the market and the investing public did not then know it, Herley was not as it seemed.  The revenues, profits, income and margins, and the growth in the foregoing, which formed the basis for the market's doubling the value of the Herley's shares, were underwritten not by operational excellence but by Defendants' above-mentioned, undisclosed and fraudulent business practices, which, as described below, exposed Herley to undisclosed and highly material liabilities including fines and penalties, disgorgement, increased legal and regulatory costs, and loss of further business with the Government.

81

105.    On April 24, 2002, before any of Herley's problems were disclosed to the investing public, Defendants took advantage of Herley's inflated stock price and completed a secondary stock offering, selling 23 million shares of Herley stock to plaintiffs and the Class at a price of $23.00 per share, very close to Herley's peak price of $24.62 per share (reached on April 16, 2002). Herley used the $69 million in proceeds from this offering to fund its growth-by-acquisition strategy and to acquire five other companies (detailed in ¶140 below). Additionally, the Individual Defendants also took advantage of Herley's share price inflation to sell more than 270,000 of their own Herley shares for proceeds of more than $4.79 million.

106.    Disclosure of the Government Indictment on June 6, 2006 was preceded by a seemingly innocuous disclosure one month earlier, on May 10, 2006, when Herley issued a press release announcing that it had created a new corporate position – the Director of Administration and Governance, in charge of contract administration and corporate governance – and appointed to it an individual with long experience in government contracting and legal/regulatory compliance:

> *Charles Pourciau, Jr. Joins Herley as Director of Administration and Governance*
>
> Herley Industries, Inc. announced that Charles Pourciau, Jr., has joined Herley as Director of Administration and Governance, a newly created, corporate position. Mr. Pourciau will oversee contract administration and direct corporate governance, reporting to the President.
>
> John Kelley, Herley's President, said, "Herley has grown to be a large, complex company, that must deal with new compliance and administration issues on a daily basis. **It is vitally important that Herley manage both the contract and compliance areas from a corporate level, and are very pleased to have Charles join us in this position**. His twenty-four years of experience in the electronics industry with government contracting, export compliance, and governance, as well as his legal background will be invaluable to the

Company. Charles will be the Company's point of contact for all Herley facilities, responsible for ensuring the compliance with contract regulations and governmental legislation as it applies with defense contractors."

Mr. Pourciau comes to Herley from TRAK Microwave Corporation, a Smiths Technologies North America company. He has over twenty years experience with the Federal Acquisition Regulations (FAR), Defense Federal Acquisition Regulations (DFAR), International Traffic in Arms Regulation (ITAR), Export Administration Regulations (EAR), Office of Federal Contract Compliance Programs (OFCCP), Equal Employment Opportunity Commission (EEOC), Environmental Protection Agency (EPA), and Occupational Safety Health Administration (OSHA) as an in-house attorney and contracts manager.

107.    On June 6, 2006, the U.S. Attorney's office for the Eastern District of Pennsylvania announced the criminal indictment of Herley and Defendant Blatt for using Herley's "advantage as a sole supplier to systematically gouge the U.S. military", and Herley issued a press release announcing and acknowledging the Government Indictment.   As the Government Indictment revealed, Herley and Defendant Blatt were charged with 29 counts of wire fraud, three counts of lying to the Government, two counts of obstruction, two counts of aiding and abetting, and one charge of major fraud against the United States.   Based upon the conduct and charges detailed in the Government Indictment, Blatt faced as many as 185 years in prison and Herley faced more than $13 million in fines as well as the disgorgement of millions of dollars of profits illegitimately gained through Defendants' fraudulent business practices.   Additionally, as analysts and the financial press speculated, Herley's relationship with its largest customer – i.e., the Government – was obviously damaged and strained, and Herley's future with the Government was uncertain and imperiled.

108.    In response to the June 6, 2006 disclosure of the Government Indictment and market assessment of the potential consequences to Herley, Herley's shares fell from their June 5, 2006

closing price of $17.50 per share to close on June 6, 2006 at $16.52 per share and, continuing to

decline, to close on June 7, 2006 at $15.04 per share, a two-day decline of $2.46 per share, or 14.1%.

109.    As Marketwatch reported on June 8, 2006 in an article titled "Herley Shares Tumble

on Fraud Charges":

> Shares of Herley Industries Inc. tumbled Wednesday after the
> company and its chairman Lee N. Blatt were charged with devising
> a scheme to defraud the U.S. military of millions of dollars on
> contracts for electronic components of aircraft radar systems.
>
> The company and Blatt denied any wrong-doing and vowed to prove
> their innocence in court.
>
> *****
>
> "Blatt abused his position and used his company's advantage as a sole
> supplier to systematically gouge the U.S. military," said U.S. Attorney
> Pat Meehan in a statement.
>
> *****
>
> Blatt, 78, co-founded the company and has served as its chairman
> since 1965. If convicted, **he faces a maximum sentence of 185 years
> in prison. In addition, Blatt and the company each face a
> maximum fine of $13.5 million. Herley might also forfeit more
> than $2.8 million in payments it received under the contracts
> included in the indictment**.
>
> Contracts with U.S. government agencies, including the Department
> of Defense and NASA, accounted for about 25% of the company's net
> sales in fiscal 2005, according to Herley's latest 10-K report.
>
> **"We're concerned that there may be some impact," Kelley said,
> referring to relations between his company and the government
> in the wake of the indictment. "We consider our government
> contracts very important to us. We'll hopefully continue to be a
> qualified, good supplier to the U.S. government."**
>
> **Raymond James downgraded Herley's stock to underperform
> from market perform Wednesday.**

