UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE HERLEY INDUSTRIES INC. SECURITIES LITIGATION | CIVIL ACTION<br><br>No. 06-2596 (JRS)<br><br>CLASS ACTION<br><br>SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

| | | | | |
|---|---|---|---|---|
| I. | | **Summary of the Action** | | 1 |
| II. | | **Jurisdiction and Venue** | | 9 |
| III. | | **The Parties** | | 10 |
| IV. | | **Background:  The Procurement and  Contracting Process For Sole-Source Federal Contractors Under the Federal Acquisition Regulations** | | 13 |
| V. | | **Defendants' Undisclosed, Fraudulent Federal Contracting Practices** | | 17 |
| VI. | A. | **Defendants' False and Misleading Filings with the SEC: Herley's Operations** | | 27 |
| VI. | B. | **Defendants' False and Misleading Filings with the SEC: Herley's Financial Statements** | | 33 |
| VI. | C. | **Defendants' Other False and Misleading Statements** | | 51 |
| VII. | | **Materiality** | | 77 |
| VIII. | | **Loss Causation** | | 80 |
| IX. | | **Defendants' Misrepresentations Proximately Caused Plaintiffs' Damages Through Fraud on the Market** | | 90 |
| X. | | **Scienter Allegations** | | 91 |
| XI. | | **Class Action Allegations** | | 102 |
| | | **COUNT I:  For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants** | | 104 |

**COUNT II:  For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants**   107

**PRAYER FOR RELIEF**   108

**JURY DEMAND**   109

# I.
## SUMMARY OF THE ACTION

Lead Plaintiff and Class Representative ("plaintiff"), on behalf of itself and all others similarly situated, upon personal knowledge as to plaintiff and its acts, and as to all other matters upon information and belief based upon, *inter alia*, the investigations of Lead Plaintiff's counsel, states as follows:

1.      This is a securities fraud class action brought on behalf of all persons who purchased the common stock of Herley Industries, Inc. ("Herley" or the "Company") between October 1, 2001 and June 14, 2006, inclusive (the "Class Period"). The action asserts claims against Herley and certain of its officers and directors for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder by the SEC.

2.      Herley engineers, manufactures and provides microwave products and technologies to defense and aerospace entities for use in command and control systems, flight instrumentation, radars, weapons sensors and electronic warfare systems. Herley's primary customers include prime defense contractors (e.g., Northrop Grumman, Lockheed Martin, Raytheon and Boeing), the U.S. Government (including the Department of Defense, NASA and other U.S. Government agencies) and international customers (including the Egyptian, German, Japanese and South Korean militaries and suppliers to international militaries). Herley's products and systems are currently deployed on numerous military platforms, including planes (such as the F-16 Falcon), missiles and missile systems (such as the Trident II D-5 and the AMRAAM air-to-air missile), and unmanned aerial vehicles. Additionally, through its commercial technologies division, Herley provides certain

1

products for use in commercial technologies (most notably, for use in magnetic resonance imaging [MRI] devices).

3.    Herley's explicit business strategy, repeatedly stated by Company executives and in Herley's filings with the Securities and Exchange Commission ("SEC"), was to target long-term, high-growth, high-priority defense programs in which Herley would function as the **sole** provider of microwave equipment. Such sole-provider status did not arise *de jure* (e.g., as a result of contract terms) but rather emerged *de facto*: i.e., as many of the contracts called for specialized products that would meet rigorous specifications and testing, the company that initially won the contract would often become the only company capable of providing the product called for by the contract. Thus, initial competitive contract wins would lead to non-competitive repeat contracts for further products. Herley's executives frequently referred to their high "batting average" in identifying, targeting and winning such contracts, and attributed Herley's revenue growth, profit growth and high margins to management's "batting average". Herley's SEC filings stated that one of Herley's "competitive strengths" was that Herley "generate[d] a significant proportion of [its] revenue" through its "high proportion of long-term sole-provider production programs".

4.    Herley's largest customer has always been the U.S. government and its agencies, such as the Navy, Air Force, etc. (the "Government"). Government contracts directly provided 22% of Herley's net sales in fiscal 2006, 25% of Herley's net sales in fiscal 2005, 17% of Herley's net sales in fiscal 2004, 25% of Herley's net sales in fiscal 2003, 17% of Herley's net sales in fiscal 2002, 19% of Herley's net sales in fiscal 2001, and 26% of Herley's net sales in fiscal 2000. Sub-contracting work performed by Herley for prime defense contractors, who themselves were working on Government contracts, resulted in yet further Government work. For example, whereas 26% of

2

Herley's net sales in fiscal 2000 resulted *directly* from Government contracts, 77% of Herley's net sales in fiscal 2000 resulted from work Herley performed directly and indirectly – i.e., as a subcontractor, or sub-subcontractor – for the Government.

5.      Given Herley's dependence on Government work, the loss of the Government as a customer would be devastating for Herley.  The company itself so warned in its SEC filings: for example, in an April 25, 2002 Prospectus filed with the SEC in connection with Herley's secondary offering and sale of 3 million shares of Herley stock:

> WE RELY ON A SMALL NUMBER OF SIGNIFICANT CUSTOMERS.
>
> Our sales have historically come mainly from contracts with agencies of, and prime contractors to, the U.S. government. Net sales directly to the U.S. government accounted for 19% of fiscal year 2001 net sales. Additionally, approximately 30% of our net sales were attributable to our next five largest customers for fiscal year 2001... If we were to lose any of these or any other major customers, or if orders by any major customer were otherwise to be delayed or reduced, including reductions due to market or competitive conditions in commercial markets or further decreases in government defense spending, then our business, financial condition and results of operations would be harmed.

6.      The U.S. government contracting process is governed by procurement regulations known as the Federal Acquisition Regulations ("FAR").   For sole-source procurement, in which there is no competitive bidding but rather a direct solicitation from the Government to the sole supplier of the needed product, FAR sets forth special procedures (detailed at in section IV, below) to ensure that the prices charged to the Government are fair and reasonable.   Essentially, in sole-source circumstances, FAR requires that the contractor provide the Government with detailed disclosures concerning the product's production costs (so as to allow the Government to negotiate

a reasonable price that provides the contractor with reasonable profit), and empowers the Government to audit the contractor so as to verify whether the contractor's bid-price (in a non-competitive situation) is reasonable or justified by the contractor's underlying costs.

7.      Given the Government's singular prominence as Herley's largest customer and Herley's main source of sales, revenues and earnings, and given the Government's rules for doing business (i.e., FAR), regulatory compliance was highly material for Herley. Failure to comply with FAR could trouble and/or undermine Herley's relationship with the Government, could expose Herley to various penalties and liabilities, and could endanger the future revenue flows from Herley's largest source of revenues. Again, Defendants so warned in Herley's SEC filings: for example, Herley's April 25, 2002 Prospectus stated:

> GOVERNMENT REGULATION
>
> Because of our participation in the defense industry, we are subject to audits by various government agencies for our compliance with government regulations... We believe that we operate our business in material compliance with applicable laws and regulations. However, any failure to comply with existing or future laws or regulations could have a material adverse impact on our business, financial condition and results of operations.

8.      The gravamen of this complaint is simple. Unbeknownst to plaintiffs and the Class, Defendants went to elaborate lengths in contracting with the Government – as detailed herein and in the federal indictment filed in criminal proceedings against Herley and Blatt under the caption *USA v. Blatt et al.*, 06-cr-00268-LS-ALL (E.D. Pa. 2006) – to submit fraudulent, false and inflated cost data to the Government. By such false and inflated cost submissions, Defendants secured Government contracts at price levels far above what Herley would have received had Herley submitted true and accurate cost information.

4

9.     As detailed below, Defendants' undisclosed, fraudulent acts had the direct effect of fraudulently inflating Herley's reported revenues, earnings, and margins, and consequently of inflating the price of Herley's shares.   As Herley recognized and reported illegitimate and fraudulently-derived revenues, earnings and margins in materially false and misleading financial statements, press releases, SEC filings, and conference calls, Herley's shares increased from a trading range of $8-$12 per share to spend the most of the Class Period at inflated prices of $16-$24 per share.  Simultaneously, Defendants' undisclosed, fraudulent acts  exposed Herley to material liabilities – including fines and penalties; disgorgement of illegitimate profits; increased legal, regulatory and compliance costs; and potential and actual loss of further contracts with its largest customer, the Government – of which plaintiffs and the Class were unaware.

10.     At all times during the Class Period, and as detailed below (section VI), Defendants maintained in Herley's SEC filings and in other public statements that:

(a)     the Government was Herley's largest and best customer;

(b)     Herley had "strong" and "mutually beneficial relationships with various agencies of the U.S. government";

(c)     one of Herley's key competitive strengths was its "long-standing relationships with the U.S. government";

(d)     because of its participation in the defense industry, Herley was "subject to audits by various government agencies for our compliance with government regulations" and that Herley "operate[d] our business in material compliance with applicable laws and regulations"; and

(e)     although "failure to comply with existing or future laws or regulations could have a material adverse impact on [Herley's] business, financial condition and results of operations"

5

Herley was "not aware of any events which are reasonably likely to result in any cancellation of its government contracts".