84

> **"Considering that the government is Herley's primary customer, bad blood between the two groups could result in a material degradation of "goodwill," both with respect to customer relationships and value on the balance sheet," analyst Chris Quilty said in a note to investors.**
>
> **Kelley acknowledged that the company's shares may suffer as a result of the suit.**...

(Emphasis added)

110.     Although Herley's share price fell sharply in response disclosure of the Government Indictment and the consequent market revisioning of Herley's past and future, the decline was mitigated by takeover rumors and actual takeover offers pursuant to which Herley would be acquired, presumably at a premium.

111.     For instance, despite disclosure of the Government Indictment, Thomas Weisel analyst David Gremmels did not downgrade his rating for Herley, explaining that despite all the negatives  "[o]n the positive side, these issues might accelerate a sale of the company. Numerous potential buyers exist and a sale would likely yield a significant premium to the current valuation, even with the overhangs."

112.     One of the Company's largest shareholders, Discovery Group I LLC, filed a Form 13D with the SEC on June 7, 2006, attaching a letter that it had sent to Herley's Board of Directors. That letter, whose contents were reported widely in the financial press between June 8, 2006 and June 10, 2006, stated:

> Dear Directors:
>
> ...on June 6, 2006, the Company and its Chairman, Lee Blatt were indicted on multiple charges in connection with purported activities

85

resulting in alleged excessive profits by the Company on three contracts with the United States Department of Defense.

\*\*\*\*\*

...**The costs to the public shareholders, for whom the Board members are fiduciaries, are mounting. Indeed, the viability of the Company may now be at stake. You must be concerned that the allegations of cheating the government might preclude Herley from doing future business with the government and its contractors**.

Here is the action plan that the Board must now adopt:

1. **Seek to remove Lee Blatt from the Board**. Mr. Blatt cannot possibly serve as an effective director under these circumstances and he will surely be turning his attention to his personal legal defense.

2. **Name a new Chairman that is independent and has interests that are aligned with public shareholders**. Note that other than Lee Blatt, Chairman, and Myron Levy, Vice Chairman, the current directors own less than 1% of the Company's outstanding stock. This is a particularly opportune time to add a director with a real and substantial economic interest in the Company. If any other large shareholders have expressed interest in serving in a director capacity, we would support their candidacy. If no other large shareholder has stepped forward, we would be willing to lend a qualified member of our management team to serve in such capacity.

3. Appoint a Special Committee of the Board to evaluate the future viability of Herley. **A committee of independent directors must be formed to assess the strength of the Company's legal defense and strategic alternatives for preserving shareholder value**.

4. **Hire an independent investment bank and independent legal counsel to assist the Special Committee**. Qualified advisors can help the Board understand the risks of the present situation and explore all strategic alternatives, including a possible sale to any of the many interested strategic parties identified in our First Letter.

5. **Consider a sale of the Company. The Board must consider the real possibility that Herley's future, the continuing livelihoods of its employees and the security of its investors may now require**

**that it become part of another company that can restore the integrity necessary to continue its business with the U.S. Department of Defense.** The Directors have no choice but to pursue such a course of action given the fiduciary responsibility they have to the Company's constituents and to avoid personal culpability in the event of an unraveling of the Company.

With an investment of over 5% of Herley's outstanding shares, we have a strong alignment of interest with all the unaffiliated shareholders. On the behalf of all the Company's non‑management shareholders, we hereby request a timely meeting with the Board to learn directly of your plans to address this grave situation. **We would also present to you the information and analysis that supports contention in the First Letter that there are logical strategic suitors willing to pay a significant premium to shareholders in order to acquire Herley.**

(Emphasis Added)

113.    As reported in the financial press between June 8, 2006 and June 10, 2006, numerous potential suitors had expressed an interest in acquiring Herley, including L-3 Communications, Crane Co., DRS Technologies Inc., EDO Corp., Honeywell International Inc., Cobham PLC, Teledyne Technologies Inc., and Tyco International Ltd.

114.    Absent the market's taking into account such takeover possibilities, Herley's share price declines following disclosure of the Government Indictment would have been even steeper.

115.    On June 9, 2006, Herley issued a press release announcing that Defendant Blatt had resigned his position as Chairman of Herley's Board of Directors.  The June 9, 2006 press release made no mention of the Government Indictment, but quoted Defendant Blatt as having "decided that the time is particularly appropriate for me to step down as Chairman and Director of the Company" and having stated that " it is long past time for me to leave Herley".