11.     As alleged in detail below, these statements were either false and misleading in and of themselves and/or were rendered false and misleading by omission of the fact that Defendants were engaged in a fraudulent scheme in which: (i) they submitted false and inflated cost information to the Government during the procurement process for certain Government contracts; (ii) they thereby secured from the Government, on the basis of such inflated cost disclosures, prices for certain products (for which Herley was the sole supplier) far above the prices Herley would have received had Herley's cost disclosures been truthful; (iii) they recorded and reported, as a result of such fraudulently-derived, inflated prices, illegitimate and unsustainable revenues, earnings and margins from such transactions; and (iv) they exposed Herley to exactly the sort of "material adverse impact" that Defendants had stated could result were Herley to fail "to comply with existing or future laws or regulations".

12.     As alleged in detail below (see section VII), Defendants' false and misleading statements and/or omissions were *materially* false and misleading and/or were *material* omissions.

13.     On June 6, 2006, the United States Attorney's Office for the Eastern District of Pennsylvania announced that Blatt (and Herley) had been indicted for submitting

> grossly inflated prices for products sold to the military for which Herley Industries was the only supplier, and falsely represented or had other Herley employees falsely represent that the prices charged were based on true and accurate information about Herley Industries' costs and expenses, when they were not.

14.     In the week following disclosure of the indictment, as further information came to light – including (i) analysts lowering of their ratings of Herley; (ii) Blatt resignation, stating, "the

time is particularly appropriate for me to step down as Chairman... it is long past time for me to leave Herley..."), (iii) Herley's replacement of its Chief Financial Officer; (iv) quantification of liability revealing that Blatt was facing as many as 185 years in prison and Herley was facing tens of millions of dollars in fines, costs and liabilities; and (v) the Government – i.e., Herley's single largest customer – announcing that it had barred three Herley facilities (responsible for approximately 55% of Herley's revenues) from receiving any new Government contracts  – Herley's shares lost nearly 50% of their value, falling from a closing price of $17.50 per share on June 5, 2006, immediately prior to disclosure of the indictment, to close at $9.21 per share on June 14, 2006.

15.     Further fallout emerged later, including: (i) Herley's reporting of quarterly financial results in which earnings had diminished under a sudden increase in legal fees resulting from the Government investigation and indictment; (ii) Herley's announcing that it would have to delay its quarterly SEC filing so as to allow its auditors to review Herley's financial results, controls and procedures in light of the indictment; (iii) Herley's shares being threatened with delisting from the NASDAQ as a result of Herley's failure to timely file required SEC filings; (iv) Herley's auditor resigning after disputes with Herley's management about the nature and extent of an internal investigation into the matters that were the subject of the Government's indictment; (v) imposition upon Herley of a costly and draconian regulatory structure, designed to ensure Herley's regulatory compliance, as a condition of Herley's being allowed to perform further Government work; and (vi) concomitant costs of approximately $10 million incurred when Herley, at the Government's demand, severed all ties with Defendant Blatt.

16.     On October 13, 2006, Herley announced that it had negotiated an agreement with the Government to lift the Government's ban on awarding new contracts to Herley. As detailed in ¶ 135

below, the agreement imposes numerous and costly ethical, operational and disclosure-related demands on Herley. A primary condition of the agreement was that Herley completely sever all ties to Blatt, which severing the Company announced on the same day. The cost to Herley of doing so, pursuant to an agreement it negotiated with Blatt, was more than $10 million, which cost swung the multi-million profit Herley would have reported for the fourth quarter of fiscal 2006 into a multi-million dollar loss. This is in addition to the impact upon Herley of being forced to terminate its founder, leader, and the driving force behind the Company.

17.     Criminal proceedings against Herley and Blatt continue.

18.     Herley has not yet restated its financial statements to remove from them the influence of fraudulently-derived revenues and the resulting fraudulently-inflated earnings. However, Herley's (now-former) auditor BDO Seidman LLP has withdrawn its previously-issued opinion certifying Herley's financial statements.

19.     In July 2006, BDO Seidman resigned from its position as Herley's auditor after concluding that Herley's management was unwilling to conduct a truly independent, adequate investigation capable of determining "the impact of the alleged illegal acts on the financial statements of the Company" or of "identify[ing] the potential involvement of other Company personnel involved" in those acts. In a letter sent to Herley's management (attached as an exhibit to Herley's August 16, 2006 Form 8-K filed with the SEC), BDO Seidman stated that it was "no longer able to rely on the representations of management provided to date":

> On several occasions prior to our resignation, including in writing on June 26, 2006, we provided a clear indication of the nature of the independent investigation that would be required, and the conditions of our access to the results of such investigation, in order for us to remain the independent registered public accountant for the

8

Company. Repeated attempts by the Company to reduce the scope of such investigation concluded with a meeting on July 24, 2006 between representatives of BDO Seidman, LLP and the firm that had been hired to perform an independent investigation. Following that meeting, we concluded that no such independent investigation acceptable to us was going to be performed due to apparent limitations on the scope of the investigation in response to attorney-client privilege concerns.

As a result of the lack of responsiveness to our request regarding the scope of the independent investigation, we believe we are no longer able to rely on the representations of management provided to date. Accordingly we have withdrawn our opinion on the Company's financial statements for the year ended June 30, 2005. In addition, pursuant to the procedures required by Section 10A(b)(2) of the Securities Exchange Act of 1934, we concluded that the scope of the independent investigation of the alleged illegal acts as contemplated by the Company would not be sufficient to allow BDO to determine either the impact of the alleged illegal acts on the financial statements of the Company or identify the potential involvement of other Company personnel involved in the accounting and financial reporting function due to the attorney-client privilege limitations that were being imposed. Accordingly, in the circumstances, we were and are unable to conclude that the Company was taking timely and appropriate remedial actions with respect to the alleged illegal acts.

## II.
## JURISDICTION AND VENUE

20.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the

Securities Exchange Act of 1934 (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 (17 C.F.R.

§240.10b-5) promulgated thereunder by the SEC.

21.     Venue is proper in this District pursuant to §27 of the Exchange Act. Many of the acts

and transactions giving rise to the violations of law complained of herein, including the preparation

and dissemination to the investing public of false and misleading information, occurred in this

District. Herley has its principal place of business at101 North Pointe Boulevard, Lancaster,

9

Pennsylvania 17601, where the day-to-day operations of the Company are directed and managed.

22.     In connection with the acts, conduct and other wrongs complained of, the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails, and the facilities of the national securities markets.

## III.
## THE PARTIES

23.     Court appointed Lead Plaintiff and class representative, Norfolk County Retirement System ("Norfolk"), purchased Herley common stock during the Class Period, as detailed in the certification previously filed with this Court, and was damaged thereby.

24.     Defendant Herley is headquartered in this District and incorporated in Delaware. Herley engineers and provides microwave products and technologies to defense and aerospace entities for use in command and control systems, flight instrumentation, radars, weapons sensors and electronic warfare systems. Herley's primary customers include large defense prime contractors (including Northrop Grumman, Lockheed Martin, Raytheon and Boeing), the U.S. Government (including the Department of Defense, NASA and other U.S. Government agencies) and international customers (including the Egyptian, German, Japanese and South Korean militaries and suppliers to international militaries). Herley's products and systems are currently deployed on numerous military platforms, including planes (such as the F-16 Falcon), missiles and missile systems (such as the Trident II D-5 and the AMRAAM air-to-air missile), and unmanned aerial vehicles. Additionally, through its commercial technologies division, Herley provides certain products for use in commercial technologies (most notably, for use in magnetic resonance imaging devices). Herley's stock is traded in an efficient market on NASDAQ under the ticker symbol

"HRLY".

25.    Defendant Lee N. Blatt ("Blatt") is the co-founder of Herley and served as Herley's Chief Executive Officer ("CEO") and as Chairman of Herley's Board of Directors ("Chairman") for thirty-five years preceding June 2001.  In June 2001, Blatt resigned from his CEO position but continued to serve as Chairman, and as a member of Herley's Executive Committee, throughout the Class Period until his resignation was announced on June 9, 2006.  On June 6, 2006, Blatt was indicted on 35 counts of price-gouging the U.S. government through submission of false and fraudulently-inflated costs (which led the government to agree to prices on certain contracts much higher than would have been possible or justified absent such fraudulent submissions).  On October 12, 2006, as a pre-condition to Herley's being allowed to contract new business with the U.S. government, Herley severed all remaining ties with Blatt.  During the Class Period, Blatt received approximately $900,000 from the sale of 48,000 shares of Herley stock.

26.    Defendant Myron Levy ("Levy") served throughout the Class Period as Herley's CEO and as a member of Herley's Executive Committee.  Levy replaced Blatt as Herley's CEO on June 21, 2001, prior to which time Levy had served as Herley's President (a position he retained until August 13, 2003).  On August 13, 2003, Levy relinquished the title of President to John M. Kelley (see below) and was appointed to serve as Vice-Chairman of Herley's Board of Directors, a position he retained until June 9, 2006, at which time he became Chairman after Blatt's resignation.  During the Class Period, Levy received more than $2 million from the sale of 125,000 shares of Herley stock.

27.    Defendant John M. Kelley ("Kelley") served as a senior executive of Herley (under numerous titles) and as a member of Herley's Executive Committee throughout the Class Period.