87

116.    On June 12, 2006, Herley issued a press release announcing the appointment of Kevin J. Purcell as Vice President and Chief Financial Officer.  Purcell replaced Defendant Garefino, who had been serving since September 2005 as Herley's "acting" CFO after the sudden and unexplained resignation of Gilboy, who himself had been hired to replaced Garefino as CFO in September 2004.

117.    Thus, after Blatt's resignation, the replacement of Herley's CFO, the Company's protestations of innocence, and swirling possibilities of an attempt to purchase Herley at a premium, Herley's share price (temporarily) stabilized after June 7, 2006, closing at $15.26 on June 8, 2006, $15.19 on June 9, 2006, and $15.25 on June 12, 2006.

118.    On June 13, 2006, however, Herley disclosed that the Government had decided to preclude certain of Herley's facilities – i.e., the ones which the Government identified as having participated in the above-mentioned fraudulent contracting practices (Herley-Lancaster, Herley-Farmingdale, Herley-Woburn, and Herley-Chicago) – from receiving any further Government contracts.

> *Three of Nine Herley Manufacturing Facilities Suspended by the U.S. Federal Government*
>
> Herley Industries, Inc. announced today that **certain of its operations have been suspended from receiving new contract awards from the U.S. Government.** The affected operations include facilities in Lancaster, Pennsylvania, Woburn, Massachusetts, Chicago, Illinois and Herley's subsidiary in Farmingdale, New York. The Chicago, Illinois location is a two-person marketing office. **The result of this suspension is that these facilities will not be solicited for or awarded new contracts or contract extensions without special exceptions, pending the outcome of legal proceedings.** The suspended facilities may receive contract awards or subcontracts from the Federal Government if the head of the agency states in writing the compelling reason to do so. A significant portion of Herley's business is received where the company is the only qualified supplier on critical defense programs. For this reason the effect of the suspension

on these manufacturing facilities cannot easily be determined at this time. Currently, Herley has a funded backlog of approximately $142 million, which is not affected by this action, and which will be delivered to customers within the next year or two.

119.    In response to the news that Herley's largest customer would not be granting Herley any new business (at least at certain of Herley's facilities which accounted for more than 50% of Herley's revenues) as a result of the ongoing investigation into fraudulent overcharges by Herley and Blatt, Herley shares fell from their June 12, 2006 closing price of $15.25 per share to close on June 13, 2006 at $10.06 per share and, continuing to decline, to close on June 14, 2006 at $9.21 per share, a two-day decline of $6.04 per share, or 39.6%.

120.    After the market closed on June 14, 2006 and after Herley's shares had closed at $9.21 per share, Herley then announced disappointing financial results for its third quarter of fiscal 2006, about which it had warned the market on June 5, 2006.

121.    In sum, disclosure of the Government Indictment and its consequences between June 6, 2006 and June 13, 2006 caused Herley shares to decline from $17.50 per share on June 5, 2006 (the last closing price of the shares prior disclosure of the Government Indictment) to $9.21 per share on June 14, 2006, a decline of $8.29 per share, representing the loss of 47.4% of the value Herley shares possessed prior to disclosure of the Government Indictment.

122.    Absent the buoyancy provided by takeover speculation, Herley's share price declines would have been even greater.

123.    In sum, during the Class Period, by failing to disclose that Herley's financial performance was the result of improper, illegitimate and illegal business practices engaged in by Defendants in their contracting with the Government , Defendants engaged in a course of conduct

that deceived the market, that artificially inflated the prices of Herley's shares, and that operated as a fraud and deceit upon plaintiffs and the Class. Defendants' failure to disclose their above-mentioned, undisclosed and fraudulent business practices misled plaintiffs and the Class not only as to Herley's contemporary financial results, but also Herley's future prospects. As a result of Defendants' undisclosed, fraudulent business practices, investors did not know of the sizeable liabilities to which Defendants' conduct had exposed Herley, nor of the possible and actual loss of Government business, nor of the Government scrutiny that would fall upon Herley and Herley's operations. Therefore, by concealing rather than disclosing such risks (and the conduct which gave rise to those risks), Defendants presented to plaintiffs and the Class a misleading picture of Herley's business and prospects. The June 2006 disclosure had a substantial and material corrective effect on the value of and artificial inflation in Herley's shares, causing plaintiffs and other Class members economic losses and thus damages under the federal securities laws.

124.    The near-50% decline in the value of Herley's shares following the above-detailed disclosures was the direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing, speed and magnitude of Herley's price declines negate any inference that the losses suffered by plaintiffs and the Class were caused by changed market conditions, macroeconomic or industry-wide factors, or Company-specific facts unrelated to Defendants' fraudulent conduct (e.g., Herley's poor financial results for the third quarter of fiscal 2006). The economic losses and legal damages suffered by plaintiffs and the Class were the direct result of Defendants' artificial inflation of Herley's share price and the subsequent decline in the value of Herley's shares when Defendants' Class-Period misrepresentations and other fraudulent conduct were revealed.