11

Prior to the Class Period, Kelley served as Vice President and Director of Corporate Communications during 2000, and subsequently was promoted to Senior Vice President in September 2000 and then to Executive Vice-President, and President of Herley's Commercial Technologies division, in July 2001. Since August 13, 2003, Kelley has served as Herley's President. During the Class Period, Kelley received more than $232,000 from the sale of 12,000 shares of Herley stock.

28.     Defendant Anello C. Garefino ("Garefino") served throughout the Class Period as Herley's Vice President, Finance, and additionally, during much of the Class Period, as Herley's Chief Financial Officer ("CFO") – a position he was forced to relinquish twice during the Class Period when the Company appointed other individuals to replace him. On September 27, 2004, Garefino was replaced as CFO by Thomas V. Gilboy (but continued to serve as VP, Finance). After Gilboy's sudden resignation on September 12, 2005, Garefino became "acting" CFO, and continued in such position until June 12, 2005 when, in the wake of the Company's indictment, Herley appointed Kevin J. Purcell as its CFO. During the Class Period, Garefino received more than $1.56 million from the sale of 88,939 shares of Herley stock.

29.     Defendant Thomas V. Gilboy ("Gilboy") served, between September 27, 2004 and September 12, 2005, as Herley's Chief Financial Officer.

30.     By reason of their positions, the officers and/or directors identified (collectively the "Individual Defendants") had access to material inside information about Herley and were able to control directly or indirectly the acts of Herley and the contents of the representations disseminated during the Class Period by or in the name of Herley.

12

**IV.**
**BACKGROUND:**
**THE PROCUREMENT AND CONTRACTING PROCESS**
**FOR SOLE-SOURCE FEDERAL CONTRACTORS**
**UNDER THE FEDERAL ACQUISITION REGULATIONS**

31.     Throughout the Class Period, the U.S. government was Herley's largest single

customer, accounting for between 17% and 26% of Herley's yearly net sales as set forth in the table

below:

| Fiscal Year | Sales to U.S. Government as % of Total Sales |
|:---:|:---:|
| 2006 | 22% |
| 2005 | 25% |
| 2004 | 17% |
| 2003 | 25% |
| 2002 | 17% |
| 2001 | 19% |
| 2000 | 26% |

32.     A high proportion of Herley's net sales flowed from non-competitive contracts in

which Herley was the "sole source" of a specialized component or system required by the U.S.

military or certain of its prime contractors (e.g., Raytheon, Lockheed, Boeing, etc.).

33.     U.S. Government purchasing is conducted by and through Federal Acquisition

Regulations ("FAR").  Among the goals of FAR is that the Government make its purchases at fair

and reasonable prices.

34.     Under FAR, competitive bidding on open Government contracts is often sufficient

in and of itself to ensure the fair and reasonable prices FAR requires.   In non-competitive, sole-

13

source contracting and procurement, however, the Government is unable to rely on competitive bidding as a mechanism to generate fair and reasonable prices. In such sole-source situations, because the Government is unable to conduct a price-check by reference to other prices submitted by other contractors, the Government evaluates the price quoted by the sole-source contractor by requiring the contractor to disclose the costs purportedly underlying the price-quote.

35.     Chapter 15 of FAR, in relevant part, authorizes and requires the Government to: (a) require that sole source contractors submit certain cost information for the product in question so as to enable the Government to ascertain whether the price the contractor wished to charge the Government was a reasonable one and whether the contractor's profits at such price were reasonable; and (b) require that sole source contractors submit to Government audits of their records to allow the Government better to "evaluate the accuracy, completeness, and currency of the cost or pricing data". *See*, *inter alia*, FAR §§ 15.305, 15.402, 15.403-3, 15.403-4, 15.404, 15.406-2, 15.408 and Table 15-2, and 52.215-2 (reproduced in Appendix A hereto and **bolded** in relevant part).

36.     The typical contracting process on sole-source government contracts exceeding *de minimis* amounts is as follows:

(a)     First, an employee of the Government with procurement responsibilities (the "contracting officer") issues a Request for Proposal ("RFP") to solicit a bid or price quotation from the supplier of the needed product (the "contractor"). As per §15 of FAR, the RFP requires the contractor to submit certain cost information, to certify that information as accurate, and to agree to submit to possible audit of its records to allow the Government to further evaluate the contractor's bid;

(b)     The contractor submits its bid, disclosing cost information as per FAR §15

14

and Table 15-2. Such cost information is required to be based on the contractor's prior experience (the contractor's "historical data"), diverging from such historical data, if necessary, as a consequence of any changed circumstances or changed estimates. The contractor's bid is submitted together with a Contract Pricing Proposal Information Cover Sheet on FAR Standard Form 1411 (the "Contract Cover Sheet"), signed by the contractor, which states in relevant part that:

> This proposal is submitted in response to the RFP... and **reflects our best estimates and/or actual costs as of this date and conforms with the instructions in FAR [] Table 15-2. By submitting this proposal, the offeror, if selected for negotiation, grants the contracting officer or an authorized representative the right to examine, at any time before award, those books, records, documents and other types of factual information, regarding the form or whether such supporting information is specifically referenced or included in the proposal as the basis for pricing, that will permit an adequate evaluation of the proposed price**.

(c) The government RFP/contract, as per FAR § 15 and 52.215-2, as well as the Contract Cover Sheet, all provide that the government, through the Defense Contract Audit Agency ("DCAA") and the Defense Contract Management Command ("DCMC"), could conduct a "pre-award audit" of the contractor. In a pre-award audit, government auditors review the contractor's bid proposal against, *inter alia*, the contractor's historical data, and otherwise examine the reasonableness of the contractor's cost quotes and estimates (*see* FAR §15.404-2(c) and, generally, §15.404), and report their audit findings to the contracting officer. The goal of such auditing is to verify that, in the absence of price competition and/or open bidding, the price paid by the government is fair and reasonable. FAR §§ 15.404-1(a)(3), 15.404-1(c), 15.404-1(d).

(d) Subsequently, the contracting parties conduct further negotiations. In such negotiations, one of the responsibilities of the contracting officer is to determine whether the profit

15

suggested by the contractor's proposal (i.e., the difference between the price quoted by the contractor and the cost information disclosed by the contractor) is reasonable. See FAR §15.404-4(c), 15.405 and generally § 15.404-4).

(e)     Ultimately, the contracting parties reach agreement on the terms and prices of the contract. The contractor is then required to certify that the cost information it had submitted was accurate, complete and current. See FAR § 15.406-2. The contractor does so by executing a Certificate of Current Cost and Pricing Data, as per FAR 15.406-2, which states:

**Certificate of Current Cost or Pricing Data**

**This is to certify that, to the best of my knowledge and belief, the cost or pricing data** (as defined in section 2.101 of the Federal Acquisition Regulation (FAR) and required under FAR subsection 15.403-4) submitted, either actually or by specific identification in writing, to the Contracting Officer or to the Contracting Officer's representative in support of [this contract/RFP] **are accurate, complete, and current** as of [the date upon which a final price was agreed to]. This certification includes the cost or pricing data supporting any advance agreements and forward pricing rate agreements between the offeror and the Government that are part of the proposal.

37.     The majority of Herley's sole-source contracts with the government were "Firm, Fixed-Price" contracts. Such contracts obligate the government to pay a firm, fixed price for the products it procures:  no allowance exists to allow subsequent price adjustments should certain contingencies occur (e.g., unexpected higher costs). Other contract types include fixed-price contracts that contain various price-adjustment or incentive clauses, or various "cost-plus" contracts that allow, in various ways, the price to be set by the contractors' eventual costs "plus" certain other amounts representing profits, incentives, etc.

38.     Defense Department Procurement and Acquisition Policy (see Contract Pricing Reference Guide at §5.3.1) advises contracting officers that Firm, Fixed-Price contracts should be used in situations where "the contractor is able to accurately estimate the cost of the work called for in the contract".

39.     FAR §16.202-2 states that Firm, Fixed-Price contracts should be used when the contracting officer can, at the outset, establish fair and reasonable prices because, *inter alia*, "available cost or pricing information permits realistic estimates of the probable costs of performance":

> A firm-fixed-price contract is suitable... when the contracting officer can establish fair and reasonable prices at the outset, such as when—
>
> (a) There is adequate price competition;
>
> (b) There are reasonable price comparisons with prior purchases of the same or similar supplies or services made on a competitive basis or supported by valid cost or pricing data;
>
> (c) Available cost or pricing information permits realistic estimates of the probable costs of performance; or
>
> (d) Performance uncertainties can be identified and reasonable estimates of their cost impact can be made, and the contractor is willing to accept a firm fixed price representing assumption of the risks involved.

## V.
## DEFENDANTS' UNDISCLOSED, FRAUDULENT FEDERAL CONTRACTING PRACTICES

40.     Unbeknownst to plaintiff and the Class, and as disclosed on June 6, 2006 in an indictment brought by the U.S. Attorney's Office for the Eastern District of Pennsylvania captioned as *USA v. Blatt et al.*, 06-cr-00268-LS-ALL (E.D. Pa.) (the "Government Indictment"), Defendants

17

Blatt and Herley and certain other officers and employees of Herley had devised and implemented a detailed scheme in which they submitted false and inflated cost information to the Government so as to secure Government approval of Herley contracts at inflated prices (which prices would not have been approved had accurate cost information been disclosed) and so as to thereby to report for Herley inflated revenues and profits (which would not have been possible had accurate cost information been disclosed).