90

## IX
## DEFENDANTS' MISREPRESENTATIONS PROXIMATELY CAUSED
## PLAINTIFFS' DAMAGES THROUGH A FRAUD ON THE MARKET

125.    At all relevant times, the market for Herley's stock was an efficient market that promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in Herley's stock price.

126.    The common stock of Herley met the requirements for listing, and was listed and actively traded, on the NASDAQ, a highly developed and efficient market.  During the Class Period, Herley stock was heavily traded, with volume averaging exceeding 120,000 shares daily.  Herley filed periodic public reports with the SEC, and was followed by analysts from brokerages including Bear Stearns & Co., Inc., Raymond James & Associates, Inc., Thomas Weisel Partners, and Roth Capital Partners, Inc.  The reports of these analysts were redistributed to their customers and the public at large, and Herley regularly issued press releases, which were carried by national newswires.  Thus, the analyst reports and Herley's press releases entered the public marketplace.  As a result, the market for Herley's stock promptly digested current information with respect to Herley from all publicly-available sources, and reflected such information in Herley's stock price. Plaintiffs and other members of the Class relied on the integrity of the market price of Herley's publicly traded stock.

127.    As would be expected where a security is traded in an efficient market, material news concerning Herley's operations, financial results, and prospects had an immediate effect on the market price of Herley stock.  Disclosure of the Government Indictment and its consequences in June 2006, and the consequent halving of the value of Herley's common stock, vividly so demonstrate.

91

128.    At the times plaintiffs purchased or otherwise acquired the Company's stock, plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts.

## X.
## SCIENTER ALLEGATIONS

129.    As alleged herein, Defendants acted with scienter in that Defendants knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading, knew that such statements and documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants either knew or recklessly disregarded the fact that the illegal acts and practices and misleading statements and omissions described herein would artificially inflate or maintain the price of Herley's stock. Each of the Defendants, by acting as herein described, did so knowingly or in such a reckless manner as to constitute a fraud and deceit upon plaintiffs and members of the Class that plaintiffs seek to represent.

130.    The Government Indictment, as alleged in detail above at section V, evidences Blatt's scienter, together with the scienter of other unnamed Herley executives, by detailing at length the fraudulent cost submissions and paper trails created by Blatt and other Herley executives in furtherance of their scheme to price-gouge the Government and thereby allow Herley to report fraudulently-inflated revenues, earnings and margins.

131.    An inference of scienter is further supported by the conjunction of: (i) the fact that Herley was a relatively small company with relatively few employees (600 employees at the

92

beginning of the Class Period; 1,000 employees at the end of the Class Period) and (ii) the fact that the Government was Herley's single largest and most important customer.  Given the centrality of the Government to Herley's operations and financial condition and results, and given Herley's relatively small size, the scienter of the Company's senior executives may be inferred.

132.    Such inference for Defendants Blatt and Levy is further supported by Herley's admission, in each of the Forms 10-K that it filed during the Class Period, that:

> the Company's chief operating decision makers are considered to be the Chairman and the Chief Executive Officer (CEO). The Company's Chairman and CEO evaluate both consolidated and disaggregated financial information consisting of revenue information in deciding how to allocate resources and assess performance. The Chairman and CEO also use certain disaggregated financial information for the Company's product groups...

133.    An inference of scienter is further supported by the Blatt's resignation from his position as Chairman, the Government's demand that Herley sever all ties to Blatt in order to be eligible to receive new Government contracts, the replacement of Garefino with Kevin Purcell as Herley's Chief Financial Officer after disclosure of the Government Indictment, and the unexplained resignation of Gilboy as Chief Financial Officer prior to disclosure of the Government Indictment.

134.    An inference of scienter is additionally supported by creation within Herley of an executive-level position for a Director of Governance and Administration, originally announced by Herley on May 10, 2006 – just one month prior to disclosure of the Government Indictment.

> Herley Industries, Inc. announced that Charles Pourciau, Jr., has joined Herley as Director of Administration and Governance, a newly created, corporate position. Mr. Pourciau will oversee contract administration and direct corporate governance, reporting to the President.
>
> John Kelley, Herley's President, said, "Herley has grown to be a large,

complex company, that must deal with new compliance and administration issues on a daily basis. **It is vitally important that Herley manage both the contract and compliance areas from a corporate level**, and are very pleased to have Charles join us in this position. **His twenty-four years of experience in the electronics industry with government contracting, export compliance, and governance, as well as his legal background will be invaluable to the Company. Charles will be the Company's point of contact for all Herley facilities, responsible for ensuring the compliance with contract regulations and governmental legislation as it applies with defense contractors."**