41.     As detailed in the Government Indictment, incorporated herein by reference, Defendants' operated their cost-falsification scheme in the following manner:

(a)     In each instance, Blatt caused Herley, in its response to the Government's RFP, to provide an inflated price quotation for the product/system in question and to 'justify' that inflated price quotation through elaborate, fictional submissions concerning its costs.

(b)     In each instance, Blatt caused Herley to represent to the Government that, as a result of a purported obsolescence in its previously-used manufacturing process (i.e., Herley's "historical data" available to the Government), a new manufacturing process would be required (i.e., resulting in a divergence from Herley's historical data).  For example, Herley represented to the Government that a necessary component of the product was no longer commercially available, and would need to be produced in-house (and expensively) by Herley.

(c)     In each instance, Blatt caused Herley to provide fraudulent, inflated costs resulting from the purported obsolescence of the old process and the requirement that a new process be used.  For example, the division of Herley contracting with the Government would, under Blatt's direction and with the participation of other Herley executives, obtain from another division of Herley a fraudulent and inflated statement of the cost of the component to be purportedly

18

manufactured in-house by that Herley division.

(d)     In each instance, after the Government agreed to contracts at prices vastly inflated by Herley's false and inflated cost representations (purportedly justified by Herley's claim that a new manufacturing process was necessary), Herley did not employ the new manufacturing process (which was in fact unnecessary) and instead used the same parts and process it had always used.

(e)     In each case, Blatt directed the creation of a paper trail to make it appear as if an unexpected event had allowed Herley to revert to the cheaper, older process.

42.     For example, as detailed in the Government Indictment, in a contract with the U.S. Air Force in which Herley was the sole-source provider of specialized voltage-controlled oscillators ("VCO") for use in F-16 fighter jet radar systems[1]:

(a)     Defendants Blatt and Herley, in response to an urgent Air Force RFP for provision of such VCOs, submitted an extremely-high price quote that diverged from Herley's historical data and did not reflect Herley's true costs or estimates;

(b)     initially, to justify the quoted price, Defendant Blatt caused other Herley executives to make false, fictitious and fraudulent representations to the Government concerning (inflated) labor requirements and costs that would be caused by an accelerated delivery schedule;

(c)     the Government then notified Herley that it would conduct a pre-award audit of Herley's price quote on the current contract, and that it would also review Herley's actual costs from a previous VCO contract;

---

[1]     VCOs are small components of larger radar systems. Essentially, a VCO consists of a signal generator and an oscillator that amplifies the signal – which signal is used by on-board F-16 radar systems to track other objects in the sky and on land.

(d)      in response, Defendant Blatt, in order to preserve his arbitrarily-inflated price quote for the VCOs, devised and implemented the following scheme:

(i)      Defendant Blatt decreed that the Herley division manufacturing the VCOs ("Herley-Lancaster") could not use a crucial component of those VCOs – a high-performance NEC transistor that was no longer being manufactured – from Herley's inventory;

(ii)      Since Herley-Lancaster could not find any other readily-available supply of the NEC transistors (other than in its own inventory), Defendant Blatt informed Herley-Lancaster that a newly-acquired Herley division – Herley-Nashua – would design, develop, manufacture and supply a substitute for the NEC transistor;

(iii)      Defendant Blatt then instructed an executive (whom Blatt knew to be unfamiliar with the product and Herley division at issue) from yet another Herley division, Herley-Woburn, to generate a document that would appear to be a (costly) bid from Herley-Nashua to manufacture the substitute part;

(iv)      Defendant Blatt caused the above-mentioned executive to fax to Herley-Lancaster the faked Herley-Nashua bid;

(v)      As intended by Defendant Blatt, Herley-Lancaster falsely informed the contracting officer that it had no NEC transistors available for the VCO contract;

(vi)      As intended by Defendant Blatt, Herley-Lancaster falsely informed the DCAA auditor (in the Goverment's pre-award audit) that Herley's price quote for the VCOs was supported/necessitated by the additional costs described in the faked Herley-Nashua bid to create a substitute part for the NEC transistor;

(vii)      Additionally, in order to further support the high price quote for the

20

current VCO contract, Herley-Lancaster falsely and fraudulently inflated its purported costs for a previous VCO contract (now being audited in the pre-award audit) by representing that it had incurred costs from work done by Syracuse University, when in fact Syracuse University had not done any such work;

       (e)     as a result of the foregoing false and inflated cost submissions to the contracting officer and the DCAA auditor, the Government entered into a contract with Herley at vastly-inflated prices, without basis in Herley's actual or estimated costs, that allowed Herley profits of approximately 250%;

       (f)     Herley submitted a Contract Cover Sheet, as required by FAR, falsely certifying that its cost disclosures, including the additional costs resulting from the purported necessity to manufacture a substitute component in-house for the purportedly-unavailable NEC transistor, reflected Defendants' actual and best-estimated costs;

       (g)     After securing the VCO contract at a price inflated by the purported necessity to manufacture substitutes for the NEC transistor, Defendant Blatt and another Herley executive then instructed Herley-Lancaster that it could proceed with the assembly and manufacture of the VCOs by using the NEC transistors that Herley-Lancaster had always possessed in inventory.

     43.     In another example, as detailed in the Government Indictment, in a contract with the U.S. Air Force in which Herley was the sole-source provider of specialized power-heads for use in the Navy's E-2C "Hawkeye" planes' radar systems (the "Power Heads")[2]:

---

     [2]     The Power Head functioned as a fuse between the power source for the radar and the radar itself, protecting the radar from harmful power surges. The E-2C Hawkeye plane was stationed on the Navy's airplane carriers and was primarily used for monitoring functions. Each E-2C Hawkeye carried extra Power Heads on board; whenever one failed, it would be replaced immediately (by either a brand-new or refurbished one).

(a)     Initially, in order to inflate Navy demand for *new* Power Heads (as opposed to refurbished/repaired ones) for which Herley as the sole source, Defendant Blatt at various times directed Herley-Farmingdale to slow down its repair of old Power Heads, to stop working on such repairs, to cancel open repair orders, to limit repairs only to recently-manufactured items, to stall repairs pending payments, and to slow repair operations by returning to inventory materials already selected and segregated for use in repairs;

(b)     the Navy issued an RFP for the Power Heads;

(c)     Defendant Blatt, knowing that Herley was the sole source for Power Heads, instructed Herley-Farmingdale to advise the Navy that Herley would no longer manufacture Power Heads;

(d)     in response to Navy's concern at being left without any source of Power Heads – which concern Defendant Blatt had expected – Defendant Blatt then agreed to have Herley-Farmingdale 'resume' manufacture and repair of Power Heads at prices inflated in the manner described below;

(e)     Defendant Blatt – who directed Power Head negotiations, supplied rationales for Power Head pricing, and knew of and expected the possibility of a pre-award audit – directed that Herley-Farmingdale provide arbitrarily-inflated price quotations for new Power Heads, which price quote was *not* based on Herley's true costs and expenses; and took elaborate action to make it appear as if the arbitrarily-inflated prices were justified on the basis of Herley's costs and expenses, repeatedly making and causing other employees of Herley-Farmingdale to make false statements to the Navy concerning Power Head costs, including:

(i)     Defendant Blatt represented that his best estimate of the cost to

22

produce the Power Heads' core – the film or element (suspended in a housing or subassembly) – was approximately $4,500, when in fact Defendant Blatt knew that Herley-Farmingdale's costs for such films/elements were so low – less than $10 – that such costs were simply incorporated into the division's overhead;

(ii)    In order to provide further purported support for the high and highly-inflated price quotations, Defendant Blatt caused Herley-Farmingdale to fraudulently represent to the Navy that it had been authorized to spend substantial sums on new equipment to be used in manufacturing the Power Heads, when Blatt knew that no such authorization existed because no new equipment was needed;

(iii)    In order to provide further purported support for the high and highly-inflated price quotations, Defendant Blatt falsely advised the Navy, and directed other Herley employees to do the same, that Herley was going to move Power Head production, in part, away from its historic location in Herley-Farmingdale and transfer it to Herley-Lancaster;

(iv)    In furtherance of that scheme, Defendant Blatt directed the head of Herley-Lancaster to issue to Herley-Farmingdale a quotation to manufacture Power-Head sub-assemblies at vastly-inflated prices;

(v)    In order to make it appear as if Herley's price quotations were based on actual costs and expenses, Defendant Blatt provided Herley-Farmingdale with a set of false, fraudulent and fictitious rationales to use to 'justify' Herley's price-quotations

(f)    Defendant Blatt signed a Certificate of Current Cost and Pricing Data fraudulently representing that the cost and pricing data submitted by Herley was accurate;

(g)    During the course of the Government's pre-award of audit of Herley's Power