135.    An inference of scienter is also supported by the numerous conditions imposed upon Herley by the Government in an agreement reached between Herley and the Government (the "Compliance Agreement") on or about October 12, 2006 allowing Herley to contract for further Government work.  A copy of the Compliance Agreement was attached as an exhibit to the Form 8-K filed by Herley with the SEC on October 13, 2006.  As stated therein, the Compliance Agreement's goal is to "ensur[e] that Herley has and will continue a program of acceptable contracting practices and procedures", which goal is to be reached, verified and enforced "by establishing and implementing a program of compliance reviews, audits, and reports".  Among the conditions imposed on Herley by the Compliance Agreement are:

(a)    that Herley neither employ Defendant Blatt (the company's founder and longtime CEO and Chairman) in any capacity nor conduct any business with him in any way;

(b)    that Herley formulate, institute and implement a multi-pronged Compliance Program "by which Herley can and will adhere to lawful and ethical procedures and practices in all areas of and relating to its provision of goods and services as a Government contractor";

(c)     that Herley establish a "written Corporate Code of Business Ethics", reviewed on an annual basis by Herley's Vice President of Administration and Governance and by duly appointed legal counsel, updated as required for compliance with statutory and/or regulatory changes

(d)     that all Herley directors, officers, employees, and consultants shall be required each year to sign a certificate stating that they have read the Corporate Code of Business Ethics and agree to abide by its provisions;

(e)     that Herley establish and maintain a position of VP, Administration and Governance, designated as the Ethics and Compliance Officer, reporting to the CEO and to Herley's Board, and that individuals cannot be appointed to such position without having received Navy approval;

(f)     that the Governance and Ethics Committee of the Board of Directors, in conjunction with the Ethics and Compliance Officer, must investigate all instances of suspected misconduct and shall report in writing the findings to the Board of Directors for management response, which response must be in writing and must be provided to the Ethics and Compliance Officer within thirty days; and that both report and response must be provided to the Navy;

(g)     that the Ethics and Compliance Officer must, within 10 working days after the end of each fiscal quarter (July, October, January and April), deliver to the Navy a Quarterly Report, including, in addition to a synopsis of each instance of suspected and/or confirmed misconduct which became known to the Ethics and Compliance Officer or the Governance and Ethics Committee of the Board of Directors during the fiscal quarter, and disclosure of any remedial action taken to date: (1) all instances of disciplinary action for violations of the Corporate Code of Business Ethics, Government Contracts Overview, or Truth In Negotiations Act Policy; (2) all

95

known, ongoing criminal investigations; (3) all known qui tam suits; (4) all known or suspected defective pricing cases; (5) all hotline reports (*see* h, *infra*) received by the Ethics and Compliance Officer including a description of the complaint and any remedial action taken or planned; (6) a summary of audit findings as required by paragraph 4.E.5.c (*see* j *infra*).; (7) reports of new employee training as required by paragraph 4.F.4 (*see* l *infra*); and (8) any other matter which might affect Herley's present responsibility status, including but not limited to actual or potential suspension and/or debarment actions by other Government and quasi-governmental agencies;

(h)    that Herley establish and maintain a "hot line" to facilitate the reporting of misconduct by or within Herley;

(i)    that Herley establish written contracting policies and procedures, in the form of a Government Contracts Overview and Truth In Negotiations Act Policy, which contain the regulatory standards and acceptable practices for doing business with the Government and/or Government prime contractors, which must be applied to all of Herley's business dealings involving Government contracts or subcontracts; and that any revisions to such written contracting policies and procedures are subject to review and disapproval by the Navy;

(j)    that Herley establish and maintain certain Audit and Compliance Review Procedures, subject at all times to Navy approval/disapproval, instituting yearly audits, conducted in December of each year, by the Ethics and Compliance Officer in conjunction with the appropriate Herley management personnel, of every procedure that is a component of the Compliance Program, and that a report describing and discussing the findings made during the audits must be included in the Ethics and Compliance Officer's Quarterly Report (*see* g *supra*);

96

(k)     that Herley create and implement a curriculum – subject at all times to Navy approval/disapproval, and to the review and comments and improvements of compliance experts retained by Herley and approved of by the Navy – of classroom-style training designed to familiarize each of its directors, officers, employees, and consultants with the concepts and precepts of each component of the Compliance Program;

(l)     that anyone who misses such classroom training must read a course syllabus, pass a written test on its salient contents, and sign a certification that the reading has been completed (and that any such certification and the completed tests be maintained in a file kept by the Ethics and Compliance Officer, who, in his Quarterly Report (*see* g *supra*), must identify each such person, the date when the person joined Herley, and whether the person has successfully met the training requirements;

(m)     that Herley hire an outside entity to survey/interview Herley's employees about the organizational culture related to ethics, specifically the atmosphere on reporting misconduct within Herley on or before December 31, 2006, and that Herley provide a report of the survey/interview results to the Navy by January 31, 2007;

(n)     that Herley include an ethics and compliance component in the performance evaluation criteria of management employees;

(o)     that Herley allow Navy representatives to interview Herley personnel and to examine Herley's financial books, records, and other company documents for the purpose of evaluating Herley's compliance with the agreement;