23

Head bid, which audit Blatt had expected, and in order to support the inflated prices Herley had submitted, Defendant Blatt, caused Herley and Herley employees to make numerous statements to DCAA and DCMC auditors that Blatt knew to be false, and directed the creation of phony documents supporting such prices to provide to the Government auditors:

(i)     Defendant Blatt directed other Herley employees to misstate the costs and labor hours needed to manufacture the Power Heads,

(ii)    Defendant Blatt caused Herley-Farmingdale to represent to DCAA auditors that Power Head sub-assemblies would be manufactured by Herley-Lancaster and then sold to Herley-Farmingdale at certain (vastly inflated) prices;

(iii)   Defendant Blatt directed Herley-Farmingdale's submission of false, fictitious and fraudulent cost data to support Herley's inflated prices, including a cost sheet, a materials cost summary sheet, an entirely fictitious cost breakdown for manufacturing Power Head films, a labor cost breakdown, a quotation from Herley-Lancaster regarding manufacture of the Power Head sub-assembly, and further submissions regarding yield;

(iv)    In response to Government auditors' requests to examine Herley-Farmingdale's costs, expenses and yields on the first batch of Power Heads provided under the contract, Defendant Blatt removed the current Herley negotiator (an employee of Herley-Farmingdale, who knew about the matters at issue) and replaced him with an employee of Herley-Chicago who, as Defendant Blatt knew, had no direct knowledge about Power Head costs, expenses and yields;

(v)     In response to a DCMC request for Herley-Farmgindale's actual labor costs and expenses concerning current manufacture of Power Head elements, Defendant Blatt caused

24

the new Herley negotiator (see immediately above) to make false, fraudulent and misleading representations on the basis of which Herley and the Government negotiated a final price;

(h)     After the Power Head contract was finalized and enlarged to three times its initial size, Defendant Blatt caused Herley to execute another Certificate of Current Cost and Pricing Data fraudulently representing that the cost and pricing data submitted by Herley was accurate, when Blatt and Herley knew it was false, fictitious and fraudulent;

(i)     Immediately after securing the Power Head contract at inflated prices in the manner described above, Defendant Blatt ordered Herley-Farmingdale to begin manufacture of Power Heads and ordered Herley-Farmingdale to perform all the work and to cancel its order to purchase Power-Head sub-assemblies from Herley-Lancaster, which order was merely a ruse devised by Defendant Blatt and others to support Herley's inflated prices;

(j)     In order to conceal this fraud, Defendant Blatt directed that, if asked about the switch, Herley-Farmingdale explain that it had unexpectedly found Power Head sub-assemblies and materials and therefore did not need to order them from Herley-Lancaster;

(k)     In order to further conceal this fraud, Defendant Blatt also directed Herley-Farmingdale to keep its book in a manner that materials costs and sub-assemblies costs not be allocated to the Power Head contract.

44.     As detailed in the Government Indictment, the prices Defendants secured from the government through engaging in the above-mentioned, undisclosed and fraudulent business practices generated tremendous profit margins for Herley of between 250% and 300%. A 300% profit margin means that profits are three times costs: e.g., if Herley sold $1 million of products at a 300% profit margin, Herley's costs would have been $250,000 and Herley's profits $750,000. Such profits

would have been considered unreasonable by the Government and would not have been possible absent Defendants' above-described fraud.

45.    By engaging in the above-mentioned, undisclosed and fraudulent business practices, Defendants Blatt and Herley defrauded the Government into paying prices higher than it would have paid had Defendants accurately disclosed Herley's true costs, and into allowing Herley to reap profits greater than would have possible had Defendants accurately disclosed Herley's true costs.

46.    As alleged in greater detail below (see section VI), the prices secured by Defendants' engaging in the above-mentioned and undisclosed fraudulent business practices resulted in: (i) Defendants' receiving and reporting of fraudulent, false and inflated revenues that would not have been received or reported absent Defendants' fraud; (ii) Defendants' receiving and reporting of fraudulent, false and inflated net income and earnings (i.e., profits) that would not have been received or reported absent Defendants' fraud; and (iii) Defendants' reporting of fraudulent, false and inflated margins that would not have been possible absent Defendants' fraud.

47.    By engaging in the above-mentioned, undisclosed and fraudulent business practices, Defendants exposed Herley to undisclosed liabilities including: disgorgement of millions of dollars of excess profits; possible fines and penalties amounting to several multiples of such excess profits; increased regulatory, legal and accounting costs; potential restatement of previously-issued financial statements; and potential and actual loss of further contracting with Herley's single largest customer, the U.S. government.

48.    That Defendants were engaging in conduct that exposed Herley to such liabilities was fact unknown to plaintiffs and the Class.

49.    When Defendants' conduct and the consequent liabilities were disclosed between

26

June 6, 2006 (when the Government Indictment was announced) and June 13, 2006 (when the Government barred certain Herley facilities from consideration for any further Government work), Herley' shares lost approximately 47% of their value, falling from $17.50 per share on June 5, 2006 to close at $9.21 per share on June 14, 2006.

### VI.A
### DEFENDANTS' FALSE AND MISLEADING FILINGS WITH THE SEC: HERLEY'S OPERATIONS

50.     During the Class Period, Defendants caused Herley to file the following Forms 10-K with the SEC:

(a)     on October 23, 2001, a Form 10-K for the fiscal year ended July 29, 2001 (the "2001 Form 10-K"), signed *inter alia* by Defendants Blatt, Levy and Garefino;

(b)     on October 25, 2002, a Form 10-K for the fiscal year ended July 28, 2002 (the "2002 Form 10-K"), signed *inter alia* by Defendants Blatt, Levy and Garefino;

(c)     on October 31, 2003, a Form 10-K for the fiscal year ended August 3, 2003 (the "2003 Form 10-K"), signed *inter alia* by Defendants Blatt, Levy and Garefino;

(d)     on October 15, 2004, a Form 10-K for the fiscal year ended August 1, 2004 (the "2004 Form 10-K"), signed *inter alia* by Defendants Blatt, Levy and Gilboy;

(e)     on October 31, 2005, a Form 10-K for the fiscal year ended July 31, 2005 (the "2005 Form 10-K"), signed *inter alia* by Defendants Blatt, Levy and Garefino.

51.     As detailed below, in each of the above-mentioned Forms 10-K that Defendants caused Herley to file with the SEC during the Class Period (collectively, the "Forms 10-K") Defendants made certain disclosures concerning Herley's strategy, Herley's competition and Herley's competitive strengths, Herley's relationship with Government agencies, Herley's

27

compliance with governmental regulations and the material risks of non-compliance, and Herley's involvement in legal proceedings.

52.     For the reasons detailed below, such disclosures created a duty to disclose Defendants' above-mentioned, undisclosed and fraudulent business practices (see section V, above).

53.     The omission from the Forms 10-K of any mention of Herley's actual, fraudulent and non-compliant business practices in its sole-source contracting with the U.S. Government was a material omission that rendered the Forms 10-K false, incomplete and misleading.

54.     The 2002 Form 10-K, in disclosures concerning Herley's strategy, competition, competitive strengths and customers, emphasized the centrality to Herley's operations and finances of non-competitive, sole-source contracts with the U.S. Government, and made certain positive representations about Herley's relationship with the Government:

> **STRATEGY**
>
> –   **STRENGTHEN   AND   EXPAND   CUSTOMER RELATIONSHIPS. We have developed mutually beneficial relationships with various agencies of the U.S. government and defense and commercial companies. We expect to continue to build and strengthen these relationships with industry leaders by anticipating and recognizing their needs and providing them with on-time and cost-effective solutions**.
>
> **COMPETITIVE STRENGTHS**
>
> **– HIGH PROPORTION OF LONG-TERM SOLE-PROVIDER PRODUCTION   PROGRAMS. We generate a significant proportion of our revenue from continuing, long-term programs**, both in the production and upgrade phases, and continue to target high growth, high priority defense programs. **Typically, on such long-term defense programs we are the sole provider of microwave equipment.**
>
> – DIVERSE PRODUCT AND CUSTOMER BASE. **We have a**

28

diverse product and customer base, with only the U.S. government, at approximately 17%, representing more than 10% of our fiscal 2002 revenues. We are a first-tier supplier to all of the prime defense contractors, as well as a direct supplier to all of the service branches of the U.S. military, including products found on over 120 individual platforms. Foreign customers accounted for approximately 32% of our revenues in fiscal 2002.

– LONG-STANDING INDUSTRY RELATIONSHIPS. We have established long-standing relationships with the U.S. government and other key organizations in the aerospace and defense industry after 35 years in the defense electronic industry. Over this period, we have become recognized for our ability to develop new technologies and meet stringent program requirements.

*****

CUSTOMERS
During the fiscal year ended July 28, 2002, approximately 17% of our net sales were attributable to contracts with offices and agencies of the U.S. government. No other customers accounted for shipments in excess of 10% of net sales.

*****

COMPETITION
The microwave component and subsystems industry is highly competitive and we compete against many companies, both foreign and domestic. Many of these companies are larger, have greater financial resources and are better known. As a supplier, we also experience significant competition from the in-house capabilities of our customers.

Competition is generally based upon technology, design, past performance and price. Our ability to compete depends, in part, on our ability to offer better design and performance than our competitors and our readiness in facilities, equipment and personnel to complete the programs. Many of the programs in which we participate are long standing programs in which we are the sole provider of product.