(p)     that Herley disclose to the Government, within 30 calendar days of any alleged occurrence, all instances in which there are reasonable grounds to suspect that Herley and/or

Government personnel have violated procurement regulation, and that Herley must take immediate corrective measures to remedy any such matter disclosed, and to notify the Government of the corrective action taken and of Herley's opinion regarding any impact the matter may have on the Government;

(q)      that Herley cooperate fully with any future Government investigations other than matters that are the subject of the Government Indictment;

(r)      that (i) upon an indictment of any Herley employee for violation of any criminal statute, which violation occurred in connection with the individual's performance of duties for or on behalf of Herley, Herley immediately remove the employee from active status relating to any dealings with the Government; and (ii) upon an unappealed conviction of, or after an unsuccessful appeal by any Herley employee for violation of any criminal statute, which violation occurred in connection with the individual's performance of duties for or on behalf of Herley, Herley promptly terminate the employment of such employee;

(s)      that Herley shall neither (i) knowingly enter into any subcontract or other business relationship relating to Federal Government contracts with any individual or business entity listed as debarred, suspended, or otherwise ineligible for contracting by the Government, nor (ii) knowingly employ, engage or accept the services of an individual who is listed by the Government as debarred, suspended, or otherwise ineligible for Federal contracting; and

(t)      that failure by Herley to meet any of its obligations under the terms or spirit of the agreement, not cured to the reasonable satisfaction of the Navy, shall constitute a cause for Herley's debarment subject to the procedures established by FAR.

98

136.    Finally, an inference of scienter is further supported by Herley's management's refusal to conduct the sort of customary, independent internal investigation capable of determining, as Herley's former auditor stated, "the impact of the alleged illegal acts on the financial statements of the Company" or of "identify[ing] the potential involvement of other Company personnel involved" in those acts. Indeed, Herley's now-former auditor BDO Seidman resigned in July 2006 after witnessing Defendants' attempts to constrict the investigation suggested by the auditor, concluding that it was "no longer able to rely on the representations of management provided to date".

137.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company were able to and did control the contents of the various quarterly and annual financial reports, SEC filings, press releases, and presentations to securities analysts pertaining to Herley. Each Individual Defendant was provided with copies of Herley's press releases and SEC filings alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their board membership and/or executive and managerial positions with Herley, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group published" information, the result of the collective actions of the Individual Defendants.

138.    Defendants possessed strong motives to engage in the fraud alleged herein.

139.    First, and quite directly, the unusual employment agreements given to Defendants Blatt and Levy gave them direct incentive to inflate Herley's reported earnings.  Pursuant to Defendant Blatt's employment agreement, Defendant Blatt's annual "incentive compensation" – over and above his cost-of-living-adjusted base salary and any option and stock grants – was set at an amount equaling 4% of Herley's annual pre-tax income.  Pursuant to Defendant Levy's employment agreement, Defendant Levy's annual "incentive compensation" – over and above his cost-of-living-adjusted base salary and any option and stock grants – was set at an amount equaling 3% of Herley's annual pre-tax income.  Thus, any increases in Herley's earnings would flow directly to the pockets of Defendants Blatt and Levy in the form of "incentive compensation".  The incentive compensation so received by Defendants Blatt and Levy, as set forth in the table below, was quite substantial:

| Incentive Compensation | | |
|---|---|---|
| | **Blatt** | **Levy** |
| 2005 | $   650,131 | $  487,598 |
| 2004 | $1,207,680 | $  987,010 |
| 2003 | $   898,000 | $  673,000 |
| 2002 | $   546,000 | $  410,000 |

140.    Defendants, knowing better than anyone the fraudulent derivation of Herley's reported revenues, earnings, and margins, and knowing the potential material adverse impact to Herley's operations, finances and stock price should their fraud be disclosed, successfully completed a secondary stock offering of 3 million shares at an inflated price of $23.00 per share on April 24, 2002, allowing the Company to raise approximately $69 million.  The proceeds from the April 24, 2002 offering were intended for use in funding, and in fact funded, Herley's strategic acquisitions of other companies, including:

100

(a)    the September 23, 2002 acquisition of EW Simulation Technology Ltd. for an undisclosed cash sum;

(b)    the March 29, 2004 acquisition of Communication Techniques Inc. for $15 million in cash;

(c)    the acquisition, announced on August 10, 2004 and completed on September 29, 2004, of Reliable System Serviced Corp. for an undisclosed cash sum;

(d)    the acquisition, announced on December 9, 2004 and completed on February 1, 2005, of Micro Systems Inc. for $20 million in cash;

(e)    the April 13, 2005 acquisition of Innovative Concepts Inc. for $20 million in cash.