55.     The 2001 Form 10-K, 2003 Form 10-K, 2004 Form 10-K and 2005 Form 10-K

29

contained statements identical to the above-mentioned statements in the 2002 Form 10-K.

56.     The omission from the Forms 10-K of Defendants' fraudulent, non-compliant, sole-source contracting with the U.S. Government was a material omission from the Forms 10-K, and rendered them materially false and misleading, especially given 10-K statements:

(a)     emphasizing the centrality of the Government as Herley's largest single customer responsible for between 17% and 26% of Herley's net sales;

(b)     characterizing Herley's "mutually beneficial relationships with various agencies of the U.S. government" adding Herley's purported "expect[ation] to continue to build and strengthen these relationships";

(c)     characterizing such "long-standing relationships with the U.S. government" as one of Herley's *competitive strengths*;

(d)     stating that Herley generated "a significant proportion of our revenue from continuing, long-term programs", that "[t]ypically, on such long-term defense programs we are the sole provider of microwave equipment" and that "[m]any of the programs in which we participate are long-standing programs in which we are the sole provider of product";

(e)     characterizing such sole-provider production programs as one of Herley's *competitive strengths*.

57.     The 2001 Form 10-K, 2002 Form 10-K, 2003 Form 10-K, 2004 Form 10-K and 2005 Form 10-K each contained a section titled "Legal Proceedings" in which Defendants disclosed the existence and status of material legal proceedings involving Herley. Although each of the Forms 10-K disclosed litigation between Herley and the former-owners of a company that Herley had acquired, none of the Forms 10-K disclosed in their Legal Proceedings disclosures the existence of the

30

government's investigation (let alone the fraudulent contracting conduct that gave rise to the investigation in the first place). This omission was a material omission that rendered the Forms 10-K materially false, incomplete and misleading, especially for the reasons described in ¶ 57 immediately above.

58.    The 2001 Form 10-K, 2002 Form 10-K, 2003 Form 10-K, 2004 Form 10-K and 2005 Form 10-K each contained substantively identical disclosures concerning the existence and importance of governmental regulations in defense contracting, Herley's regulatory compliance, and the theoretical consequences of theoretical non-compliance with such regulations:

> **GOVERNMENT REGULATION**
> **Because of our participation in the defense industry, we are subject to audits by various government agencies for our compliance with government regulations.** We are also subject to a variety of local, state and federal government regulations relating to, among other things, the storage, discharge, handling, omission, generation, manufacture and disposal of toxic or other hazardous substances used to manufacture our products. **We believe that we operate our business in material compliance with applicable laws and regulations. However, any failure to comply with existing or future laws or regulations could have a material adverse impact on our business, financial condition and results of operations.**
>
> *****
>
> The Company believes that presently anticipated future cash requirements will be provided by internally generated funds, its existing unsecured credit facility, and the approximately $64,812,000 net proceeds from the sale of 3,000,000 shares of common stock to the public on April 30, 2002 (See Note M of the financial statements). A significant portion of the Company's revenue for fiscal 2003 will be generated from its existing backlog of sales orders. The backlog of orders at July 28, 2002 was approximately $82,678,000. All orders included in backlog are covered by signed contracts or purchase orders. **Nevertheless, contracts involving government programs may be terminated at the discretion of the government. In the**

31

**event of the cancellation of a significant amount of government contracts included in the Company's backlog, the Company will be required to rely more heavily on cash reserves and its existing credit facility to fund its operations. The Company is not aware of any events which are reasonably likely to result in any cancellation of its government contracts.**

59.     The above-quoted representations were materially false and misleading.  To state that "failure to comply with existing or future laws or regulations could have a material adverse impact on our business, financial condition and results of operations" is to repeat tautological boilerplate rather than to inform investors of actual compliance failures. To warn that government contracts could be terminated is to describe an eternal and unchanging truth rather than to inform investors of the existence of real grounds for such cancellation.  And to state that "[w]e believe that we operate our business in material compliance with applicable laws and regulations"and that "[t]he Company is not aware of any events which are reasonably likely to result in any cancellation of its government contracts" is to affirmatively misrepresent material facts that Defendants knew were otherwise.

60.     The omission from the Forms 10-K of Defendants' fraudulent, non-compliant, sole-source contracting with the U.S. Government was a material omission from the Forms 10-K, and rendered them materially false and misleading, especially given 10-K statements:

(a)     disclosing the regulatory framework under which defense contracting operated;

(b)     advising that "failure to comply with existing or future laws or regulations could have a material adverse impact on our business, financial condition and results of operations" but asserting Defendants' belief that "we operate our business in material compliance with applicable laws and regulations";

32

(c)      advising that "contracts involving government programs may be terminated at the discretion of the government" but asserting that Defendants were "not aware of any events which are reasonably likely to result in any cancellation of its government contracts".

**VI.B**
**DEFENDANTS' FALSE AND MISLEADING FILINGS WITH THE SEC:**
**HERLEY'S FINANCIAL STATEMENTS**

61.      As alleged above and detailed in the Government Indictment, the prices secured by Defendants' above-mentioned, undisclosed and fraudulent business practices were prices that were vastly inflated by Defendants' false, fictitious and fraudulent cost submissions to the U.S. Government, which convinced the Government to agree to contract prices based on the seeming (but fabricated) truth of such cost submissions. Had Defendants acted truthfully, complied with FAR, and disclosed to the Government their accurate and actual product costs, price negotiations would have occurred at levels far below the ones inflated by Defendants' fraudulent cost submissions, and final contracts would have been executed at price levels far below the ones inflated by Defendants' fraudulent cost submissions. Although FAR provides that contractors may enjoy reasonable profits, the 250%-300% profit margin secretly created for Herley by Defendants' fraudulent practices is far above the Government's definition of "reasonable profits". Absent Defendants' false, fictitious and fraudulent cost submissions, the Government would never have agreed to pay Herley the prices it did.

62.      Consequently, Defendants' above-mentioned, undisclosed and fraudulent business practices resulted in Defendants' receiving, and reporting in Herley's financial statements, fraudulent, false and inflated revenues that would not have been received or reported absent Defendants' fraud. Such fraudulent, false and inflated revenues also had the effect of inflating the

33

net income and earnings (i.e., profits), as reported in Herley's financial statements, which such net income and earnings would not have been received or reported absent Defendants' fraud.

63.     Additionally, and as a mathematical consequence, Defendants' above-mentioned, undisclosed and fraudulent business practices resulted in Defendants' reporting of fraudulent, false and inflated margins (i.e., the difference between revenues and costs/expenses, expressed as a percentage of revenues) that would not have been possible absent Defendants' fraud. Margins are a metric of great interest to investors and the market because they are often interpreted as indicators of a given company's comparative efficiency and operational skill. For example, if one company has costs that are 50% of revenues, while another company in the same industry has costs that are only 40% of revenues, that suggests to investors that the latter company is a more skillful and better-managed organization. Herley's materially-inflated margins – margins among the very highest in the defense industry – were highly misleading. They were not the result of management's operational skill, but rather the result of the extra-high, illegitimate, fraudulently-derived revenues secured through Defendants' secret and elaborate price-gouging of the Government.

64.     In short, Defendants' above-mentioned, undisclosed and fraudulent business practices caused Herley to report – in quarterly press releases, quarterly conference calls with analysts and investors, quarterly and annual financial statements, and quarterly and annual SEC filings – inflated revenues, net income and earnings, and margins.

65.     To the extent they are detailed in the Government Indictment, Defendants' above-mentioned, undisclosed and fraudulent business practices caused Herley to recognize and report sales from such practices at least during Fiscal 2001, Fiscal 2002, and Fiscal 2003. However, the full extent of Defendants' fraudulent business practices remains unclear. As alleged above, Herley's

34

(now-former) auditor resigned after finding that Herley's management was unwilling to conduct a truly independent, adequate investigation capable of determining, *inter alia*, "the impact of the alleged illegal acts on the financial statements of the Company". Defendants may have continued their fraudulent business practices and caused Herley to recognize and report sales from such practices for periods later than those identified in the specific examples detailed in the Government Indictment.

66.     Although the full extent and effects of Defendants' fraud remains unclear, it is clear that all of the Forms 10-K contained financial statements reporting materially inflated, false and misleading revenues, net income and earnings, and margins. The 2001 Form 10-K, 2002 Form 10-K and 2003 Form 10-K contained financial statements that reported inflated revenues, net income, earnings and margins for each of those fiscal years. Because each Form 10-K contains financial statements for the issuer's previous three years, the 2004 Form 10-K and 2005 Form 10-K, at the very least, contained financial statements for previous years that reported materially inflated, false and misleading revenues, net income and earnings, and margins.

67.     The same undisclosed misconduct that rendered the financial statements in Herley's Forms 10-K materially false and misleading also rendered certain of Herley's Forms 10-Q filed by Defendants during the Class Period false and misleading, including at the very least:

(a)     Herley's March 8, 2002 Form 10-Q, signed by Defendants Levy and Garefino, for second quarter of fiscal 2002;

(b)     Herley's December 17, 2002, March 18, 2003, and June 11, 2003 Forms 10-Q, signed by Defendants Levy and Garefino, for the first, second and third quarters of fiscal 2003;

(c)     Herley's December 17, 2003, March 17, 2004, and June 16, 2004 Forms 10-Q,

35

signed by Defendants Levy and Garefino, for the first, second and third quarters of fiscal 2004.