141.    Furthermore, the Individual Defendants received more than $4.79 million from their aggregate sales of more than 270,000 of their Herley shares during the Class Period, as detailed in the table below:

|  | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| Blatt | 10/11/2001 | 20,000 | $17.32 | $346,000 |
|  | 12/28/2001 | 2,000 | $16.21 | $ 32,420 |
|  | 3/1/2002 | 3,000 | $18.96 | $ 56,880 |
|  | 11/26/2003 | 3,000 | $19.31 | $ 57,930 |
|  | 4/16/2004 | 9,810 | $20.20 | $198,162 |
|  | 4/19/2004 | 10,190 | $20.22 | $206,042 |
| total |  | 48,000 |  | $897,834 |
|  |  |  |  |  |
| Levy | 10/16/2001 | 12,500 | $17.00 | $212,500 |
|  | 10/19/2001 | 50,000 | $16.90 | $845,000 |

101

|  | 10/22/2001 | 12,500 | $16.90 | $211,250 |
|---|---|---|---|---|
|  | 10/24/2001 | 25,000 | $16.46 | $411,500 |
|  | 10/31/2001 | 25,000 | $16.46 | $411,500 |
| **total** |  | **125,000** |  | **$2,091,750** |
|  |  |  |  |  |
| Garefino | 10/2/2001 | 20,000 | $17.00 | $340,000 |
|  | 10/16/2001 | 17,000 | $17.00 | $289,000 |
|  | 10/21/2003 | 19,239 | $18.23 | $350,727 |
|  | 6/14/2005 | 9,000 | $18.05 | $162,450 |
|  | 6/14/2005 | 9,000 | $18.05 | $162,450 |
|  | 6/14/2005 | 7,200 | $18.05 | $129,960 |
|  | 6/14/2005 | 2,250 | $18.05 | $40,612 |
|  | 6/14/2005 | 2,250 | $18.05 | $40,612 |
|  | 1/10/2006 | 3,000 | $17.50 | $52,500 |
| **total** |  | **88,939** |  | **$1,568,312** |
|  |  |  |  |  |
| Kelley | 3/14/2006 | 12,000 | $19.35 | $232,200 |
| **total** |  | **12,000** |  | **$232,200** |
|  |  |  |  |  |
| **TOTAL** |  | **273,939** |  | **$4,790,096** |

142.    Although the above-mentioned sales gave rise to a legal duty to disclose all known

material information, Defendants opted instead for profitable silence.  The April 24, 2002 secondary

stock offering, in which Defendants sold 3 million Herley shares to the Class at $23.00 per share,

allowed Defendants to monetize Herley shares during their peak Class Period prices: a brief window

in April 2002 during which time Herley shares traded at prices of between $23.00 and above.  The

Individual Defendants' insider sales were completed at inflated prices – e.g., prices approximately double the price of Herley's shares following disclosure of the Government Indictment in June 2006.

## XI.
## CLASS ACTION ALLEGATIONS

143.    Plaintiffs bring this lawsuit pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and on behalf of a class of persons who purchased Herley stock from October 1, 2001 through June 14, 2006, inclusive (the "Class"). Excluded from the Class are Defendants herein, members of the immediate families of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party

144.    This action is properly maintainable as a class action for the following reasons:

(a)    The Class is so numerous that joinder of all Class members is impracticable. As of October 18, 2006, Herley had approximately 13.86 million shares outstanding, and an average of more than 120,000 Herley shares traded per day during the Class Period. Members of the Class are scattered throughout the United States.

(b)    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to members of the Class predominate over any questions affecting only individual Class members. These common questions include, inter alia:

(i)    Whether the Defendants' acts as alleged herein violated the federal securities laws;

103

(ii)    Whether Defendants participated in and pursued the common course of conduct complained of herein;

(iii)    Whether documents, SEC filings, press releases and other statements disseminated to the investing public and Herley's common stockholders during the Class Period misrepresented material facts about the operations, prospects, financial condition and financial results of Herley;

(iv)    Whether Defendants' statements omitted material facts necessary to make the statements made, in light of circumstances under which they were made, not misleading;

(v)    Whether Defendants knew or deliberately disregarded that their statements were false or misleading;

(vi)    Whether the market prices of Herley stock during the Class Period were artificially inflated due to material misrepresentations and the failure to correct the material misrepresentations complained of herein; and

(vii)    To what extent the members of the Class have sustained damages and the proper measure of damages.

(c)    Plaintiffs' claims are typical of the claims of other members of the Class. Plaintiffs and the Class sustained damages from Defendants' wrongful conduct, which caused all Herley shares to trade at artificially inflated prices throughout the Class Period.

(d)    Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in litigation of this nature. Plaintiffs have no interests that are adverse or antagonistic to the interests of the Class. Accordingly, plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class.

(e)     Plaintiffs anticipate that there will not be any difficulty in the management of this litigation as a class action.

145.     For the reasons stated herein, a class action is superior to other available methods for the fair and efficient adjudication of this action and the claims asserted herein. Because of the size of the individual Class members' claims, few, if any, Class members could afford to seek legal redress individually for the wrongs complained of herein.