68.     Each of the Forms 10-K that Defendants caused Herley to file with the SEC during the Class Period, in addition to containing materially false and misleading financial statements as alleged above, also contained a statement from Herley's auditor concerning the annual audit of Herley's financial statements and the auditor's opinion concerning Herley's financial statements (the "Auditor Certifications"). Each of the Auditor Certifications stated that the financial statements "are the responsibility of the [Herley's] management", and certified Herley's financial statements as materially accurate, complete and GAAP-compliant when, as a result of Defendants' above-mentioned, undisclosed and fraudulent conduct, they were none of these things. Each of the Auditor Certifications was therefore, as a result of Defendants' above-mentioned, undisclosed and fraudulent conduct, materially false and misleading.

(a)     The Auditor Certification contained in Herley's 2001 Form 10-K, provided by Arthur Andersen LLP, stated:

REPORT OF INDEPENDENT PUBLIC ACCOUNTANTS

To the Board of Directors of Herley Industries, Inc.

We have audited the accompanying consolidated balance sheets of Herley Industries, Inc and Subsidiaries as of July 29, 2001 and July 30, 2000, and the related consolidated statements of income, shareholders' equity and flows for the 52 weeks ended July 29, 2001, July 30, 2000 and August 1, 1999. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material

36

misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Herley Industries, Inc. and Subsidiaries as of July 29, 2001 and July 30, 2000, and the consolidated results of their operations and their cash flows for the 52 weeks ended July 29, 2001, July 30, 2000 and August 1, 1999 in conformity with accounting principles generally accepted in the United States.

/S/ ARTHUR ANDERSEN LLP
Lancaster, PA
October 3, 2001

(b)      The Auditor Certification contained in Herley's 2002 Form 10-K, provided by Deloitte & Touche LLP, stated:

INDEPENDENT AUDITORS' REPORT

To the Board of Directors ofHerley Industries, Inc.

We have audited the accompanying consolidated balance sheet of Herley Industries, Inc. and Subsidiaries ("the Company") as of July 28, 2002, and the related consolidated statement of income, shareholders' equity, and cash flows for the year then ended. Our audit also included the financial statement schedule listed in the Index at Item 14 as it relates to the year ended July 28, 2002. These consolidated financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements and financial statement schedule based on our audit. The financial statements of the Company for the years ended July 29, 2001 and July 30, 2000 were audited by other auditors who have ceased operations. Those auditors expressed an unqualified opinion on those financial statements in their report dated October 3, 2001, updated as of March 1, 2002.

We conducted our audit in accordance with auditing standards

37

generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of the Company as of July 28, 2002, and the results of their operations and their cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, such financial statement schedule as it relates to the year ended July 28, 2002, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

As discussed in Note A to the consolidated financial statements, in 2002 the Company changed its method of accounting for goodwill by adopting Statement of Financial Accounting Standards No. 142, "Goodwill and Other Intangible Assets."

/s/ DELOITTE & TOUCHE LLP
October 15, 2002
Baltimore, Maryland

(c)     The Auditor Certification contained in Herley's 2003 and 2004 Forms 10-K,

also provided by Deloitte & Touche LLP, were substantively identical to the Auditor Certification

in the 2002 Form 10-K.

(d)     The Auditor Certification contained in Herley's 2005 Form 10-K, provided

by BDO Seidman LLP, stated:

REPORT   OF   INDEPENDENT   REGISTERED   PUBLIC
ACCOUNTING FIRM

To the Board of Directors

38

Herley Industries, Inc.
Lancaster, Pennsylvania

We have audited the accompanying consolidated balance sheet of Herley Industries, Inc. and subsidiaries (the "Company") as of July 31, 2005, and the related consolidated statements of income, shareholders' equity, and cash flows for the year ended July 31, 2005. We have also audited the financial statement schedule listed in the index at Item 15 as it relates to the year ended July 31, 2005. These financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit. The financial statements of the Company for the years ended August 1, 2004 and August 3, 2003 were audited by other auditors who have expressed an unqualified opinion on those financial statements in their report dated October 14, 2004.

We conducted our audit in accordance with standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Herley Industries, Inc. as of July 31, 2005, and the results of its operations and its cash flows for the year ended July 31, 2005, in conformity with accounting principles generally accepted in the United States of America.  Also, in our opinion, the schedule presents fairly in all material respects the information set forth therein.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of Herley Industries, Inc. internal control over financial reporting as of July 31, 2005, based on criteria established in Internal Control -- Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO criteria) and our report dated October 7, 2005 expressed an

unqualified opinion thereon.

/s/ BDO SEIDMAN, LLP
Philadelphia, Pennsylvania
October 7, 2005

69.     Furthermore, each of Herley's Forms 10-K and Forms 10-Q filed after 2001 contained

certifications signed by Herley's Chief Executive Officer and Chief Financial Officer, as per the

Sarbanes-Oxley Act of 2002, attesting to the material accuracy, truth and completeness of the Forms

10-K (the "SOX Certifications").   Each of the SOX Certifications was therefore, as a result of

Defendants' above-mentioned, undisclosed and fraudulent conduct, materially false and misleading.

(a)     The 2002 Form 10-K contained the following SOX Certifications signed by

Defendants Levy and Garefino:

Certification of Chief Executive Officer
pursuant to Section 302(a) of the SARBANES-OXLEY ACT OF 2002

I, Myron Levy, Chief Executive Officer of Herley Industries, Inc. (the "Registrant"), certify that:

(a) I have reviewed this annual report on Form 10-K of Herley Industries, Inc. for the fiscal year ended July 28, 2002;

(b) Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report; and

(c) Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this annual report.

Dated: October 21, 2002

40

By: /s/ Myron Levy
Chief Executive Officer

\*\*\*\*\*

Certification of Chief Financial Officer
pursuant to Section 302(a) of the SARBANES-OXLEY ACT OF 2002

I, Anello C. Garefino, Chief Financial Officer of Herley Industries,
Inc. (the "Registrant"), certify that:

(a) I have reviewed this annual report on Form 10-K of Herley
Industries, Inc. for the fiscal year ended July 28, 2002;

(b) Based on my knowledge, this annual report does not contain any
untrue statement of a material fact or omit to state a material fact
necessary to make the statements made, in light of the circumstances
under which such statements were made, not misleading with respect
to the period covered by this annual report; and

(c) Based on my knowledge, the financial statements, and other
financial information included in this annual report, fairly present in
all material respects the financial condition, results of operations and
cash flows of the Registrant as of, and for, the periods presented in
this annual report.

Dated: October 21, 2002
By: /s/ Anello C. Garefino
Chief Financial Officer

\*\*\*\*\*

Certification of Chief Executive Officer
pursuant to 18 U.S.C. SECTION 1350, as adopted pursuant to
Section 906 of the SARBANES-OXLEY ACT OF 2002

I, Myron Levy, certify, pursuant to 18 U.S.C. Section 1350, as
adopted pursuant to Section 906 of the SARBANES-OXLEY ACT
OF 2002, that the Annual Report of Herley Industries, Inc. on Form
10-K for the fiscal year ended July 28, 2002 fully complies with the
requirements of Section 13(a) or 15(d) of the Securities Exchange Act
of 1934 and that information contained in such Annual Report on
Form 10-K fairly presents in all material respects the financial

41

condition and results of operations of Herley Industries, Inc.

Dated: October 21, 2002
By: /s/ Myron Levy
Chief Executive Officer

*****

Certification of Chief Financial Officer
pursuant to 18 U.S.C. SECTION 1350, as adopted pursuant to
Section 906 of the SARBANES-OXLEY ACT OF 2002

I, Anello C. Garefino, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the SARBANES-OXLEY ACT OF 2002, that the Annual Report of Herley Industries, Inc. on Form 10-K for the fiscal year ended July 28, 2002 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in such Annual Report on Form 10-K fairly presents in all material respects the financial condition and results of operations of Herley Industries, Inc.