**COUNT I**
**For Violation of Section 10(b) of the Exchange Act**
**and Rule 10b-5 Promulgated Thereunder Against All Defendants**

146.     Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

147.     This Count is brought by plaintiffs pursuant to §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against all Defendants.

148.     The Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Herley stock in an effort to maintain artificially high market prices for Herley stock in violation of §10(b) of the Exchange Act and Rule 10b-5. Defendants are sued as primary participants in the wrongful and illegal conduct charged herein and/or as controlling persons as alleged below.

149.     In addition to the duties of full disclosure imposed on the Defendants by their status as controlling persons of Herley, as a result of their affirmative statements and reports, or

105

participation in the making of affirmative statements and reports to the investing public, and as a result of their sales of Herley stock during the Class Period, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC regulations S-X (17 C.F.R. §210.01, et seq.) and S-K (17 C.F.R. §229.10, et seq.) and other SEC regulations, including accurate and truthful information with respect to Herley's stock, operations, financial condition and earnings so that the market price of Herley stock would be based on truthful, complete and accurate information.

150.    Defendants, individually and in concert, directly and indirectly, by using the means and instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Herley as specified herein. The Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Herley's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Herley and its business operations and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Herley stock during the Class Period.

151.    The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or recklessly disregarded the same. Defendants' material misrepresentations or omissions were done knowingly or recklessly and for the purpose and effect

of concealing Herley's true operations, results and future business prospects from the investing public and supporting the artificially inflated price of Herley's stock.

152.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts by all Defendants, as set forth above, the market price of Herley stock was artificially inflated during the Class Period. In ignorance of the fact that the market price for Herley stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the shares trade, and the truth of any representations made to appropriate agencies and to the investing public, at the times at which any statements were made, and/or on the absence of material adverse information that was known by Defendants but not disclosed in public statements by Defendants during the Class Period, plaintiffs and the other members of the Class acquired Herley stock during the Class Period at artificially high prices and were damaged thereby as the market price of Herley stock declined in response to disclosures of Herley's true state of affairs.

153.    At the time of said misrepresentations and omissions, plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true. Had plaintiffs and the other members of the Class and the marketplace known of Defendants' fraudulent business practices and of the revenues, profits and margins that such practices had generated and of the liabilities to which such practices exposed Herley and Herley investors, which were not disclosed by Defendants, plaintiffs and other members of the Class would not have purchased Herley stock during the Class Period, or, if they had purchased such stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

107

154.    By virtue of the foregoing, Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

155.    As a direct and proximate result of the wrongful conduct of the Defendants, plaintiffs and the other members of the Class suffered damages in connection with their purchases of Herley stock during the Class Period.

**COUNT II**
**For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants**

156.    Plaintiffs repeat and reallege the allegations set forth above as if set forth fully herein.

157.    The Individual Defendants acted as controlling persons of Herley within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, substantial stock holdings, participation in and/or awareness of Herley's operations and/or intimate knowledge of its business practices, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Herley, including the content and dissemination of the various statements which plaintiffs contend are false and misleading.  Herley controlled the Individual Defendants and all of its employees. Each of the Individual Defendants was provided with or had unlimited access to copies of Herley's internal reports, press releases, public filings and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. In particular, each of the Individual Defendants had direct involvement in or intimate knowledge of the day-to-day operations of Herley and therefore is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

108

158.    As set forth above, Defendants violated §10(b) of the Exchange Act and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

159.    As a direct and proximate result of the wrongful conduct of the Individual Defendants, plaintiffs and other members of the Class suffered damages in connection with their purchases of Herley stock during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs, on behalf of themselves and the Class, pray for judgment as follows:

A.    Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding plaintiffs and other members of the Class damages together with interest thereon;

C.    Awarding plaintiffs and other members of the Class costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

D.    Awarding plaintiffs and other members of the Class such equitable/injunctive and/or other and further relief as may be just and proper under the circumstances.

## JURY DEMAND

Plaintiffs demand a trial by jury.


DATED: October 30, 2009                  Respectfully submitted,


                                                   /s
_____
By: Ira M. Press (pro hac vice)
Andrew M. McNeela
Sarah G. Lopez (pro hac vice)
KIRBY McINERNEY LLP
825 Third Avenue, 16th Floor
New York, NY  10022
Telephone:   (212) 371-6600
Facsimile: (212) 751-2540


*Plaintiffs' Lead Counsel and Counsel for Lead Plaintiff/Class Representative Galleon Management, L.P.*


Stanley P. Kops (SPK 6328)
LAW OFFICE OF STANLEY P. KOPS
102 Bala Avenue
Bala Cynwyd, PA19004
(610) 949-9999


*Plaintiffs' Liaison Counsel*


LABATON SUCHAROW LLP
Christopher Keller (*pro hac vice*)
Jonathan Gardner (*pro hac vice*)
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
*Plaintiffs' Counsel*
*Counsel for Class Representative Norfolk County Retirement System*


F:\Files\C1\C1\FILES\herley\Consolidated      Amended Complaint.wpd