Dated: October 21, 2002
By: /s/ Anello C. Garefino
Chief Financial Officer

(b)      The 2003 Form 10-K contained the following SOX Certifications signed by Defendants Levy and Garefino, which, in addition to certifying the company's financial statements and the company's overall filing, also certified the company's internal, financial and disclosure controls and procedures:

CERTIFICATION PURSUANT
TO RULE 13a-14(a)

I, Myron Levy, certify that:

1. I have reviewed this Annual Report on Form 10-K of Herley Industries, Inc.;

42

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

a. designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

c. disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. all significant deficiencies and material weaknesses in the design

43

or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: October 31, 2003
By: /s/ Myron Levy
Title: Vice Chairman of the Board and
Chief Executive Officer

\*\*\*\*\*

CERTIFICATION PURSUANT
TO RULE 13a-14(a)

I, Anello C. Garefino, certify that:

1. I have reviewed this Annual Report on Form 10-K of Herley Industries, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

a. designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the

44

registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

c. disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: October 31, 2003
By: /s/ Anello C. Garefino
Title: Vice President Finance and
Chief Financial Officer

*****

CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350

In connection with the Annual Report of Herley Industries, Inc. (the

45

"Company") on Form 10-K for the fiscal year ended August 3, 2003, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Myron Levy, Vice Chairman of the Board and Chief Executive Officer of the Company, hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: October 31, 2003
By: /s/ Myron Levy
Title: Vice Chairman of the Board and
Chief Executive Officer

*****

CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350

In connection with the Annual Report of Herley Industries, Inc. (the "Company") on Form 10-K for the fiscal year ended August 3, 2003, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Anello C. Garefino, Vice President Finance and Chief Financial Officer of the Company, hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: October 31, 2003
By: /s/ Anello C. Garefino
Title: Vice President Finance and
Chief Executive Officer

46

(c)     The 2004 and 2005 Forms 10-K contained the SOX Certifications substantively identical to the SOX Certification contained in the 2003 Form 10-K. The 2004 SOX Certifications were signed by Defendants Levy and Gilboy; the 2005 SOX Certifications by Defendants Levy and Garefino.

(d)     The Forms 10-Q filed between December 17, 2002 and March 10, 2006 contained SOX certifications substantively identical to the SOX Certification contained in the 2003 Form 10-K. All of these Form 10-Q SOX Certifications were signed by Defendant Levy as Herley CEO; all but three (the December 9, 2004, March 11, 2005 and June 10, 2005 Forms 10-Q) by Defendant Garefino as Herley's CFO (the three exceptions were signed by Defendant Gilboy, who replaced Garefino as Herley's CFO for one year).

70.     At all times, Defendants represented falsely that Herley's financial statements, including the above-mentioned financial statements, were prepared in accordance with Generally Accepted Accounting Principles ("GAAP").   Ultimately, after disclosure of the Government Indictment and Defendants' undisclosed and illegal price-gouging, and after Defendants' failure to authorize and implement a truly independent and adequate investigation capable of determining "the impact of the alleged illegal acts on the financial statements of the Company" or of "identify[ing] the potential involvement of other Company personnel involved" in those acts, Herley's then-auditor BDO Seidman LLP concluded that it was "no longer able to rely on the representations of management provided to date", resigned, and withdrew its previously-issued certification of Herley's financial results as materially accurate, complete and GAAP-compliant.

71.     Herley's above-mentioned financial results and financial statements did not comply with GAAP.

72.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

73.     Due to Defendants' above-mentioned, undisclosed and fraudulent business practices, and their distortive effects upon Herley's financial statements and reported financial results, Defendants presented Herley's financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)     The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b)     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c)     The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(d)     The principle that financial reporting should provide information about how

48

management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)     The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(f)     The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

(g)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

(h)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

74.     Further, the undisclosed adverse information concealed by Defendants during the

Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

75.     GAAP provides that financial statements should be restated in limited circumstances: when there is a change in the reporting entity; when there is a change in accounting principles used; or to correct an error in previously-issued financial statements. As alleged above, Herley's previously-issued financial statements were materially false and misleading when issued, due to: (i) the omission of Defendants' true business practices; (ii) the misleading, illegitimate and inflated revenues, earnings, profits and margins that such practices effected; and (iii) the omission of the sizeable liabilities to which Herley was exposed as a result of such practices. Herley's auditor at the time of the disclosure of the Government Indictment subsequently resigned after concluding that Defendants were refusing to authorize and implement a truly independent and adequate investigation capable of determining "the impact of the alleged illegal acts on the financial statements of the Company", and withdrew its certification of Herley's previously-issued financial statements. Herley's previously-issued financial statements exist now in limbo, lacking auditor approval, and distorted to as-yet unknown extent by Defendants' illegitimate and illegal business practices. A restatement of such financial results is necessary, but has been precluded by Defendants' refusal to delve into the past in order to determine exactly who did what and to what effect.

**VI.C**
**DEFENDANTS' OTHER FALSE AND MISLEADING STATEMENTS**

76.     Throughout the Class Period, Defendants, in addition to issuing the materially false and misleading SEC filings discussed above, issued to the public other materially false and misleading statements.  As detailed below, such statements included:

(a)     Quarterly press releases announcing Herley's quarterly and annual financial results (the "Financial Press Releases") (see ¶ 78);

(b)     Quarterly conference calls with analysts and investors in which Defendants further discussed Herley's operations, results, and prospects;

(c)     Frequent press releases announcing new, renewed, extended or augmented contracts with the Government (the "Government Defense Contract Press Releases") (see ¶ 80);

(d)     Yearly speeches by Defendant Blatt, given at Herley's annual meeting of shareholders and simultaneously disseminated to the public in press releases, discussing Herley's operations, results, strategies and prospects (the "Chairman's Addresses") (see ¶¶ 84-90); and

(e)     Various other statements concerning Herley's operations, results and prospects contained in press releases and conference calls (see ¶ 92).

77.     In addition to the quarterly and annual financial statements contained in Herley's SEC filings, which were materially false and misleading for the reasons stated above (see ¶¶ 72-74), Defendants also reported Herley's purported financial results in quarterly press releases (the "Financial Press Releases") and in quarterly conference calls with analysts and investors, listed in the table below:

51

**The Financial Press Releases and the Conference Calls**

| Date | Event | Contents |
|---|---|---|
| October 1, 2001 | press release | Q4 2001 and 2001 results |
| December 26, 2001 | press release | Q1 2002 results |
| March 6, 2002 | press release | Q2 2002 results |
| May 29, 2002 | press release | Q3 2002 results |
| September 25, 2001 | press release | Q4 2002 and 2002 results |
| December 12, 2002 | press release | Q1 2003 results |
| March 12, 2003 | press release | Q2 2003 results |
| March 13, 2003 | conference call | Q2 2003 |
| June 5, 2003 | press release | Q3 2003 results |
| October 7, 2003 | press release | Q4 2003 and 2003 results |
| October 7, 2003 | conference call | Q4 2003 and 2003 |
| December 11, 2003 | press release | Q1 2004 results |
| March 15, 2004 | press release | Q2 2004 results |
| March 16, 2004 | conference call | Q2 2004 |
| June 14, 2004 | press release | Q3 2004 results |
| June 15, 2004 | conference call | Q3 2004 |
| October 15, 2004 | press release | Q4 2004 and 2004 results |
| October 18, 2004 | conference call | Q4 2004 |
| December 9, 2004 | press release | Q1 2005 results |
| December 10, 2004 | conference call | Q1 2005 |
| March 8, 2005 | press release | Q2 2005 results |
| March 9, 2005 | conference call | Q2 2005 |

| June 9, 2005 | press release | Q3 2005 results |
| June 10, 2006 | conference call | Q3 2005 |
| October 24, 2005 | press release | Q4 2005 and 2005 results |
| November 1, 2005 | conference call | Q4 2005 and 2005 |
| December 13, 2005 | press release | Q1 2006 results |
| December 14, 2005 | conference call | Q1 2006 |
| March 8, 2006 | press release | Q2 2006 results |
| March 9, 2006 | conference call | Q2 2006 |

78.     The Financial Press Releases and the above-mentioned conference-calls, in which Defendants reported Herley's purported financial results, were materially false and misleading for the same reasons as stated above in section VI(B).

79.     Throughout the Class Period, Defendants caused Herley to issue numerous press releases announcing that Herley had won new defense contracts, or had had old defense contracts extended and/or augmented at the option of the Government, to provide the Government directly or indirectly (through contracting with certain prime defense contractors – e.g., Northrop Grumman, Lockheed Martin, Raytheon and Boeing – themselves working on Government contracts) with Herley's products.  Such press releases (collectively, the "Government Defense Contract Press Releases") are listed in the table below:

**Government Defense Contract Press Releases[3]**

| Date | Title of Press Release |
| --- | --- |
| December 4, 2001 | Herley Receives $1.0 Million Contract Award To Supply High Power Microwave Hardware For E-2C Aircraft |
| January 7, 2002 | Herley Receives Contract Awards Totaling $3.4 Million – Herley Will Supply Microwave Products for the E2-C Surveillance Aircraft, the F-18 Fighter Aircraft and the HARM and RAM Missiles |
| January 15, 2002 | Herley Receives Contract Awards Totaling $4.29 Million; Microwave Hardware for F-16 Aircraft And AMRAAM Missiles |
| February 22, 2002 | Herley Receives Contract Award's Totaling $7.5 Million; Herley Will Supply Microwave Products for the National Missile Defense And E-2C Programs |
| April 3, 2002 | Herley Receives $3.5 Million Contract Award for the U.S. Navy's F-18 E/F Super Hornet; This Award Represents the 2nd Year Release of a Five-Year $16.5 Million Contract |
| June 10, 2002 | Herley Receives a $15.3 Million Contract From The U.S. Navy; Herley Will Supply Complex Integrated Microwave Assemblies for Electronic Warfare Simulation |

---

[3]     Excluded from this list are press releases announcing: (i) non-defense contracts won and/or extended by Herley (e.g., medical imaging systems) and (ii) defense contracts with foreign governments (e.g., Switzerland, South Korea, Australia, India) or non-governmental entities (e.g., NATO, EADS).